**EXHIBIT C  to NOTICE OF REMOVAL**

1    FRED W. ALVAREZ, State Bar No. 68115
     ALLISON B. MOSER, State Bar No. 223065
2    JONES DAY
     Silicon Valley Office
3    1755 Embarcadero Rd.
     Palo Alto, CA 94303
4    Telephone: (650) 739-3939
     Facsimile: (650) 739-3900
5    Email: falvarez@jonesday.com
     Email: amoser@jonesday.com
6
     TROY A. VALDEZ, State Bar No. 191478
7    ERIN M. DOYLE, State Bar No. 233113
     VALDEZ TODD & DOYLE LLP
8    1901 Harrison Street, Suite 1450
     Oakland, California 94612
9    Telephone:  (415) 202-5950
     Facsimile:  (415) 202-5951
10   Email: tvaldez@vtdlaw.com
     Email: edoyle@vtdlaw.com
11
     Attorneys for Defendants
12   COMCAST CABLE COMMUNICATIONS
     MANAGEMENT, LLC, erroneously sued as
13   COMCAST CORPORATION and
     COMCAST OF CONTRA COSTA, INC.
14
15              SUPERIOR COURT OF THE STATE OF CALIFORNIA
16                   FOR THE COUNTY OF STANISLAUS
17
18   JOSEPH JOSHUA DAVIS, PENNY          CASE NO. 2011900
     SCHOONOVER, LEON GIBSON,
19   DUSTIN WAYNE HAGENS, RAYMOND        Assigned for all purposes, including Trial
     AGUNDEZ, RAFAEL BARAJAS, JR.,       to Judge William A. Mayhew
20
               Plaintiffs,              Dept. 21
21
          v.
22                                       DEFENDANT'S NOTICE OF MOTION
     COMCAST CORPORATION, a              AND MOTION TO STRIKE PORTIONS
23   Pennsylvania Corporation; COMCAST OF  OF THE COMPLAINT
     CONTRA COSTA, INC., a Washington
24   Corporation; and DOES 1 through 50,  Date:   March 27, 2015
     Inclusive,                          Time:  8:30 a.m.
25                                        Dept.:  21
               Defendants.
26
                                         Complaint filed October 27, 2014
27
28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF THE
COMPLAINT - CASE NO. 2011900

1    TO EACH PARTY AND TO THE COUNSEL OF RECORD FOR EACH PARTY:

2    PLEASE TAKE NOTICE that on March 27, 2015 at 8:30 a.m., or as soon thereafter as

3    may be heard, in Department 21 of the above-entitled Court, located at 1100 I Street #1, Modesto,

4    CA 95354, Defendant Comcast Cable Communications Management, LLC, erroneously sued as

5    Comcast Corporation and Comcast of Contra Costa, Inc., will and hereby does move this Court

6    for an order striking the following portions of the First Amended Complaint filed October 27,

7    2014 by Plaintiffs Joseph Joshua Davis, Penny Schoonover, Leon Gibson, Dustin Wayne Hagens,

8    Raymond Agundez, and Rafael Barajas, Jr. (collectively, "Plaintiffs") pursuant to California Code

9    of Civil Procedure § 435 *et seq.*:

10    1.    This complaint challenges Defendants' systemic illegal employment practices

11          resulting in violations of the California Labor Code, Business and Professions

12          Code and applicable IWC wage orders against employees of Defendants.  Page 2,

13          ¶ 2.

14    2.    Plaintiffs are informed and believe and based thereon allege Defendants, joint

15          and severally have acted intentionally and with deliberate indifference and

16          conscious disregard to the rights of all employees in receiving all wages due and

17          lawful meal and rest periods.  Page 2, ¶ 3.

18    3.    Plaintiffs are informed and believe and based thereon allege Defendants have

19          engaged in, among other things, a system of willful violations of the California

20          Labor Code, Business and Professions Code and applicable IWC wage orders by

21          creating and maintaining policies, practices and customs that knowingly deny

22          employees (a) all wages due, (b) the opportunity to take meal and rest periods,

23          and (c) accurate, itemized wage statements.  Page 2, ¶ 4.

24    4.    The policies, practices and customs of defendants described above and below

25          have resulted in unjust enrichment of Defendants and an unfair business

26          advantage over businesses that routinely adhere to the strictures of the California

27          Labor Code, Business and Professions Code and applicable IWC wage orders.

28          Page 2, ¶ 5.

<center>2</center>

1    5.    . . . to the present. Page 3, ¶ 8 at line 8.

2    6.    Plaintiffs are and were victims of the policies, practices and customs of

3    Defendants complained of in this action in ways that have deprived them of the

4    rights guaranteed them by California Labor Code § 204, 226.7, 1194, 1198, and

5    512, California Business and Professions Code § 17200, et seq., (Unfair Practices

6    Act) and the applicable wage order(s) issued by the Industrial Welfare

7    Commission including IWC Wage Order No. 4 §§ 11 and 12. Page 3, ¶ 8 at lines

8    8-13.

9    7.    Defendant had a uniform policy and practice of contacting Plaintiffs through

10    their Nextel devices at all times of the day including interrupting Plaintiffs during

11    what would otherwise be meal periods and rest breaks. Page 5, ¶ 21 at lines 23-

12    25.

13    8.    . . . and the uniform policy of being "on duty" at all times . . . Page 6, ¶ 24 at

14    lines 19-20.

15    9.    . . . and the uniform policy of being "on duty" at all times . . . Page 6, ¶ 25 at

16    lines 22-23.

17    10.    As a pattern and practice, Defendants relied on punch data/time sheets in many

18    instances filed [sic] out before the work day commenced to compensate Plaintiffs

19    for hours worked rather than relying on the actual records that reflect hours

20    worked and meal periods, i.e. the CSG records that were kept in real time. As a

21    result, Plaintiffs were not compensated for all hours they were subject to the

22    control of Defendants, including all time they were suffered or permitted to work.

23    Page 7, ¶ 30.

24    11.    Plaintiffs are informed and believe and based thereon allege Defendants

25    uniformly administered a corporate policy concerning staffing levels, duties, and

26    responsibilities which required Plaintiffs to work without appropriate pay. This

27    included a uniform corporate pattern and practice of allocating and authorizing

28    inadequate staffing levels. The inadequate staffing levels were enforced and

3

1   ensured through the uniform and mandated corporate policy of a minimal labor

2   budget.  This corporate conduct is accomplished with the advance knowledge

3   and designed intent to save labor costs by required [sic] Plaintiffs to work

4   without proper compensation because they were unable to take the meal periods

5   which were automatically deducted from their time records.  Page 7, ¶ 31.

6   12.   As a pattern and practice, in violation of the aforementioned labor laws and wage

7   orders, Plaintiffs are informed and believe and based thereon allege Defendants

8   did not properly maintain records pertaining to when Plaintiffs began and ended

9   each work period, meal period, the total daily hours worked, and the total hours

10   worked per pay period and applicable rates of pay in violation of California

11   Labor Code § 1174.  Page 8, ¶ 32.

12   13.   Plaintiffs are informed and believe and based thereon allege Defendants willfully

13   failed to pay employees proper compensation for all hours worked.  Plaintiffs are

14   informed and believe and based thereon allege Defendants' willful failure to

15   provide wages due and owing them upon separation from employment results in

16   a continued payment of wages up to thirty (30) days from the time the wages

17   were due.  Therefore, Plaintiffs who have separated from employment are

18   entitled to compensation pursuant to Labor Code § 203.  Page 8, ¶ 34.

19   14.   Such a pattern, practice and uniform administration of corporate policy regarding

20   illegal employee compensation as described herein is unlawful and creates an

21   entitlement to recovery by Plaintiff [sic] in a civil action, for the unpaid balance

22   of the full amount of straight time compensation and overtime premiums owing,

23   including interest thereon, penalties, reasonable attorneys' fees, and costs of suit

24   according to Labor Code § 1194, et seq.  Page 8, ¶ 35.

25   15.   By failing to properly compensate hourly-paid employees for off-the-clock work,

26   Defendants breached their employment contracts with Plaintiffs.  Page 9, ¶ 41.

27   16.   Defendants failed in their affirmative obligation to ensure that all of their

28   employees, including Plaintiffs, were actually relieved of all duties, not

4

1    performing any work, and free to leave the premises during meal periods.

2    Plaintiffs were suffered and permitted to work through legally required meal

3    breaks. As such, Defendant is responsible for paying premium compensation for

4    missed meal periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4

5    § 11(B). Defendants shall pay the [sic] each affected employee one (1) hour of

6    pay at the employee's regular rate of compensation for each workday that the

7    meal break was not provided. Pages 9-10, ¶ 44.

8    17.    As a pattern and practice, Defendants regularly required employees to work

9    through their meal periods without proper compensation. Defendants did staff

10    and schedule employees in such a manner and at such posts that would make it

11    impossible for these employees to take their meal period as required under

12    California law. This policy of requiring employees to work through their legally

13    mandated meal periods is a violation of California law. Indeed, Defendants' own

14    records, i.e. the CSG data, confirms whether an employee used the Nextel device

15    to clock out for a meal period lasting not less than thirty minutes. For those

16    instances where the CSG data shows a meal period lasting less than 30 minutes,

17    Defendants did not compensate Plaintiff with an extra hour of pay. Page 10, ¶ 46.

18    18.    Plaintiffs are informed and believe and based thereon allege Defendants willfully

19    failed to pay employees who were not provided the opportunity to take meal

20    breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage

21    Order No 4 § 11(B). Plaintiffs are informed and believe and based thereon allege

22    Defendants' willful failure to provide Plaintiffs the wages due and owing them

23    upon separation from employment results in a continued payment of wages up to

24    thirty (30) days from the time the wages were due. Therefore, Plaintiffs who

25    have separated from employment are entitled to compensation pursuant to Labor

26    Code § 203. Pages 10-11, ¶ 49.

27    19.    As a pattern and practice, in violation of the aforementioned labor laws and wage

28    orders, Plaintiffs are informed and believe and based thereon allege Defendants

5

did not properly maintain records pertaining to when Plaintiffs began and ended each meal period in violation of California Labor Code § 1174 and § 4 of the applicable IWC Wage Order(s). This, despite the fact that Defendant knew the CSG data was an accurate record of meal periods taken and the length of each meal period. Page 11, ¶ 50.

20.  Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff [sic] identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No 4 § 11(B), including interest thereon, penalties, reasonable attorneys' fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194. Page 11, ¶ 51.

21.  Plaintiff regularly worked in excess of three and half (3 ½) hours per day Defendants' policies and practices prevented Plaintiff [sic] from enjoying their right to a ten (10) minute rest period in the middle of each four (4) hour work period. Page 12, ¶ 55.

22.  As a pattern and practice, Defendants regularly required employees to work through rest periods. Defendants and Defendants' supervisors assigned work, scheduled shifts, and staffed worksites in a manner that did not allow Plaintiff [sic] to regularly take rest periods. Page 12, ¶ 56.

23.  Plaintiffs are informed and believes [sic] and based thereon alleges [sic] Defendants willfully failed to pay employees who were not provided the opportunity to take rest breaks the premium compensation set out in Labor Code 226.7 and IWC Wage Order No 4 § 12(B). Plaintiffs are informed and believes and based thereon alleges [sic] Defendants' willful failure to provide Plaintiffs the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were

6

1      due. Therefore, Plaintiffs who have separated from employment are entitled to

2      compensation pursuant to Labor Code § 203. Page 12, ¶ 58.

3    24.    Such a pattern, practice and uniform administration of corporate policy as

4           described herein is unlawful and creates an entitlement to recovery by the

5           Plaintiffs identified herein, in a civil action, for the unpaid balance of the unpaid

6           premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order

7           No 4 § 12(B), including interest thereon, penalties, reasonable attorney's [sic]

8           fees, and costs of suit according to the mandate of California Labor Code §§

9           218.5 or 1194. Pages 12-13, ¶ 59.

10   25.    Defendants, and each of them, have engaged and continue to engage in unfair

11          business practices in California by practicing, employing and utilizing the

12          employment practices outlined above, inclusive, to wit, (a) not compensate

13          employees for all hours worked, and (b) to require employees to work through

14          meal and rest periods. Page 13, ¶ 62.

15   26.    As a pattern and practice, Defendant failed to furnish Plaintiffs, either

16          semimonthly or at the time of each payment of wages, either as a detachable part

17          of the check or separately, an accurate, itemized statement in writing showing

18          gross wages earned, total hours worked, and the applicable hourly rates and

19          corresponding number of hours worked by Plaintiffs at each rate. Page 14, ¶ 71.

20        This motion is based upon sections 435 through 437 of the California Code of Civil

21   Procedure and California Rule of Court 3.1322; this Notice; the Memorandum of Points and

22   Authorities, the Request for Judicial Notice, and the Proposed Order filed herewith; the pleadings

23   on file in this case; and such further evidence and argument as may be presented at or before the

24   hearing on this matter.

25

26

27

28

<div align="center">7</div>

1   Dated: January 28, 2015                JONES DAY

2

3                                           By: _____

4                                               Fred W. Alvarez
                                                Allison B. Moser
5
                                            Attorney for Defendants
6                                           COMCAST CORPORATION and
                                            COMCAST OF CONTRA COSTA, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

1    FRED W. ALVAREZ, State Bar No. 68115
     ALLISON B. MOSER, State Bar No. 223065
2    JONES DAY
     Silicon Valley Office
3    1755 Embarcadero Rd.
     Palo Alto, CA 94303
4    Telephone: (650) 739-3939
     Facsimile: (650) 739-3900
5    Email: falvarez@jonesday.com
     Email: amoser@jonesday.com
6
     TROY A. VALDEZ, State Bar No. 191478
7    ERIN M. DOYLE, State Bar No. 233113
     VALDEZ TODD & DOYLE LLP
8    1901 Harrison Street, Suite 1450
     Oakland, California 94612
9    Telephone: (415) 202-5950
     Facsimile: (415) 202-5951
10   Email: tvaldez@vtdlaw.com
     Email: edoyle@vtdlaw.com
11
     Attorneys for Defendants
12   COMCAST CABLE COMMUNICATIONS
     MANAGEMENT, LLC, erroneously sued as
13   COMCAST CORPORATION and
     COMCAST OF CONTRA COSTA, INC.

14

FILED

2015 JAN 28  AM 9: 53

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS

BY EVA REYES
                              DEPUTY

15                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                        FOR THE COUNTY OF STANISLAUS

17                                                          FILED BY FAX

18   JOSEPH JOSHUA DAVIS, PENNY          CASE NO. 2011900
     SCHOONOVER, LEON GIBSON,
19   DUSTIN WAYNE HAGENS, RAYMOND        Assigned for all purposes, including Trial
     AGUNDEZ, RAFAEL BARAJAS, JR.,       to Judge William A. Mayhew
20
              Plaintiffs,               Dept. 21
21
         v.
22                                       DEFENDANT'S MEMORANDUM OF
     COMCAST CORPORATION, a              POINTS AND AUTHORITIES IN
23   Pennsylvania Corporation; COMCAST OF SUPPORT OF ITS MOTION TO STRIKE
     CONTRA COSTA, INC., a Washington    PORTIONS OF THE COMPLAINT
24   Corporation; and DOES 1 through 50,
     Inclusive,
25                                       Date:   March 27, 2015
              Defendants.                Time:   8:30 a.m.
26                                       Dept.:  21

27                                       Complaint filed October 27, 2014

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND .......................................... 2

III.  ARGUMENT ...................................................................................................... 4

    A.    Plaintiffs Misstate the Law Regarding Equitable Tolling and Meal Breaks .......... 4

        1.    To the Extent Equitable Tolling Applies, the Statute of Limitations is Tolled Only to the Date of the Fayerweather Decertification Order .................................................................................... 4

        2.    Comcast Has No Affirmative Obligation to Ensure Employees Take Meal Breaks ................................................................................ 5

    B.    Plaintiffs Cannot Relitigate the Issue of Whether Comcast has Unlawful Policies, Patterns, or Practices that Prevented Employees from Taking Off-Duty Meal and Rest Breaks and Required Employees to Work Off the Clock ............................................................................................ 6

        1.    Plaintiffs' Policy, Pattern, and Practice Allegations Are Identical to Those at Issue in the Fayerweather Action ........................................ 6

        2.    Plaintiffs' Policy, Pattern, and Practice Allegations were Actually Litigated in the Fayerweather Action .......................................... 8

        3.    The Decertification Order Necessarily Decided that Comcast's Policies, Patterns, and Practices are Not Unlawful in a Final Decision on the Merits ....................................................... 9

        4.    Plaintiffs are Bound by the Decision in the Fayerweather Decertification Order ................................................................... 10

        5.    Applying Collateral Estoppel to Plaintiffs' Claims Promotes Public Policy ..................................................................................... 11

    C.    Plaintiffs' Understaffing Theory Is Also Precluded Because It Was Abandoned In The Prior Proceeding .......................................................... 11

IV.   CONCLUSION ................................................................................................ 13

i

1

## TABLE OF AUTHORITIES

2

Page

3

CASES

4

*Alvarez v. May Department Stores Co.*,
   143 Cal. App. 4th 1223 (2006)..............................................................10

5

*American Pipe v. Utah*,
6   414 U.S. 538 (1974)..................................................................................5

7

*Brinker Restaurant Corp. v. Superior Court*,
   53 Cal. 4th 1004 (Cal. 2012)................................................................1, 6

8

*Castillo v. City of Los Angeles*,
9   92 Cal. App. 4th 477 (Cal. App. 2d Dist. 2001) .................................11

10

*Fayerweather v. Comcast Corp.*,
   No. S221245, Dkt No. 8 (Cal. Nov. 25, 2014)..................................3, 10

11

*Fayerweather v. Comcast Corporation*,
12   Docket No. CIVMSC08-01470................................................... passim

13

*Hall v. Variable Annuity Life Ins. Co.*,
   727 F.3d 372 (5th Cir. 2013)...................................................................5

14

*Hernandez v. City of Pomona*,
15   46 Cal. 4th 501 (Cal. 2009).....................................................................9

16

*Jolly v. Eli Lilly & Co.*,
   44 Cal. 3d 1103 (1988) ............................................................................5

17

*Lucido v. Superior Court*,
18   51 Cal. 3d 335 (Cal. 1990) ......................................................... passim

19

*Lumpkin v. Jordan*,
   49 Cal. App. 4th 1511 (1995)...................................................................7

20

*Martin v. County of L.A.*,
21   51 Cal. App. 4th 688 (Cal. App. 2d Dist. 1996) .............................10, 11

22

*PH II, Inc. v. Superior Court*,
   33 Cal. App. 4th 1680 (Cal. Ct. App. 1995) ..........................................4

23

*Rose v. Superior Court of Imperial County*,
24   80 Cal. App. 739 (Cal. Ct. App. 1927) ...................................................4

25

*Younan v. Caruso*,
   51 Cal. App. 4th 401 (1996)................................................................8, 12

26

STATUTES

27

California Code of Civil Procedure § 436................................................4

28

ii

1  <div align="center">**MEMORANDUM OF POINTS AND AUTHORITIES**</div>

2  **I.    INTRODUCTION**

3      In their operative Complaint, filed on October 27, 2014 (the "Complaint"), Plaintiffs

4  Joseph Joshua Davis, Penny Schoonover, Leon Gibson, Dustin Wayne Hagens, Raymond

5  Agundez, and Rafael Barajas, Jr. (collectively, "Plaintiffs") allege virtually identical causes of

6  action to those previously litigated in the class decertification proceedings before the Contra

7  Costa Superior Court in a related lawsuit, captioned as *Fayerweather v. Comcast Corporation*,

8  Docket No. CIVMSC08-01470.  The Plaintiffs here are represented by the same law firm that

9  represented the purported class in *Fayerweather*.  Inexplicably, Plaintiffs' counsel attempts to

10 relitigate several key findings that the *Fayerweather* court squarely decided against them and that

11 were affirmed by the Court of Appeals.  Plaintiffs' counsel also makes several incorrect

12 statements of the law, such as citing the wrong standard with respect to meal breaks per the

13 California Supreme Court's decision in *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th

14 1004, 1017 (Cal. 2012).

15      This motion seeks to strike specific allegations of the Complaint because Plaintiffs cannot

16 proceed in this litigation as if the prior (and extensive) *Fayerweather* case never occurred or

17 existed or as if *Brinker* was never decided.  Accordingly, Comcast moves to strike the portions of

18 the Complaint that (1) purport to extend the tolling period of the statute of limitations beyond the

19 date Judge Goode ordered the *Fayerweather* class decertified, (2) are inconsistent with California

20 law regarding meal breaks, and (3) attempt to relitigate the lawfulness of Comcast's policies,

21 patterns, or practices.  Such allegations must be stricken for the following reasons:

22      •    A pending class action may toll the running of the statute of limitations for

23           purported class members only until class certification is denied;

24      •    Comcast need not ensure that employees are off duty during meal periods;

25      •    The Class Decertification Order forecloses Plaintiffs' argument that Comcast has a

26           policy, pattern, or practice of failing to pay wages or denying employees meal and

27           rest breaks; and

28

<div align="center">1</div>

1          &bull;     Plaintiffs are precluded from asserting the same "understaffing" theory that was

2                 abandoned in the Fayerweather class action when the Fayerweather class could not

3                 present an acceptable trial plan.

4 **II.     FACTUAL AND PROCEDURAL BACKGROUND**

5         On May 27, 2008, Gabriel Fayerweather filed a class action on behalf of himself and all

6 similarly situated current and former service technicians, communications technicians, and other

7 non-exempt hourly employees ("CommTechs") of Defendant Comcast Cable Communications

8 Management, LLC, erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc.,

9 (hereinafter, "Comcast"). See Request for Judicial Notice ("RJN"), Exhibit A (hereinafter, the

10 "*Fayerweather* Complaint"). Fayerweather moved for and obtained class certification on April 7,

11 2010 on the theory that Comcast maintained a corporate practice of understaffing with respect to

12 the CommTech positions, which prevented them from being able to take meal and rest breaks. In

13 certifying the class, Judge Goode noted that it was a "close case" and expressed concern over how

14 the case would be tried. In subsequent hearings, after being pressed for a trial plan, the

15 *Fayerweather* class abandoned the understaffing theory. Instead, the *Fayerweather* class alleged

16 that CommTechs were never truly off-duty because they were required to carry a handheld

17 communication tool. This changed theory drew concern from the court as to "whether there has

18 been a bait and switch," but the court allowed the *Fayerweather* class to present a trial plan on the

19 new theory. When the *Fayerweather* class could not produce a satisfactory trial plan, the court

20 issued an Order to Show Cause as to why the class should not be decertified. See RJN, Exhibit B

21 at 38:6-11.

22         After substantial discovery and extensive briefing, a lengthy hearing on the Order to Show

23 Cause took place on October 26, 2012. *See* RJN, Exhibit C. On December 15, 2012, Judge

24 Goode issued an order decertifying the class. *See* RJN, Exhibit D (hereinafter, the

25 "Decertification Order"). In concluding that the class must be decertified, Judge Goode made

26 several crucial factual findings that bear on the present case. First, the Decertification Order

27 notes that "plaintiff abandoned his claim that Comcast has a 'policy of understaffing or over-

28 scheduling.'" Decertification Order at 3:10-12. Judge Goode also considered the *Fayerweather*

2

1   class's new allegations that Comcast has (i) a policy or practice that requires CommTechs to keep
2   their phones on, preventing them from being relieved of all duty during their meal and rest breaks,
3   and (ii) a policy or practice that requires CommTechs to record 60 minute meal periods although
4   other company records show shorter lunch periods, resulting in uncompensated off-the-clock time.
5   Specifically, with regard to whether Comcast has a policy, pattern, or practice of preventing
6   employees from taking off-duty meal and rest breaks the trial court concluded:

7       •    It is clear that Comcast has not adopted a 'policy' of requiring Com-Techs to
8              remain on duty during their meal breaks.  Decertification Order at 12:19-20.

9       •    Comcast's policy is clear.  When Com-Techs are on break or at lunch, they are to
10             be relieved of all duty.  *Id.* at 14:5-6.

11      •    A careful analysis of the parties' positions shows there is really no dispute about
12             Comcast's policy: Com-Techs are to do no work during their breaks.  *Id.* at 18:5-6.

13      •    As discussed below, the practices engaged in by dispatchers and technicians are far
14             from consistent.  *Id.* at 21:13-16.

15      •    In short, there is not a consistent practice that violates the company's stated policy.
16             *Id.* at 24:5.

17      Similarly, Judge Goode found no unlawful policies, patterns, or practices in support of the
18  *Fayerweather* class's "off the clock" theory of liability.  Instead, the court found:

19      •    Plaintiff says that employees are pressured into filling out what are, in effect,
20             fictitious timesheets.  Plaintiff cites no common evidence of a central direction that
21             this be done.  Instead, plaintiff contrasts the time sheets with something called
22             CSG data.  *Id.* at 26:10-12.

23      •    [Plaintiff's expert] relies on the CSG data as if they were more accurate than the
24             time records.  But there are serious questions about their accuracy.  *Id.* at 28:4-5.

25      These findings in *Fayerweather* were appealed, and the Court of Appeals affirmed the
26  findings of the trial court.  RJN, <u>Exhibit E.</u>  Fayerweather then filed a Petition for Review with
27  the California Supreme Court, which was denied.  *Fayerweather v. Comcast Corp.*, No. S221245,
28  Dkt No. 8 (Cal. Nov. 25, 2014).

<div align="center">3</div>

1    Despite the clear language in the Decertification Order finding no unlawful policies,

2    patterns, or practices, Plaintiffs included these same exact allegations in their Complaint.  For

3    example, Plaintiffs' causes of action for failure to pay wages, failure to provide meal breaks, and

4    failure to provide rest breaks allege that Plaintiffs are entitled to recovery as a result of Comcast's

5    "***pattern, practice and uniform administration of corporate policy***."  Complaint at ¶¶ 35, 51, 59

6    (emphasis added); *see also Fayerweather* Complaint at ¶¶ 48, 63, 71.  Substantively, each of

7    these claims is plead in a nearly identical manner to those in the *Fayerweather* Complaint.[1]

8    **III.    ARGUMENT**

9    Under California Code of Civil Procedure section 436, a court may strike out any

10    "irrelevant, false, or improper matter inserted in any pleading."  Cal. Code Civ. Proc. § 436.  This

11    includes "a substantive defect [that] is clear from the face of a complaint, such as . . . a purported

12    claim of right which is legally invalid."  *PH II, Inc. v. Superior Court*, 33 Cal. App. 4th 1680,

13    1682-83 (Cal. Ct. App. 1995); *see also Rose v. Superior Court of Imperial County*, 80 Cal. App.

14    739, 745 (Cal. Ct. App. 1927) ("It has been the practice to raise the issues of law by a demurrer or

15    motion to strike and we see nothing improper in this method of confining and defining the

16    issues.").

17    Here, the provisions of Plaintiffs' Complaint regarding equitable tolling and requirements

18    regarding meal and rest breaks should be stricken because they misstate the law.  Further,

19    Plaintiffs' allegations that the purported violations are caused by Comcast's systematic unlawful

20    policies, patterns, or practices are also legally invalid and should be stricken because collateral

21    estoppel prevents Plaintiffs from relitigating these claims.

22    **A.    Plaintiffs Misstate the Law Regarding Equitable Tolling and Meal Breaks.**

23    **1.    To the Extent Equitable Tolling Applies, the Statute of
         Limitations is Tolled Only to the Date of the**

24    **_Fayerweather_ Decertification Order.**

25    Under California law, the filing of a class action complaint may toll "the running of the

26    _____

27    [1] In fact, the same attorneys who represented Fayerweather in the class case have filed at
    least 20 separate cases in 20 separate counties utilizing the exact same complaint that Plaintiffs
    used to initiate this lawsuit.

28

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE COMPLAINT - CASE NO. 2011900**

1  statute of limitations for all members of the purported class until class certification [is] denied."

2  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1120 (1988) (citing *American Pipe v. Utah*, 414 U.S.

3  538 (1974)) (emphasis added).  The purpose of the tolling doctrine is to protect a plaintiff who

4  both knew of and had been reasonably relying on the class action as a vehicle for their claims.

5  *Jolly*, 44 Cal. 3d at 1119.  Such reasonable reliance ends when decertification is granted, even if

6  an appeal is pending.  *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 375-376 (5th Cir.

7  2013) (holding that the statute of limitations resumes running when a trial court decertifies a class

8  and is not extended by an unsuccessful appeal).

9       In the Complaint, Plaintiffs misstate the law in an attempt to improperly extend the tolling

10  period.  Plaintiffs assert that "[t]he filing of the *Fayerweather* class action complaint on May 27,

11  2008 tolled the statute of limitations for the named Plaintiffs from four years from the filing of the

12  *Fayerweather* class action complaint **to the present**."  Complaint at ¶ 8 (emphasis added).  Once

13  the trial court decertified the class in *Fayerweather*, it was no longer reasonable for plaintiffs to

14  rely on the class action as a vehicle for their claims.  *See Hall*, 727 F.3d at 375-376.  Therefore,

15  assuming equitable tolling applies, the statute of limitations is tolled only until December 15,

16  2012, the date the Decertification Order was filed.  Accordingly, this Court should strike the

17  phrase "to the present" in paragraph 8 of Plaintiffs' Complaint.

18       **2.     Comcast Has No Affirmative Obligation to Ensure Employees Take
          Meal Breaks.**

19

20       Plaintiffs' Third Cause of Action alleging denial of meal periods relies on an incorrect

21  statement of law.  The California Supreme Court has made clear that "an employer's obligation is

22  to relieve its employee of all duty, with the employee thereafter at liberty to use the meal period

23  for whatever purpose he or she desires, but the employer need not ensure that no work is done."

24  *Brinker*, 53 Cal. 4th at 1017.  An employer is "not obligated to police meal breaks and ensure no

25  work thereafter is performed."  *Id.* at 1055.

26       Plaintiffs allege that Comcast "failed in [its] affirmative obligation to ensure that all of

27  their employees, including Plaintiffs, were actually relieved of all duties, not performing any

28  work, and free to leave the premises during meal periods."  Complaint at ¶ 44.  As the trial court

1  noted in its Decertification Order, this "theory of liability is not consistent with the California

2  Supreme Court's decision in *Brinker*." Decertification Order at 30:23-24. Because Comcast has

3  no "affirmative obligation" beyond providing employees with an opportunity to take a meal break,

4  Plaintiffs' improper statement of law should be stricken from the Complaint.

**B.**   **Plaintiffs Cannot Relitigate the Issue of Whether Comcast has Unlawful Policies, Patterns, or Practices that Prevented Employees from Taking Off-Duty Meal and Rest Breaks and Required Employees to Work Off the Clock.**

7  Issue preclusion prevents a party from relitigating an issue that has already been

8  adjudicated. The doctrine applies when: (1) the issue sought to be precluded is identical to that

9  decided in a prior proceeding; (2) the issue is actually litigated in the prior proceeding; (3) the

10  issue was necessarily decided in the prior proceeding; (4) the decision in the prior proceeding was

11  final and on the merits; and (5) the party against whom preclusion is sought is the same as, or in

12  privity with, the party to the former proceeding. *Lucido v. Superior Court*, 51 Cal. 3d 335, 341

13  (Cal. 1990).

14  Here, Plaintiffs seek to relitigate <u>identical allegations</u> regarding unlawful policies, patterns

15  and practices, against the same defendants, and that were considered and rejected in Judge

16  Goode's Decertification Order. These findings were affirmed on appeal, and Plainitffs are

17  represented by the same law firm involved in the *Fayerweather* case. Accordingly, this Court

18  should strike language in the Complaint that is inconsistent with the findings in the

19  Decertification Order.

**1.**   **Plaintiffs' Policy, Pattern, and Practice Allegations Are Identical to Those at Issue in the *Fayerweather* Action.**

22  The Decertification Order considered identical issues to those alleged in Plaintiffs'

23  Complaint. To determine whether the issues are identical, courts look to the factual allegations at

24  stake, not whether the ultimate issues or dispositions are the same. *Lucido*, 51 Cal. 3d at 341; *see*

25  *also Lumpkin v. Jordan*, 49 Cal. App. 4th 1511, 1516 (1995) ("[T]he doctrine of collateral

26  estoppel depends on what issues were adjudicated, not the nature of the proceeding or the relief

27  requested.").

28  The policy, pattern, and practice allegations at issue in Plaintiffs' Complaint are

6

1  substantively identical to those alleged in the *Fayerweather* Complaint. *Compare, e.g.,*

2  Complaint ¶¶ 32, 41, 46, 55 with *Fayerweather* Complaint ¶¶ 45, 54, 59, 67.[2] Further, Judge

3  Goode reiterated the issues that were litigated in the hearing preceding the Decertification Order:

4  "Now plaintiff's theories are: "Comcast has adopted a <u>policy or practice</u> that requires Com-Techs

5  to (a) keep their phones on and (b) remain logged-on to the TechNet network, so that they are not

6  relieved of all duty during their meal and rest breaks; [and] (2) Comcast has adopted a <u>policy or</u>

7  <u>practice</u> that requires Com-Techs to record a 60 minute meal period on their timecards even

8  though other company records show shorter lunch periods, making it likely that employees are

9  required to work off-the-clock." Decertification Order at 3:13-20 (emphasis added). In

10 determining that class treatment was not appropriate in *Fayerweather*, Judge Goode specifically

11 considered whether Comcast maintained unlawful policies, patterns, or practices regarding meal

12 and rest breaks and off-the-clock work and concluded that it did not.

13      Judge Goode reached the following relevant findings and conclusions:

14 •    Comcast's policy is clear. When Com-Techs are on break or at lunch, they are to

15      be relieved of all duty. Decertification Order at 14:5-6.

16 •    A careful analysis of the parties' positions shows there is really no dispute about

17      Comcast's policy: Com-Techs are to do no work during their breaks. *Id.* at 18:5-6

18 •    Testimony submitted by Comcast shows that, while dispatchers may have sent

19      messages to Com-Techs during break periods, there was not necessarily an

20      expectation that a Com-Tech would read or respond to the message if he or she

21      were on a break. *Id.* at 18:21-19:2

22 •    As discussed below, the practices engaged in by dispatchers and technicians are far

23      from consistent. *Id.* at 21:15-16

24

25  _____

26  [2] This list is not exhaustive. All of the identical policy, pattern, and practice allegations from the *Fayerweather* Complaint that Comcast seeks to strike are articulated in Comcast's

27  Notice of Motion to Strike filed concurrently herewith. Additionally, Comcast seeks to strike policy, pattern, and practice allegations that are derivative of Plaintiffs' invalid claims, including

28  Paragraph 71 of the Complaint.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE COMPLAINT - CASE NO. 2011900

1       •     In short, there is not a consistent practice that violates the company's stated policy.

2            *Id.* at 24:5

3       •     Plaintiff says that employees are pressured into filling out what are, in effect,

4            fictitious time sheets.  Plaintiff cites no common evidence of a central direction

5            that this be done. *Id.* at 26:10-12

6       •     Accordingly, to succeed in showing the case should be litigated as a class action,

7            plaintiff must show there is a company-wide practice that undermines this formal

8            policy.  *Id.* at 32:15-17

9       These factual findings are directly at odds with the allegations in Plaintiffs' Complaint.

10    *See, e.g.*, Complaint at ¶¶ 30 ("As a pattern and practice, Defendants relied on punch data/time

11    sheets in many instances filed [sic] out before the work day commenced . . ."); 46 ("As a pattern

12    and practice, Defendants regularly required employees to work through their meal periods

13    without proper compensation."); 56 ("As a pattern and practice, Defendants regularly required

14    employees to work through rest periods.").[3]  Because Plaintiffs seek to re-litigate the precise

15    issues that the Decertification Order adjudicated, the first *Lucido* factor is met.

16            **2.**     **Plaintiffs' Policy, Pattern, and Practice Allegations were Actually**

17                 **Litigated in the *Fayerweather* Action.**

18       The second *Lucido* factor, that the issue be actually litigated, is satisfied when the issue

19    has been properly raised by the pleadings, is submitted for determination, and is actually

20    determined. *Younan v. Caruso*, 51 Cal. App. 4th 401, 407 (1996).  A determination may be based

21    on failure of proof. *Id.*  Further, to determine what issues were actually litigated in the underlying

22    action, a court should "look carefully at the entire record from the prior proceeding," including

23    the evidence presented and the pleadings.  *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 511

24    (Cal. 2009).

25       In addition to Judge Goode's specific determinations finding no unlawful policies,

26

---

27         [3] A complete list of the language in Plaintiffs' Complaint that is inconsistent with Judge Goode's conclusions is included in Comcast's Notice of Motion to Strike filed concurrently

28    herewith.

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO STRIKE PORTIONS OF THE COMPLAINT - CASE NO. 2011900**

1  patterns, or practices, discussed above, the briefing and hearing transcript in the *Fayerweather*

2  decertification proceedings provide further confirmation that Comcast's policies, patterns, and

3  practices were thoroughly briefed and actually litigated in the prior case.  At the October 26, 2012

4  hearing on the Order to Show Cause as to why the class should not be decertified, the parties

5  submitted 103 pages of briefing and 4556 pages of evidence and objections thereto.  The

6  predominant issue litigated at the hearing was whether the *Fayerweather* class could establish that

7  Comcast had unlawful policies, patterns, or practices, as alleged in the *Fayerweather* Complaint.

8       Following Judge Goode's Decertification Order, these issues were appealed and re-argued

9  before the California Court of Appeal.  RJN, <u>Exhibit E.</u>  Affirming the Decertification Order, the

10  Court of Appeal held that there was "no evidence suggesting a general policy or practice

11  precluding second breaks . . . or the assignment of so much work that technicians had no time for

12  a break." *Id.* at 11-12.  Further, the Court of Appeal held that the *Fayerweather* class provided

13  "no direct proof" of a policy requiring technicians to report round-number lunch breaks of 30 or

14  60 minutes or of any "widespread pressure on technicians by their supervisors to underreport their

15  working hours." *Id.* at 15.  The policy, pattern, or practice issue was raised by the pleadings,

16  submitted for determination, and actually determined in the *Fayerweather* proceedings.

17          **3.**     **The Decertification Order Necessarily Decided that Comcast's**

18                  **Policies, Patterns, and Practices are Not Unlawful in a Final Decision**
                **on the Merits.**

19

20       The Decertification Order also satisfies the third and fourth *Lucido* factors, that an issue

21  be necessarily decided and that the prior decision is a final judgment on the merits.  An issue is

22  "necessarily decided" when it is not entirely unnecessary to the judgment in the prior proceeding.

23  *Lucido*, 51 Cal. 3d at 342.  A judgment is final when it is not open to direct attack.  *Id.*

24       The conclusions in the Decertification Order turned on whether the *Fayerweather* class

25  could establish that Comcast maintained unlawful policies, patterns, or practices.  The issue was

26  necessarily decided on the merits by Judge Goode's conclusion that no such uniform policy,

27  pattern, or practice exists.  Further, the *Fayerweather* class has exhausted the available direct

28  attacks to the Decertification Order.  The Court of Appeal affirmed Judge Goode's opinion, and

9

1    the Supreme Court of California denied review. *See* RJN, Exhibit E; *Fayerweather v. Comcast*

2    *Corp.*, No. S221245, Dkt No. 8. Thus, the Decertification Order is a final decision.

3
       ### 4.    Plaintiffs are Bound by the Decision in the *Fayerweather*
4                 Decertification Order

5          To meet the fifth *Lucido* factor, issue preclusion must be sought against a person who was

6    a party or was in privity with a party in the earlier proceeding. *Lucido*, 51 Cal. 3d at 341. Privity

7    requires "some relationship or connection with the party which makes it proper to hold 'privies'

8    bound with the actual parties." *Martin v. County of L.A.*, 51 Cal. App. 4th 688, 700 (Cal. App. 2d

9    Dist. 1996). Privity exists where a nonparty for whom the unsuccessful party in the first action

10   acted in a representative capacity. For example, in *Alvarez v. May Department Stores Co.*, 143

11   Cal. App. 4th 1223, 1238 (2006), the court held that plaintiffs in a prior class action certification

12   were "virtual representatives" of the plaintiffs (who were putative class members but not named

13   plaintiffs in the class action) in a subsequent individual action before the court. The court

14   considered the fact that the parties, claims, and counsel were the same in both actions and

15   concluded that denial of class certification in the first case precluded plaintiffs from certifying a

16   class in the second case. *Id.* The *Alvarez* court concluded that denial of class certification can

17   establish collateral estoppel against absent putative class members on issues that were actually

18   decided in connection with the denial. *See id.* at 1236.

19         Here, Fayerweather acted as a "virtual representative" for Plaintiffs, who were members

20   of the certified *Fayerweather* class until the Decertification Order was issued. Like in *Alvarez*,

21   both the claims asserted and the plaintiffs' counsel are identical in both the *Fayerweather* matter

22   and the present case. Through a representative, Plaintiffs had the opportunity and motive to fully

23   litigate the issue of whether Comcast has a policy, pattern, or practice that resulted in on-duty

24   meal and rest breaks and uncompensated off-the-clock work. Because Plaintiffs fall within the

25   scope of the *Fayerweather* class, Plaintiffs' interests were adequately represented in the prior

26   proceeding. Further, the judgment in *Fayerweather* was based on the same arguments and

27   evidence presented by the same counsel that would be considered in the present case. Therefore,

28   Plaintiffs are in privity with the *Fayerweather* class and it is fair to bind Plaintiffs to the final

                                              10

1    decision in that case.

2            **5.**      **Applying Collateral Estoppel to Plaintiffs' Claims Promotes Public**

3                  **Policy.**

4       In determining whether to apply collateral estoppel, courts also consider the public

5 policies of "preservation of the integrity of the judicial system, promotion of judicial economy,

6 and protection of litigants from harassment by vexatious litigation." *See Castillo v. City of Los*

7 *Angeles*, 92 Cal. App. 4th 477, 481 (Cal. App. 2d Dist. 2001); *Martin*, 51 Cal. App 4th at 701.

8 All three policy considerations weigh in favor of precluding Plaintiffs' claims.

9       Following the decertification of the 1,800-member *Fayerweather* class, Comcast

10 acknowledges that each class member is entitled to assert individual claims alleging wage and

11 hour violations as applied to that individual. This Court, however, should not provide a

12 duplicative forum for plaintiffs to have a "redo" of allegations they made and lost. Further,

13 Comcast should not be forced to re-litigate the same class action allegations of company-wide

14 policies, patterns, and practices in each individual case. Rather, each individual plaintiff's case

15 should rise or fall on the merits of each plaintiff's individual claims. First, applying collateral

16 estoppel will preserve the integrity of the judicial system by preventing inconsistent judgments on

17 an identical issue. Second, application of collateral estoppel will promote judicial economy by

18 preventing Plaintiffs from relitigating the same issues that were previously adjudicated, following

19 extensive discovery and briefing, in *Fayerweather*.[4] Finally, applying collateral estoppel protects

20 Comcast from vexatious litigation in which Comcast must repeatedly defend the same policies,

21 patterns, and practices in each individual claim.

22      **C.**      **Plaintiffs' Understaffing Theory Is Also Precluded Because It Was**

23             **Abandoned In The Prior Proceeding.**

24       Plaintiffs are also collaterally estopped from bringing the same claims that the

25 *Fayerweather* class abandoned after failing to provide adequate proof. The *Fayerweather* class

---

26        [4] Comcast has already participated in years of expensive and time consuming discovery
regarding Fayerweather's allegations of systematic unlawful policies and practices, and as Judge
27 Goode found, Fayerweather and his counsel could not present any evidence to support their
allegations. Comcast should not be made to relive this experience yet again.

28

1  was certified based on the same understaffing theory alleged in Plaintiffs' First and Second

2  Causes of Action.  Plaintiffs allege that "Defendants uniformly administered a corporate policy

3  concerning staffing levels, duties and responsibilities which required Plaintiffs to work without

4  appropriate pay.  This included a uniform corporate pattern and practice of allocating and

5  authorizing inadequate staffing levels.  The inadequate staffing levels were enforced and ensured

6  through the uniform and mandated corporate policy of a minimal labor budget."  Complaint at

7  ¶ 31.  Paragraph 44 of the *Fayerweather* Complaint contains identical language, substituting only

8  "Plaintiff and the class members" for "Plaintiffs."  *Fayerweather* Complaint at ¶ 44.  The

9  *Fayerweather* class abandoned this theory, however, because it was unable to produce an

10  acceptable trial plan for how the matter could be tried.

11         Plaintiffs' understaffing theory should be precluded because it meets all five *Lucido*

12  factors.  First, as evidenced by the identical language in the complaints, Plaintiffs in the present

13  case are asserting the exact same claim that was at issue in *Fayerweather*.  Second, the

14  understaffing issue was actually litigated in *Fayerweather*.  After the trial court provided the

15  *Fayerweather* class with an opportunity to provide support for their understaffing theory, the

16  *Fayerweather* class abandoned the theory.  In the Decertification Order, Judge Goode notes that

17  the plaintiffs "discarded" the understaffing theory.  Decertification Order at 3:11.  The

18  *Fayerweather* class's inability to prove understaffing is sufficient to show a determination on the

19  merits.  *See Younan*, 51 Cal. App. 4th at 407 (holding that a determination may be based on

20  failure of proof).  As to the third factor, the understaffing theory was necessarily determined in

21  Judge Goode's Decertification Order.  *See* Decertification Order at 3:10-11 ("Essentially, plaintiff

22  abandoned his claim that Comcast has a "policy of understaffing or over-scheduling").  As

23  discussed above, the fourth and fifth factors are also satisfied because the Decertification Order is

24  a final judgment, and Plaintiffs are in privity with Fayerweather and are therefore properly bound

25  by the decision.  Accordingly, Plaintiffs' understaffing theory should be stricken from the

26  Complaint.

27

28

1    **IV.    <u>CONCLUSION</u>**

2        For the foregoing reasons, Comcast requests that the Court strike (1) the portions of

3    Plaintiffs' Complaint that misstate the law regarding equitable tolling and Comcast's obligations

4    regarding meal breaks and (2) the portions of Plaintiffs' Complaint alleging violations caused by

5    Comcast's unlawful policies, patterns, or practices that are subject to collateral estoppel.

6    Dated: January 28, 2015            JONES DAY

7

8                          By: _____

9                              Fred W. Alvarez
                          Allison B. Moser

10                         Attorney for Defendants
                      COMCAST CORPORATION and

11                         COMCAST OF CONTRA COSTA, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE COMPLAINT - CASE NO. 2011900**

1   FRED W. ALVAREZ, State Bar No. 68115
    ALLISON B. MOSER, State Bar No. 223065
2   JONES DAY
    Silicon Valley Office
3   1755 Embarcadero Rd.
    Palo Alto, CA 94303
4   Telephone: (650) 739-3939
    Facsimile: (650) 739-3900
5   Email: falvarez@jonesday.com
    Email: amoser@jonesday.com
6
    TROY A. VALDEZ, State Bar No. 191478
7   ERIN M. DOYLE, State Bar No. 233113
    VALDEZ TODD & DOYLE LLP
8   1901 Harrison Street, Suite 1450
    Oakland, California 94612
9   Telephone: (415) 202-5950
    Facsimile: (415) 202-5951
10  Email: tvaldez@vtdlaw.com
    Email: edoyle@vtdlaw.com
11
    Attorneys for Defendants
12  COMCAST CABLE COMMUNICATIONS
    MANAGEMENT, LLC, erroneously sued as
13  COMCAST CORPORATION and
    COMCAST OF CONTRA COSTA, INC.
14

**FILED**

**JAN 2 8 2015**

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS
BY_____
    EVA REYES DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF STANISLAUS

**FILED BY FAX**

| | |
|---|---|
| JOSEPH JOSHUA DAVIS, PENNY SCHOONOVER, LEON GIBSON, DUSTIN WAYNE HAGENS, RAYMOND AGUNDEZ, RAFAEL BARAJAS, JR., <br><br> Plaintiffs, <br><br> v. <br><br> COMCAST CORPORATION, a Pennsylvania Corporation; COMCAST OF CONTRA COSTA, INC., a Washington Corporation; and DOES 1 through 50, Inclusive, <br><br> Defendants. | CASE NO. 2011900 <br><br> Assigned for all purposes, including Trial to Judge William A. Mayhew <br><br> Dept. 21 <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE COMPLAINT** <br><br> Date:   March 27, 2015 <br> Time:   8:30 a.m. <br> Dept.:  21 <br><br> Complaint filed October 27, 2014 |

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE
PORTIONS OF THE COMPLAINT - CASE NO. 2011900

1    Pursuant to sections 452(d) and 453 of the California Evidence Code and Rule 3.1306(c)

2    of the California Rules of Court, Defendant Comcast Cable Communications Management, LLC,

3    erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc., (hereinafter,

4    "Comcast") respectfully requests that the Court take judicial notice of the following documents in

5    support of its Motion to Strike Portions of Plaintiffs' Complaint:

6    1.    Exhibit A is a true and correct copy of the First Amended Complaint filed in

7          *Fayerweather v. Comcast Corporation*, Contra Costa County Superior Court, Case

8          No. MSC08-01470 (hereinafter, "*Fayerweather*").

9    2.    Exhibit B is a true and correct copy of the Transcript of Proceedings, dated

10         November 17, 2011, in *Fayerweather*.

11   3.    Exhibit C is a true and correct copy of the Transcript of Proceedings, dated

12         October 26, 2012, on the Order to Show Cause in *Fayerweather*.

13   4.    Exhibit D is a true and correct copy of the Order Decertifying Class filed on

14         December 15, 2012 in *Fayerweather*.

15   5.    Exhibit E is a true and correct copy of the California Court of Appeal's opinion

16         affirming *Fayerweather*, available at 2014 Cal. App. Unpub. LEXIS 6185.

17   Exhibits A, B, C, D, and E are records of California courts that are properly the subject of judicial

18   notice under Evidence Code section 452(d)(1). Cal. Evid. Code § 452 ("Judicial notice may be

19   taken of . . . records of any court of this state").

20   Dated: January 28, 2015                    JONES DAY

21

22                                              By: _____

23                                              Fred W. Alvarez
                                                Allison B. Moser

24                                              Attorney for Defendants
25                                              COMCAST CORPORATION and
                                                COMCAST OF CONTRA COSTA, INC.

26

27

28

2

# EXHIBIT A

**RECEIVED**

SEP 1 7 2008

WILSON, SONSINI,
GOODRICH & ROSATI

1  Arlo Garcia Uriarte, SBN 231764
2  Jason J. Szydlik, SBN 238356
   LIBERATION LAW GROUP
3  2760 Mission Street
   San Francisco, CA 94110
4  Telephone: (415) 695-1000
5  Facsimile:  (415) 695-1006

6

7  Jennifer Kramer, SBN 203385
   Judith Wiederhorn, SBN 239885
8  JENNIFER KRAMER LEGAL, APC
9  707 Wilshire Blvd., Suite 3600
   Los Angeles, CA 90017
10 Telephone: (213) 955-0200
11 Facsimile: (213) 955-0215

12 Attorneys for Plaintiff
13 GABRIEL FAYERWEATHER

14
            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
15
              **FOR THE COUNTY OF CONTRA COSTA**
16

17 | GABRIEL FAYERWEATHER, as an       | **Case No.: C-08-01470**
18 | individual and on behalf of others similarly |
19 | situated,                          |
                                        | **FIRST AMENDED COMPLAINT:**
20 |              Plaintiff,            | **(1) FAILURE TO PAY WAGES**
21 |        vs.                         | **(2) BREACH OF IMPLIED CONTRACT**
22 | COMCAST CORPORATION, a             | **(3) DENIAL OF MEAL PERIODS**
23 | Pennsylvania Corporation; COMCAST OF | **(4) DENIAL OF REST PERIODS**
   | CONTRA COSTA, INC., a Washington   |
24 | Corporation; and DOES 1 through 50, | **(5) UNFAIR BUSINESS PRACTICES**
25 | Inclusive,                         | **(Violation of California Business &**
                                        | **Professions Code §17200 et seq.)**
26 |              Defendants.           | **(6) FAILURE TO PROVIDE**
27 |                                    | **ACCURATE, ITEMIZED WAGE**
                                        | **STATEMENTS**
28

1

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff GABRIEL FAYERWEATHER (hereinafter referred to as "Plaintiff" or "FAYERWEATHER"), hereby submits his First Amended Complaint against Defendants COMCAST CORPORATION, COMCAST OF CONTRA COSTA, INC ("COMCAST"), and Does 1-50 (hereinafter collectively referred to as "Defendants") on behalf of himself, and the class of others similarly situated, as follows:

## INTRODUCTION

1. This class action is within the Court's jurisdiction under California <u>Labor Code</u> §§ 201-204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission ("IWC") including IWC Wage Order No. 4.

2. This complaint challenges systemic illegal employment practices resulting in violations of the California <u>Labor Code</u>, <u>Business and Professions</u> Code and applicable IWC wage orders against employees of Defendants.

3. Plaintiff is informed and believes and based thereon alleges Defendants, joint and severally have acted intentionally and with deliberate indifference and conscious disregard to the rights of all employees in receiving all wages due and lawful meal and rest periods.

4. Plaintiff is informed and believes and based thereon alleges Defendants have engaged in, among other things a system of willful violations of the California <u>Labor Code</u>, <u>Business and Professions Code</u> and applicable IWC wage orders by creating and maintaining policies, practices and customs that knowingly deny employees: (a) all wages due, (b) the opportunity to take meal and rest periods, and (c) accurate, itemized wage statements.

5. The policies, practices and customs of defendants described above and below have resulted in unjust enrichment of Defendants and an unfair business advantage over businesses that routinely adhere to the strictures of the California <u>Labor Code</u>, <u>Business and Professions Code</u> and applicable IWC wage orders.

2

## JURISDICTION AND VENUE

**6.** The Court has jurisdiction over the violations of the California <u>Labor Code</u> §§ 201-204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12 claims alleged herein.

**7.** Venue is proper because the alleged wrongs occurred in Contra Costa County. Defendants are located within California and Contra Costa County. Plaintiff worked for Defendants in Contra Costa County. The events that are the subject of this action took place in Contra Costa County.

## PARTIES

**8.** Plaintiff has been employed as a service technician with Defendants since September of 1996. Plaintiff is and was a victim of the policies, practices and customs of Defendants complained of in this action in ways that have deprived him of the rights guaranteed him by California <u>Labor Code</u> §§ 204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12. Plaintiff resides in Contra Costa County, and is and was employed by Defendants at all times relevant to this complaint in Contra Costa.

**9.** Plaintiff is informed and believes and based thereon alleges Defendant COMCAST CORPORATION was and is a California Corporation doing business in the State of California with its principal place of business in San Ramon.

**10.** Plaintiff is informed and believes and based thereon alleges Defendant COMCAST OF CONTRA COSTA, INC. was and is a California Corporation doing business in the State of California with its principal place of business in Contra Costa County.

**11.** Plaintiff is informed and believes and thereon alleges that at all times herein mentioned Defendants and DOES 1 through 50, are and were corporations, business

3

entities, individuals, and partnerships, licensed to do business and actually doing business in the State of California. Defendants own and operate an industry, business and establishment throughout California and is headquartered in San Ramon County, for the purpose of providing cable, internet, telephone and other communications services. As such, and based upon all the facts and circumstances incident to Defendants' business in California, Defendants are subject to California <u>Labor Code</u> §§ 201-204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12.

12.    Plaintiff does not know the true names or capacities, whether individual, partner or corporate, of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, said Defendants are sued under such fictitious names, and Plaintiff prays leave to amend this complaint when the true names and capacities are known. Plaintiff is informed and believes and thereon alleges that each of said fictitious Defendants was responsible in some way for the matters alleged herein and proximately caused Plaintiff and members of the class to be subject to the illegal employment practices, wrongs and injuries complained of herein.

13.    At all times herein mentioned, each of said Defendants participated in the doing of the acts hereinafter alleged to have been done by the named Defendants; and furthermore, the Defendants, and each of them, were the agents, servants and employees of each of the other Defendants, as well as the agents of all Defendants, and at all times herein mentioned, were acting within the course and scope of said agency and employment.

14.    Plaintiff is informed and believes and based thereon alleges that at all times material hereto, each of the Defendants named herein was the agent, employee, alter ego and/or joint venturer of, or working in concert with each of the other co-Defendants and was acting within the course and scope of such agency, employment, joint venture, or

FIRST AMENDED CLASS ACTION COMPLAINT

1 concerted activity. To the extent said acts, conduct, and omissions were perpetrated by

2 certain Defendants, each of the remaining Defendants confirmed and ratified said acts,

3 conduct, and omissions of the acting Defendant.

4      **15.**   At all times herein mentioned, Defendants, and each of them, were

5 members of, and engaged in, a joint venture, partnership and common enterprise, and

6 acting within the course and scope of, and in pursuance of, said joint venture, partnership

7 and common enterprise.

8      **16.**   At all times herein mentioned, the acts and omissions of various

9 Defendants, and each of them, concurred and contributed to the various acts and

10 omissions of each and all of the other Defendants in proximately causing the injuries and

11 damages as herein alleged.

12      **17.**   At all times herein mentioned, Defendants, and each of them, ratified each

13 and every act or omission complained of herein. At all times herein mentioned, the

14 Defendants, and each of them, aided and abetted the acts and omissions of each and all of

15 the other Defendants in proximately causing the damages as herein alleged.

16 

17 <center>**CLASS ACTION ALLEGATIONS**</center>

18      **18.**   **Definition:** The named individual Plaintiff brings this action on behalf of

19 himself and the class pursuant to California <u>Code of Civil Procedure</u> § 382 and is

20 consistent with Fed. R. Civ. P. Rules 23(a), (b)(1), (b)(2), and (b)(3). The class is defined

21 as: "All current and former service technicians, communications technicians, and other

22 non-exempt, hourly-paid employees with similar job duties who worked for Defendants

23 in California from May 27, 2004 to the present."

24      **19.**   **Numerosity:** The members of the class are so numerous that joinder of all

25 members would be impractical, if not impossible. The identity of the members of the

26 class is readily ascertainable by review of Defendants' records. Plaintiff is informed and

27 believes and based thereon alleges that (a) class members regularly were denied payment

28 of all wages due, and (b) class members were regularly denied meal breaks and/or rest

<center>5</center>

breaks.

**20.    Adequacy of Representation:** The named Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the class defined above. Plaintiff's attorneys are ready, willing and able to fully and adequately represent the class and individual Plaintiff.

**21.**    Defendants uniformly administered a corporate policy, practice and/or custom concerning staffing levels, duties, responsibilities of the class members, which required that the class members to work through the legally required rest and meal breaks. Plaintiff is informed and believes and based thereon alleges this corporate conduct is accomplished with the advance knowledge and designed intent to willfully withhold appropriate wages for work performed by class members. Additionally, Defendants uniformly administered a corporate policy, practice and/or custom of not paying members of the class for all hours worked. Plaintiff is informed and believes and based thereon alleges this corporate conduct is accomplished with the advance knowledge and designed intent to willfully withhold appropriate wages for work performed by class members.

**22.**    Plaintiff is informed and believes and based thereon alleges Defendants, in violation of California Labor Code §§ 201 and 202, et seq., respectfully, had a consistent and uniform policy, practice and custom of willfully failing to comply with Labor Code §§ 226.7 and 1194, and 1198. Plaintiff and other members of the class did not secret or absent themselves from Defendants, nor refuse to accept the earned and unpaid wages from Defendants. Accordingly, Defendants are liable for waiting time compensation for the unpaid wages to separated employees pursuant to California Labor Code § 203.

**23.**    As a pattern and practice, in violation of the aforementioned labor laws and wage orders, Defendants did not maintain adequate records, and/or altered with records pertaining to when Plaintiff and the members of the class began and ended each work period, meal period, the total daily hours worked, and the total hours worked per pay

6

1 | period and applicable rates of pay in violation of California Labor Code § 1174.

2 |     **24.**   **Common Question of Law and Fact:** There are predominant common

3 | questions of law and fact and a community of interest amongst Plaintiff and the claims of

4 | the class concerning whether (a) class members regularly were denied payment of all

5 | wages due, and (b) class members were regularly denied meal breaks and/or rest breaks,

6 | was and is a violation of California Labor Code §§ 201-204, 226.7, and 512 and

7 | California Industrial Welfare Commission wage orders including IWC Wage Order No.

8 | 4. Defendants' employment policies and practices wrongfully and illegally failed to

9 | compensate Plaintiff and the other members of the class as required by California law.

10 |     **25.**   **Typicality:** The claims of Plaintiff are typical of the claims of all members

11 | of the class. The Plaintiff is a member of the class and has suffered the alleged violations

12 | of California Labor Code §§ 201-204, 226.7, and 512 and California Industrial Welfare

13 | Commission wage orders including IWC Wage Order No. 4.

14 |     **26.**   The California Labor Code and Wage Order provisions upon which

15 | Plaintiff bases his claims are broadly remedial in nature. These laws and labor standards

16 | serve an important public interest in establishing minimum working conditions and

17 | standards in California. These laws and labor standards protect the average working

18 | employee from exploitation by employers who may seek to take advantage of superior

19 | economic and bargaining power in setting onerous terms and conditions of employment.

20 |     **27.**   The nature of this action and the format of laws available to Plaintiff and

21 | members of the class identified herein make the class action format a particularly

22 | efficient and appropriate procedure to redress the wrongs alleged herein. If each

23 | employee were required to file an individual lawsuit, the corporate Defendants would

24 | necessarily gain an unconscionable advantage since it would be able to exploit and

25 | overwhelm the limited resources of each individual plaintiff with their vastly superior

26 | financial and legal resources. Requiring each class member to pursue and individual

27 | remedy would also discourage the assertion of lawful claims by employees who would be

7

disinclined to file an action against their former and/or current employer for real and justifiable fear of retaliation and permanent damage to their careers at subsequent employment.

28.     The prosecution of separate actions by the individual class members, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual class members against the Defendants and which would establish potentially incompatible standards of conduct for the Defendants, and/or (b) adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interest of the other class members not parties to the adjudications or which would substantially impair or impede the ability of the class members to protect their interests.  Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

29.     Such a pattern, practice and uniform administration of corporate policy regarding illegal employee compensation described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the class identified herein, in a civil action, for the unpaid balance of the full amount of unpaid premium compensation for missed meal and rest periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 §§ 11(B) and 12 (B), unpaid wages both straight-time and overtime, including interest thereon, applicable penalties, reasonable attorney's fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194 and Code of Civil Procedure § 1021.5.

30.     Proof of a common business practice or factual pattern, of which the named Plaintiff experienced, are representative and will establish the right of each of the members of the plaintiff class to recovery on the causes of action alleged herein.

31.     The plaintiff class is commonly entitled to a specific fund with respect to the compensation illegally and unfairly retained by Defendants.  The Plaintiff class is

1    commonly entitled to restitution of those funds being improperly withheld by Defendants.

2    This action is brought for the benefit of the entire class and will result in the creation of a

3    common fund.

## FACTUAL ALLEGATIONS RELEVANT TO CAUSES OF ACTION

5    **32.**   Defendants are a cable services and communications company.

6    **33.**   Plaintiff FAYERWEATHER has been employed by Defendants for a

7    period of over eleven (11) years beginning in September of 1996.  Plaintiff

8    FAYERWEATHER is currently employed by Defendants.

9    **34.**   Plaintiff and the class members report to Defendants' Richmond office at

10   around 7:15 a.m. to load equipment and tools onto their trucks and check their routes

11   before they head out to their first job.  Plaintiff and the class members then commute

12   from job site to job site.

13   **35.**   Class members are not allowed to clock in and receive payment for hours

14   worked until they leave the office around 7:30 a.m.  The class members work another

15   eight (8) hours on the clock.

16   **36.**   Plaintiff and class members work for periods of more than five (5) hours

17   without a meal period of thirty (30) minutes.

18   **37.**   Plaintiff and class members work for periods of more than four (4) hours

19   without a rest period of ten (10) minutes.

20   **38.**   After completing their work at the job sites, Plaintiff and class members

21   then travel back to the office to unload their truck and complete paperwork while off the

22   clock and not receiving compensation.

23   **39.**   Plaintiff and the class members were not paid for hours worked in the

24   office in the mornings or evenings.

9

## FIRST CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### FOR FAILURE TO COMPENSATE FOR ALL HOURS WORKED IN
### PURSUANT TO
### IWC WAGE ORDER NO. 4 AND LABOR CODE § 1194)

40.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 39 as though fully set for herein.

41.   This cause of action is brought pursuant to Labor Code §1194, et seq., which provides that employees are entitled to wages and compensation for work performed, and provides a private right of action for failure to pay legal compensation for work performed, whether it be straight-time or overtime.

42.   At all times relevant herein, Defendants were required to compensate its non-exempt, hourly employees for all hours worked pursuant to in violation of California Labor Code §1194 and IWC Wage Order No. 4.

43.   As a pattern and practice, Defendants regularly deducted time from employees' daily time records for the time they worked at Defendant's office in the morning and at the end of their shifts.  Plaintiff and class members were not compensated for all hours they were subject to the control of Defendants; including all time they were suffered or permitted to work.

44.   Plaintiff is informed and believes and based thereon alleges Defendants uniformly administered a corporate policy concerning staffing levels, duties and responsibilities which required Plaintiff and the class members to work without appropriate pay.  This included a uniform corporate pattern and practice of allocating and authorizing inadequate staffing levels.  The inadequate staffing levels were enforced and ensured through the uniform and mandated corporate policy of a minimal labor budget. This corporate conduct is accomplished with the advance knowledge and designed intent to save labor costs by required Plaintiff and members of the class to work without proper

1    compensation because they were unable to take the meal periods which were

2    automatically deducted from their time records.

3        **45.**   As a pattern and practice, in violation of the aforementioned labor laws and

4    wage orders, Plaintiff is informed and believes and based thereon alleges Defendants did

5    not properly maintain records pertaining to when Plaintiff and the class began and ended

6    each work period, meal period, the total daily hours worked, and the total hours worked

7    per pay period and applicable rates of pay in violation of California Labor Code §1174.

8        **46.**   The conduct of Defendants and their agents and employees as described

9    herein was oppressive, fraudulent and malicious, done in conscious disregard of

10   Plaintiff's and class members' rights, and was done by managerial employees of

11   Defendants.  Plaintiff and class members are thereby entitled to an award of punitive

12   damages against Defendants, in an amount appropriate to punish and make an example of

13   Defendants, and in an amount to conform to proof.

14   

15       **47.**   Plaintiff is informed and believes and based thereon alleges Defendants

16   willfully failed to pay employees proper compensation for all hours worked.  Plaintiff is

17   informed and believes and based thereon alleges Defendants' willful failure to provide

18   wages due and owing them upon separation from employment results in a continued

19   payment of wages up to thirty (30) days from the time the wages were due.  Therefore,

20   Plaintiff and other members of the class who have separated from employment are

21   entitled to compensation pursuant to Labor Code § 203.

22       **48.**   Such a pattern, practice and uniform administration of corporate policy

23   regarding illegal employee compensation as described herein is unlawful and creates an

24   entitlement to recovery by Plaintiff in a civil action, for the unpaid balance of the full

25   amount of straight time compensation and overtime premiums owing, including interest

26   thereon, penalties, reasonable attorneys' fees, and costs of suit according to California

27   Labor Code §1194, et seq.

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

## SECOND CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### FOR BREACH OF IMPLIED CONTRACT FORM BY CONDUCT:  WORKING
### OFF-THE CLOCK)

49.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

50.     Plaintiffs plead this cause of action as an alternative theory of liability to their First Cause of Action.

51.     As noted by the United States Supreme Court, ""[A]n informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace." Hishon v. King & Spalding, 467 U.S. 69, 74 (1984).

52.     The employment contracts between hourly-paid employees and Defendants, arise from, among other things: Defendants' conduct of treating hourly-paid employees as their employees; Defendants' standardized employee orientation; hourly-paid employees' pay-stubs; Defendants' corporate meal break policy; and the distribution of the Handbook to hourly-paid employees.

53.     By furnishing their labor on behalf of Defendants and/or with their knowledge and/or acquiescence, hourly-paid employees duly performed all the conditions on their part under their employment contracts.

54.     By failing to properly compensate hourly-paid employees for off-the-clock work, Defendants breached their employment contracts with Plaintiffs and the Class members.

55.     Plaintiffs and the Class members suffered damages in the form of lost wages and benefits as a direct result of Defendants' conduct. Defendants are liable to Plaintiffs and the Class members for the damages incurred as a result of Defendants' failure to pay Plaintiffs and the Class members for their off-the-clock work.

12

## THIRD CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### FOR FAILURE TO PROVIDE MEAL BREAKS
### IN VIOLATION OF LABOR CODE §§ 226.7 AND 512
### AND IWC WAGE ORDER NO. 4)

**56.** Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

**57.** Defendants failed in their affirmative obligation to ensure that all of their employees, including Plaintiff and other members of the class, were actually relieved of all duties, not performing any work, and free to leave the premises during meal periods. Plaintiff and the class were suffered and permitted to work through legally required meal breaks. As such, Defendant is responsible for paying premium compensation for missed meal periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B). Defendants shall pay the each affected employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal break was not provided.

**58.** Plaintiff and class members regularly worked in excess of five (5) hours per day and accordingly had a right to take a 30-minute meal period each day worked in excess of five (5) hours.

**59.** As a pattern and practice, Defendants regularly required employees to work through their meal periods without proper compensation. Defendants did staff employees in such a manner and at such posts that would make it impossible for these employees to take their meal period. This policy of requiring employees to work through their legally mandated meal periods is a violation of California law.

**60.** Plaintiff is informed and believes and based thereon alleges Defendants failure to provide Plaintiff and other members of the class with the opportunity to take meal breaks was willful and done with the wrongful and deliberate intention of injuring Plaintiff and other members of the class, from improper motives amounting to malice,

13

and in conscious disregard of Plaintiff and other members of the class' rights.

61. Plaintiff is informed and believes and based thereon alleges Defendants willfully failed to pay employees who were not provided the opportunity to take meal breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B). Plaintiff is informed and believes and based thereon alleges Defendants' willful failure to provide Plaintiff and other members of the class the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due. Therefore, Plaintiff and other members of the class who have separated from employment are entitled to compensation pursuant to Labor Code § 203.

62. As a pattern and practice, in violation of the aforementioned labor laws and wage orders, Plaintiff is informed and believes and based thereon alleges Defendants did not properly maintain records pertaining to when Plaintiff began and ended each meal period in violation of California Labor Code §1174 and § 4 of the applicable IWC Wage Order(s).

63. Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the class identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B), including interest thereon, penalties, reasonable attorney's fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194.

64. Defendants' wrongful and illegal conduct in failing provide class members with the opportunity to take meal breaks and to provide premium compensation in accordance with Labor Code §§ 226.7 and 512 and IWC Wage Order No. 4 § 11(B) despite the clear legal obligation to do so, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff and all members of the class in that the Defendants will continue to violate these California laws, represented

14

by labor statutes and IWC wage orders, unless specifically ordered to comply with same. This expectation of future violations will require current and future employees to repeatedly and continuously seek legal redress in order to gain compensation to which they are entitled under California law. Plaintiff has no other adequate remedy at law to insure future compliance with the California labor laws and wage orders alleged to have been violated herein.

## FOURTH CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS FOR FAILURE TO PROVIDE REST BREAKS IN VIOLATION OF LABOR CODE §§ 226.7 AND 512 AND IWC WAGE ORDER NO. 4)

65. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

66. Defendants affirmatively prevented Plaintiff and class members from taking legally mandated rest breaks. As such, Defendant is responsible for paying premium compensation for missed rest periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 12(B). Defendants shall pay the each affected employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest break was not provided.

67. Plaintiff and class members regularly worked in excess of three and half (3 ½) hours per day. Defendants' policies and practices prevented Plaintiff and class members from enjoying their right to a ten (10) minute rest period in the middle of each four (4) hour work period.

68. As a pattern and practice, Defendants regularly required employees to work through rest periods. Defendants and Defendants' supervisors assigned work, scheduled shifts, and staffed worksites in a manner that did not allow Plaintiff and class members to regularly take rest periods.

69. Plaintiff is informed and believes and based thereon alleges Defendants

15

failure to provide Plaintiff and other members of the class with the opportunity to take rest breaks was willful and done with the wrongful and deliberate intention of injuring Plaintiff and other members of the class, from improper motives amounting to malice, and in conscious disregard of Plaintiff and other members of the class' rights.

70.     Plaintiff is informed and believes and based thereon alleges Defendants willfully failed to pay employees who were not provided the opportunity to take rest breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage Order No. 4 § 12(B).  Plaintiff is informed and believes and based thereon alleges Defendants' willful failure to provide Plaintiff and other members of the class the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due.  Therefore, Plaintiff and other members of the class who have separated from employment are entitled to compensation pursuant to Labor Code § 203.

71.     Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the class identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 12(B), including interest thereon, penalties, reasonable attorney's fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194.

72.     Defendants' wrongful and illegal conduct in failing provide class members with the opportunity to take rest breaks and to provide premium compensation in accordance with Labor Code §§ 226.7 and 512 and IWC Wage Order No. 4§ 12(B) despite the clear legal obligation to do so, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff and all members of the class in that the Defendants will continue to violate these California laws, represented by labor statutes and IWC wage orders, unless specifically ordered to comply with same. This expectation of future violations will require current and future employees to

16

repeatedly and continuously seek legal redress in order to gain compensation to which they are entitled under California law. Plaintiff has no other adequate remedy at law to insure future compliance with the California labor laws and wage orders alleged to have been violated herein.

## FIFTH CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS FOR VIOLATIONS OF BUSINESS AND PROFESSIONS CODE § 17200 ET SEQ.)

73.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

74.    Defendants, and each of them, have engaged and continue to engage in unfair business practices in California by practicing, employing and utilizing the employment practices outlined above, inclusive, to wit, by requiring Plaintiff and the members of the class to (a) not compensate employees for all hours worked, and (b) to require employees to work through meal and rest periods.

75.    Defendants' utilization of such unfair business practices constitutes unfair competition and provides an unfair advantage over Defendants' competitors.

76.    Plaintiff seeks, on his own behalf, on behalf of other members of the class similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies withheld, acquired and/or converted by the Defendants by means of the unfair practices complained of herein.

77.    Plaintiff seeks, on his own behalf, on behalf of other members of the class similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair business practices complained of herein.

78.    The restitution includes the equivalent of (a) all unpaid wages for hours worked whether it be straight-time or overtime, and (b) all unpaid premium compensation mandated by Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B) and 12(B),

17

1  including interest thereon.

2      **79.**    The acts complained of herein occurred within the last four years preceding

3  the filing of the complaint in this action.

4      **80.**    Plaintiff is informed and believes and on that basis alleges that at all times

5  herein mentioned Defendants have engaged in unlawful, deceptive and unfair business

6  practices, as proscribed by California <u>Business and Professions Code</u> § 17200 et seq.,

7  including those set forth herein above thereby depriving Plaintiff and other members of

8  the class the minimum working condition standards and conditions due to them under the

9  California laws and Industrial Welfare Commission wage orders as specifically described

10  therein.

## SIXTH CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### For Violation of <u>LABOR CODE § 226</u>

11
12
13
14
15      **81.**    Plaintiffs re-allege and incorporate by reference each and every allegation
16  set forth in the preceding paragraphs.

17      **82.**    Plaintiff and all similarly situated employees have been harmed as
18  described herein and set forth in the First, Second, Third, and Fourth Causes of Action.

19      **83.**    As a pattern and practice, Defendant failed to furnish Plaintiff and all

20  similarly situated employees, either semimonthly or at the time of each payment of

21  wages, either as a detachable part o the check or separately, an accurate, itemized

22  statement in writing showing gross wages earned, total hours worked, and the applicable

23  hourly rates and corresponding number of hours worked by Plaintiff and all similarly

24  situated employees at each rate.

25      **84.**    Defendant willfully and intentionally failed to provide Plaintiff and all

26  similarly situated employees with accurate, itemized statements, to show on such

27  itemized statements the proper total hours, including overtime hours, worked by Plaintiff

28  and all similarly situated employees in that it required or suffered them to work and failed

to pay wages to them for all hours worked. Defendant willfully and intentionally failed to show accurate gross wages earned, total hours worked by Plaintiff and all similarly situated employees, and all applicable hourly rates and the corresponding number of hours worked by Plaintiff and all similarly situated employees at each rate.

85.    As such, Plaintiff and all similarly situated employees are entitled to payment from Defendant of the greater of actual damages or $50 for the initial pay period in which the violation occurred and $100 for each subsequent violation, up to a maximum of $4000, pursuant to Labor Code § 226, as well as reasonable attorney's fees and costs of suit

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on his own behalf and on the behalf of the members of the class, prays for judgment as follows:

1.    For an order certifying the proposed class;

2.    Upon the First and Second Cause of Action, for consequential damages according to proof;

3.    Upon the First and Second Cause of Action, for punitive and exemplary damages according to proof;

4.    Upon the First and Second Cause of Action, for waiting time wages according to proof pursuant to California Labor Code § 203;

5.    Upon the Third Cause of Action, for consequential damages according to proof as set forth in California Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B) related to meal breaks;

6.    Upon the Third Cause of Action, for waiting time compensation according to proof pursuant to California Labor Code § 203;

7.    Upon the Third Cause of Action, that Defendants be ordered to show cause why they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to meal breaks and record

keeping for Defendants' employees related to same; and for an order enjoining and restraining Defendants and their agents, servants and employees related thereto;

8.  Upon the Fourth Cause of Action, for consequential damages according to proof as set forth in California Labor Code § 226.7 and IWC Wage Order No. 4 § 12(B) related to rest breaks;

9.  Upon the Fourth Cause of Action, for waiting time compensation according to proof pursuant to California Labor Code § 203;

10. Upon the Fourth Cause of Action, that Defendants be ordered to show cause why they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to rest breaks; and for an order enjoining and restraining Defendants and their agents, servants and employees related thereto;

11. Upon the Fifth Cause of Action, for restitution to Plaintiff and other similarly effected members of the class of all funds unlawfully acquired by Defendants by means of any acts or practices declared by this Court to be violative of the mandate established by California Business and Professions Code § 17200 et seq.;

12. Upon the Fifth Cause of Action, for an injunction to prohibit Defendants to engage in the unfair business practices complained of herein;

13. Upon the Fifth Cause of Action, for an injunction requiring Defendants to give notice to persons to whom restitution is owing of the means by which to file for restitution;

14. Upon the Sixth Cause of Action, for actual damages or statutory penalties according to proof as set forth in California Labor Code § 226 and IWC Wage Order No. 4 § 7(B) related to record keeping;

15. Upon the Sixth Cause of Action, that Defendants be ordered to show cause why

20

they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to record keeping for Defendant's' employees related to same; and for an order enjoining and restraining Defendants and their agents, servants and employees related thereto;

16. For pre-judgment interest as allowed by California Labor Code §§ 218.5 or 1194 and California Civil Code § 3287;

17. For reasonable attorneys fees, expenses and costs as provided by California Labor Code §§ 218.5 or 1194 and Code of Civil Procedure § 1021.5; and,

18. For such other and further relief the court may deem just and proper.

Dated:  September 12, 2008              JENNIFER KRAMER LEGAL, APC


                                        By:  _____
                                              Jennifer Kramer, Esq.
                                              Judith Wiederhorn, Esq.
                                              Attorneys for Plaintiffs

FIRST AMENDED CLASS ACTION COMPLAINT

**PROOF OF SERVICE**

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA | **FOR COURT USE ONLY** |

| |
|---|
| **TITLE OF CASE**<br>FAYERWEATHER v. COMCAST CORPORATION, et al. |

| |
|---|
| **ATTORNEY(S) NAME AND ADDRESS**    **TELEPHONE**<br>Jennifer Kramer, Esq., SBN 203385    (213) 955-0200<br>Judith Wiederhorn, Esq., SBN 239885<br>JENNIFER KRAMER LEGAL, APC<br>707 Wilshire Boulevard, Suite 3600<br>Los Angeles, CA  90017 |

| | | |
|---|---|---|
| **ATTORNEY(S) FOR:**<br>Plaintiff | **HEARING DATE-TIME-DEPT** | **CASE NUMBER**<br>C-08-01470 |

I am employed in the City of Los Angeles, County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 707 Wilshire Boulevard, Suite 3600, Los Angeles, CA  90017.  On **September 15, 2008,** I served the documents named below on the parties in this action as follows:

**DOCUMENT(S) SERVED:**    <u>FIRST AMENDED COMPLAINT</u>:  (1) FAILURE TO PAY WAGES

(2) BREACH OF IMPLIED CONTRACT; (3) DENIAL OF MEAL PERIODS; (4) DENIAL OF REST PERIODS

(5) UNFAIR BUSINESS PRACTICES (Violation of California Business & Professions Code §17200 et seq.)

**(6) FAILURE TO PROVIDE ACCURATE, ITEMIZED WAGE STATEMENTS**

**SERVED UPON:**        **SEE ATTACHED SERVICE LIST**

☒  (BY U.S. MAIL) I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail Los Angeles, California.  I am readily familiar with the practice of the Firm for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection.

☐  (BY PERSONAL SERVICE) I caused to be delivered by an authorized courier or driver the documents listed above to be received and delivered on the same date.  A Proof of Service signed the authorized courier will be filed forthwith.

☐  (BY FACSIMILE) I caused to be transmitted the document(s) described herein via fax

☐  (BY OVERNIGHT MAIL) I am readily familiar with the practice of the Firm for collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by California Overnite for overnight delivery.

☒  (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 15, 2008, at Los Angeles, California.

Michael Bew

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
FAYERWEATHER v. COMCAST CORPORATION, et al.
CCSC Case No. C-08-01470

## SERVICE LIST

Fred W. Alvarez
Troy A. Valdez
Michael D. Schlemmer
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
    Attorneys for Defendants COMCAST CORPORATION, and COMCAST OF CONTRA COSTA,
INC.

# EXHIBIT B

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

---o0o---

**FAYERWEATHER,**

                Plaintiff,

vs.                                    No. **MSC08-01470**

**COMCAST,**

                Defendant.

COPY

**BEFORE THE HONORABLE BARRY P. GOODE, JUDGE**

**DEPARTMENT 17**

WAKEFIELD TAYLOR COURTHOUSE, MARTINEZ, CALIFORNIA

**NOVEMBER 17, 2011,** AFTERNOON SESSION

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES

FOR THE PLAINTIFF:  MATTHEW RIGHETTI, ESQ.
                    JOHN GLUGOSKI, ESQ.
                    Righetti & Glugoski
                    456 Montgomery Street, Suite 1400
                    San Francisco, CA 94104

                    ARLO URIARTE, ESQ.
                    Initiative Legal Group
                    1800 Century Park East, Second Floor
                    Los Angeles, CA 90067

FOR THE DEFENDANT:  FRED ALVAREZ, ESQ.
                    JENNIFER MARTINEZ, ESQ.
                    Wilson Sonsini Goodrich & Rosati
                    650 Page Mill Road
                    Palo Alto, CA 94304

                    TROY VALDEZ, ESQ.
                    Valdez Dunson & Doyle
                    116 New Montgomery Street, Suite 210
                    San Francisco, CA 94105

REPORTED BY:  Sarah Thompson, CSR 12635

1

1    NOVEMBER 17, 2011                    AFTERNOON SESSION

2

3                    *P R O C E E D I N G S*

4

5         THE COURT:  Good afternoon.  This is

6    Fayerweather versus Comcast.  Can we get appearances,

7    please?

8             MR. RIGHETTI:  Matthew Righetti for Plaintiff.

9             THE COURT:  Thanks.

10            MR. GLUGOSKI:  John Glugoski for Plaintiff.

11            MR. URIARTE:  Arlo Uriarte for Plaintiff.

12            MR. ALVAREZ:  Fred Alvarez for Comcast.

13            MR. VALDEZ:  Troy Valdez for Comcast, Your

14    Honor.

15            MS. MARTINEZ:  Jennifer Martinez for Comcast.

16            THE COURT:  All right.  Thanks.

17         I read, I believe, everything you've submitted

18    for today, and I'm really a little troubled about where

19    we are in this case from a couple of standpoints.

20         I went back and I looked at the tentative

21    ruling from the class certification motion, and what it

22    said in talking about the predominance of common

23    questions is, "The court believes this is a close case;

24    however, ultimately, it is required to consider whether

25    the theory of recovery advanced by the Plaintiff is

26    likely to prove amenable to class treatment.  Here it

27    appears to be Plaintiff's theory that Comcast has

28    adopted a policy of under-staffing or over-scheduling

2

1    that makes it unlikely that Comtechs can have their

2    required breaks each day.  Given that theory of the

3    case, it appears that the common issues can be

4    litigated in a manageable way and the case need not be

5    overwhelmed with individual issues," and then I laid

6    out some specific common issues of fact and law which I

7    took to arise from your pleadings.

8         I thought the hearing today was to discuss how

9    we're going to try this case and to start getting a

10   handle on when the case could be tried and what we're

11   going to ask the jury to decide and what kind of

12   evidence we're going to be looking at so I could

13   understand it and start trying to get this case ready.

14        I don't have that from your status conference

15   statement; it's not even close.

16        MR. RIGHETTI:  Right.

17        THE COURT:  On the other hand, you talk about

18   all sorts of delays in getting discovery from Comcast,

19   and that's -- what concerns me about that is a couple

20   of things:  one, I don't know what's true and what's

21   not true, but I do know that -- because I had it in my

22   notes -- that once upon a time I told you if you had

23   discovery problems, I want you to call my clerk and

24   we'll try to work these things out, and I've had no

25   call, no motion to compel, no nothing.  So this case

26   has been kind of just drifting along, and whether

27   there's been discovery problems or not, I don't know.

28        I don't think the Plaintiff necessarily has to

3

1  be held in leg irons to the theory of the case that was

2  stated in the class certification motion, but if it

3  moves away from that theory, it -- it breaks loose from

4  the moorings on which the class certification was

5  granted, and the Defendant keeps saying they want to

6  move for de-certification.

7       At this point, I'm just not quite sure where

8  the case is, and all of that is a little addled by the

9  fact that we finally have had oral argument in *Brinker*,

10 so within 85 or -- 80 or 85 days at the outside, we

11 should know a little bit more about what the law is,

12 and I'm a little reluctant, given the imminence finally

13 of a *Brinker* ruling, to make major decisions that

14 *Brinker* might implicate, but I still am left very

15 troubled as to what we're doing with this case and how

16 far we've moved from the theory on which class was --

17 the class was certified.

18      You talk in your papers about this

19 pre-populated timesheet.  I -- something I read,

20 though, makes me wonder, I don't know if it was one of

21 the depositions or what, whether that was just used in

22 Sacramento or whether it was used system-wide because I

23 kind of get the impression it was used in more than one

24 office, and the more I find things like that, the more

25 I wonder about whether we are really looking at very

26 individualized operations here.

27      So those are the things troubling me, so why

28 don't I let you start and tell me where you think you

4

1  are.

2            MR. RIGHETTI:  Yeah.  Matthew Righetti, Your

3  Honor.

4            I think you -- I think we're fortunate that

5  your intuition is correct.  We're fortunate that we're

6  not farther along on a trial plan or into briefing on

7  de-certification because of *Brinker*, and once *Brinker*

8  comes out, I mean, that is going to, I would expect,

9  influence trial plans, certification, de-certification,

10 perhaps even what further discovery we may need to do

11 in order to meet whatever standard the court sets in

12 that decision.

13           That being said, once we left the court last

14 time, we did have a discovery conference with the court

15 following the last hearing, and the Court said we

16 need -- let's do a *Belaire* letter to the dispatchers --

17           THE COURT:  That's right.  We did that one,

18 that's right.

19           MR. RIGHETTI:  We'll do a *Belaire* letter to

20 the dispatchers, and that *Belaire* letter process just

21 expired in the last couple of weeks, and I think we

22 just got the *Belaire* -- we just got the contact

23 information for the dispatchers end of last week, so

24 we're moving forward on the dispatchers, and we're

25 getting information from the dispatchers now.

26           In addition, we randomly selected six

27 dispatchers for deposition; three of those depositions

28 have been completed, one yesterday, two last week, and

5

1    the other two are coming up.

2         In addition, we learned something else that I

3    don't think -- I'm sure that the Plaintiffs did not

4    know at the time of certification even though the

5    information had been requested in discovery.  The

6    information was what records are there that reflect

7    breaks that were or were not taken by techs, and what

8    was not mentioned pre-certification was these techs

9    carry a Nextel device, which is a radio and cell phone,

10   and it's -- and text message, like a cell phone type of

11   thing, it has many functions, and -- and that device is

12   configured with a piece of software provided by CSG

13   Systems out of Denver that allows, and the company

14   expects techs to pull down a drop-down menu and hit a

15   button when they go on break, and pull down that

16   drop-down menu and hit another button when they come

17   back from break.

18        That is electronically transmitted with the

19   tech's ID information and the date and time that the

20   break is started and stopped back to a database at CSG

21   in Denver -- I'm not sure if -- we had the CSG

22   deposition coming up in December, in another three

23   weeks it was the first time they could be available,

24   and we'll find out more information about where exactly

25   that database is, but we have asked CSG to provide that

26   information, of when those breaks start and stop for

27   each day.

28        It's our expectation that when you put those

6

1   on top of the payroll record -- time records that they

2   provided for payroll that show precise and exact

3   60-minute breaks every day from 12:00 to 1:00 for each

4   tech for every day, you're going to see problems.  I

5   mean, there's just -- but we don't know because we

6   haven't seen those records.

7          Our anecdotal information from the class

8   members is that they didn't get the 60-minute breaks

9   and those time records were pre-populated, and if you

10  want the real times that they reflected and were

11  expected to show their breaks, you have to look at this

12  Nextel drop-down menu information.

13         Now --

14         THE COURT:  Can I just ask --

15         MR. RIGHETTI:  Yes.

16         THE COURT:  -- it's maybe a footnote, but on

17  the pre-population, I thought I saw Mr. Fayerweather

18  testified that he didn't use pre-populated forms, that

19  he filled out a time sheet, and -- am I wrong about

20  that?

21         MR. ALVAREZ:  No, you're not, Your Honor.

22         MR. GLUGOSKI:  I may be in a better place to

23  address that.

24         Basically, what happened was the testimony had

25  to do in a situation where he came in early and had

26  actually loaded his truck.  It wasn't specifically

27  about pre-populating.

28         I have had conversations with mister -- with

1  Mr. Fayerweather about this issue, and co-counsel as

2  well, and the point is the policy was there was

3  pre-population, and if we need a declaration from him,

4  I'm happy to submit it; I'm happy to submit it from his

5  manager who would also confirm that, in fact, that was

6  the practice.

7        What -- what Comcast is apparently saying is

8  that he should have gone back in and fixed it, but to

9  suggest that he never pre-populated would be a

10  misstatement.  Well, either Mr. Fayerweather would not

11  be telling the truth or Comcast wouldn't be, but you

12  know, if Defendant wants to suggest that that did not

13  happen, then so be it, but I think --

14        THE COURT:  Well, I'm looking at Page 89 of

15  his deposition transcript, and the question was, "So

16  were the timesheets already pre-filled in?

17        Answer:  No, they weren't pre-filled in at

18  all, so we would have to fill it in ourselves, the

19  handwritten ones, also the electronic ones."

20        MR. URIARTE:  That's correct, Your Honor.  I

21  could speak to that because I spoke to Mr. Fayerweather

22  specially about this, and "pre-filled in" means that

23  there are pre-printed time on it.  And he said, No,

24  there's not pre-printed time on it, okay?

25        That's different from "pre-population,"

26  meaning he writes down the time in advance for the next

27  week.  That's -- that's what "pre-population" is as

28  defined by Comcast.

8

1        THE COURT:  Well, wait.  "Pre-population," I

2   read something, I thought it was somewhere out of

3   Sacramento, where a manager, I think, was being deposed

4   and said, We -- we give them these sheets already

5   filled in, I think it was two weeks in advance, so God

6   forbid, they don't fill in their timesheets, we can get

7   them paid, and if it's something other than that,

8   they're supposed to change them.

9        If I'm confabulating, just let me know, but

10   I'm pretty sure that's what I read.

11        That's not -- and the deposition testimony

12   from Mr. Fayerweather just didn't seem to say what

13   you're saying.

14        MR. GLUGOSKI:  I think that there's -- the

15   disconnect is that when we say "pre-population," we're

16   not suggesting that they get a sheet with times filled

17   in.  What we meant by "pre-population" is they fill it

18   in before the work is actually performed.  So, for

19   example, if I'm working tomorrow, today, on a sheet

20   that's not pre-populated, I fill in the times that I'm

21   supposedly taking -- starting and taking rest breaks

22   for the next day before I've actually worked it, so

23   that's what was meant by "pre-populated."

24        MR. RIGHETTI:  It's like a schedule.  It's a

25   schedule of hours and break -- hours to be worked and

26   breaks to be taken.  That's pre-populating, before the

27   work is performed.

28        THE COURT:  Okay.  All right.

9

1          MR. RIGHETTI:  So what we learned just a week

2   or two ago was that these drop-down menu Nextel records

3   that show the actual breaks, which have been requested

4   now for several months, and CSG says they're working on

5   putting them together from their database, Comcast says

6   it may -- and they haven't confirmed to us

7   specifically, but they may have another database or

8   another server that contains the information that

9   may be more or less than what CSG has.

10          But what we learned last week, at least from

11   CSG's standpoint, they scrub their database so that

12   they are saying that they only have that information

13   going back to April of 2011.

14          THE COURT:  Hmmm.

15          MR. RIGHETTI:  Now, Comcast -- and that's what

16   generated our evidence retention letter to Comcast,

17   which is attached to our supplemental -- I don't know

18   if you received our supplemental statement.

19          THE COURT:  I did.

20          MR. RIGHETTI:  Comcast has not confirmed

21   whether they go back farther than April of 2011 or not,

22   but it has been represented that the existence of these

23   Nextel records and break log-ons and log-offs was a

24   surprise to Comcast's attorneys, and, you know, it --

25   so I don't know whether this information really only

26   goes back to April of 2011 or it goes back farther than

27   that, we're trying to get our arms around that.

28          As we were at your conference -- not your

| | |
|---|---|
| 1 | conference, but the Bar Association conference, so we |
| 2 | may end up, to borrow a phrase from that, "We need to |
| 3 | get the geeks involved," and we've retained one called |
| 4 | the Data Chasers out of Orange County -- |
| 5 | THE COURT:  A whole firm of geeks. |
| 6 | MR. RIGHETTI:  Yeah, a whole firm of geeks, |
| 7 | who's a former police officer, and he's willing to get |
| 8 | involved to see the extent to which this information |
| 9 | can be retrieved and may have been backed up or not, |
| 10 | and if it was destroyed, whether it can be be saved |
| 11 | somehow and how far. |
| 12 | But these are the types of things that we've |
| 13 | been dealing with.  I swear, there's probably not 48 |
| 14 | hours that goes by in this case where there's not |
| 15 | emails and discussions going on about where things are |
| 16 | and and trying to get this -- |
| 17 | THE COURT:  Well, bottomline, Mr. Righetti, |
| 18 | are you telling me you're sort of at a loss to tell me |
| 19 | what kind of evidence you want to put in at this point, |
| 20 | what the trial's going to look like? |
| 21 | MR. RIGHETTI:  What we expect the trial's |
| 22 | going to look like is, A, these are on-duty breaks. |
| 23 | We've gone through all the policies and procedures of |
| 24 | Comcast and all the training and education, and nowhere |
| 25 | does Comcast tell techs what a break is, that -- and a |
| 26 | break, of course, is off-duty time where you're not |
| 27 | subject to being called by dispatch or your supervisor |
| 28 | and having to, you know, be told, Hey, when you're back |

11

1    from break, we need to make sure you're available to go

2    to Antioch instead of Walnut Creek.  We're re-routing

3    you because of another situation.

4           Our information is, from all the people, that

5    to the extent they received any breaks, they were

6    on-duty breaks.  They had to keep their Nextel device

7    on, they had to be receiving text messages and emails

8    and radio traffic and phone calls from their

9    dispatchers and their supervisors, and if they didn't

10   respond to dispatch, then they would get a call from

11   the supervisor saying, What the heck's going on?

12   You're not responding to dispatch.

13          THE COURT:  So you're saying this is a

14   company-wide policy they have to keep their pager on,

15   their Nextel, whatever it is on, some magic machine,

16   turned on and be subject to call --

17          MR. RIGHETTI:  And be available for calls,

18   right.

19          THE COURT:  And I have a recollection of

20   there's some case law that deals with this kind of

21   problem with some -- something in the merchant marine

22   industry, I think, or something where there was some

23   people who were having to be on-call near a port.  I

24   think there's a whole body of case law about this kind

25   of problem, if I remember correctly.

26          MR. RIGHETTI:  Is that the sleeping cases?

27          THE COURT:  Yeah, there's some sleeping cases.

28          MR. RIGHETTI:  We were just talking about

12

 1    that.

 2            MR. URIARTE:  On-duty sleep periods, yeah.

 3            THE COURT:  Right, yeah.

 4            MR. RIGHETTI:  But the very definition of a

 5    break is it has to be off-duty under the law, and if

 6    it's not off-duty, then it's not a break, and it really

 7    becomes, apart from *Brinker,* whether it's provide or

 8    make available, where you have deductions from time

 9    worked from a worker's time when that time is really

10    on-duty, then it's an off-the-clock issue as well

11    because it's really time worked if you're on-duty

12    during your work day, and then on top of that, you have

13    the meal break issue which *Brinker* will speak to.

14            And then -- and then the second issue is

15    comparing the time record, quote, unquote, "breaks" of

16    exact and precise 60-minute breaks used for payroll,

17    which we contend are pre-populated, with the Nextel

18    records where the -- the techs are expected and

19    required to punch in the precise times that they took

20    breaks.

21            And on top of that, we've requested records of

22    traffic between dispatch and supervisors and the techs

23    to show that -- so we can lay that on top of these

24    payroll records to show that this time between noon and

25    1:00 every day that the tech was supposed to be on

26    break, he received, you know, six texts and three phone

27    calls and -- and that type of thing, so --

28            THE COURT:  And how does that come in?  If

13

1    this were just Mr. Fayerweather's case, I can see you

2    take his records and lay his records versus his payroll

3    versus his whatever, but here, you've got some number

4    of -- I forget the number of people involved here --

5    thousands of --

6           MR. ALVAREZ:  2000.

7           THE COURT:  Sorry?

8           MR. VALDEZ:  2500.

9           THE COURT:  2000, right, techs; how do you see

10   presenting that?

11          MR. RIGHETTI:  It would be summary of

12   voluminous records from a database person who would

13   show that -- and we don't have to show -- I mean, this

14   is circumstantial evidence that these people were on

15   duty during their breaks showing that they were

16   receiving all this traffic from corporate, this

17   communication traffic from corporate during times --

18   and responding to it during times that corporate has

19   them as off-duty on a break.

20          So it's really circumstantial evidence to show

21   that these breaks were on-duty as well, and if they're

22   on-duty, then, A, it's not a break, and B -- and

23   depending on *Brinker*, may be a violation of the meal

24   period rules, and B, should not have been deducted

25   by -- the 60 minutes should not have been deducted from

26   time worked.

27          THE COURT:  In -- given where you are with

28   discovery, when do you think you'll know in sufficient

14

1    detail that we can sit down and talk about how we're

2    really doing this?

3         MR. RIGHETTI:  Well, the -- CSG said it's

4    going to produce whatever information it has first week

5    of December, and their deposition of two people, the

6    PMK by subpoena, is taking place the second week of

7    December in Denver, so we'll be a long way towards

8    that.  We will not have, at that point, had our -- any

9    expert, the Data Chasers, in to look at the -- whatever

10   computer servers or other information they may have to

11   see if we can retrieve more data.

12        Then on top that, we've requested the Nextel

13   information from Comcast, and that's -- you know,

14   you're right, we haven't been in touch with the Court

15   complaining about discovery issues because we've worked

16   with defense counsel in other cases, we appreciate

17   where they're coming from, and it just seems a bit

18   unseemly and unprofessional for us to run to court

19   saying they aren't giving us information when they are

20   promising to give us information, and they have

21   promised all along, but the information is coming and

22   they're not objecting to it, it's not a privilege

23   issue, it just -- it's just, you know, they're working

24   on getting their arms around it.

25        THE COURT:  Okay.  Thanks.

26        Mr. Valdez, Mr. Alvarez, how do you see it?

27        MR. ALVAREZ:  Just a couple of points, Your

28   Honor, then I'll ask Mr. Valdez to address your

15

1    discovery questions; he's been managing that.

2            THE COURT:  I know.

3            MR. ALVAREZ:  You know, I was inclined -- I

4    reread the transcript of the last time we were here, I

5    was inclined to just offer that as our brief because I

6    think you said the same things then, and they said the

7    same things then that they're saying now.

8            THE COURT:  Um-hmmm.

9            MR. ALVAREZ:  You identified the same issues

10   then, you told us if we have a discovery problem to

11   call you.  We had one over the dispatchers, we called

12   you, and now in their papers, they're accusing us of

13   spoliation and inventing new data, and I thought it was

14   interesting -- and there was no trial plan.  He

15   promised you a trial plan, you didn't get it.  He

16   promised you cases that show you can use sampling to

17   prove a meal period, you didn't get it.

18            You know, I just think, Your Honor, that I'm

19   not sure how long -- how many more times we have to say

20   the same thing to you and you have to say the same

21   thing to them.  You asked him for his trial plan and he

22   just gave it to you, and he didn't mention the word

23   "under-staffing" at all.  I mean, it's now about

24   off-duty meal periods, and if I -- you know, I think we

25   don't have to think too hard about how individualized

26   that could well be.  When did they call in?  Was it

27   during the 30 minutes, what was it about?  Did he

28   answer the call, did he not?  You know, what was your

16

1   understanding, did he take a break later?  So maybe

2   they interrupted one meal period, but he had a gap of

3   two hours in the afternoon.  I mean, I think it

4   wouldn't be very hard for you to imagine how

5   individualized that could be.  If that's our case, then

6   that should be our case.

7           The frustration we have, Your Honor and we're

8   working very hard with them, we know they're terrific

9   lawyers and we go head-to-head often with them.  The

10  frustration is we're trying to do the case that you

11  certified, and they're trying to do a different case.

12          So, for example, we've asked for discovery

13  from them.  Okay, tell us what information you have

14  that would support under-staffing, and they just

15  haven't answered that.  It's just -- they just didn't

16  say a word and haven't told us what it is.  OH, we'll

17  get to it; well, I don't know, we'll think of

18  something.  They're trying to ask our class members for

19  information -- I mean, when are we going to get the

20  discovery that they claim they have or hope they think

21  they have that would show under-staffing?  We just

22  haven't received it.

23          So I guess what I'm saying, Your Honor, and

24  I'll let Mr. Valdez talk to you about the discovery

25  because it's frustrating to hear we're not producing

26  because we're producing a lot of stuff.  The

27  frustration is we're doing the case you certified, and

28  they're doing a different case, and until we get on the

17

1    same page, we're going to be doing this on and on and

2    on.

3                THE COURT:  All right.

4                MR. ALVAREZ:  So we can talk about discovery.

5                MR. VALDEZ:  I'm happy to answer any questions

6    about the discovery, Your Honor.

7                We have been working diligently to respond to

8    Comcast -- or the Plaintiffs' requests, and we've

9    produced a ton of data.  We're in the process of

10   getting this daily timeline report, which I actually

11   told Plaintiffs' counsel about in September.  This is

12   the --

13               THE COURT:  That's the CSG --

14               MR. VALDEZ:  This is the CSG statuses.

15               Now, we produced the -- if you recall back to

16   the class certification hearing, we produced that 70-

17   or 80-people sampling of CSG data that we thought was

18   the universe of CSG data.  This is all the jobs for

19   checking in and checking out.

20               At some point in the history of Comcast,

21   roughly 2009, they introduced statuses, so people --

22               THE COURT:  Statuses?

23               MR. VALDEZ:  Yeah.  People could check in

24   in-route, on job, whatever.  This is the information

25   that we're talking about.

26               When they noticed a --

27               THE COURT:  Let me stop you for a second

28   because I I want to track what you're saying.

18

1          MR. VALDEZ:  Yeah.

2          THE COURT:  Before they introduced statuses in

3  2009 -- well, first, is statuses the CSG data?

4          MR. VALDEZ:  Statuses is a subset of CSG data

5  that -- that was introduced in around 2009.

6          THE COURT:  What was it before 2009?

7          MR. VALDEZ:  It was still CSG being captured,

8  but it was mostly check-in/check-out times for jobs,

9  on-job, off-job.

10          THE COURT:  And status added to the check-in,

11  check-out whether you're on meal or --

12          MR. VALDEZ:  Yes.

13          THE COURT:  -- break?

14          MR. VALDEZ:  Yes.

15          THE COURT:  So it just -- it increased the

16  amount of information that the tech was registering

17  with CSG?

18          MR. VALDEZ:  It did.  Just -- but just like

19  the job data they presented to you back at the

20  de-certification stage, this data is dependant upon the

21  tech actually checking in and checking out.

22          What we've found out is, just like we have

23  with the job information, that information isn't used

24  for record keeping, we use the payroll records which

25  the techs attest to under, you know, not penalty of

26  perjury, but I -- this is my true and accurate time --

27          THE COURT:  Right.

28          MR. VALDEZ:  -- that's what we use.

19

1    The new information is unreliable, but it's a
2  double-edged sword.  If you're going to say, Oh, we're
3  going to go in and use this data to show you that they
4  were actually not taking their meal or rest breaks or
5  that they were on a break when their timesheets say
6  that they weren't, those records also show huge gaps of
7  time, just like the job data, so again, we're going to
8  walk into individual issues right there.
9    THE COURT:  What do you mean huge gaps of
10  time?
11    MR. VALDEZ:  So big gaps of time in between
12  when techs are not in any status, when they could be
13  available to --
14    THE COURT:  In other words, when they've
15  checked out of the last job, and it just goes radio
16  silence, there's nothing doing for them?
17    MR. VALDEZ:  Yep, absolutely, and so -- so,
18  you know, it's going to lead down a road where, okay,
19  we're going to have to fight about every individual
20  record on every individual day to say, Okay, you had
21  four hours in your day where you could have taken
22  breaks or rest breaks; why didn't you?  That's one
23  thing.
24    The next thing is the dispatcher depositions
25  which we've started.  Plaintiffs have made a reference
26  in their case management statement that those
27  dispatcher depositions went very badly for us.  I
28  actually read them yesterday, we just got the

1    transcripts yesterday.  I'm ecstatic about them.

2            First, they do not show any policy or practice

3    with respect to this new theory that Comcast calls

4    people during their lunch break; quite the opposite,

5    you know, what will happen sometimes, and this is,

6    again, a bunch of individual issues, Lisa Salazar

7    (phonetic) testified, Well, are you saying that there

8    are -- you've never called a tech while on break?  No.

9    I called my friends because they asked me to.

10           So again, we're going to get into these

11   individual issues.  Well, why did you call them?  Was

12   it for work, was it because a tech initiated the call,

13   what -- but what is very clear is that from the

14   depositions taken, these dispatchers, if the tech

15   doesn't check into lunch, they're going to call after a

16   little while, and say, Hey, you need to take your

17   lunch.  The tech may say, You know what, I've already

18   had my lunch.  I forgot to check out.  That was made

19   clear in here.

20           The statuses are only as good as the people

21   that use them, so again, this whole idea that there's

22   this second set of records out there, and one would be

23   more accurate than another, we trust our people --

24   Comcast trusts their people.  They trust them to enter

25   their time in on a daily basis and do it.

26           With respect so the pre-population issue, the

27   Plaintiffs have put forth a challenge in their papers

28   for me to stand up in court and say it's not a policy.

21

1    I will gladly --

2              THE COURT:  That it's not a...

3              MR. VALDEZ:  Policy.  I will gladly tell you

4    it is not a policy.

5              I questioned Mr. Fayerweather.  I was pretty

6    open-ended with my questions of him, as you saw from

7    the deposition transcript.  He didn't say that anybody

8    dictated what he could or could not put in into his

9    time records, so when they started talking about this

10   pre-population theory, it was news to me.

11             THE COURT:  Well, actually, Mr. Fayerweather

12   said -- you say, at one point summarizing some

13   testimony, "So your testimony is that your managers

14   told you to write down on your time records your time

15   for lunge and meal periods, even if you didn't take

16   them during those times?  Yes."

17             MR. VALDEZ:  He did say that, and when I

18   questioned him about it, it was one manager, it wasn't

19   every manager.  It was one manager, and that is --

20             THE COURT:  Well, what was given me skipped

21   from Page 123 to 126, so I had to guess what was at the

22   bottom of the page, so --

23             MR. VALDEZ:  Yeah, when I heard that, I went

24   into it and I asked, and I said, Which manager?  And we

25   found out it was one manager, Mr. -- I think it was

26   Vontoure (phonetic), Navarro, or something to that

27   extent, but it's not a Comcast policy, and to the

28   extent they use it in Sacramento, it's not a nefarious

22

1   policy to deprive techs of their time, it's a policy to

2   make sure techs techs get paid.  They're instructed, as

3   Mr. Lindner (phonetic) went on to say, to go in daily

4   and correct their time, but is there a forecasting in

5   Sacramento?  Yes.  Does it exist throughout California?

6   No.  And so I will gladly stand by that.

7            MR. URIARTE:  Your Honor, can I just say

8   something?  Mr. Valdez actually said something that's

9   important here.

10           Our class cert. motion was based on CSG

11   records, as he said, that he thought was the universe

12   of CSG records then.  Now we're finding out that

13   there's actually more CSG records, so, of course, our

14   class -- the class cert. motion and the theory that was

15   proposed then was based only on the records they did

16   produce.  Now we're finding out there's more CSG

17   records coming.

18           THE COURT:  Well, let me ask a question

19   because I have sort of a working hypothesis in my head.

20           Mr. Alvarez, if you were to move to

21   de-certify, I wouldn't want to go into every single

22   element of the class certification criteria, including

23   those that we've already determined, like

24   ascertainability, numerosity and such.

25           MR. ALVAREZ:  Right.

26           THE COURT:  Seems to me like the issue that

27   was the close one before was predominance of common

28   questions.

23

1          MR. ALVAREZ:  Right.

2          THE COURT:  What I'm thinking, hypothetically

3   at this point, I'm going to throw this out there, was

4   if you were to move to de-certify on that basis, then

5   we could get a response from you that would be, I would

6   imagine, as clear a statement as you could make as to

7   what the common questions are and how they predominate,

8   and rather than do it in this fashion where I'm trying

9   to get a sense of how to manage the case, we could see,

10  given the fact the case has shifted and your theories

11  of the case have shifted based on the new data, whether

12  or not given the shift in the theories, this should

13  still be a certified class because that's really --

14  there's two things going on:  one, I'm trying to figure

15  out if the theories have shifted, is the case

16  manageable?  Mr. Alvarez is saying, Wait a minute,

17  before you get to manageability, if the theories have

18  shifted, then the fundamental basis on which class was

19  granted need to be revisited.  There's something fair

20  about that, I guess.

21          But rather than trying to pull this out in

22  this abstract way I've been trying to do it, which I

23  thought might work, maybe we have to get a little more

24  formal about it and try a de-certification on that

25  issue, and let me say one more thing, which is I would

26  not invite that motion to be made until after *Brinker*

27  comes down so we know what we're shooting at because it

28  would be pointless, it seems to me, to brief it on one

24

1   theory of *Brinker*, then have *Brinker* come out

2   differently.

3        MR. RIGHETTI:  I think you're right.  I think

4   it's a matter of timing, and we need *Brinker,* and we

5   need some of this discovery, and then perhaps we can

6   even do a briefing schedule.  I know the case has been

7   certified, but we could also have Plaintiffs file a

8   motion to confirm certification and have Defendant

9   oppose it again.

10       THE COURT:  Well, I don't know if there's a

11  motion to confirm certification, but I know there's a

12  motion to de-certify, but --

13       MR. RIGHETTI:  Just allows us to do the reply.

14       THE COURT:  We can work on that point.

15       MR. ALVAREZ:  Your Honor, what I -- what I

16  like about the hypothetical you're presenting us is

17  some clarity and some certainty and making them put

18  paper to pen, making them convince you --

19       THE COURT:  Pen to paper.  But they'll

20  probably use a computer anyway.

21       MR. ALVAREZ:  But -- but some -- something

22  we can sink our teeth into --

23       THE COURT:  Right.

24       MR. ALVAREZ:  -- because, again, if you read

25  these transcripts, it's -- it's, Well, we're going to

26  do this and we're going to do that, it's going to

27  happen; yeah, we could use a little more of this,

28  little more of that.  Let's call the question.

25

1          And -- and I guess I -- I guess I hear you

2    about the *Brinker* decision.  I think most of us think

3    it's going to come out that "provide" means "given the

4    opportunity," but they could put some wrinkle in it, I

5    don't put it beyond the Supreme Court to wrinkle this

6    area of the law, but be that as it may, that does make

7    sense, and it's just frustrating to have this thing

8    slide another three months.

9          THE COURT:  I know it is, but when *Brinker* was

10   not even on the horizon, it was just a case sitting up

11   there in San Francisco somewhere, we all thought one

12   way about it, but now there's some imminence to it --

13         MR. ALVAREZ:  Right.

14         THE COURT:  -- and it may not even take the

15   full 90 days because they had so much time to study it

16   beforehand.  Maybe they'll get a little faster.

17         As I think about it, it may even make since

18   that Mr. Righetti does file the first brief because

19   then you know what you're shooting at, it seems to me;

20   in other words, if you were, at this point, to move to

21   de-certify, you'd be hypothesizing what their case is,

22   whereas if you file the opening brief, we would know

23   what your case is, and you'd be able to address

24   something more specific than otherwise, but if you have

25   a different view of it, I'm curious.

26         MR. ALVAREZ:  Well, what about the case we

27   have?  Would the case that we have -- that's fine.  I

28   mean, I think the burden should be on them to prove

26

1    that whatever theory they're going to ride, they have
2    to prove to you that that's certifiable, and if they go
3    onto this off-duty meal period thing, I'd love to see
4    how they're going to justify that from the class-wide
5    basis.

6         So I agree the burden is on them, but the case
7    that we have, the burden is on me to deal with it, so
8    I'm not sure whether --

9         THE COURT: Well, but I -- I -- as I hear the
10   Plaintiffs speaking, it sounds like they're not
11   necessarily standing on the case that was certified,
12   they're saying, We've had discovery, we found more
13   records, we found more information, and tell me if I'm
14   wrong, but I -- I hear you saying that -- I haven't
15   heard you say, Well, this is what we said on class
16   certification originally, this was the theory of the
17   case and by God, we're standing by it, and we have the
18   evidence for it. I hear you saying the ground has
19   shifted on you and that you've got something different
20   going on now. If I'm misunderstanding --

21        MR. GLUGOSKI: I'm happy to address that.

22        I think from the start, one of the arguments
23   that was made at certification was you had these meal
24   period recordations and you had these other documents
25   that just showed there was no way they could have
26   possibly been on lunch because they were, in fact,
27   doing work.

28        The theory hasn't changed; you know, that was

27

1    one of the things that if you looked at some of the the

2    times -- the time stamps from the actual jobs, you

3    could see that a lunch that was recorded at 12:00 to

4    1:00 wasn't, in fact -- didn't gel with the fact that

5    there was a job being done during that 12:00 to 1:00

6    period.

7            We haven't changed our theory, what we're

8    saying is there's now additional documents out there

9    that not only address that, but, in fact, show an

10   entire timeline of what's going on in this text day, so

11   you can actually not just look and see that, in fact,

12   he might have been working at 12:10 versus, you know,

13   12:15 or if lunch was at 12:00, then, in fact, it

14   doesn't match with the time record for a particular

15   job; what we're saying now is you actually can go back

16   and recreate the entire day for this tech.

17           THE COURT:  If you had made that argument on

18   class certification, nobody would have been happier

19   than Mr. Alvarez because his whole argument was you

20   can't make that as a common issue because of all the

21   differences and he put in all these declarations, if I

22   recall, about how the operations are different from

23   place to place and person to person.

24           What I took from your papers -- I remember

25   talking to Mr. Alvarez and saying, That's not

26   Plaintiffs' theory.  Your theory was that Comcast had a

27   policy of either under-staffing or under-scheduling so

28   that no human being could possibly do all the work they

28

1  were given to do and still have their breaks and meals.

2  That was your theory then.

3          I'm not -- as Mr. Alvarez said, when

4  Mr. Righetti stated what your theory is now, he never

5  used the word "under-staffing" or "over-scheduling,"

6  it's something different, and -- and as far as I'm

7  concerned, you could say whatever you want to say next

8  is your theory, I just want to know what it is so I

9  know what -- whether the case still remains a certified

10  class or whether -- and if so, what on earth am I going

11  to be managing and how do I start getting my arms

12  around how we frame questions for a jury and what kind

13  of issues we're going to have pretrial that we have to

14  manage.  That's what I'm trying to do, I'm trying to

15  figure out how to get what could be an extraordinarily

16  messy case to trial, and that's why I've been asking

17  for a trial plan and I've been frustrated in not

18  getting it, but I can understand why you're frustrated

19  in not being able to get it to me.

20          I'm thinking maybe the way to do it most

21  effectively is to give you an order to show cause why

22  the class shouldn't be de-certified, and that gives you

23  the first brief and the last brief, that puts on you

24  the burden of stating what the theory of the case is

25  and how it's going to be managed and why it is

26  manageable and why it's superior, it gives the

27  Defendants something very clear to shoot at, and it

28  also frames it procedurally in a way that really is a

29

1   de-certification question rather than a let's be really

2   sure we have a class here, which I would be making up,

3   so that's kind of where --

4           MR. URIARTE:  And may we, Your Honor, if we

5   could suggest that it be the -- that the briefing

6   schedule could be tied to the *Brinker* decision, maybe

7   numerical number of days of the decision --

8           THE COURT:  I was thinking the same thing,

9   that -- that, you know, your brief be due, say, 30 days

10  after *Brinker* comes down or 45 days after *Brinker* comes

11  down, and we set it up from there.

12          MR. RIGHETTI:  The dilemma with the timing is

13  mister -- Troy has said that he is promising, has

14  promised, and -- and is still working on getting us the

15  data.  I mean, when you give deadlines like this, these

16  guys are listening, you're putting us in a time box,

17  and when you put us in a time box, then the premium

18  becomes can we have that box expire before we have to

19  provide them with the discovery?

20          THE COURT:  Is there a milestone on discovery

21  that you can say, so either when *Brinker* comes down or

22  when X happens, whichever's later?

23          MR. RIGHETTI:  It's getting the Nextel data

24  and it's having -- I'm not sure whether, without a

25  formal discovery request, we can have their geek meet

26  with our geek to look at all these hard drives to

27  figure out whether any of this information can be

28  recovered or not.  That would be the quick way of doing

30

1    it.  If they're all about expediency, which, on the one

2    hand, they say they are, then they should say, Listen,

3    we will make our data systems available to your tech

4    experts so we can figure out what's there and whether

5    anything that was destroyed can be -- can be recovered.

6          THE COURT:  Is it clear to everybody that CSG

7    overwrites its data or whatever it does to it so

8    there's nothing earlier --

9          MR. VALDEZ:  Your Honor, if I may address

10   that.  So CSG overwrites its data.  CSG wasn't on any

11   preservation order, they just came into the case when

12   they issued discovery requests in June of this year to

13   ask for that information.

14         What we were talking about before was the job

15   information, so, you know, when I say that we thought

16   that the universe of job information was out there, we

17   were unaware of these statuses, but we gave them all

18   the data.  As soon as the class certification period

19   closed and they knew who the class was, we dumped

20   everything from 2004 to the present in terms of job

21   data for all class members.

22         THE COURT:  Including the statuses?

23         MR. VALDEZ:  No, not the statuses.  We found

24   out about the statuses in September, and I told them

25   then before they deposed our PMK with respect to CSG,

26   Hey, guys, there is a way that we can get the reports

27   on daily time logs -- or this daily time log report.

28   I'm looking into it.

31

1        What we've discussed since is this contains a

2   lot of information about class members, non-class

3   members, and Comcast contractors that utilizes to staff

4   these jobs, so what we -- we're talking about, but we

5   don't want to destroy the integrity of the report, but

6   what can we do to get you the data in a way that keeps

7   the report as it looked.

8        So we're doing that.  We've now figured out

9   that we can take the reports and suppress the names but

10  give them the employee ID number, so we're in the

11  process of doing that, but this is millions and

12  millions of -- and I'm not a geek, so it's a lot and

13  lot of data; that's the best way I can describe it.

14       But we have the report since its inception,

15  which is sometime in 2010, and we're giving them that.

16       THE COURT:  How long do you think that will

17  take?

18       MR. VALDEZ:  Yeah.  I want to be -- would be

19  within three weeks, I would imagine, and then we are --

20  they are deposing CSG to verify what we're telling

21  them --

22       THE COURT:  That's fine.  But with respect to

23  the stuff that you can give them hopefully within three

24  weeks --

25

26            (Pause in proceedings for the court

27            reporter.)

28

32

1          THE COURT:  Do you both have a clear enough

2    sense of what it is that you want and that he's

3    preparing to give you so that you'll know when the --

4    the time starts running?

5          MR. RIGHETTI:  I think we do now.  I mean,

6    Troy said he had provided this stuff to us, these meal

7    period punches to us several months ago.  Went down to

8    the office, they said, Our people are looking at this,

9    I'm looking at this, I don't see it, where is it?  We

10   went back and forth on, It's in there, and it was in

11   there, and it was never in there, so I think -- I think

12   defense counsel at least knows now what we're talking

13   about and should be able to get it to us.

14         MR. VALDEZ:  Yes, we are getting it, and we --

15   we do know what they're talking about, we've worked

16   diligently with them to try and clarify any -- any

17   vagary in the request.

18         The one thing I'm concerned about, Your Honor,

19   is because of the switch in theories, there's new stuff

20   they've started asking for.  They are tasks, which are

21   text messages that are sent to techs.  This was never

22   something we were looking at, never something we were

23   even considering, so stuff like that in items of that

24   was kept in the normal course and scope, I'm not sure

25   how far we can go back from that.  I think we're going

26   to find that out with CSG.

27         We've put in a redundant order with CSG for

28   that same information, it should go back a little

33

1    farther than what CSG's providing --

2            THE COURT:  When you say "tasks," you mean

3    when the dispatcher sends a note or message in time?

4            MR. VALDEZ:  Let me -- here's where I can be a

5    geek, I know this system pretty well.

6            There are -- there is -- CSG, it's a database.

7    CSG captures all the information about Comcast's jobs.

8    It -- it basically is just this warehouse that when a

9    job gets created for a customer on Main Street, that

10   job goes -- begins there, its life begins there.  When

11   things happen to it, some information is stored -- not

12   all, some.

13           One of the -- the ways that that database

14   is -- is accessed are through two means:  one is Work

15   Force Express.  Work Force Express is the management

16   and dispatcher access to the CSG database -- or it's an

17   interface to the database.  When they go in and they

18   send some information about a job, some of the

19   information that they send is captured within CSG.

20           The techs, on the other hand, access or put

21   information out there about jobs through a thing called

22   TechNet, it's another software interface.  So if a tech

23   is out in the field, they can access TechNet through a

24   laptop or a Nextel telephone.

25           This whole thing just came into being in about

26   mid 2007, and it evolved over the years, so it had

27   features added to it.  So the statuses eventually were

28   a feature that was added to it in roughly 2009, but

1  initially, it was a very sort of simplistic way for

2  everybody to kind of see where everybody was, but it is

3  still dependant on communication, it's still dependant

4  on humans actually inputting information in.

5  So that's the information we're talking about.

6  When we first started this case, what they asked for

7  and what we gave them, and this was the sampling, was

8  the CSG job data, so when they start and stop jobs; we

9  provided that.

10  When they asked for a CSG PMK, we started --

11  and this was this summer, we -- I met with that person,

12  the people that we identified, and we're dealing with a

13  brain loss within Comcast because when they implemented

14  this system, the people who originally implemented it

15  aren't there, but we have somebody in the reporting

16  department who utilizes it who was there for some of

17  the meetings when they initiated it.

18  When I met with her, I found out there is a

19  daily time log, I told them that, and then that's when

20  we went, but now they've asked for over the summer when

21  the off-duty or on-duty meal periods started to become

22  an issue, Mr. Glugoski said we want dispatchers and we

23  want text messages. And I was like, Text messages?  I

24  don't know what text messages are.

25  So I started looking into that.  Tasks are

26  text messages, they're just text messages sent through

27  the Work Force Express or Tech Net system, and they

28  were -- they are not maintained for very long periods

35

```
1   because if there's huge volumes of this stuff going in,
2   you can imagine how overrun the database would be.
3            THE COURT:  Is this a text sent by the tech or
4   by the dispatcher or whom?
5            MR. VALDEZ:  It could be a text -- it -- a
6   task -- let me use "task" because then it will be
7   easier.  Task sent by a dispatcher to a tech, a task
8   sent by a supervisor to a tech, or vice versa, a -- a
9   task sent from the tech to the dispatcher or
10  supervisor.
11           So we are gathering every task that we can get
12  our hands on at the moment to get into our hands so
13  that we can then review and produce.
14           THE COURT:  How long do you think it will take
15  you to get the tasks?
16           MR. VALDEZ:  I'm told by CSG we should have
17  that in the first week of December, but then it's going
18  to take time to go through and review, so --
19           THE COURT:  So sometime in early January
20  maybe?
21           MR. VALDEZ:  Yeah.
22           MR. RIGHETTI:  So the -- these daily
23  timelines, not that it makes much difference, but we
24  didn't know about those until Shante Miguel (phonetic),
25  their PMK, testified about them October 5th, 2011.
26           And what I'm hearing is apparently we don't
27  have any missing data.
28           MR. VALDEZ:  I did not say that.  I said that
```

36

1    we have the report from the inception of the report,

2    and that was -- that was around March of 2010.  There

3    may be a period between 2009 and 2010 where there's

4    irrecoverable data.

5         MR. RIGHETTI:  Well, you at least go back

6    farther --

7         MR. VALDEZ:  I have -- I have an email before

8    Ms. Miguel's deposition where I tell Mr. Righetti and

9    John -- or Mr. Glugoski, Guys, I think there's a daily

10   time log, I'm looking into it.

11        THE COURT:  Okay.  Well, let's do this:

12   suppose we say that your brief would be due 45 days

13   from the later of the date on which the Supreme Court

14   decides *Brinker* or that the discovery of the timelines

15   and the tasks are turned over to you, whichever is

16   later.

17        And what I would expect would be that when

18   Mr. Valdez believes he's finished turning over the

19   timelines and the tasks, he would send you a letter

20   saying, Clock starts running.  If you disagree with

21   whether he's completed turning over the timelines and

22   the tasks, meet and confer, make a record of where you

23   are, whether you agree that that original letter of his

24   should be rescinded or whether or not it's confirmed,

25   and if you can't agree upon that, call my clerk and

26   we'll have a conference about it.  And that way, you

27   won't be in the box that you were worried about,

28   Mr. Righetti.  It will give you some time to analyze

37

1  the data, and I'm hoping that's enough time for you, 45

2  days, and if he gets this to you by early January and

3  the Supreme Court takes a little later with *Brinker,*

4  that gives you a little bit more time.

5          MR. RIGHETTI:  I think that's fine.  I think

6  we would ask that they also confirm what is -- what is

7  or is not missing that used to exist in the database

8  that is no longer available, and therefore, not being

9  produced.

10          MR. VALDEZ:  I think that's fair, Your Honor,

11  and I -- the the sort of period I forgot to put at the

12  end of my sentence when I gave you that long history

13  and sort of primer on CSG is because of the shift in

14  theories and given the Plaintiffs' supplemental case

15  management statement, what I don't want to do is be

16  back here in January and have you hearing arguments

17  that we've despoliated (sic) evidence because quite the

18  contrary is true, and that's the only reason I put that

19  out there is because we're working very hard to try and

20  litigate the case that was certified.  And when we now

21  get requests, and these router sheets you've heard

22  about are another issue there, requests for things that

23  weren't even on the radar, weren't in the -- even in

24  the ballpark that don't -- haven't existed since 2007

25  or earlier, and then they're going to accuse us of

26  having destroyed evidence -- accuse Comcast, I take it

27  a little personal because I try to be very good at what

28  I do, but I just want to put that out there and --

38

```
 1          THE COURT:  Okay.  I'm not going to decide
 2   anybody's doing anything wrong or anything to tell you
 3   for sure, and I kind of hope this issue just doesn't
 4   arise, period, but I'm just trying to figure out how we
 5   manage what we've got.
 6          So -- so what I would do would be to then
 7   issue an order to show cause for Plaintiffs to show
 8   cause why the class should not be de-certified, and the
 9   focus of that showing should be on issues of
10   predominance of common questions and -- and on
11   superiority of class treatment.
12          MR. RIGHETTI:  Right.
13          THE COURT:  It seems to me those are really
14   the two issues we're grappling with.  Is there anything
15   else that should be included in that OSC?
16          MR. ALVAREZ:  I would include manageability
17   under superiority.
18          THE COURT:  Fair enough.
19          MR. VALDEZ:  The only other thing I would
20   be -- put out there is now if the -- if the theory,
21   whatever it becomes, is in dispute with
22   Mr. Fayerweather's testimony, maybe potentially
23   adequacy of the representation of Mr. Fayerweather.
24          MR. RIGHETTI:  I think that's a -- I don't
25   know, I'm not sure that's an adequacy issue.  Adequacy
26   is usually things like he didn't hold the position
27   during the timeframe, he's a felon, he, you know,
28   whatever.
```

39

```
 1          THE COURT:  Well, let's -- it may be
 2   typicality, I'm not sure what it is, but let's do this:
 3   the show cause order would deal with the predominance
 4   of common questions, the superiority and manageability
 5   factors; that's your burden.
 6          And if the response necessarily needs to go
 7   into typicality or adequacy, you can raise that, and
 8   then you'll have time to respond to that, and we'll get
 9   it clarified that way.
10          The -- the opening brief would be due 45 days
11   after the Supreme Court hands down its decision in
12   Brinker, or after Mr. Valdez, Comcast, certifies that
13   the discovery has been produced with respect to the
14   timelines and tasks, whichever is later.
15          And then how much time would you need to
16   respond?
17          MR. ALVAREZ:  45 days, Your Honor.
18          THE COURT:  Okay.
19          MR. VALDEZ:  Your Honor, the only reason I
20   might ask for a little more is because we're not going
21   to have access to declarants that they'll probably
22   provide in response, so there may need to be some
23   depositions that occur.
24          THE COURT:  Let's do this:  let's say 45 days,
25   and if you do need more time, meet and confer, you can
26   stipulate to adjust the schedule, and I'll be happy
27   to --
28          MR. ALVAREZ:  Okay.
```

40

1      THE COURT:  -- take your stipulation on that.

2  If you can't agree upon that, then we'll deal with the

3  specific case and you tell me what you can't get done,

4  and then we'll deal with that as a conference call.

5      THE COURT:  Mr. Righetti, how much time would

6  you want to do your closing brief?

7      MR. RIGHETTI:  Usually the reply is -- goes on

8  the same theory as the opposition, which is we don't

9  know what they're going to provide, so I would say the

10  same rules would apply --

11      THE COURT:  45 days?

12      MR. RIGHETTI:  -- 45 days, and we'll let you

13  know if we need more time.

14      THE COURT:  And then -- that's fine.

15      And then let's do this:  as soon as the clock

16  starts running, why don't the two of you do the

17  calculation, see if you can stipulate to a hearing date

18  with my clerk, okay?  You can count and figure out what

19  Friday the hearing would appropriately be held on on

20  the law and motion calendar, and give us a couple of

21  dates so if I'm going to be dark or if the calendar's

22  already getting clogged up, we can make sure we

23  accommodate you.

24      So take into account the 45-45-45 schedule,

25  and take into account your schedules, if anybody is

26  going to be on vacation or anything like that, and then

27  just give us a couple of days and we'll calendar it

28  even before you file your first brief so that we have a

41

1   firm date for you.

2        I think this is probably the most sensible way

3   of trying to get our arms around this problem at this

4   point, and I think once we go through this -- this

5   proceeding, however it comes out, assuming the class

6   remains certified, let's say, it will give us a much

7   clearer view of then what we're going to do in terms of

8   managing it and figuring out how to get it to trial.

9   If the class is de-certified for some reason, then we

10  have a different animal on our hands.

11       We'll just take it one step at a time, but I

12  think this probably is going to be the best way to get

13  to where we're trying to get in terms of figuring out

14  how to try this thing.

15       MR. RIGHETTI:  Right.  And one more issue,

16  because I don't want to surprise anybody, I don't think

17  it will surprise the Defense, we have exhausted an

18  LWDA, Labor Workforce Development Agency request to

19  bring a PAGA claim with a class member that would be

20  within the one-year statute, and we're going to be

21  asking to amend to include that person in the PAGA

22  claim.

23       MR. VALDEZ:  We'll meet and confer and address

24  it with them.

25       One last issue, Your Honor, we'd address.

26       THE COURT:  Sure.

27       MR. VALDEZ:  There was the issue we raised in

28  the CMC statement with respect to being able to conduct

42

1    individual discovery of class members.

2            THE COURT:  Right.

3            MR. VALDEZ:  We have to seek leave from the

4    Court, and we ran into some issues with respect to the

5    discovery we were seeking on the under-staffing theory

6    being objected to that we were seeking individual

7    discovery.  We would like to ask for leave to do that.

8            THE COURT:  What is it specifically you want

9    to do?

10            MR. VALDEZ:  Probably some interrogatories

11    directed at the individuals.  I mean, that's what we

12    have to ask for.  We can't do, under the code, document

13    requests, but we'd like to, just to avoid any further

14    delay.

15            THE COURT:  And how many class members do you

16    have in mind and how are you going to select them?

17            MR. VALDEZ:  That's a good question.  We

18    haven't -- we haven't went through that, but maybe

19    we can do it in rolling 50s or something.

20            THE COURT:  You want to ask interrogatories of

21    all the class members?

22            MR. VALDEZ:  Potentially.

23            THE COURT:  Hmmm... what is your thought on

24    that?

25            MR. RIGHETTI:  It's -- it's easy for them to

26    develop the interrogatory, even one interrogatory, and

27    then drop it on our desk and very, very difficult --

28    and they did this to us in the Marvel (phonetic)

43

```
 1   litigation -- and very, very difficult for us to get
 2   responses from absent class members, even from one
 3   interrogatory.
 4        I mean, we can do our best for some, maybe
 5   focus on the declarants or do something else, do a
 6   random sample, perhaps, of class members, and -- but,
 7   you know, how many class members are there?  There's
 8   over a thousand.
 9            MR. VALDEZ:  Well, I guess, Your Honor --
10            THE COURT:  2000, they said.
11            MR. VALDEZ:  2500, about, approximately 2500.
12        I guess if we have responses to the discovery
13   that's outstanding, that might help, you know, instruct
14   us in terms of what additional discovery we need to do.
15   You know, we do have this discovery that's been pending
16   since around May.
17            MS. MARTINEZ:  May.
18            MR. VALDEZ:  And we've met and conferred and
19   met and conferred, and we've got supplemental responses
20   and promise of supplemental responses that still
21   haven't arrived, so we'd just like to get a response to
22   that, and then maybe we can be more finite in terms of
23   telling you what it is we'd like to do.
24            THE COURT:  How close are you to getting the
25   supplemental responses?
26            MR. GLUGOSKI:  I can probably have them in two
27   weeks' time, Your Honor.
28            THE COURT:  Why don't we do this:  why don't
```

44

1   you do that.

2          MR. GLUGOSKI:  Okay.

3          THE COURT:  Two weeks with Thanksgiving

4   intervening?

5          MR. GLUGOSKI:  I will include Thanksgiving in

6   there so that it's 14 days from today.

7          THE COURT:  Okay.

8          MR. VALDEZ:  I don't want to make counsel work

9   over Thanksgiving; I'm taking time off, so John, if you

10  need --

11         MR. GLUGOSKI:  Well, let's see... we're at

12  the --

13         MR. ALVAREZ:  Take the 14 days.  Just --

14         MR. GLUGOSKI:  All right.  How about December

15  5th; does that --

16         THE COURT:  Okay.

17         MR. VALDEZ:  Yeah, that's fine

18         THE COURT:  Good.  And -- all right.  Then if

19  you'd do that by December 5, then why don't you meet

20  and confer about whether you need them because I'm not

21  even clear whether you need the interrogatories given

22  the change in theory.

23         MR. VALDEZ:  Well, if we're going to be -- if

24  we're going to be defending against the new theory that

25  we think we know what it is, we need to conduct some

26  discovery on that.

27         THE COURT:  Why don't you then meet and

28  confer, and I'm -- as we did before, I'm happy to have

45

1  you -- a couple of you come in here and sit and talk

2  about it and try to figure it out, and to make it

3  either over the phone or try to come in and we'll deal

4  with a concrete plan and a concrete request and see

5  what you do with that.

6         MR. VALDEZ:  Sounds great, Your Honor.

7         THE COURT:  Thank you.

8         MR. ALVAREZ:  Good.

9         MR. RIGHETTI:  Good.

10         THE COURT:  Anything else we can do right now?

11         MR. ALVAREZ:  No, that's it, Your Honor.

12         MR. URIARTE:  No.

13         THE COURT:  Sounds like a plan.

14         MR. VALDEZ:  Thank you, Your Honor.  Happy

15  Thanksgiving.

16         THE COURT:  Thanks.  All of you, too.

17         MR. RIGHETTI:  Thanks for your time.

18

19            (Whereupon proceedings were concluded.)

20

21                   ---oOo---

22

23

24

25

26

27

28

1                    REPORTER'S CERTIFICATE

2

3   STATE OF CALIFORNIA          )

4                                )        ss.

5   COUNTY OF CONTRA COSTA       )

6

7        I, SARAH L. THOMPSON, a Certified Shorthand

8   Reporter of the Superior Court in and for the State of

9   California, County of Contra Costa, do hereby certify

10  that the foregoing pages above my printed name contain

11  to the best of my ability a full, true and correct

12  transcription of my stenotype notes of the proceedings

13  had within the trial of said Court of the cause

14  entitled FAYERWEATHER VS. COMCAST.  Case was numbered

15  MSC08-01470 in the files of CIVIL actions of said

16  Court; and that said transcript includes all rulings,

17  acts or statements of the Court, also all motions,

18  objections or exceptions of counsel, and all matters to

19  which the same relate.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21  this _23rd___ day of ____November___ ,2011.

22

23

24  _____

25       Sarah L. Thompson, RPR, CSR #12635

26            Certified Shorthand Reporter

27

28

# EXHIBIT C

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

---oOo---

| | |
|---|---|
| **FAYERWEATHER,** )<br> )<br>                          Plaintiff, )<br> )<br>                                   )  No. **MSC08-01470**<br> vs.                               )<br>                                   )<br> **COMCAST,**                      )<br>                                   )<br>                          Defendant. )<br>                                   ) | |

**BEFORE THE HONORABLE BARRY P. GOODE, JUDGE**

**DEPARTMENT 17**

WAKEFIELD TAYLOR COURTHOUSE, MARTINEZ, CALIFORNIA

**OCTOBER 26, 2012,** MORNING SESSION

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES

FOR THE PLAINTIFF:    MATTHEW RIGHETTI, ESQ.
                      JOHN GLUGOSKI, ESQ.
                      Righetti & Glugoski
                      456 Montgomery Street, Suite 1400
                      San Francisco, CA 94104


FOR THE DEFENDANT:    FRED ALVAREZ, ESQ.
                      Wilson Sonsini Goodrich & Rosati
                      650 Page Mill Road
                      Palo Alto, CA 94304

                      TROY VALDEZ, ESQ.
                      Valdez Dunson & Doyle
                      116 New Montgomery Street, Suite 210
                      San Francisco, CA 94105




REPORTED BY:   Sarah Thompson, CSR 12635

1

1  OCTOBER 26, 2012                    MORNING SESSION

2

3                    *P R O C E E D I N G S*

4

5         THE COURT:  Let's call Fayerweather versus

6  Comcast.

7         Why don't I give you a couple of minutes to

8  get yourselves set up.  I know I've got a lot of paper;

9  I see -- I don't see much paper for you; maybe it's on

10  the computer.

11         MR. RIGHETTI:  I know it's somewhere.

12          .

13               (Pause in proceedings.)

14

15         THE COURT:  You're welcome to be seated,

16  please.

17         MR. VALDEZ:  Thank you.

18         THE COURT:  There was somebody who had been on

19  the phone.  Jennifer Kramer had been on the phone, then

20  you probably heard the phone go to a dial tone.  I

21  assume she got bored and hung up.

22         MR. RIGHETTI:  Maybe she logged off.

23         THE COURT:  That's what I'm guessing.

24         MR. ALVAREZ:  She's out of range or something.

25         MR. RIGHETTI:  Out of range, went in a tunnel.

26         THE COURT:  Or is exercising discretion.

27         Okay.  All right.  Why don't we get

28  appearances.

Sarah L. Thompson, C.S.R. No. 12635

2

1    MR. RIGHETTI:  Matthew Righetti for Plaintiff

2  and John Glugoski for Plaintiffs.

3    MR. ALVAREZ:  Good morning, Your Honor.

4    Fred Alvarez, Troy Valdez, and Jennifer

5  Martinez for Comcast.

6    MR. VALDEZ:  Good morning, Your Honor.

7    THE COURT:  All right.  Thanks.

8    I have been through this enormous amount of

9  material that you will folks have provided.  We've got

10  a number of issues.  I gave you some indication of

11  things I wanted you to address.  I don't know if first

12  you wanted to address the motion to strike or if you

13  just want to include that in the discussion of the, in

14  effect, the merits of whether or not the case ought to

15  be de-certified.

16    MR. ALVAREZ:  Your Honor, I think we should

17  include that on the discussion on de-certification.

18    THE COURT:  Okay.  All right.  Then

19  Mr. Righetti, were you going to make the argument for

20  your side?

21    MR. RIGHETTI:  Yes, Your Honor.

22    THE COURT:  All right.  Then what I'd like to

23  do is just invite you to address the issues I've

24  outlined.  If there's anything else you want to

25  address, please feel free to do so, but I've tried to

26  highlight some of the issues that I think are really at

27  the crux of what I have to decide.

28    MR. RIGHETTI:  Okay.  Thank you, Your Honor.

3

```
 1           And I have the issues here.  I'm going to
 2   get -- I'm going to go through those, but I wanted to
 3   first kind of bring together what all the claims are at
 4   certification because the claims at certification are
 5   somewhat more robust than what the Court put down as
 6   the issues in his tentative ruling, and so I wanted to
 7   make sure that some of the claims did not -- were not
 8   lost on the Court in all the paperwork, because the
 9   Court is correct, we do have an on-duty lunch claim,
10   and in addition to that, we have a second meal period
11   claim, right?
12           THE COURT:  I know.
13           MR. RIGHETTI:  Okay.  And then we have the
14   off-the-clock claims and the late meal period claims;
15   those are the main claims I think that are here at
16   certification.
17           In terms of --
18           THE COURT:  No, I understand that you have all
19   those claims --
20           MR. RIGHETTI:  Okay.
21           THE COURT:  -- but with respect to the
22   second-meal-period claim, the off-the-clock claim, and
23   the late-meal claim, it seems to me there's a cluster
24   of issues that relate to the commonality and the
25   superiority issue with regard to whether or not we
26   could know without individual inquiry when somebody was
27   missing a second meal, when they were working off the
28   clock, when they took a late meal.  That's a cluster of
```

4

1    issues in my mind, and the most important issue to me

2    relates to the commonality of proof with respect to

3    that cluster of issues; I didn't ignore them, I just

4    lumped them, so --

5        MR. RIGHETTI:  Okay.  Well, the simplest claim

6    is actually the second-meal-period claim, if that's

7    clustered into the other claims in the tentative ruling

8    because the second-meal-period claim, you just have to

9    look at -- as many of these claims, but especially the

10   second meal period claim, whether you look at the CSG

11   TechNet records, time records, or you look at the ESS

12   you know, timesheet records, right?  We have two sets

13   of records, one set of --

14       THE COURT:  I know.

15       MR. RIGHETTI:  Yeah, one set of records are

16   done on the phone, the other are submitted for payroll.

17       THE COURT:  They're not necessarily done on

18   the phone.  I thought they were done on a laptop or

19   they were done by using some Nextel device, but not on

20   the phone.

21       MR. RIGHETTI:  It's a Nextel phone radio.  The

22   Nextel device is a phone radio.  It's like a multi --

23   multi-communication device.

24       THE COURT:  Right, but in any event, it's a

25   CSG system where they're supposed to log in in the

26   morning, supposed to log out at the end of the day,

27   they're supposed to long in their change in status

28   during the day, including the lunch status and so on.

1      MR. RIGHETTI:  Correct.  You've got it.

2      So what we have is -- and Mr. Breshears makes

3  this clear -- almost no instances of second meal

4  periods shown on any of the records, whether you look

5  at the ESS time-keeping records or the CSG records for

6  shifts over 10 and shifts over 12.

7      Now *Brinker*, one of the main discussions in

8  *Brinker* was, well, you know, what about waiver?  What

9  about this issue of waiver?  And in this case, what's

10  important regarding waiver is we don't have waiver

11  issues like the *Brinker* case had.

12      For the first meal period, Comcast does not

13  allow a waiver of the first meal period.  For the

14  second meal period, Comcast does allow waiver, but only

15  if it's in writing, agreed to by the tech and agreed to

16  by Comcast; both have to agree to it in written waiver.

17      Now Comcast has, thus far, you know, produced

18  very few waivers of the second meal period.  I think

19  there's only one we've ever found, and they're

20  continuing to go through their records, but regardless

21  of how many they find, the fact is you can identify the

22  waivers of the second meal period because they would be

23  in writing according to Comcast policy.

24      Now I think Comcast had all of about a half of

25  a page or so addressing the second meal period issue,

26  but that's an issue that seems like perhaps the easiest

27  issue the Court has with regard to certification.

28      Now going on to the on-duty meal period, the

1  Court has asked whether there's a common issue with

2  regard to an on-duty lunch, and our position is that

3  the determination of what is going on at Comcast as to

4  whether that -- what is going on constitutes an on-duty

5  lunch or not is a predominant issue.

6      THE COURT:  Let's -- let's be real careful

7  about this.  We've talked about policies, practices,

8  and procedures.  I would like both of you, in

9  addressing these arguments, to differentiate policies

10  from practices and procedures.

11      MR. RIGHETTI:  Okay.

12      THE COURT:  Now procedures, I'm not quite sure

13  what is.  Procedures may be policies, they may be

14  practices, but there's two real issues:  one is what is

15  the policy of the company, and the other what are the

16  practices, and to my way of thinking, the commonality

17  and superiority issues require distinguishing between

18  policy and a practice because the practice can be

19  multifarious, then the policy is unitary, and I don't

20  want to mess up the analysis by mushing together the

21  policies on the one hand and practices on the other,

22  which you were just about to start doing.

23      So let me tell you, as I thought through this

24  problem, I think it's really important to keep the two

25  of them separate.

26      MR. RIGHETTI:  I will make a note to myself to

27  keep them separate where I can.  If I fall into the

28  ditch, throw me a life line --

1    THE COURT:  You just said determination of

2  what is going on at Comcast, and there's two sets of

3  things going on there.

4    MR. RIGHETTI:  Okay.  So let me look -- let's

5  look at the policy at Comcast, and if we step back, I

6  think it's common sense to say that no employer's going

7  to have policies that do anything but mimic, I would

8  think, the statutory requirements in terms of, oh, you

9  know, you're supposed to get your breaks within this

10  period of time, et cetera, et cetera.

11    THE COURT:  Well, that's not what case law

12  seems to show.  There's a lot of employers that have

13  had some pretty crummy policies that have given rise to

14  a lot of cases.

15    MR. RIGHETTI:  Well, I guess my point is that

16  the fact that there is a policy does not necessarily

17  mean that what's going on is compliant because you just

18  can't -- the compliance isn't that simple where there's

19  a policy and something else is going on behind the

20  scenes --

21    THE COURT:  Sure.

22    MR. RIGHETTI:  -- but that's the practice.

23    So let's go to the policy.  What we know from

24  the policy, Exhibit 1B to John Glugoski's declaration

25  in the opening brief, sets forth -- I'm sorry, Exhibit

26  31 to my declaration in the reply, it sets forth the

27  field technician daily responsibility.

28    THE COURT:  Let me get there.

Sarah L. Thompson, C.S.R. No. 12635

1
2                      (Pause in proceedings.)
3
4           THE COURT:  This is your reply?
5           MR. RIGHETTI:  Yes.
6
7                      (Pause in proceedings.)
8
9           MR. RIGHETTI:  And I -- I --
10          THE COURT:  Hang on.  Hang on.
11          MR. RIGHETTI:  Okay.
12          THE COURT:  31?
13          MR. RIGHETTI:  Correct.  It begins with Bates
14   20479.
15          THE COURT:  I'm there.
16          MR. VALDEZ:  I'm sorry.  What are you reading
17   from?
18          THE COURT:  Exhibit 31, Bates 20479.
19          MR. VALDEZ:  I don't have the reply, Your
20   Honor.  Can you tell me the name of the document?
21          THE COURT:  Yes.
22          MR. VALDEZ:  Thank you.
23          MR. RIGHETTI:  Field Technician Daily
24   Responsibilities.
25          THE COURT:  MNP.
26          MR. RIGHETTI:  MNP.
27          THE COURT:  It's a field manual.
28          MR. RIGHETTI:  And -- are we ready?

1        THE COURT:  I'm there.

2        MR. RIGHETTI:  Okay.  And basically, it sets

3   forth in some level of detail for the technicians what

4   they're supposed to do at the beginning of the day.

5        At the beginning of the day, they show up, and

6   one of the first things they do, as you see on Page 2,

7   At the beginning of your shift, and it says, "At the

8   start of each day, log on to TechNet at the beginning

9   of the shift before the beginning -- before beginning

10   any Comcast work-related tasks."

11        And then you can go through this whole

12   document where it says, you know, "You receive dispatch

13   messages, your ETA on the first job, throughout your

14   shift," it kind of lays out how the tech's day is

15   supposed to go.  Nowhere in here does it say the tech

16   is to shut off their phone or log out of TechNet,

17   except at the end of the day.

18        THE COURT:  Right.  But if you look at...

19   page -- this is from Exhibit 31, I believe, also --

20   20500, it says, "Note:  Comcast technician WFX policy

21   indicates you should change your status to 'break' or

22   'lunch' as appropriate during which you should not

23   perform any work-related tasks."

24        Isn't that the policy?

25        MR. RIGHETTI:  Yes.

26        THE COURT:  Okay.

27        MR. RIGHETTI:  Yes.  So they stay logged on.

28        THE COURT:  Right.

1         MR. RIGHETTI:  Right.  And the question is,
2   well, what are work-related tasks, right?  This is
3   where you have to get -- you have to start looking at
4   the practice because Comcast --
5         THE COURT:  Well, let's stick with the policy
6   first.
7         MR. RIGHETTI:  I know, yeah.
8         THE COURT:  The policy is not to do any
9   work-related tasks while you're at lunch or on break.
10        MR. RIGHETTI:  Right.
11        THE COURT:  Okay.
12        MR. RIGHETTI:  All right.  That's what it
13  says.  Page 22.
14        THE COURT:  If you're going to shift to
15  practices, we'll --
16        MR. RIGHETTI:  What's that?
17        THE COURT:  If you're going to shift to
18  practices, let's be conscious about that.
19        MR. RIGHETTI:  I am.
20        THE COURT:  Okay.
21        MR. RIGHETTI:  Okay.  So now the question is
22  how does Comcast define "work-related tasks" for
23  purposes of them not performing -- wanting them not to
24  perform those tasks during a lunch status while they're
25  at lunch status, and does Comcast consider messaging
26  back and forth to be work-related tasks -- or phone
27  calls?
28        THE COURT:  Let's talk about "back and forth."

1    I see a lot of "forth" from the dispatchers; I'm not

2    sure I see a lot of "back" from the technicians.

3            In other words, in the depositions, you folks

4    spent a lot of time using the word "communicate" in

5    a way that did not clearly communicate meaning among

6    all the people in the room.  You kept asking people

7    about communications, and dispatchers kept talking

8    about sending messages.

9            MR. RIGHETTI:  Right.

10           THE COURT:  But a lot of the dispatchers,

11   sometimes, in the very next line after the part you had

12   bracketed, said, But I don't expect a response if

13   they're on lunch, and to me, if I send an email to

14   somebody while they're on lunch, I'm just sending an

15   email; I don't know when they're going to open it up,

16   look at it, or whether they're off down the street

17   having lunch, and -- and I don't want -- again, just as

18   I wanted to separate the policies from practices, I

19   don't want the word "communicate" to obfuscate what's

20   really going on.

21           If what you're talking about is a practice of

22   people needing to have their systems turned on and

23   respond promptly, like immediately when they get a

24   message from a dispatcher, that's one thing, but I

25   looked very carefully at Box 38 in your statement of

26   evidence, and there was very little evidence to support

27   the fact that the techs feel obligated to respond when

28   the communication goes out.  The dispatchers are

1  saying, I'm just sending out an electronic message; I
2  can do that anytime I want, but unlike the limousine
3  case, whose name I'd mangle if I tried to pronounce it,
4  unlike the cases of the security guards where they're
5  actually on duty, I was looking for evidence, and I --
6  I dwelled particularly on Box 38.

7       MR. RIGHETTI:  Of our summary of evidence?

8       THE COURT:  Of your summary of evidence.  And,
9  you know, for example, Ms. Cabada says on Page 14 above
10 the part you had outlined for me to read, "I don't
11 communicate with them during their lunch break, but I
12 can send them messages."

13      And a number of these people said that they --
14 it's okay for them to send messages, but they don't
15 necessarily expect it to be read.

16      Leon, on Page 92, just below the part you
17 asked me to read, says -- where you say -- you asked me
18 to read the part where you say, "And you send
19 work-related notifications, right?  Answer:  Correct."
20 And then you stopped asking me to read, but I just kept
21 reading --

22      MR. RIGHETTI:  No, no, you're not supposed to
23 do that.

24      THE COURT:  "Question:  Do you expect them to
25 read those?  Answer:  Not while they're at lunch."

26      MR. RIGHETTI:  Let me address that.

27      THE COURT:  And there's a number of people who
28 said exactly the same thing.

1          MR. RIGHETTI:  So the Comcast system, what

2     we've learned in the discovery -- and I think you're

3     right, because you learn things -- as an attorney, you

4     learn things about the case as you're going through the

5     discovery process, and what we learned is -- and if I

6     had the opportunity to take some of those earlier

7     depositions again, I think I would ask the question

8     slightly different, because what we learned, and I hope

9     our reply brings this forth, is that Comcast has a

10    system where messages are sent by dispatch to techs,

11    and the dispatch doesn't even know -- the dispatcher is

12    not sending the message; the dispatcher doesn't even

13    know, necessarily, the message is being sent, and the

14    reason that is is that when -- see, the tech finishes

15    their morning jobs and then they can take lunch, all

16    right?  During the lunch, dispatch is busy arranging

17    the afternoon jobs based upon what was completed in the

18    morning and not completed and all those things, and

19    when those changes -- when the dispatch makes changes

20    to a tech's schedule, drops a new -- changes something

21    or drops a new job in, the system automatically

22    generates a message to the tech that the dispatcher

23    does not send to the tech.  Dispatcher doesn't create

24    an email and send it, the system sends it, and that is

25    an integrated message.  It's an alert that goes to the

26    tech, and the tech has to read it, and the tech has to

27    respond to it.

28          And what's critical about the system that's

1  integrated into the system is that there's a phone tree

2  that the customer uses to try and figure out when -- I

3  don't know if you have Comcast, but you try and figure

4  out -- if you want to figure out when the tech is going

5  to come to your house --

6          THE COURT:  You mean like one of those phone

7  mail things where you have to hit 1, then you hit 3 and

8  get another --

9          MR. RIGHETTI:  They would figure out who you

10  are, they would tell you, "hit star," and it would --

11  the automated message would come on saying the window

12  when the tech is supposed to arrive at your house.

13          The the only way that that system works is if

14  the tech immediately responds giving the ETA of when he

15  can make that job, and if he can't make the job, you

16  know, he says, can't make it or whatever.

17          THE COURT:  Where do I have that evidence?

18  Because I went through volumes and volumes of evidence

19  here, Mr. Righetti.  Show me where in the evidence it

20  says that because I -- I thought I had been through

21  what you folks submitted, but I'm not sure I've seen

22  what you're telling me.

23          MR. RIGHETTI:  Well, it -- it -- I believe

24  it's in the reply, and John is going --

25          THE COURT:  Well, you tell me where.

26          MR. RIGHETTI:  I'm going to look for it while

27  we're going through it, but that's --

28          THE COURT:  I used a lot of Visine going

Sarah L. Thompson, C.S.R. No. 12635

1    through this stuff.

2         MR. RIGHETTI:  That's the way that phone tree

3    works, and I think what the messaging shows --

4         THE COURT:  Well, wait.  Let's do one point at

5    a time because this is really important and I want to

6    be sure I got it right, and if I missed something in

7    terms of the evidence, then I'll feel bad; I don't want

8    to do that.  If there's something that supports what

9    you just said, I'd like to know it.

10        MR. RIGHETTI:  Okay.

11

12             (Pause in proceedings.)

13

14        MR. RIGHETTI:  We mention it on Page 4 of our

15    reply.

16        THE COURT:  What -- what evidence should I be

17   looking at?

18        MR. RIGHETTI:  I'll have to look at the

19   summary of evidence, Your Honor.  It is -- it is -- I

20   know it's in here.  It's one of the -- of the last

21   depositions that we took in the case where we went

22   through -- it's one of the managers.  We went through

23   how the system works, and he confirmed, Yeah, this is

24   how the automatic phone system works.

25        THE COURT:  Okay.  Well, why don't you move on

26   and if you find that let me know.

27        MR. RIGHETTI:  Yeah, let me move on and I'll

28   get that to you.

1    And, you know, for purposes of -- I -- I --
2  job-related communications should include -- should be
3  counted as time worked, and according to com -- we
4  believe that that's the case under California law, and
5  in fact, that is the case --

6    THE COURT:  What do you mean by "job-related
7  communications"?  Again, I don't want to use words to
8  obscure; I want to be clear.

9    Are you talking about a dispatcher sending a
10  message or the system sending the message or the tech
11  reading the message?

12    MR. RIGHETTI:  Let's talk about the practice
13  again because the Court has highlighted that there are
14  situations where messages or emails are sent to the
15  techs when they're logged on, and those are going to
16  come up and the person may be on lunch, and the
17  question is, well, if they're on lunch, do they
18  necessarily need to respond to it?  And I think the
19  Court is -- you know, the -- I think the answer is it
20  depends whether they have to respond to it or not, and
21  the "depends" part of it is it depends on what the
22  subject of the communication is, and there are probably
23  a lot of communications where the tech doesn't need to
24  respond or doesn't need to respond immediately because
25  there's tree communications that goes out, but there
26  are also communications that require immediate
27  response, which is what this phone tree
28  changing-of-the-schedule situation is part of, which

1   we're going to get back to.

2        THE COURT: When you say there are a lot that

3   require immediate response, do you have evidence that

4   says that, something in these -- all this bunch of

5   papers that I've got?

6        MR. RIGHETTI: The ones that require an

7   immediate response are the ones that relate to the

8   scheduling, but I think my -- the ultimate point here

9   is not whether the tech actually responds or has to

10  respond to the email immediately, the point is is that

11  the tech has to read the communications during his or

12  her lunch to figure out what's going on, so --

13       THE COURT: Where do I find that because,

14  again, in -- in looking at Box 38 in your statement of

15  evidence, which seemed to be the point that we're

16  talking about, most of what I read said they don't have

17  to respond.

18       MR. RIGHETTI: Well, whether or not they have

19  to respond, though, they still have to read them;

20  that's our point.

21       THE COURT: Well, where does it say they have

22  to read them?

23       MR. RIGHETTI: Because they have to figure out

24  whether they have to respond or not. If some of these

25  alerts require response, then every communication has

26  to be read to figure out which ones require response

27  and which ones don't.

28       THE COURT: Well, here's Palma. Palma, Page

1   39, and again, you asked me to read, you bracketed,

2   "You sent the messages while they are on their meal

3   periods even if it's a courtesy," comma, "correct?

4   Answer:  Sometimes, yes."  That's where you ask me to

5   stop reading.

6          The next line says, "And you expect them to

7   read the message you send to them at some point in the

8   day," comma, "correct?  Answer:  After their lunch

9   period."

10         So where's the evidence that supports the

11  point you just made which is they have to read them

12  during their lunch period?

13         MR. RIGHETTI:  Well, if they have to -- if

14  some of the messages -- I think the answer to that is

15  if some of the messages require an immediate

16  response --

17         THE COURT:  Well, you keep saying that,

18  Mr. Righetti, but I've read through the materials that

19  were submitted to me, and this is foreign-sounding to

20  me, so I'm asking you to show me where, in all of this

21  material you asked me to read, it says what you're now

22  telling me.

23         MR. RIGHETTI:  We're going to get that to you.

24  That's what -- that's -- I -- I hear what you're saying

25  and -- but that's the point I want to make.  I mean, I

26  know it's in the record; it's in the depositions.  I'm

27  expecting that it made it into the papers.  I took that

28  deposition, and, you know, it was not a controversial

1   deposition, it was just an explanation of how the

2   scheduling works and the phone tree works and the

3   messages, and yes, they're supposed to respond, and

4   it's critical they respond to make the whole system

5   work, and if they don't respond, that's a problem that

6   that will be taken up with the tech.

7          So what we have is this practice where these

8   techs are -- and obviously, if the techs have to

9   stay -- I mean, there's a reason why the techs stay

10  logged on.  Comcast wants to know what these techs are

11  doing and wants to communicate with these techs, and if

12  you look at the exhibit -- now we get to Exhibit 1B of

13  John Glugoski's declaration of the opening brief.

14         THE COURT:  Which exhibit is that exhibit?

15         MR. RIGHETTI:  1B to the Glugoski declaration

16  with the opening brief.

17         THE COURT:  Let me get there.  Hang on.

18         MR. RIGHETTI:  Page 17.

19

20             (Pause in proceedings.)

21

22         THE COURT:  Okay.  I'm with you, 1B.

23         MR. RIGHETTI:  It says -- on Page 17 it

24  says -- Bates 15960.

25         THE COURT:  Okay.

26         MR. RIGHETTI:  "Continual communication with

27  the field is a critical component in a dynamic dispatch

28  environment.  You should utilize the dispatch messaging

1  function in WFX to maintain communication to individual

2  or groups of technicians."

3          And so I think that that gives the picture

4  that these dispatchers are very much in sync and in

5  contact with the techs all day long, and there's no

6  block-out for lunches.

7          Now --

8          THE COURT:  But -- but we looked at that other

9  page that expressly says, and it's the same kind of

10  instructional material that says don't do any work on

11  lunch or on breaks, and they tell them put up this icon

12  so that the dispatcher will know you're on -- on lunch.

13          What would be the point of having people log

14  off for lunch or put up the icon, that lunch pail icon

15  for lunch, if they weren't being relieved of their

16  duties?

17          MR. RIGHETTI:  They do.  They -- the bell

18  comes up, but they still have to communicate.  Dispatch

19  has to communicate with the techs during the lunch --

20          THE COURT:  Dispatch --

21          MR. RIGHETTI:  -- because it's a critical part

22  of the system.

23          THE COURT:  That's the -- the -- that's the --

24  we talked about back-and-forth earlier; that's the

25  "forth", dispatch communicates with the -- or to the

26  dispatch, but the way communications work these days,

27  it's not grabbing somebody by the lapels and talking to

28  them face-to-face, they're sending some electronic

1    something, and the dispatcher has to be looking at some

2    electronic device to do it, and I'm looking for the

3    evidence that says despite the fact that the policy

4    says don't do any work at lunch, and the dispatchers'

5    depositions say, I don't expect them to respond, I'm

6    looking for something that says that the dispatch --

7    that the techs have to be in electronic communication

8    at all times.

9         It's not even like they're carrying a pager

10   and the pager beeps, which is another case -- or

11   actually, it's the DLSE opinion on pagers.  It looks to

12   me like if these guys want to put their electronic

13   devices in their truck and lock it up while they go to

14   lunch or while they hop on one foot, as one of them

15   said, they can do that, and I'm -- I just -- I -- I

16   keep coming back to asking you what's the evidence that

17   says they can't, that they have to be in communication

18   two ways?

19        MR. RIGHETTI:  Okay.  So there's two parts of

20   that.  The first is whether the -- whether the "forth"

21   is enough.  Well, there's actually several aspects of

22   this.  First is whether requiring them to remain logged

23   on is -- requires -- is a -- means that they're on

24   duty, okay?  That, by itself, and I think that's a

25   merits question all by itself.

26        The second question is whether receiving

27   communications during the lunch, you know, added on

28   top -- it's kind of a layered analysis -- receiving the

1  communications -- if having to stay logged on is not

2  enough, is receiving communications enough --

3          THE COURT:  What do you mean by the word

4  "receiving"?

5          MR. RIGHETTI:  I mean that messages are

6  being -- that their phone is, what did they say,

7  blowing up during lunch beeping --

8          THE COURT:  But what if the phone is in the

9  truck?

10         MR. RIGHETTI:  Well, now, here's the thing --

11         THE COURT:  That's why I focus on the word

12  "receiving."

13         MR. RIGHETTI:  You see some declarations where

14  these people say, I know that the -- dispatchers who

15  say, I know the tech left his phone in the truck; I

16  know the techs shut their phones off.  When we got

17  these dispatchers into depo, say, Well, who was it that

18  left their phone in the truck?  I don't know.  How many

19  times -- who -- does it happen?  I don't know.  Well,

20  who was it?  I don't know.  They don't have any -- any

21  information to support it.

22         THE COURT:  Right, but I have -- I also have

23  tech depositions and declarations, and they're kind of

24  all over the map.  Some of them feel as if they're

25  obligated to respond whenever anybody communicates with

26  them; those are the Type-As.  Some of them seem not to

27  feel that way.  They say, I go to lunch, I can take

28  lunch.  I can do whatever I want.

1          So that's why I differentiate policies from

2    practices in trying to determine whether I've got a

3    common question here, and -- and that's why I'm

4    being -- trying to be very careful about words like

5    "communications" and "receiving" because, you know, if

6    I have a colleague here who stays later than I do some

7    night and sends an email to me on my work computer

8    after I've gone home, have they communicated with me?

9    Well, in one sense they have, but I'm not going to see

10    that email until I come in at 7:30 or 8:00 o'clock in

11    the morning.

12          MR. RIGHETTI:  But the tech is going to see

13    that email, and the reason they're going to see --

14          THE COURT:  I keep asking you to show me where

15    the evidence is that I have that.

16          MR. RIGHETTI:  Well, and the reason -- well,

17    ask yourself, why does Comcast require they stay logged

18    on during lunch?  Why doesn't Comcast say, Go ahead and

19    log off during lunch.  For that matter, shut your phone

20    off during lunch; you can go into that level of

21    analysis, but Comcast says, No, you're not supposed to

22    shut off your phone and you're not supposed to log off

23    for lunch.

24          Well, why would Comcast not want them to log

25    off for lunch?  And the reason is because Comcast wants

26    to stay tethered to them to communicate with them, and

27    when these people are at lunch, logged on, it gives

28    Comcast the ability to beep them, and when it beeps --

1    if Comcast didn't care when they read the message or

2    when they responded to the message, Comcast could allow

3    them to log off, in which case they would log back on

4    after lunch and get their messages; instead, Comcast

5    says, You got to stay logged on.

6         So when you see a Comcast tech out at the

7    McDonald's or Quiznos or whatever at lunch, you're

8    going to see a Nextel phone on the table next to them,

9    and I'll bet you a doughnut that they will have their

10   message, their -- you know, that thing will be beeping,

11   and they'll pick it up -- put their hamburger down,

12   pick it up and look at it and respond to it, but every

13   time it beeps and every time it indicates a message was

14   sent to them, they're reading it.

15        THE COURT:  Well, I don't eat doughnuts, but I

16   do look for evidence, and it's not a question of

17   betting me, it's just a question of showing me where in

18   this several feet of paper I've got that evidence.

19        MR. RIGHETTI:  All right.  Right.

20        THE COURT:  Right.  That's the question.

21        MR. RIGHETTI:  We're going to do that.  Okay.

22        So that's the main on-duty aspect of these

23   lunches is the fact that --

24        THE COURT:  Okay.

25        MR. RIGHETTI:  -- Comcast has a policy that

26   they keep the phones on, has a policy that in addition

27   they stay logged on, and that -- and we have this

28   messaging going back and forth, and I know the

Sarah L. Thompson, C.S.R. No. 12635

1  additional analysis the Court is looking for, and we're

2  going to get that to the Court without adding any more

3  information.

4      THE COURT:  Just so I'm really clear about

5  your argument, when you raise the question is being

6  logged on sufficient as receiving or -- receiving

7  communication, to use your words, sufficient, what do

8  you think is your strongest case that says that that

9  makes out an on-duty lunch claim?

10     MR. RIGHETTI:  *Morillian* (phonetic) would be

11  the strongest case.

12     I think, you know, John and I were just

13  talking about it on the way over here, that this is

14  like an on-call lunch where, you know, we have stand-by

15  and on-call, which is a whole different analysis if you

16  have somebody who's an ambulance person, for instance,

17  who's on-call --

18     THE COURT:  Right.

19     MR. RIGHETTI:  -- and is able to be at home

20  and do what they want with their time and sometimes

21  have to respond; that may or may not be time worked,

22  but how do you handle stand-by, on-call time in this

23  situation where you have, vis-a-vis a lunch period

24  where the person is essentially taking a lunch but it's

25  on-call, so they -- they -- they are subject to being

26  pulled in, and, you know, you can see through the

27  training of Frank -- remember the Frank training?

28     THE COURT:  Oh, the 45-minute call -- the

1   fellow who's called 45 minutes into the -- into his

2   lunch?

3          MR. RIGHETTI:  It's Exhibit 30 to my reply.

4          THE COURT:  Right.

5          MR. RIGHETTI:  Where he gets into his lunch --

6          THE COURT:  And he gets a call 45 minutes

7   in --

8          MR. RIGHETTI:  -- call from his supervisor --

9          THE COURT:  45 minutes in, right?  Is that the

10  one you're talking about?

11         MR. RIGHETTI:  But it could happen any time,

12  but they seize on the fact it's a 45-minute --

13         THE COURT:  But I'm tethered to the

14  evidence --

15         MR. RIGHETTI:  I know.

16         THE COURT:  -- and I just want to make sure

17  we're talking about the same thing.  That's the one

18  where -- it's the illustration used in their training

19  where some guy named Frank is called 45 minutes into

20  the lunch, and it said what should he do about

21  recording his time.

22         MR. RIGHETTI:  It's Exhibit 30 to my

23  declaration and the reply.  And --

24         THE COURT:  Let me just pull that up and make

25  sure I'm with you.

26

27         (Pause in proceedings.)

28

1          THE COURT:  Okay.  I've got Exhibit 30.  What

2     page are you on?

3          MR. RIGHETTI:  Page 15.

4          THE COURT:  15.

5          MR. RIGHETTI:  Correct.

6          THE COURT:  Thanks.

7          MR. RIGHETTI:  It's a test or a quiz that they

8     give Frank.

9          THE COURT:  I remember what it looked like.

10    It was a sideways page, if I remember.  Yeah.

11         Okay.  I'm there.  What did you want to say

12    about this?

13         MR. RIGHETTI:  Um... so what you have is

14    Frank, 45 minutes into his lunch, Frank receives a call

15    from his supervisor.  Now this, I think, highlights

16    something for the Court, which is if -- if these people

17    were off duty not subject to being on-call or on

18    stand-by, I would expect this training to say Frank

19    should not be answering his darn phone during lunch

20    because he has an off-duty lunch break, and on top of

21    that, what the heck is Frank's supervisor doing calling

22    him during his lunch break?

23         Now, instead, you have, oh, it's okay for

24    Frank's supervisor to call him during lunch -- this is

25    the -- what the -- the inference, it's okay for Frank's

26    supervisor to call him during lunch, and Frank should

27    be expected to answer his phone during lunch, and when

28    Frank does answer his phone during lunch, you know,

1  maybe if Frank did not answer his phone, saw it was his

2  supervisor and ignored the call, there's a question is

3  that an on-duty lunch?  I would say he still has his

4  phone on and is screening his calls -- his work-related

5  calls, but the fact of the matter is this is a

6  situation where he is actually answering the call, and

7  then the question is -- further level of analysis is,

8  well, okay, then when he answers the call, he's back on

9  duty but not before and how should Frank record that

10 time?  They say Frank should record that time forward

11 from when he answered the call as time worked but not

12 the time before.

13        Now, if you go back to the opinion letter that

14 the Defendants submitted from the DLSE, the opinion

15 letter --

16        THE COURT:  There were a couple of opinion

17 letters; which one?

18        MR. RIGHETTI:  I think they say the same thing

19 on this point.

20        THE COURT:  There were at least two that I

21 saw.

22        MR. RIGHETTI:  Victoria Bradshaw, I believe,

23 where she says that if the -- it's a 1992 --

24        THE COURT:  '92?

25        MR. RIGHETTI:  1991 or '92 opinion letter

26 where she says, well, if the person does work during

27 their lunch, then the entire period of time should be

28 counted as time worked.

Sarah L. Thompson, C.S.R. No. 12635

1    Now, I guess back to the earlier comment from
2    Your Honor, you say, well, sometimes I do see cases
3    where employers have policies that facially violate the
4    law, this would be a situation where it facially
5    violates the law, assuming that Victoria Bradshaw's
6    correct.
7         Now, that's a DLSE opinion letter; it's not
8    anything binding on this Court by any means.  The
9    Defendant relies upon it.  In that respect, I think
10   it's favorable to the Plaintiff.  In other respects,
11   the Defendant seems to think that that opinion letter
12   is favorable to the defense, that if they're on-call
13   but actually don't have to be put into service, that
14   that's not -- that doesn't count.
15        Now, there aren't any cases that have delved
16   into this, but this is a, again, a common issue that
17   predominates as to, you know, when you start getting
18   into this opinion letter, roll up your sleeves on those
19   two issues, the Defense seems to think that the opinion
20   letter is persuasive to say that being on-call but not
21   being put into service should not count as time worked;
22   we say that that would conflict with Morillian, and
23   Morillian was decided after that opinion letter came
24   out.  On the other hand, we would look at that opinion
25   letter and say, Gee, if you look at the opinion letter
26   and compare it to the Frank situation, the Defendant
27   is -- has just stepped in a bear trap because they
28   don't -- they don't pay according to what Victoria

1  Bradshaw and the DLSE said should be paid in those

2  situations where there's interruptions.

3         So those are two -- again, those are two

4  things that's it's up to the Court so decide the

5  statutory construction in light of Morillian.

6         THE COURT:  Right.

7         MR. RIGHETTI:  Okay.  And... so if you look --

8  I mean, this isn't the depo that I was thinking about

9  that I took, but if you look at Page 12 of our reply,

10  Lines 4 through 9, it quotes the testimony of Shawn

11  Mainville.  It says, "I believe the" --

12         THE COURT:  Let me catch up with you.

13         MR. RIGHETTI:  Yeah.

14         THE COURT:  This is your reply brief?

15         MR. RIGHETTI:  Right.

16         THE COURT:  Okay.

17         MR. RIGHETTI:  It says at page -- Line 6,

18  pardon me.  "Couldn't technicians choose whether they

19  wanted to acknowledge receipt of a job that you gave

20  them while they were on their lunch break?"

21         And the answer was, "I believe the

22  expectation" -- and this is defense counsel questioning

23  him -- "I believe the expectation was that they would

24  answer or acknowledge receipt of a job or most

25  technicians would acknowledge receipt of the job," and

26  that's -- that's the --

27         MR. VALDEZ:  Can I ask for a page cite?  I'm

28  sorry to interrupt.

1    THE COURT:  It's Mainville deposition, Page

2  64, Line 20, to 65, Line 7, according to the brief

3  here.

4    MR. VALDEZ:  Thank you, Your Honor.

5    MR. RIGHETTI:  So that's an example of the

6  expectation that these techs were expected to read

7  these messages during their lunches and respond.

8    I mean, whether or not they respond, I still

9  say they have to read these messages, and the question

10  is whether that creates an on-duty lunch.

11    THE COURT:  All right.

12    MR. RIGHETTI:  I think you can look at -- you

13  know, we can also -- the messaging is now available to

14  us.  CSG initially didn't turn over the messaging to

15  us, and then just before we filed our reply, we asked

16  ourselves a question, Hey, we subpoenaed the messaging

17  data; why don't we have it?  So we got back in touch

18  with CSG, and they said, Oh, we thought we downloaded

19  all that data for you as well; we're going to work on

20  getting you messaging data.

21    Now we have all the messaging data to lay on

22  top of all this showing when messages were sent to

23  techs, whether techs responded.  I mean, I have a --

24  attached to the declaration of Breshears --

25    THE COURT:  The second declaration?

26    MR. RIGHETTI:  Breshears.

27    THE COURT:  The second Breshears declaration?

28    MR. GLUGOWSKI:  Yes, it is the second --

1      MR. RIGHETTI:  Yes, the second one.

2      MR. GLUGOWSKI:  Filed with the reply.  It's

3  Exhibit G.

4      THE COURT:  Let me get there.

5

6           (Pause in proceedings.)

7

8      THE COURT:  What's the date of this

9  declaration?

10     MR. GLUGOWSKI:  It would have been somewhere

11  very close to when we submitted our reply which would

12  have been around the --

13     MR. RIGHETTI:  September --

14     MR. GLUGOWSKI:  Hold on.

15     THE COURT:  Do you know what part in the --

16     MR. GLUGOWSKI:  Around September 17th

17  somewhere.

18     THE COURT:  I'm looking at September 17th, but

19  online it's got all these parts.

20     MR. GLUGOWSKI:  Oh, it's broken down into

21  parts?  Okay.

22     THE COURT:  Yeah, I made indices as to some of

23  these parts but not all of them.

24     MR. RIGHETTI:  Well, Attachment G, I just want

25  to make a note -- I don't even think this is

26  controversial -- Attachment G has examples of meal

27  period entries with messages sent by techs during the

28  meal periods, so that level of analysis can be done

1   which would obviously show a tech being put in service

2   during the lunch period --

3            THE COURT:  Wait, I'm sorry.  I have it here.

4            MR. RIGHETTI:  Okay.  I mean, I would just

5   point to Page 31 of 56 of Attachment G where Anthony

6   Hayes --

7            THE COURT:  Page which?

8            MR. RIGHETTI:  Page 31 of 56 on Attachment G.

9            MR. GLUGOWSKI:  Page numbers are in the

10  bottom --

11           THE COURT:  I see them, bottom right.

12           MR. RIGHETTI:  It shows the example of Anthony

13  Hayes, 21 minutes into his lunch time, he sends a

14  message saying, "10-4.  I am on lunch now.  Be back at

15  4:10."  And the subject of the message was, Well, I

16  have to assign all the work -- that was from dispatch.

17           So, you know, the messages that are being sent

18  to the techs, and I think the fact that techs are

19  reading those messages and, in fact, responding in some

20  cases, saying, Hey, lay off, I'm on lunch, is -- is --

21  can be put together, and the examples -- some examples

22  of it being put together are set forth in Attachment G

23  to the Breshears reply declaration, and this is by --

24  this is -- I think this is just an exemplar.  It's not,

25  by any means, all the messaging that went on, but it

26  shows you can overlay the records and determine when

27  messages were sent in relation to when lunch periods

28  were being taken, and in fact, when messages were being

1   responded to by techs during the lunch periods.

2           THE COURT:  Okay.

3           MR. RIGHETTI:  So that's -- that's the

4   on-duty -- that's the on-duty aspect of this.  I mean,

5   we haven't even talked about the other two issues.

6           The the second issue was the *Brinker*, *Walmart*

7   analysis, and I think, you know, in terms of *Brinker*,

8   we discussed it in our opening brief, what the

9   take-away was from *Brinker*.  Page 23 of our opening

10  brief has a number of bullet points concerning *Brinker,*

11  and one of the things I think that is taken away from

12  *Brinker* is that it is difficult in situations where

13  meal -- where breaks of any sort can be waived verbally

14  or without a written record of something being made.

15  It's difficult to certify that type of case because it

16  inherently requires you to go to that employee and try

17  and figure out the extent to which he was prevented

18  from taking the break or -- or, you know, chose

19  voluntarily not to take the break.

20          In this situation, we don't have that.  That

21  was, I think the -- in terms of not certifying or the

22  certification hurdle that the court had in *Brinker* was

23  how do you differentiate that without talking to the

24  tech?  Now in the sit -- the court drew the line in the

25  situation where, well, if they -- if there's evidence

26  that the employer is actually impeding the tech from

27  taking the break, that's a whole different situation;

28  that can be certified and go forward.

1      Well, here we have a slight variation on that.

2  We have a situation where Comcast has a policy that

3  first meal breaks cannot be waived at all, second meal

4  breaks can only be waived in writing, and there's a

5  written record of that.  So the inference is there's

6  no -- that these people -- I mean, the expectation is

7  these people follow policy.  If they don't follow

8  policy, there's some, you know, consequences that would

9  come down.

10      THE COURT:  I'm sorry.  Let me make sure I'm

11  following.  You say the policy is the first meal breaks

12  can't be waived.

13      MR. RIGHETTI:  Right.

14      THE COURT:  And the -- but the second can be

15  waived with a writing, and you're saying there's no

16  writings showing the waiver.

17      MR. RIGHETTI:  Right, and to the extent there

18  are writings, they're -- then there's a -- that's a

19  situation that would not be a violation of California

20  law and would be consistent with Comcast policy.

21      THE COURT:  So then how do I know -- how are

22  we going to find out, what's the common proof that's

23  going to show whether or not a second meal wasn't

24  taken?

25      MR. RIGHETTI:  Comcast deducts time for meal

26  periods that are taken.  All you have to do is look at

27  the ESS records.  If the meal period is taken, the tech

28  is required to deduct that meal period from their time;

1  it's not time worked according to Comcast, so you look

2  at the -- whether you look at any of their records,

3  look at the CSG TechNet records or look at the punch

4  detail records --

5          THE COURT:  My question must not have been

6  plain.

7          MR. RIGHETTI:  Yeah.

8          THE COURT:  If the complaint is that -- or the

9  allegation is that some of the techs did not get a

10 second meal period; that's the charge?

11         MR. RIGHETTI:  Did not take a second meal

12 period.

13         THE COURT:  Did not take a second meal

14 period --

15         MR. RIGHETTI:  And did not waive it.

16         THE COURT:  And didn't waive it, then how do

17 you know who didn't take it, and how do you know why

18 they didn't take it?  What's the common proof of that?

19         MR. RIGHETTI:  You know who didn't take it by

20 looking at the time records, plain and simple, because

21 the time records -- if one was taken, it would be

22 evident in the time records.

23         THE COURT:  Okay.

24         MR. RIGHETTI:  Both time records, either one

25 of them, either the -- they're required to hit the

26 lunch status if they go on lunch whether it's first or

27 second break --

28         THE COURT:  Right.

1    MR. RIGHETTI:  -- and they're required to

2  deduct for lunch on their time records, so that's how

3  you know whether they took it.

4    Whether they waived it or not, the waiver had

5  to be in writing for the second meal period, and

6  Comcast retains those written waivers, and Comcast has

7  been turning over the records that would indicate

8  whether written waivers exist, to the extent to which

9  they exist, so in those situations where you had people

10  working over 10 hours not taking a second meal period

11  and there's no written waiver, the second meal period's

12  done, okay?

13    Now for -- that's for shifts between 10 and

14  12, over 10 and less than 12.  For shifts over 12,

15  remember, under California law, the second meal period

16  can't be waived, so that's another level of analysis,

17  but I think anything over 10 is -- Comcast has a

18  problem when the policy requires a written waiver and

19  no written waivers exist.

20    THE COURT:  Let me ask this:  let's assume

21  that Tech No. 472 --

22    MR. RIGHETTI:  Yeah.

23    THE COURT:  -- worked more than 12 hours, and

24  there's no evidence on the timesheets of a second meal

25  period.  As I understand it under *Brinker*, the company

26  has the obligation to provide the opportunity to

27  relieve that person of all duty, but they're not

28  required to ensure that the meal period is actually

1    taken.

2         How do I deal in a common fashion with the

3    question of Tech No. 472 and maybe 587 and 648, each of

4    whom show no second meal period, but how do we know

5    without individual inquiry why they didn't take that

6    second meal period, and how do you get through all of

7    what *Brinker* requires?

8         I mean, you've now identified, let's say,

9    hypothetically, three people who the records show

10   didn't take a second meal period, but that's not the

11   full inquiry; under *Brinker*, don't we have to figure

12   out why they didn't take the second meal period?

13        MR. RIGHETTI:  There's only one way they could

14   not have taken it, and that is that they waived it.  I

15   can't think of any other -- I mean, no matter how you

16   characterize it or -- or slice it, if a meal period is

17   made available and is -- and is not taken and is not

18   impeded, then the only thing that could happen is that

19   it was waived.

20        Now, if it's voluntarily waived, then that's

21   okay; if it's -- if it was a forced waiver, then that's

22   not okay, but if there was no waiver, then the

23   inference is that the meal period should have been

24   taken.

25        THE COURT:  Are you saying that the law

26   requires that the waiver be in writing?

27        MR. RIGHETTI:  No.  I'm saying --

28        THE COURT:  Well, if the waiver doesn't have

1    to be in writing --

2         MR. RIGHETTI:  Well, except -- okay, no,

3    you're right, it does not have to be in writing.  No

4    waivers have to be in writing.

5         THE COURT:  If it doesn't have to be in

6    writing, how do I know how -- why 472 didn't take that

7    second meal?  How do I know the dispatcher didn't say

8    to him, You got to go take a second meal, and he said,

9    Forget it, I'm outta here.  I'm not going to take that

10    meal.  I'm going home instead.

11         MR. RIGHETTI:  What you're saying is -- would

12    you say that would constitute a waiver?

13         THE COURT:  No, no, no, I'm asking how do I

14    deal with the fact that *Brinker* doesn't say there's an

15    absolute requirement that there be breaks taken, the

16    company has a requirement to provide the opportunity,

17    and now the question is how on common proof I deal with

18    the fact that somebody may not have taken a -- you

19    may be able to show me statistically or through

20    analysis -- not statistically, but through analysis of

21    the records, you might be able to get Mr. Breshears or

22    a computer to spit out a list of 77 people who missed a

23    second meal, but how do I know, as a matter of

24    commonality and manageability, why they missed the

25    second meal, whether the company provided the

26    opportunity and they just didn't take advantage of it,

27    or whether the company had somebody standing over them

28    with a whip saying, You're not going to have a second

Sarah L. Thompson, C.S.R. No. 12635

1    meal?

2              MR. RIGHETTI:  Well, in those situations where

3    the company provides it and the employee decides not to

4    take advantage of it, then that's a waiver, and when

5    there's a waiver, employee's waived, is deciding not to

6    take a second meal period.  In the situations where

7    there's a waiver, Comcast requires that it be in

8    writing; otherwise, the person is expected to take that

9    second meal period.

10             So I -- I -- I'm -- I guess I'm not quite -- I

11   thought this was like the easiest of all the analyses

12   in the certification papers, which is that either

13   somebody waived it or they don't waive it, and in order

14   to have a waiver, Comcast -- you know, it's a mutual

15   agreement; it's not just the tech saying, I waive it,

16   Comcast requires that Comcast agree to it as well.

17   It's -- both sides have to agree to it, and so that's

18   the evidence.

19             I mean, we're not saying that California law

20   requires a written waiver, but in this situation, for

21   common proof, Comcast has provided the common proof as

22   part of its policies and procedures and practices,

23   which is that you're -- if you don't take that second

24   meal period because you have voluntarily waived it,

25   sign -- you know, make sure to get that written waiver

26   done.  We don't have written waivers.

27             Now, again, over 12, can't be waived.  Period.

28             So, you know, we -- we -- in those situations

1    where there's waivers, of course you know what the
2    intent of the parties was, the intent was that, yes,
3    the meal period was made available and we decided to
4    waive it.
5         THE COURT:  Okay.  I keep interrupting you.
6    You had a set of notes you wanted to talk about.
7         MR. RIGHETTI:  So anyway, the -- I think I was
8    talking about *Brinker* and the waiver issue, and the --
9    I think what's interesting, when you talk about
10   *Walmart*, and *Walmart* talks about being able to resolve
11   liability in one stroke.  I think that's what everybody
12   always believes comes back to is that line out of
13   *Walmart*, and I think the answer here is, yes, it can be
14   resolved in one stroke on a number of issues.
15        First, on the off-the-clock work, all you have
16   to do is look at Comcast's own daily timelines which
17   are created every day by Shante Miguel (phonetic) and
18   are circulated to a wide distribution list, which on
19   their face, show meal periods taken that are far less
20   than the perfect 60s that we have in the punch detail,
21   and --
22        THE COURT:  Those are based on the the CG --
23        MR. RIGHETTI:   CSG.
24        THE COURT:  CSG.
25        MR. RIGHETTI:  The statuses, lunch statuses.
26        THE COURT:  Thank you.
27        MR. RIGHETTI:  She does a daily timeline every
28   day for every region, for every employee and does

1  averages and summaries of it showing -- invariably
2  showing that the perfect 60s, which I think defies
3  common sense that you would have all these perfect 60s
4  when you've got workers out in the field.  The question
5  is, well -- initially was, well, gee whiz, we got these
6  perfect 60s in the time records, how do we handle that?
7  It's there, that's evidence that Comcast is going to
8  point to.  Then all the sudden we discover after
9  certification that Shante Miguel has been doing these
10 daily timelines which show less-than-perfect 60s, which
11 is what we would expect to see.  I mean --

12         THE COURT:  Where do I have those timelines,
13 please?

14         MR. RIGHETTI:  Exhibit 8 to the Glugoski
15 brief -- opening brief.  In his declaration in the
16 opening brief.  And it shows, you know, for all the
17 regions for all of California, average lunch status is
18 49 minutes --

19         THE COURT:  I see.  This is a sample of a
20 day -- a couple days, couple of periods.  Okay.  I see.

21         MR. RIGHETTI:  Daily timelines, right.

22         And they had these for, you know, going back,
23 and these can be created, and it shows more of what
24 common sense would expect one to see, which is statuses
25 that are not perfect 60s; however, Comcast deducts
26 perfect 60s from people's time periods -- from people's
27 paychecks every week and every day.

28         THE COURT:  Okay.

Sarah L. Thompson, C.S.R. No. 12635

1      MR. RIGHETTI:  So, you know, that's a --

2  that's a -- the off-the-clock issue is a issue that

3  should be certified.

4      We've already talked about the on-duty work

5  period issue, and we can talk about the Breshears, what

6  weight to give the Breshears declaration.

7      THE COURT:  Tell you what, before we do that,

8  my court reporter's been going for a long time, and

9  especially since we're talking about wage and hour

10 cases.

11     MR. RIGHETTI:  Need some coffee?

12     THE COURT:  We're going to take a break.  So

13 we're going to take 15 minutes and we'll come back and

14 pick up from there.

15     I have the afternoon open, too, if we run past

16 the noon hour, so I want to give this all the attention

17 it deserves.  Okay.  Thanks.

18     MR. ALVAREZ:  Thank you, Your Honor.

19

20         (Recess taken.)

21

22     THE COURT:  I'm told we may have Ms. Kramer

23 back.

24     Ms. Kramer, are you there?

25     MS. KRAMER:  Yes, I am.

26     THE COURT:  You're more than welcome to

27 listen.  You've missed quite a bit, but I'm sure you'll

28 hear all about it sometime.

1    We're back on the record in the Comcast and
2    Fayerweather case.
3    Mr. Righetti, I want to make sure I understand
4    the argument you were making just before we broke.
5    You're saying that over 12 hours, a lunch -- a meal
6    break cannot be waived; do I have that right?
7    MR. RIGHETTI:  Correct.
8    THE COURT:  And you're saying that the law
9    does not permit a waiver.  But what happens if the
10   individual worker just doesn't take it, the company
11   makes it available, but the individual doesn't take it?
12   Is the individual in violation of a law for having not
13   taken his meal?  I mean, I don't understand what it
14   means to say you can't waive it if the company provides
15   the opportunity for the break and then the employee
16   doesn't do it; how is that the company's fault?  I'm
17   trying to square *Brinker* with what you're saying is the
18   inability to waive over 12 hours.
19   MR. RIGHETTI:  So I'm not sure that *Brinker*
20   dealt with the over-10 and over-12 situation, but in
21   the over-10 situation, it requires a mutual waiver, a
22   mutual waiver that, you know, that -- which is
23   different than -- than under 10.  *Brinker* was dealing
24   with the under-10 situation, shifts under 10 -- 10 and
25   under.  If you go over 10, then the statute says, well,
26   if you're over 10, you need a second meal period and --
27   unless there's a written mutual waiver.
28   Now, I don't know how somebody cannot take it

1   without -- without waiving it.  I think we're -- it's a

2   little bit of semantics, I think, that we're talking

3   about here because you're suggesting, well, how can

4   you -- how can you say that somebody -- what happens if

5   somebody didn't take it but it was made available; to

6   me, that's the same as saying that they waived it, and

7   if they waived it, then there should be a written

8   waiver of it.  If they didn't waive it, then -- listen,

9   we're not putting Comcast in jail, they just have to,

10  according to I think it's *Murphy* (phonetic), they just

11  have to pay one hour of pay.  It's not even a penalty,

12  it's just one hour of pay that's owed to the employee

13  for having worked a shift of over 10 hours where

14  there's no waiver and no second meal period.

15          And for over 12, not having the second meal

16  period on the record where -- where you're over 12,

17  that can't be waived.

18          THE COURT:  So you're saying it can't be

19  waived, and if the tech doesn't take it, then Comcast

20  simply has to pay for it?

21          MR. RIGHETTI:  Pays an hour pay, right.

22          THE COURT:  Pays an hour pay.  And you're

23  saying that the time records will disclose that quite

24  readily?

25          MR. RIGHETTI:  Right.

26          THE COURT:  Okay.

27          MR. RIGHETTI:  And I think Mr. Breshears

28  summarizes the frequency of shifts over 10 and over 12

Sarah L. Thompson, C.S.R. No. 12635

1   to show that, you know, it's not an aberration that

2   these people are working over 10 or over 12; it's

3   actually quite a substantial number.

4           THE COURT:  Okay.

5           MR. RIGHETTI:  Now getting back to -- I think

6   we started off, and I'm going to go back in the

7   backfield for just a second, the Court was wondering

8   about whether techs have to do anything with messages

9   that are sent to them during their breaks, you know,

10  can they just ignore them, can they stick the phone in

11  the glove compartment and not worry about it.

12          And if you look at the summary of evidence

13  that we supplied, 40, 41 and 42 on Pages 9 and 10 --

14          THE COURT:  Just a second.  Let me get there.

15          40?

16          MR. RIGHETTI:  40 -- Items 40, 41 and 42 at

17  the bottom of Page 9 and the top of Page 10.  It speaks

18  to those -- to that issue, and it does not reference

19  another excerpt from the Chung (phonetic) deposition,

20  which is in the record.  It's Exhibit 11 to my --

21          THE COURT:  I have Chung.  Hang on one second.

22  I have Chung.  All right.  Which part of Chung?

23          MR. RIGHETTI:  Page 27, Line 15, to 28, Line 7

24  where she says, hey, some messages have to be responded

25  to immediately and some not so, but the only way a tech

26  would know is by reading the messages.

27          MR. VALDEZ:  So can you repeat that cite?

28          MR. RIGHETTI:  It's 27, line -- the Chung

1  deposition, Exhibit 11.  27, Line 15 to 28, Line 7.

2         So we're back to Breshears now, I think,

3  unless the Court --

4         THE COURT:  Excuse me.  Let's look at 41, Box

5  41 --

6         MR. RIGHETTI:  Yes.

7         THE COURT:  -- because I -- this page I think

8  I have in my head.  I don't have all the testimony in

9  my head.

10        It says, "If CTs do not timely," quote

11 "'acknowledge' all newly assigned jobs, TechNet will

12 prompt them to acknowledge those jobs."

13        I thought when I looked at that page that you

14 cite there, 20483, that that was an electronic thing

15 where if somebody doesn't acknowledge something, then

16 the computer or some electronic device, quote,

17 "prompts" them, just sends them a little message --

18        MR. RIGHETTI:  Re-beeps them, yeah.

19        THE COURT:  Yeah, so again, it's not a

20 question of somebody calling up and saying, Hey, you

21 got to do this, it's a question of some electronic

22 device sending a message to something else; am I right

23 about that?

24        MR. RIGHETTI:  Right, it's an electronic

25 alert, and they'll keep alerting the tech until the

26 tech responds.

27        THE COURT:  Okay.

28        MR. RIGHETTI:  For the -- for the new jobs.

Sarah L. Thompson, C.S.R. No. 12635

48

1          THE COURT:  Then in Box 42, the way I --
2    again, I don't have these pages of Leon and Breshears
3    in my head, I have to look them up, but it says, "When
4    messages are sent to CTs, Workforce Express
5    automatically sends a notification that alerts them
6    through their mobile devices."  How does that support
7    the notion they have to then respond?
8          MR. RIGHETTI:  Well, I think you have to take
9    that in conjunction with 20483 about job changes, that
10   you have to acknowledge the job --
11         THE COURT:  But you know, and I'm looking at
12   this, and I -- I do remember a lot of this.  You're
13   citing that same TechNet manual, 20482, 20499, and
14   that -- which talks just generally about what the --
15   what the system is all about, but in -- in and among
16   all those same pages, 20500, which was the special
17   instructions for lunch which is saying don't do any
18   work on lunch.
19         MR. RIGHETTI:  And the reason for that is that
20   Comcast does not consider the communication traffic to
21   techs --
22         THE COURT:  Right.
23         MR. RIGHETTI:  -- techs reading communications
24   and or techs responding to communications as work.
25   That's -- that's --
26         THE COURT:  Right.  Well --
27         MR. RIGHETTI:  -- and they say don't do
28   work-related tasks --

1    THE COURT:  It's the second and third, the
2  techs reading them and the techs responding to them
3  that I'm looking for the evidence of, and I'll look at
4  the -- I'll ask Mr. Alvarez about these declarations --
5  these depositions that you cite here.
6    MR. RIGHETTI:  And 40 is important at the
7  bottom of Page 9, and then that incorporates part of
8  the Chung depo, and then I give you a little bit more
9  cite to the Chung depo, Pages 27, 28.
10    THE COURT:  Okay.  Thanks.
11    MR. RIGHETTI:  When you look at Breshears,
12  I -- you know, I'm -- I shake my head and wonder at
13  Comcast's -- at the volume of Comcast's protest over
14  Breshears declaration and his exhibits, and the reason
15  for that is is that all Breshears has done is
16  summarized Comcast's own records, and I'm not even sure
17  we needed an expert to provide a summary of voluminous
18  evidence, and Comcast hired its own expert, Johnson, to
19  go through, and in some instances, he criticized some
20  of the summary, in other areas he said, yeah, Breshears
21  got that part right in terms of the perfect 60s and
22  shifts over 10 and shifts over 12.
23    So why -- the question that has to -- one has
24  to wonder is why does Comcast run so hard from its own
25  records?  And you know, the -- the -- these are
26  records -- these Comcast CSG records, the Court makes a
27  little note that, you know, I'm not really -- the
28  Court's not really sure how credible these CSG records

1  can be, but, you know, you have to put these records
2  into context because CSG is, you know, a big company,
3  and it's actually the leading company in tracking techs
4  in the telecommunications industry.  Comcast spent
5  millions of dollars with CSG to get them to put this
6  system together, and the goal of the system was not,
7  gee, we kind of want to figure out where these guys are
8  off and on and whatever, the goal was 100% accuracy, we
9  want to know where these techs are all the time --
10         THE COURT:  Right.  I guess my concern in
11  reading it, though, is that may have been the goal, but
12  you're dealing with human beings, you're dealing with a
13  lot of human beings, and I looked at a number of these
14  CSG records where there would be hours where there
15  would just be no status.  You would have said, See,
16  they didn't take an hour lunch, and then Comcast would
17  say, But if you look, you'll see there's two or three
18  hours where they're not in status.  Period.
19         And there's just -- it's -- it just goes back
20  to garbage in, garbage out --
21         MR. RIGHETTI:  Well, yeah.
22         THE COURT:  -- and the question is the
23  reliability of the information the techs are putting
24  into the -- that CSG system, and I've never known any
25  system to be infallible, and this sure looks real
26  fallible.
27         MR. RIGHETTI:  Okay.  So you're right, no
28  system is infallible, and humans, you know, despite all

1    the greatness about humans, they err -- you know, to be
2    human is to err, I think they use -- is the phrase, but
3    the fact is that Comcast has not taken a broad approach
4    to systemically discredit CSG and the records of CSG.
5    What Comcast has done -- neither has Comcast embraced
6    CSG and its records; instead, Comcast has nibbled
7    around the edges of CSG by saying, Look, some techs may
8    have gone out of range or gone into a tunnel or not had
9    good service, some techs may have entered the wrong
10   status, some techs may have entered a status at the
11   wrong time, these types of human error situations, and
12   of course you're going to find those.  It's not very
13   difficult to find those in any case, in any situation,
14   and in class action cases in particular, that's exactly
15   what you expect to see is one side or the other relying
16   upon the system and policies and procedures and
17   practices, and the other side in a more defensive
18   position nibbling away at the edges, and I think that's
19   what Comcast is doing here is nibbling away at the
20   edges, saying, Sure, there's a red light out here on
21   the intersection, and sure, you know, 98% of the cars
22   stop at the -- you know, slow down at the yellow and
23   stop at the red, but gee, Your Honor, look, we've got,
24   you know, 5% or 3% or, you know, 10 people who are
25   going say they ran the red light or they saw people
26   running the red light, and that's exactly what we'd
27   expect to see is those exceptions.
28              THE COURT:  But for example, the system has a

1  feature that says if somebody hasn't entered a status
2  in the last two hours of the day, you're logged off.
3  There's something that logs you off after two hours,
4  and there were a number of instances where people just
5  didn't bother to turn their computer off or turn this
6  machine off, and so they look like they're working two
7  hours more under Mr. Breshears analysis than they
8  really did.  There's people who are compulsive, who
9  get up and turn this little gizmo on, whatever it is,
10 to see what they've got coming up for the day, then
11 they go take a shower, then they get dressed, have
12 breakfast and go to work, so it looks like they were
13 working a couple hours more a day.
14        There's just so many of these -- these --
15 these human issues with the data, and in terms of the
16 ability to rely on Breshears in the face of *Walmart* and
17 *Brinker*, which are after all those cases that talk
18 about using statistics in a class action, it just gives
19 me real pause.
20        MR. RIGHETTI:  Well, the statistical issue is,
21 of course, up in the *Duran* (phonetic) case at the
22 Supreme Court now.  Who knows when we'll get guidance
23 on that.
24        THE COURT:  As soon as we got it in *Brinker*.
25        MR. RIGHETTI:  What's that?
26        THE COURT:  Might be as soon as we got it in
27 *Brinker*.  I'm not going to wait for that one.
28        MR. RIGHETTI:  So I'm not sure --

53

1    THE COURT:  That's not even been fully briefed

2  yet, has it?

3    MR. RIGHETTI:  No, I think there was just an

4  extension on one of the briefs.

5    THE COURT:  That's what I thought.

6    MR. RIGHETTI:  The -- I -- I'm -- when the

7  Court says, Well, you know, the time -- the time

8  records may show people working longer than they

9  actually worked, I think the Breshears over-10 and

10  over-12 analysis had to do with time that was actually

11  paid by Comcast, the ESS records, not the -- Breshears

12  did not take -- in order to figure out over-10 and

13  over-12 shifts, he did not rely upon the CSG data, he

14  relied upon Comcast's payroll --

15    THE COURT:  In his second declaration.

16    MR. RIGHETTI:  I think in both, in analyzing

17  the over-10 and over-12.

18    THE COURT:  Okay.  I'll look that up.

19    MR. GLUGOWSKI:  My understanding in the second

20  declaration, it was an issue of he had counted shifts

21  where it ended at the 10th hour --

22    THE COURT:  Right.

23    MR. GLUGOWSKI:  -- so he came back and he

24  said, Well, when you back out the shifts where -- are

25  10 hours or less, that's what you're left with, but he

26  did look at the ESS because that was the records that

27  were used for payroll.

28    THE COURT:  Right, the second declaration he

Sarah L. Thompson, C.S.R. No. 12635

1   reduced the number of, quote, "potential" violations.

2   MR. GLUGOWSKI:  On the grounds he captured

3   some where the length of the day was at 10 hours.

4   MR. RIGHETTI:  The second meal period only is

5   triggered after 10, and in his first declaration, he

6   included shifts of 10, and it should have been only

7   shifts over 10, but both analyses were done on the ESS

8   records, which, you know, if the -- if neither the CSG

9   records nor the ESS records are accurate, then, you

10  know, I don't know where that leaves us in terms of the

11  Comcast record-keeping.

12  In addition, on the -- on the accuracy of the

13  CSG data, there's just a couple of exhibits that I

14  wanted to bring to the Court's attention, which is the

15  Dutton exhibit, which is Exhibit 9 to the opening brief

16  which talks about -- to John's declaration, and this is

17  the CSG most-knowledgeable person saying that, you

18  know, as you sit here today -- he's worked with Comcast

19  for 10 years, "As you sit here today, do you have any

20  concerns that the information captured by CSG is

21  inaccurate?  No, I have no concerns."

22  If you go to --

23  THE COURT:  No, no, but if I remember the

24  Dutton declaration, I think he recognizes the

25  garbage-in-garbage-out problem.  He's saying the system

26  accurately captures whatever it is that's input, but he

27  can't vouch for the accuracy of what's input.

28  MR. RIGHETTI:  Nobody can, you're right.

1    Murphy's law.

2            THE COURT:  Right.

3            MR. RIGHETTI:  If you go to the Jason Leon

4    deposition in terms of cell coverage, again, you know,

5    Comcast -- you know, to their credit, they make end

6    roads where there are end roads to be made.  You know,

7    in the cell coverage, sure, there's going to be

8    instances where there's cell coverage issues.  Jason

9    Leon in dispatch, "Question:  Would you characterize

10   that as a big problem, the cell coverage, or is it

11   something that's an exception rather than the norm?

12   Answer:  It's not a large problem, no."

13           And then in the Navarro, he's another

14   dispatcher, he talks about the fact that these people

15   have to stay logged on throughout the day and can't log

16   off until the end of the day.

17           So, you know, I don't think there's any reason

18   to completely throw out the baby with the bath water

19   here in terms of the CSG data.  Comcast went to a lot

20   of effort to create this system, to have policies with

21   the system, to train regarding the system, and Comcast

22   uses the system, and it uses it to report and to

23   investigate techs, but when it comes time for us -- for

24   them to disclose it and for us to call attention to it,

25   then all of the sudden, all of the work, all of the

26   system, all of the money they spent on it, and all of

27   the policies and training and procedures they use for

28   the system should not be relied upon by the Court,

1    so...

2            THE COURT:  All right.  Thank you very much.

3            MR. RIGHETTI:  Thank you.

4            THE COURT:  Why don't I hear from Mr. Alvarez.

5            MR. ALVAREZ:  Where to start, Your Honor.  Let

6    me start from the back.

7            MR. RIGHETTI:  How about you rest?

8            MR. ALVAREZ:  Let me start from the back.

9    What's wrong with --

10           THE COURT:  Excuse me.  Let me ask Ms. Kramer,

11   can you hear Mr. Alvarez when he stands up?

12   Ms. Kramer, are you able to hear Mr. Alvarez?

13           MS. KRAMER:  Yes, I am.

14           THE COURT:  It's actually the small

15   microphone.

16           MR. ALVAREZ:  The fundamental problem with the

17   Breshears declaration is that, as the Courts of Appeal

18   in *Lamps Plus* and *Chipotle* said, they can't answer the

19   question why, and that's ultimately the issue after

20   *Brinker*.

21           So in *Lamps Plus* and *Chipotle*, they had an

22   expert who actually used time records, and as you know,

23   we have a big argument as to whether these are time

24   records.  He used time records and the court said that

25   doesn't help; how is the finder of fact going to know

26   whether he wrote down the right time, whether -- why he

27   took less time to work.  It was completely useless when

28   the question is was a meal period provided.

1          So Breshears -- Brashears' testimony just

2    doesn't help on the commonality, and that's what those

3    two Courts of Appeal said.

4          THE COURT:  Can I ask you about the --

5          MR. ALVAREZ:  Yeah.

6          THE COURT:  -- over-12?

7          MR. ALVAREZ:  Yes.

8          THE COURT:  Mr. Righetti says you can't waive

9    over 12, and so if the record shows somebody went over

10   12 hours and didn't take a meal break, QED.

11         MR. ALVAREZ:  No.

12         THE COURT:  Okay.  Tell me why.

13         MR. ALVAREZ:  Because he's talking about a

14   waiver, and *Brinker* talks about the opportunity to

15   take, provide.  A waiver is not the same thing as

16   not -- as not taking the opportunity that's provided to

17   you.  A waiver is a mutual agreement between two

18   parties.

19         An employer may want to ask somebody to waive

20   their meal period, and so that's when you enter into a

21   waiver, but an employee has the right, after *Brinker*,

22   to not take their meal period that's provided,

23   including if it's after 12 hours.

24         If you look at Section 515, I think is the

25   section, it talks about a mutual waiver, but the

26   provide standard is what governs here.  So you can not

27   take the opportunity to take your meal period even if

28   it's after 12 hours, so I'd ask the Court not to

1  confuse the term "waiver" with not taking the
2  opportunity to have your meal period because the
3  waiver's a mutual agreement.
4       THE COURT:  So what you're saying, if I can
5  put it in maybe simpler terms, is that the law protects
6  the employee by saying that over 12 hours, he can't be
7  asked even to waive the meal period because there might
8  be some coercive effect to all of that --
9       MR. ALVAREZ:  Right.
10      THE COURT:  -- and we don't even want to see
11 waivers, but the employee, if he decides -- he or she
12 decides not to take that second meal, could still just
13 do that and walk off and go home.
14      MR. ALVAREZ:  Absolutely true.
15      THE COURT:  Okay.
16      MR. ALVAREZ:  I think that's exactly how
17 *Brinker* fits with 515.
18      MR. VALDEZ:  Your Honor, I'd just ask you to
19 consider --
20      THE COURT:  Excuse me.  Mr. Alvarez is
21 talking --
22      MR. VALDEZ:  Okay.  Sorry, sorry.
23      THE COURT:  Thanks.
24      MR. ALVAREZ:  I think that's the answer to why
25 you can't just use Breshears even for the 12-hour thing
26 because you don't know why people didn't have an extra
27 meal period, you don't know what actually happened that
28 day without actually doing an individualized inquiry.

1    So since the key question is why, and that's

2   what *Chipotle* and *Lamps Plus* make perfectly clear, I

3   think that is what the Court is understanding in the

4   questions today, so I wanted to raise that.

5    You know, just a quick response on why Comcast

6   is fussing about CSG data is because it's being

7   misused; that wasn't what it was for. Comcast has a

8   record-keeping policy that employees attest to every

9   pay period in which they attest to the fact that they

10   have a duty-free meal period, they attest to the fact

11   they have all the breaks they need, and so there's a

12   system for regulating that that's attested to by the

13   class members themselves. And so when they come and

14   try to use data that was designed for another purpose,

15   of course we're going to fuss about it; in fact,

16   Mr. Dutton's declaration, he says, I honestly declare

17   there's absolutely no foundation for Mr. Breshears

18   opinions. Of course, because he's using data for one

19   purpose that wasn't designed for it.

20    I guess the only other thing I'll say, Your

21   Honor, because I think I understand what the Court is

22   thinking, the policies are very clear, and they have a

23   burden of showing that there's a common set of evidence

24   that would show liability here. They don't have that.

25   We've shown you very clear policies, certifications by

26   the employees, the training manual, the policies

27   themselves, the WFX manual; they all say the right

28   thing, and they say the same thing.

1    So we've also shown you a lot of anecdotal

2  evidence that supports that, and it's all summarized in

3  our summary of evidence.  They have the burden of

4  showing that there's a whole nother [sic] way to try

5  this case, which they just haven't done.  Breshears

6  isn't a way to try the case.  You've been asking them

7  for two years for a trial plan, we still don't see one.

8    I just think, Your Honor, the time has come to

9  say we can't do this.  They're very capable lawyers;

10  they couldn't answer your question, they couldn't come

11  up with a trial plan.  Your Honor, I just submit that

12  you should de-certify this class.

13    THE COURT:  Let me ask you a couple of

14  specific questions.

15    Mr. Righetti says why does Comcast require

16  them to stay logged on during lunch, and he points to

17  the Frank exhibit, the example of Frank getting a phone

18  call 45 minutes in, and he says isn't it a fair

19  inference that because they have to stay logged on

20  during lunch and because that example shows Frank

21  actually responding to something 45 minutes in, the

22  practice really is that they're in two-way

23  communication during what's supposed to be a

24  uninterrupted meal period.  How do you respond to that?

25    MR. ALVAREZ:  *Brinker* allows employees to work

26  during their meal period if they choose to, and the

27  only purpose of that training was to show how to

28  properly record time worked.  It wasn't -- it wasn't

1   training that says you must answer your phone during a

2   break; it was training that says if you do, which is

3   what *Brinker*'s all about, if you do, then you're

4   entitled to be paid for it.   Footnote 19 in *Brinker*

5   makes that very clear.

6         But that example shows the other problem,

7   which is it would depend on when the call is being

8   placed, so if the call was received at 45 minutes, they

9   already had 30 minutes of a break.   So if you're

10  talking about a violation, using the fact that the

11  phone may ring will drag us into individualized

12  inquiries over when it rang, why they answered the

13  phone, and what they did after they answered it.   So it

14  isn't -- it doesn't demonstrate anything other than the

15  kind of individuality that you can't handle in a class

16  action case.

17        THE COURT:  Mr. Righetti also cited Shawn

18  Mainville's, I guess, deposition that there was an

19  expectation that they would answer or acknowledge

20  receipt of a job.  I -- I -- I have this general

21  recollection, I thought Mainville was more favorable to

22  the Defense than to the Plaintiff, but I don't remember

23  that particular piece of testimony.   Do you have in

24  your head Mainville?

25        MR. ALVAREZ:  I -- I -- go ahead.

26        MR. VALDEZ:  Yeah, I can tell you.

27  Mr. Mainville said, after the questioning, are -- do

28  you expect them to answer?  I mean, it was just, again,

1    one of those blocks where -- where they showed you one

2    piece of it about setting an ETA, and he said, No, I

3    don't expect hem to respond.  I don't -- I don't hound

4    them.

5             And it just -- it runs it, and I think we put

6    into our objections in evidence the context for a lot

7    of the deposition transcripts, and that's one of them

8    that we showed you, Your Honor.

9             THE COURT:  Let me just take a look at that.

10   That's -- Mainville was Exhibit 19 to Mr. Alvarez'

11   declaration.

12            MR. VALDEZ:  I have the transcript here, Your

13   Honor, if you have the --

14            THE COURT:  I have it all.

15

16            (Pause in proceedings.)

17

18            THE COURT:  Yeah, Page 64 of Mainville, "If

19   you knew that a technician was on a lunch break, did

20   you personally expect technicians to respond to you on

21   their lunch break?  Answer:  Not usually, no."

22

23            (Pause in proceedings.)

24

25            THE COURT:  And then Page 65 has -- at Line 20

26   has an interesting question, but the -- Page 66 is not

27   attached to this portion.  I'll have to go looking for

28   that.

1    MR. VALDEZ:  I can read it for you if you'd

2  like.

3    THE COURT:  Okay.

4    MR. VALDEZ:  He asks, "So the technicians that

5  you worked with then" --

6    THE COURT:  You have to read slowly and

7  distinctly for the court reporter.

8    MR. VALDEZ:  Sorry.

9    THE COURT:  You're speaking into your iPad.

10    MR. VALDEZ:  "So the technicians that you

11  worked with then, if they were on a lunch break and

12  decided to pick up their cell phones and respond to

13  messages, wouldn't you say that was their decision to

14  do so because you weren't mandating that they do so?"

15    THE COURT:  Then there's an objection.

16    MR. VALDEZ:  "Objection.  Calls for

17  speculation.

18    I don't know.  I don't know whether they were

19  aware of my expectations because I was rarely in the

20  role of assigning jobs, so I don't know.

21    Did you ever personally tell any technician

22  that it was mandatory for a technician to keep their

23  cell phone turned on during their meal period or rest

24  breaks?

25    No, I don't.  No, I did not."

26    And it runs on.

27    THE COURT:  Okay.  All right.  Thank you.

28    MR. ALVAREZ:  Your Honor, I guess I would also

1  just refer you to our summary of evidence, Point No. 1,

2  there's something like 40 different witnesses who say

3  they're not required to answer their phones during a

4  meal period.

5          THE COURT:  Right.

6          MR. ALVAREZ:  I mean, it's -- that's just our

7  Point No. 1; Point No. 2, 3, 4, and 5 has very similar

8  evidence.

9          So maybe there's somebody who might have

10  thought that, but how are we going to try that on a

11  class-wide basis?  It's -- we'd be searching for the

12  needle in the haystack somewhere, have to burn down the

13  whole ranch to find this particular person who was told

14  to work.

15          THE COURT:  Mr. Righetti, how do we do that on

16  a class-wide basis?  That -- that seems to me to be

17  kind of a serious issue because that goes back to my

18  distinguishing policies from practices and procedures,

19  and I remember reading some of the declarations you put

20  in way back when, and it's clear there was some

21  technicians who had a very deep and biding sense of

22  responsibility to their work and took it upon

23  themselves, it looked like, to just want to be in touch

24  at all times with everybody about everything, but then

25  I looked to see what was the policy of the company, and

26  it's clearly not the policy of the company.  Then I

27  looked to see, well, what's the -- the range of

28  practices, and far and away, the anecdotal evidence I

1    have through the declarations and the depositions seems

2    to suggest that it's not a requirement to be in touch,

3    but the question really is, as Mr. Alvarez says, how do

4    we try that on a class basis; how is this a manageable

5    question to put on a class basis?  What are we trying?

6         MR. RIGHETTI:  We're trying the level of

7    control or the level of involvement that these techs

8    had during their what's supposed to be an uninterrupted

9    lunch break, so --

10        THE COURT:  Excuse me, but one of the

11   opinions, I think it was Judge Kuhl's opinion from Los

12   Angeles, talked about the different security guards,

13   and she granted summary judgment of the plaintiffs on a

14   piece of it, but then she denied certification on the

15   rest of it, saying, look, these jobs come in all

16   different shapes and sizes, sometimes you've got, you

17   know, one person being a security guard all by himself

18   or herself, and sometimes you got rafts of people

19   guarding someplace, and she said in terms of figuring

20   out in that case whether or not the on-duty, off-duty

21   standards were met, you have to do all these individual

22   inquiries.

23        Here, I've got so many people saying, It was

24   not my expectation, how do you do this without putting

25   every single -- I mean, do you put everything single

26   tech on the stand and then you sort of weigh, out of

27   all of that testimony, whether it was more likely than

28   not that the company was requiring them to do this?

1   I'm not quite sure.

2        MR. RIGHETTI:  Well, I think you're going to

3   hear some anecdotal testimony from techs, and the

4   Court's going to have to determine from that anecdotal

5   testimony, you know, what the practice was in the

6   field.  You're going to hear the policy information,

7   you're going to hear the Chung testimony explaining,

8   you know, that these -- there was an expectation at

9   least that these people read the messages during their

10  breaks, and in some instances, depending on what the

11  importance of the message was, respond immediately.

12        There was another exhibit --

13        THE COURT:  Can you give me the cite to Chung,

14  please, because I do -- I think I do remember her

15  saying that.

16        MR. RIGHETTI:  It was 27, 15 to 28, 7.

17        MR. GLUGOWSKI:  That's Exhibit 11 to the

18  Righetti declaration.

19        MR. RIGHETTI:  I think it's in reply, yeah.

20        THE COURT:  Let me get there.

21        Well, here's Ms. Chung.  Page 24, a block of

22  this is from Mr. Righetti's declaration.  "Why do you

23  send any messages during the meal period when you know

24  they're on a meal period?

25        Answer:  I don't.  I try," dash, dash, "I

26  don't.  That was several years ago, but I have done it

27  some, but then I don't remember all of them."

28        And then it says on Page 27, "When you send a

1  message, do you put in the heading, 'Do not open until
2  after lunch'?
3        Answer:  I add that in the message.
4        In the heading?
5        Not in the heading.
6        Question:  The only way they will know that
7  they don't need to immediately respond is by reading
8  the text, correct?
9        Correct."
10       What about Ms. Chung?
11  MR. ALVAREZ:  Your Honor, that's one
12  dispatcher who's saying she doesn't call them, and I
13  guess the criticism is she doesn't put in the email,
14  Gee, don't answer this until after lunch.
15       You know, so this is one dispatcher among
16  many.  We have -- as I said earlier, in the evidence
17  points, we have lots and lots and lots of people who
18  say they don't.  Where's the commonality?  I mean, if
19  she was the only dispatcher for the entire company, for
20  the entire class, we would have kind of an interesting
21  discussion as to what she expected or not, but when
22  you're talking about 2,000 people over six years
23  expectation, how is the commonality going to be proven
24  when you have solid practice that Mr. Righetti conceded
25  was compliant with the law and a ton of that anecdotal
26  evidence in support of that.
27       I don't know how he gets to a liability
28  theory, which is really the key issue here.  The second

Sarah L. Thompson, C.S.R. No. 12635

1   question you asked in the -- in the tentative I think

2   is the key issue, how do you get to liability on a

3   common basis when you have this kind of a morass of

4   testimony on an issue like expectations?

5        Because, you know, just let me be clear about

6   this.  So let's say -- I mean, I would be entitled to

7   ask somebody, So was there an expectation that you

8   respond?  Some would say, Yes; some would say, No.

9   Okay.  If you did, did you respond?  Sometimes they

10  would say, No, I didn't; sometimes they would say, Yes,

11  I did.  Then I could ask them, So why did you respond?

12  So if he says, Well, because my boss says I have to,

13  then I have a problem.  If he says, Well, because I

14  really wanted to; I'm a type-A person.  So then I could

15  ask them, Okay.  What time of day was it that you

16  responded?  Did you already have 30 minutes, or did you

17  take 30 minutes afterwards?

18       I mean, every one of these things is going to

19  go down that path, and that's what's wrong where their

20  theory of the case, Your Honor.

21       THE COURT:  Okay.  Anything else you wanted to

22  say then, Mr. Righetti?

23       MR. RIGHETTI:  Just briefly.

24       You know, the field technician -- we started

25  off by talking about the Field Technician Daily

26  Responsibilities MNP, and there's a sentence out of

27  there right in the top of it, right in the beginning --

28       THE COURT:  Where are you reading from?

1           MR. GLUGOWSKI:  Exhibit 31.

2           THE COURT:  Sorry?

3           MR. GLUGOWSKI:  Exhibit 31 to the Righetti

4  declaration.

5           MR. RIGHETTI:  In reply.  And it says, quote,

6  "Every team member must remain committed to updating

7  their statuses in realtime and communicating

8  continuously throughout the day."

9           THE COURT:  What page is that, please?

10          MR. RIGHETTI:  That's Bates 20479, first page

11  of the Field Technician Daily Responsibilities MNP.

12          THE COURT:  Okay.

13          MR. RIGHETTI:  Third paragraph.

14          Then one other thing we didn't mention is the

15  Kurzhals depo, and Kurzhals is a manager who -- he's

16  block quoted on Page 8 of our reply papers -- I'm

17  sorry, Page 9 of our reply papers.  And that confirms

18  that nothing was ever given to techs informing them

19  that they are not to be responding to phone calls or

20  messaging during breaks.

21          So, you know, there's -- there's -- there are

22  ways, and then the other part of this whole thing,

23  which is, I think, interesting, which is in all of

24  these millions of lines of data, all these thousands of

25  employees in California, never has Comcast paid one

26  hour of pay for meal break or rest break issues, and I

27  think that's -- that was brought up to the Court in the

28  teleconference, the Court may recall, because they put

1    it in their papers, and during the teleconference on

2    discovery, I said, you know, I feel like we need to

3    respond to that issue, Your Honor, in our reply, and

4    the Court said, Well, I think that's more of a merits

5    issues than a class certification issue, but the fact

6    of the matter is is that Comcast does not have a policy

7    to pay one hour of pay, doesn't investigate these

8    situations, and where the daily timelines conflict with

9    their records for off-the-clock situations, they just

10   ignore those aspects of the records.  They don't even

11   conduct a further investigation into it, they just

12   ignore it.

13           So in terms of the other class -- the way this

14   can be tried on the class-wide basis, in addition to

15   the ESS and CSG records, we also have the messaging

16   records, which I mentioned before we took our break,

17   Mr. Breshears in Exhibit I think G to his second

18   declaration submitted with the reply, provides the

19   overlay that we can do showing showing those shifts

20   where clearly a tech read and responded to messages.

21   So you have this whole kind of layered analysis of

22   whether it's an on-duty break if they have to stay

23   logged on, or you can go deeper and say if they

24   actually received -- if a message was actually sent to

25   them, or deeper if they reviewed the message -- now, we

26   wouldn't know if they reviewed a message from the

27   records, we would have to -- from the messaging data,

28   but we know that from Chung that they had to review

1  records in order to figure out whether they had to

2  respond immediately because some messages required

3  immediate response.  And then, of course, we have the

4  messaging data showing actual responses to messages.

5      So there's a lot of -- John just mentioned to

6  me there's good things and bad things about technology.

7  In the old days, you know, we didn't have all this

8  information, and now there's, you know, a lot of

9  information available to us to use in these cases, and

10  there's no reason why we shouldn't put it to use in

11  this case.

12      THE COURT:  Thank you.

13      MR. RIGHETTI:  Thank you.

14      MR. ALVAREZ:  May I make one point, Your

15  Honor?

16      THE COURT:  Sure.

17      MR. ALVAREZ:  With respect to the premium pay,

18  I think as we discussed on the phone, that's a remedy

19  issue.  In order for a premium to be paid, somebody has

20  to not be provided a meal period, and our policies are

21  they're provided meal periods, so that's not a class

22  certification issue.

23      But I guess I'd ask the Court to get back to

24  where the Court started, which is all of these issues

25  he's raising, on-duty meal, late meals, second meals,

26  all are focused on the provide standard, so there would

27  have to be a showing that a meal wasn't provided at all

28  or was provided late or was not provided after the --

1  after 10 hours, and that is all an individualized

2  inquiry if you're going to disregard all of the

3  policies and practices and the anecdotal testimony from

4  multiple dozens of class members and dispatchers.

5        So with that, Your Honor, we think --

6        MR. RIGHETTI:  So -- two seconds.

7        MR. ALVAREZ:  -- we're through.

8        MR. RIGHETTI:  If -- if -- I just forgot to

9  mention this.  If what Mr. Alvarez says is correct,

10 that every meal period class action or every meal

11 period claim requires an answer for the question "why,"

12 whether it's a -- an eight -- the first meal period or

13 the second meal period, over 10, less than 12, or even

14 a meal period over 12, if you have to answer the "why"

15 for every one of those, then you might as well just

16 come right out and say that categorically, meal period

17 class actions are not going to be certified because

18 that's what you're doing, and I think everybody would

19 appreciate that guidance and make it a nice clear issue

20 for the Court of Appeal as well.

21        THE COURT:  Well, all right.  Let me just say,

22 I -- I've -- I've wondered about that question, and

23 that's what drove me initially to the policies versus

24 the -- the procedures.  I don't think there's anything

25 that says you can't have wage and hour claims with

26 respect to policies.  Practices I think are much dicier

27 post-*Brinker* because you do have the "provide" standard

28 now, and that does raise underlying factual questions.

73

1          So I -- my habit in mind is not to judge cases
2  not before me.  I'm not going to say that there's never
3  going to be a practices case that could be certified.
4  I just think it becomes more difficult post-*Brinker*.   I
5  think the ground has shifted given especially *Brinker*,
6  but also to some extent, *Walmart* and *Dukes* and, you
7  know, we'll see what happens with that, but I -- I -- I
8  think it's a little hyperbolic to say that therefore,
9  there will never be class actions in this field of law.
10          But I think we have -- I think it drives us to
11  a more careful analysis, a more detailed analysis than
12  maybe was made pre-*Brinker*, and even maybe I made
13  pre-*Brinker*.
14          So what I'm planning on doing is writing this
15  because sometimes things write differently than they
16  appear otherwise, so I will get you a written opinion
17  within the time required, and probably sooner since I
18  become -- I move out of this department on December
19  31st.
20          But I do want to thank you for all the
21  briefing and all the material you provided.  It was
22  very, very helpful, and it was particularly helpful in
23  finding out some tables and indices that showed me
24  where things were, but this was very, very careful
25  briefing.  It's clear you folks have put in an enormous
26  amount of work and thought into it and that just
27  first-rate lawyering is going into this on both sides.
28  It's kind of a treat to read all of this and to see the

1   quality of the product, so thank you for all of that,

2   and I'll just get you a decision as soon as I can.

3            MR. ALVAREZ:  Thank you, Your Honor.

4            MR. VALDEZ:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6

7            (Whereupon proceedings were concluded.)

8

9                    ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA        )
                           )        ss.
COUNTY OF CONTRA COSTA     )


I, SARAH L. THOMPSON, a Certified Shorthand Reporter of the Superior Court in and for the State of California, County of Contra Costa, do hereby certify that the foregoing pages above my printed name contain to the best of my ability a full, true and correct transcription of my stenotype notes of the proceedings had within the trial of said Court of the cause entitled FAYERWEATHER VS. COMCAST.  Case was numbered MSC08-01470 in the files of CIVIL actions of said Court; and that said transcript includes all rulings, acts or statements of the Court, also all motions, objections or exceptions of counsel, and all matters to which the same relate.

IN WITNESS WHEREOF, I have hereunto set my hand this __30th__ day of __August__,2013.


_____
Sarah L. Thompson, RPR, CSR #12635
Certified Shorthand Reporter

# EXHIBIT D

1
2

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**CONTRA COSTA COUNTY**

3
4
5

GABRIEL FAYERWEATHER, as an individual

6

and on behalf of others similarly situated

7

                        **PLAINTIFF**

8

V.

9

COMCAST CORPORATION, a Pennsylvania

10

Corporation; COMCAST OF CONTRA COSTA,

11

INC.; a Washington Corporation; and DOES 1

12

through 50 Inclusive,

13

                       **DEFENDANTS**

14

MSC08-01470

ORDER DECERTIFYING CLASS

15

     This is a wage and hour class action.  Plaintiff is a communications technician

16

("Com-Tech") employed by Comcast[1] and is responsible for installing cable, internet,

17

telephone and related services in Comcast customers' homes and offices.

18

     In his first amended complaint, plaintiff asserts causes of action for: (1) failure to

19

pay for all hours worked, (2) breach of an implied-in-fact contract, (3) failure to provide

20

proper meal breaks, (4) failure to provide proper rest breaks, (5) unfair business practices

21

and (6) failure to provide accurate itemized wage statements.

22

     Plaintiff sues on behalf of himself and others similarly situated.  The parties have

23

identified a class of more than 1,800 communications technicians.

24
25

---

[1] As used in this Order, "Comcast" refers to defendants Comcast Corporation and Comcast of Contra
Costa, Inc.

On April 12, 2010, the Court granted plaintiff's motion for class certification. In its order granting class certification, the Court found the issue of commonality, specifically the predominance of common questions, presented a "close case." (Order Granting Class Certification, Apr. 12, 2010, p. 5.) However, the court granted the motion, finding that there was a predominance of common questions under "plaintiff's theory that Comcast has adopted a policy of understaffing (or over-scheduling) that makes it unlikely that Com-Techs can have their required breaks each day." (*Id.* at p. 6.)

The Court rejected defendants' argument that individualized inquiries would be needed to determine liability. In rejecting that argument, the Court expressly relied on plaintiff's theory of the case that defendants had a company-wide policy that created liability.

Once the class was certified, plaintiff sought to set a trial date. The Court asked the parties how long the trial would take. Plaintiff was unable to give a reasoned estimate because he had not sufficiently considered how he would present his case.

The Court asked plaintiff to prepare a workable plan for the trial of his case-in-chief. It also asked the parties to meet and confer about the trial plan and attempt to determine a realistic estimate for the length of the trial. The Court conducted case management conferences on April 21, 2011, July 18, 2011 and November 17, 2011. At none of those hearings was plaintiff able to present a workable plan for the management of the trial. Defendant asked the Court to decertify the class.

By the time of the November 17, 2011 hearing, the California Supreme Court had heard oral argument in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal. 4th 1004. It was clear that the outcome of that case could have a significant bearing on this litigation.

After a discussion of these matters the Court ordered plaintiff to show cause why the class should not be decertified based on lack of predominance of common questions and lack of superiority and manageability. (Minute Order, Nov. 17, 2011.)  It also asked the parties to address – in their decertification briefs – the effect of the California Supreme Court decision in *Brinker Restaurant Corp. v. Superior Court* on the issue of certification. (*Id.*)  It ordered that plaintiff's opening brief be filed 45 days after the Supreme Court issued its ruling in *Brinker*.

Plaintiff filed his opening brief on May 29, 2012.  In it he advanced new theories which he claimed support a finding that common questions dominate the litigation. Essentially, plaintiff abandoned his claim that Comcast has a "policy of understaffing or over-scheduling."  In other words, plaintiff discarded the principal theory on which the Court had based its decision to certify a class.

Now plaintiff's theories are:

(1) Comcast has adopted a policy or practice that requires Com-Techs to (a) keep their phones on and (b) remain logged-on to the TechNet network[2], so that they are not relieved of all duty during their meal and rest breaks;

(2) Comcast has adopted a policy or practice that requires Com-Techs to record a 60 minute meal period on their timecards even though other company records show shorter lunch periods, making it likely that employees are required to work off-the-clock;

---

[2] TechNet is a component of a scheduling system developed for Comcast by CSG. The TechNet component is used by Com-Techs to log various status (*e.g.* "on job", "en route", "break", "lunch", etc.) that are reviewed by Comcast's dispatchers and supervisors for purposes of managing Com-Techs' schedules and work assignments.  The component of the CSG system used by dispatchers and supervisors is called WorkForce Express. (See, Dutton Decl. ¶¶ 4-7.)  Collectively, these components are sometimes referred to as the "CSG system."

3

(3) Comcast has failed to pay putative class members one hour of premium pay for missed or late meal periods;

(4) Comcast has adopted a policy that prohibits Com-Techs from waiving a second meal period for shifts greater than 12 hours, yet Comcast's records show that meal breaks for such shifts are often not taken; and

(5) Comcast has adopted a policy of not providing a third rest break for shifts greater than 10 hours in duration.[3]

In opposition, Comcast argues that plaintiff has not met his burden of showing these theories are susceptible to common proof. Comcast also argues that class treatment is not a superior means of litigating the case and that plaintiff's case would be unmanageable as a class action. Comcast adds that, under his new theories, plaintiff is no longer an adequate representative of the putative class.[4] Finally, Comcast moves to strike the declaration of plaintiff's expert, David Breshears.

On October 25, 2012, the court issued a tentative ruling with respect to the class certification motion and the motion to strike. As to the former, it wrote:

> The parties are to appear and be prepared to argue the merits of the class certification issues. The Court will allow each side an opening argument and asks that each side address at least: 1) whether there is a common issue with regard to an "on-duty lunch" and if so, what evidence supports the argument that Comcast has a policy of

---

[3] With his first motion for class certification, plaintiff presented theories similar to numbers two and three above. In its prior order granting class certification, these two theories were not separately addressed. Rather, the Court treated these two theories as derivative of plaintiff's theory that Comcast had a policy of understaffing and found that common issues predominated based on this overarching theory.

[4] Plaintiff testified in his deposition that the only basis for his meal and rest break claims was that Comcast was understaffed, which forced him to miss his breaks. (Alvarez Decl., Exh. 5, Depo. of Gabriel Fayerweather, p. 131:10-13.)

requiring Com Techs to remain on duty; 2) how there can be proof
that comports with *Brinker* and *Wal-Mart* to establish liability with
regard to alleged missed meal and rest breaks; 3) what weight, if any
to give to the Breshears declaration – and if it is to be given any
weight, how (if at all) it is helpful in deciding the issue before the
Court. [¶] By identifying these issues, the Court does not mean to
preclude counsel from addressing whatever else he or she thinks
relevant to the issue before it.

As to the Breshears declaration, it wrote:

> Defendants' motion to strike the declaration of David Breshears is <u>denied</u>.
> This order is made without prejudice to defendants' ability to challenge the
> admissibility of Mr. Breshears' testimony at a later stage of the litigation.
> It is also without prejudice to any argument that may be made as to what
> weight that should be given to Mr. Breshears' conclusions about "potential
> violations" at this stage of the litigation.

A hearing was held on October 26, 2012 at which time the court heard oral
argument from counsel for plaintiff and defendants.

The Court has read the extensive pleadings filed by the parties. It has read the
declarations, testimony and other supporting material submitted by them. It has carefully
considered the issues raised by both the motion to strike and the order to show cause. It
has determined that the motion to strike should be denied but that the class must be
decertified.

/// 

///

5

**I.    EVIDENTIARY RULINGS**

As a preliminary matter, the Court addresses the parties' evidentiary objections.

On October 25, 2012 the Court provided the parties with its tentative rulings on those objections. Neither party challenged the tentative rulings which, therefore, became final. Those rulings were (and are) as follows.

Defendants' Objections to Plaintiff's Opening Brief are <u>overruled</u> on all stated grounds. The objections are directed to the briefs as opposed to the underlying evidence, which goes to the weight of the argument and not the admissibility of the evidence.

Defendants' Objections to Dispatcher Declarations are <u>overruled</u> on all stated grounds, except as follows:

- Alcantar Declaration ¶ 4, last sentence, <u>sustained</u> for lack of foundation and lack of personal knowledge.

- Hodson Declaration ¶ 11, <u>sustained</u> for lack of personal knowledge and hearsay.

- Hodson Declaration ¶ 18, last sentence, <u>sustained</u> as improper opinion testimony.

- Hodson Declaration ¶ 21, first sentence, <u>sustained</u> for lack of personal knowledge.

- Douglas Declaration ¶ 13, last sentence, <u>sustained</u> as improper opinion testimony.

Plaintiff's Objections to Defendant's Evidence are <u>overruled</u>. Code of Civil Procedure § 436 is not a valid grounds for evidentiary objections; rather, it addresses the procedure for bringing a notice motion to strike an improper pleading. The objection to the declaration of Joshua Simes on relevance and foundational grounds is also <u>overruled</u>.

Defendants' Objections to Plaintiff's Evidence in Reply are <u>overruled</u> on all stated grounds. Though the objections appear to be directed to particular evidence, the bases for the objections are that plaintiff mischaracterized the evidence in his reply brief and his statement of evidence. This goes to the weight of the argument, not the admissibility of the evidence.

Defendants' unopposed request for judicial notice is <u>granted</u>. Evid. Code § 452, subd. (b), (d).

II.    **MOTION TO STRIKE**

Comcast seeks to strike the declaration of Mr. Breshears on the grounds that (1) he is not qualified to give an expert opinion on the matters asserted in his declaration; (2) his testimony is based on an unreliable scientific method; and (3) his testimony is based on unreliable data and does not concern issues that aid the trier of fact.

In his report, Mr. Breshears summarizes "potential" meal period violations based on his analysis of both Comcast's electronic time keeping system ("ESS") as well as a system developed CSG and used by Comcast to facilitate communications between Com-Techs and Dispatchers regarding the scheduling of appointments ("CSG"). Mr. Breshears opines that the CSG data is a more accurate representation of Com-Techs' hours, including when meal breaks were taken and the duration of each meal break.

Comcast first argues Mr. Breshears is not a qualified expert because he is not a statistical expert and no special training is required to report on employee pay data. Comcast cites no authority in support of its contention that only a statistical expert is qualified to testify on matters relating to an analysis of employee time records.

As a Certified Public Accountant (CPA) and Certified Financial Forensics professional (CFF), Mr. Breshears is qualified to review financial and payroll records from Comcast and prepare summary reports of those records. Indeed, Mr. Breshears

1   testified that he has performed such analyses in wage and hour matters, including class

2   actions, for over ten years. (Alvarez Decl., Exh. B, p. 11:6-12:15.)

3        The real concern, as discussed below, is not whether Mr. Breshears is qualified

4   but, rather, whether his testimony and reports will aid the court in determining common

5   questions of liability. In order to rely on this type of procedural tool, plaintiff "must

6   [first] explain how the procedure will effectively manage the issues in question." *Dunbar*

7   *v. Albertson's, Inc.* (2006) 141 Cal. App. 4th 1422, 1432.

8        Comcast next argues that Mr. Breshears' testimony does not satisfy the *Kelly/Frye*

9   standard because it is not based on generally accepted scientific techniques. The purpose

10  of the test set forth in the *Kelly* and *Frye* cases is to determine whether a new scientific

11  method or novel method of proof employed by an expert is sufficiently reliable. *People*

12  *v. Kelly* (1976) 17 Cal. 3d 24 (declining to admit expert testimony regarding voiceprint

13  identification because there was insufficient evidence the procedure had gained general

14  scientific acceptance); *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 (holding expert

15  testimony regarding lie detector results was not admissible because the new procedure

16  had not yet gained scientific recognition).

17       There is no evidence that Mr. Breshears has employed a new scientific method or

18  that preparing a summary of payroll records is a novel method of proof in wage and hour

19  class actions. To the contrary, analyses of payroll records have regularly been relied on

20  at various stages of wage and hour class actions. Although that kind of evidence has had

21  varying success on the merits, the evidence has been admitted by the courts. *See, e.g.,*

22  *Bell v. Farmers Ins. Exchange* (2004) 115 Cal. App. 4th 715, 746-7. Moreover,

23  Comcast's expert testified that Mr. Breshears' methods were appropriate for preparing a

24  summary report of the data he analyzed. (Righetti Decl., Exh. 1, Depo. of Dr. Johnson, p.

25  187:16-188:20.)

8

1   Comcast finally argues that Mr. Breshears' testimony does not satisfy the standard

2   set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 because

3   the testimony and declaration are based on unreliable data and do not aid the trier of fact.

4   In evaluating the admissibility of expert testimony, *Daubert* provides that a court must

5   consider whether the proposed expert is qualified to testify about the proposed scientific

6   knowledge and the testimony will aid the trier of fact. *Daubert*, 509 U.S. at 592-3.

7        With respect to the CSG data, there is evidence that Comcast has employed the

8   CSG system to provide visibility into what Com-Techs are doing throughout their work

9   shifts, including identifying when and for how long the Com-Techs are on meal and rest

10  breaks.  There is also evidence that Comcast trains its employees to update the CSG

11  system in real time and to attempt to ensure the data is accurate.

12        However, Comcast has also offered ample, persuasive evidence that a number of

13  factors interfere with the Com-Techs accurately reporting break times including human

14  error, poor cellular reception and issues with the CSG system software.

15        With respect to the ESS data, Comcast does not argue that the data are unreliable;

16  however, as with the CSG data, there is evidence that some of the data may not be

17  accurate.  For example, some employees testified that they recorded their lunch break at

18  noon even if they took an earlier or later lunch whereas others Com-Techs testified they

19  put the actual time of the lunch break in their ESS timesheet.  (Alvarez Decl., Exh. 1,

20  Alega Depo., p. 167:12-168:4; Alvarez Decl., Exh. 2, Brennan Depo., p. 53:13-54:25;

21  Alvarez Decl., Exh. 3, Brodeur Depo., p. 108:23-109:5; Alvarez Decl., Exh. 8, Grimes

22  Depo., p. 88:8-15; Alvarez Decl., Exh. 21, Harrell Depo. p. 142:8-17.)

23        At this stage, the Court has serious concerns about Mr. Breshears' reliance on the

24  CSG data.  However, those concerns appear to go to the weight, not the admissibility of

25  his opinion.  Since his conclusions refer largely to "potential violations" it appears that

1  the opinion may be entitled to very limited weight and (more to the point) may not aid the

2  court in determining the class certification motion.

3      Thus, the court denies the motion to strike. However, it will give Mr. Breshears'

4  declaration only the weight to which it is entitled. In addition, the Court will consider

5  carefully Mr. Breshears' conclusions, noting the limitations on what he does say and

6  equally importantly, the absence of conclusions that would be more useful in determining

7  the class certification issue.

8  **III.    CLASS CERTIFICATION**

9      The standard for determining whether to decertify a class is "simply whether the

10 class meets the requirements for class certification." *Walsh v. IKON Office Solutions,*

11 *Inc.* (2007) 148 Cal. App. 4th 1440, 1451.

12     Code of Civil Procedure section 382 provides that a plaintiff may sue for the

13 benefit of a class of individuals "when the question is one of a common or general

14 interest, of many persons, or when the parties are numerous, and it is impracticable to

15 bring them all before the court." Code Civ. Proc. § 382; *Sav-On Drug Stores, Inc. v.*

16 *Superior Court* (2004) 34 Cal.4th 319, 332.

17     The party seeking class certification has the burden of establishing by a

18 preponderance of evidence (1) the existence of an ascertainable class, (2) a well-defined

19 community of interest among the class members, and (3) that substantial benefit to

20 litigants and court would result from class certification. *Sav-On, supra,* 34 Cal. 4th at

21 326; *Brinker v. Superior Court* (2012) 53 Cal. 4th 1004, 1021. Community of interest is

22 comprised of three elements: (a) predominant common questions of law or fact; (b) class

23 representatives with claims or defenses typical of the class; and (c) class representatives

24 who can adequately represent the class. *Id.*

25

10

1    The certification question is essentially a procedural one that does not ask whether

2    an action is legally or factually meritorious. *Sav-On, supra,* 34 Cal. 4th at 326; *Linder v*

3    *Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439-440. The task of the court is to "examine the

4    allegations of the complaint and supporting declarations and consider whether the legal

5    and factual issues they present are such that their resolution in a single class proceeding

6    would be both desirable and feasible." *Brinker v. Superior Court* (2012) 53 Cal. 4th 1004,

7    1021-2 (internal citations omitted).

8        Here, the parties' filings include argument on the merits of the claims. The Court

9    has considered them, but only to understand the nature of the claims made by Mr.

10   Fayerweather, the defenses asserted by Comcast and how the litigation could and would

11   proceed as a practical matter. It has attempted to determine what the litigation involves,

12   what proof would be proffered and how the court's processes might be used to discover,

13   refine and resolve the issues presented. This ruling neither makes nor implies any

14   decision on any question of the merits of the litigation.[5]

15   A. Predominance of Common Questions of Law or Fact.

16       Common issues predominate if "'the issues which may be jointly tried, when

17   compared with those requiring separate adjudication, are so numerous or substantial that

18   the maintenance of a class action would be advantageous to the judicial process and to

19   the litigants.'" *Brinker, supra,* 53 Cal. 4th at 1021. Conversely, "the community of

20   interest requirement is not satisfied if every member of the alleged class would be

21   required to litigate numerous and substantial questions determining his individual right to

22   recover...." *City of San Jose v. Superior Court* (1974) 12 Cal. 3d 447, 459.

23

24   ───────────────

     [5] Though the Court did not consider the merits of the parties' claims in resolving the certification

25   question, it is not precluded from doing so under certain circumstances. "When evidence or legal issues
     germane to the certification question bear as well on aspects of the merits, a court may properly evaluate
     them." *Brinker, supra,* 53 Cal. 4th at 1023-4.

In wage and hour class actions, predominance of common issues may often be found where the plaintiff claims "a uniform policy consistently applied to a group of employees is in violation of wage and hour laws...." *Brinker, supra,* 53 Cal. 4th at 1033. Even where there is a policy in place that complies with applicable law, common issues may predominate where there is substantial evidence the policy is a sham – *i.e.* the employer has a common practice that undermines the formal policy "'by pressuring employees to perform their duties in ways that [violate the regulations].'" *Brown v. Wal-Mart Stores, Inc.* (2012) 2012 U.S. Dist. LEXIS 120733 at * 12 (citing *Brinker, supra,* 53 Cal. 4th at 1040).

### 1. *On Duty Breaks.*

Plaintiff argues Comcast has adopted a policy or practice that requires its technicians to keep their phones on and to remain logged-on to the TechNet network. This, they say, makes it unlikely that Com-Techs are relieved of all duty during their meal and rest breaks. Essentially, they argue the technicians get no breaks.

In determining whether to certify a class it is important to distinguish between a "policy" and a "practice." If a company has adopted a company-wide "policy," common proof is more easily found. If plaintiff relies on a "practice," then matters of proof may be far more individualized and problematic. That distinction is well-illustrated here.

It is clear that Comcast has not adopted a "policy" of requiring Com-Techs to remain on-duty during their meal and rest breaks. The evidence, as summarized below, shows that Comcast's policy is to relieve the Com-Techs of duty during their meal breaks. Instead, plaintiff seeks to rely on establishing that there is a "practice" that is at odds with the "policy."

///

///

12



a. The Legal Standard For Meal and Rest Breaks.

The employer's duty to provide a meal break is satisfied "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute meal break, and does not impede or discourage them from doing so." *Brinker, supra,* 53 Cal. 4th at 1040. An employer must also permit employees to take a second meal period for workdays in excess of 10 hours, which may be waived under certain circumstances. *Id.* at 1037. For rest breaks, an employer must authorize and permit its non-exempt employees "10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Id.* at 1029. Though the employer must provide the employee with an opportunity to take such breaks, the employer "need not ensure that the employee does no work." *Id.* at 1034.

Whether an employee is relieved of duty when he is required to carry a beeper or company telephone depends on several factors including:

"'1. Whether there are excessive geographic restrictions on the employee's movements[;] [¶] 2. Whether the frequency of calls is unduly restrictive[;] [¶] 3. Whether a fixed time limit for response is unduly restrictive[;] [¶] 4. Whether the on-call employee can easily trade his or her on-call responsibilities with another employee[;] and [¶] 5. Whether and to what extent the employee engages in personal activities during on-call periods.'" *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal. App. 4th 1524, 1535.

13

1   The determinative factor is "the level of the employer's control over its

2   employees, rather than the mere fact that the employer requires the employees'

3   activity...." *Morillion v. Royal Packing Co.* (2000) 22 Cal. 4th 575, 587.[6]

4            b.  Comcast's Policy.

5        Comcast's policy is clear.  When Com-Techs are on break or at lunch, they are to

6   be relieved of all duty.  The relevant policy is stated in at least two places.  The first is in

7   Comcast's Northern California Pay Policy Manual:

8            POLICY STATEMENT:

9            • Rest (Break) Periods

10           Non-exempt employees scheduled to work at least 3 ½ hours in a

11           workday will be given a ten (10) minute paid rest period for every

12           four (4) hours (or major portion thereof) worked.  The Company may

13           require employees to remain on the premises during the rest (break)

14           period.  At the department manager's discretion, breaks may be

15           fifteen (15) minutes.

16           • Meal Period

17           Non-exempt employees who work a shift in excess of five hours are

18           provided at least a thirty (30) minute unpaid, duty free, meal period;

19           unless, the employee's total number of hours worked is not more

20           than six (6) hours and the Company and employee have agreed to

21           waive this meal period requirement.  When an employee works more

22           than ten hours per day, the second meal period may be waived if (1)

23           the employee works no more than twelve hours that day, (2) the

24

25   _____

[6] This is discussed in more detail below.

1    employee and the employer agree in writing to waive the second

2    meal period, and (3) the first meal period has not been waived.

3    Employees may be allowed to leave the premises during unpaid meal

4    periods. Actual time the non-exempt employee spends on meal

5    period must be recorded on the employee time sheet. An 'on-duty'

6    meal period is permitted only when the nature of the work prevents

7    the employee from being relieved of all duty and when agreed to in

8    writing by both the employer and the employee. Time worked

9    during 'on-duty' meal periods is included for purposes of overtime

10   calculations, hence these types of arrangements should be kept to a

11   minimum.[7] (Glugowski Decl., Exh. 15 at p. 26.)

12   The other policy statement is found in the Field Technician Manual:

13   Comcast's Technician WFX policy indicates that you should change

14   your status to 'Break' or 'Lunch' as appropriate, during which you

15   should not perform any work-related tasks. You should change your

16   status back to 'Available' when the break period has been completed

17   and prior to beginning any work-related tasks. (Glugoski Decl., Exh.

18   1A at p. 22.)

19   This is supported by the testimony and declarations of numerous supervisors,

20   dispatchers and Com-Techs.[8] On the other hand, there was little or no testimony that

21

22   [7] Comcast University training materials also cited by plaintiff provides that if a Com-Tech performs any
     work during his meal break, he should record it as time worked on his timesheet. (Glugoski Decl., Exh.

23   21.)

24   [8] See, e.g., Benefield Decl. ¶ 4; Bratcher Decl. ¶ 7; Chambers Decl. ¶ 6; Darlin Decl. ¶ 4; Escobar Decl. ¶
     5; Goyer Decl. ¶ 4; Jones Decl. ¶ 7; King Decl. ¶¶12, 15; Kurzhals Decl. ¶¶ 11-13; Simes Decl. ¶ 5;

25   Vargas Decl. ¶¶ 9-10; Walkover Decl. ¶ 3; Sears Decl. ¶¶ 12-13; Cabada Decl. ¶¶ 5, 16; Chong Decl. ¶¶
     8-9; Alvarez Decl., Exh. 6, Florino Depo., p. 44:9-45:6, 55:3-12, 190:10-19; Alvarez Decl., Exh. 1, Alega
     Depo., p. 64:12-65:11; Alvarez Decl., Exh. 2, Brennan Depo., p. 36:13-18; Alvarez Decl., Exh. 13, Sivell

                                                                                              15

1   there was a policy that Com-Techs respond to communications during meal and rest

2   breaks.[9]

3        Plaintiff seeks to show that there was a different policy. He cites portions of the

4   Field Technician and Dispatcher manuals that say Com-Techs and Dispatchers should be

5   in communication throughout the work day via TechNet/Workforce Express. For this he

6   cites, Exh. 1A (p.1) and Exh. 1B (p. 17) of the Glugoski Declaration.

7        The first says,

8            Increased communication amongst the team is a key element of

9            success. Every team member must remain committed to updating

10           their status in real time and communicating continuously throughout

11           the day.

12       The second says,

13           Dispatch Messaging — continual communication with the field is a

14           critical component in a dynamic dispatch environment. You should

15           utilize the Dispatch Messaging function in WFX to maintain

16           communication to individual or groups of technicians.

17       But those passages are simply general statements about the use of the CSG system.

18   They are clearly modified by the more specific policies regarding meal and rest breaks.

19   So, for example, the document quoted above (Glugoski Decl., Exh. 1A at p. 22), says that

20   _____

21   Depo., p. 104:21-105:11; Alvarez Decl., Exh. 21, Harell Depo., p. 65:3-19; Alvarez Decl., Exh. 18,
    Douglas Depo., p. 64:17-65:25; Alvarez Decl., Exh. 19, Mainville Depo., p. 88:1-89:12; Alvarez Decl.,
22   Exh. 23, Burroughs Depo., p. 20:7-11; Alvarez Decl., Exh. 25, Navarro Depo., p. 25:4-12; Alvarez Decl.,
    Exh. 26, Ng Depo., p. 34:12-35:2, 53:13-25; Alvarez Decl., Exh. 27, Salazar Depo., p. 39:17-40:3, 40:22-
23   41:3, 42:3-21; Righetti Reply Decl., Exh. 15, Cabada Depo., p. 49:3-21; Righetti Reply Decl., Exh. 15,
    Chong Depo,. p. 16:19-17:10; Righetti Decl., Exh. 9, Sears Depo., p. 25:21-26:25.

24   [9] Though there were declarations and deposition testimony from Com-Techs who were told they had to
25   respond to calls and messages during meal breaks, the testimony is clear that it was at the request of a
    specific supervisor and not because of a company-wide policy. (Alvarez Decl., Exh. 6, Florino Depo., p.
    48:17-49:17; Alvarez Decl., Exh. 7, Fore Depo., p. 155:18-22, 179:21-180:15.)

                                                                                    16

1    part of the "continual communication" process is having the technician use the system to

2    indicate when he or she is at lunch or on a break, during which time he or she should do

3    no work-related tasks.

4        Plaintiff also cites sections of the Field Technical manual as well as dispatcher

5    deposition testimony that say the TechNet system will prompt Com-Techs if an assigned

6    job has not been acknowledged by the Com-Tech. (See, e.g., Righetti Reply Decl., Exh.

7    31, p. 5.)

8        But "prompting Com-Techs" means that the system will automatically send an

9    electronic message. It does not mean that the Com-Tech is required to respond to the

10   message instantaneously.[10] It is more like the sending of an e-mail. Though a task

11   message may be sent to a Com-Tech while he is on lunch, the evidence is there is no

12   expectation or requirement that the message be read simultaneously (or near-

13   simultaneously). Rather, the evidence shows that the expectation is it will be read when

14   the recipient returns to duty and looks at his communication device.

15       Plaintiff argues, more generally, that the policy requires the technician to be "in

16   communication" with the dispatchers at all times. But plaintiff has chosen the phrase "in

17   communication" very carefully. A close review of the material submitted by plaintiff —

18   as illuminated by colloquy during oral argument — shows that "in communication" is

19   different from "speaking with." "In communication" means that some electronic device

20   _____

21   [10] Alvarez Decl., Exh. 1, Alega Depo., p. 124:21-125:20 (if received message from dispatch his phone
     would beep but he could press the button to stop the reminder and then wait until after lunch to respond
22   after lunch); Alvarez Decl., Exh. 2, Brennan Depo., p. 83:4-18; Alvarez Decl., Exh. 17, Alcantar Depo., p.
     79:13-19; Alvarez Decl., Exh. 18, Douglas Depo., p. 93:12-94:1, 94:20-95:6; Alvarez Decl., Exh. 9,
23   Hodson Depo., p. 96:15-20; Alvarez Decl., Exh. 19, Mainville Depo., p. 89:13-90:4, 90:13-91:23;
     Alvarez Decl., Exh. 26, Ng Depo. p. 151:-152:5; Alvarez Decl., Exh. 23, Burroughs Depo., p. 32:2-10,
24   54:4-17; Righetti Reply Decl., Exh. 15, Chong Depo., p. 27:1-28:7; Righetti Reply Decl., Exh. 22,
     DeGuzman Depo., p. 43:3-44:25; Righetti Reply Decl., Exh. 8, Leon Depo., p. 92:4-25; Righetti Reply
25   Decl., Exh. 10, Palma Depo., p. 32:23-33:24 (did not expect immediate response to task messages that
     were sent during Com-Techs meal break); Righetti Reply Decl., Exh. 9, Sears Depo., p. 41:9-15; Righetti
     Reply Decl., Exh. 8, Leon Depo., p. 11-25.)

1    is capable of receiving messages while the Com-Tech has a meal or rest break regardless

2    of whether the device is turned on or is available to the Com-Tech. That a machine

3    remains capable of receiving messages even while the human is on break does not mean

4    that the human is not relieved of all work during a break.

5         A careful analysis of the parties' positions shows there is really no dispute about

6    Comcast's policy: Com-Techs are to do no work during their breaks. The Court finds

7    that plaintiff's argument about a policy that the Com-Techs remain "in communication"

8    does not come close to meeting the standards of *Ghazaryan* and *Morillion* discussed

9    below. There is no common issue to be tried with respect to Comcast's policy.

                    c.   Comcast's Practices.

11        Plaintiff also asserts there is a company-wide practice that undermines the

12    company's meal and rest break policy.

                    i.   Dispatchers' Declarations and Depositions.

14        In support of his argument, plaintiff submits declarations from dispatchers who

15    stated that they send messages to Com-Techs through the CSG system throughout the

16    work day and, to do their jobs, they need Com-Techs to be in "constant and continuous

17    contact" with them. (See, *e.g.*, Declarations of Leticia Alcantar, Celeste Bartol (Marty),

18    Marlene Charlie, Winifred Davey, Paulette Douglas, William Hodson, Shawn Mainville

19    and Anthony Lee.) Many of these declarations are written in identical language.[11]

20        However, when Comcast deposed these declarants, their testimony was often

21    quite different from the declaration. Testimony submitted by Comcast shows that, while

22    dispatchers may have sent messages to Com-Techs during break periods, there was not

23

24    ───────────────

25    [11] At the hearing on the order to show cause, plaintiff also cited the deposition testimony of dispatcher
      Phoeun Chong who testified that if a Com-Tech does not timely acknowledge a job, she will try to reach
      him and, if she is unsuccessful, will call his supervisor. (Righetti Reply Decl., Exh. 11, Depo. of Phoeun
      Chong, p. 20:16-21:18.)

                                                                                    18

1  necessarily an expectation that a Com-Tech would read or respond to the message if he or

2  she were on a break.

3      For example, several dispatchers testified that they did not expect Com-Techs to

4  respond to dispatch calls or messages when they were on break.  (See, e.g., Alvarez

5  Decl., Exh. 20, Depo. of Celeste (Bartol) Marty, p. 68:4-24; Alvarez Decl., Exh. 18,

6  Depo. of Paulette Douglas, p. 71:7-15, 86:4-19; Alvarez Decl., Exh. 9, Depo. of William

7  Hodson, p. 131:18-21; Alvarez Decl., Exh. 19, Depo. of Shawn Mainville, p. 88:1-89:7,

8  90:13-91:2.)

9      Other dispatchers testified that when they knew a Com-Tech was at lunch, they

10  would not actively attempt to contact the Com-Tech but might send updates on jobs for

11  the Com-Tech to review after his break.  (See, e.g., Alvarez Decl., Exh. 9, Depo. of

12  William Hodson, p. 92:5-93:19; Alvarez Decl., Exh. 31, Depo. of Marlene Charlie, p.

13  149:7-151:9.) [12]

14      Dispatchers also testified they understood they would not be able to communicate

15  with Com-Techs at all times and would simply move on to other technicians and other

16  job assignments until the Com-Tech was available again.  (See, e.g., Alvarez Decl., Exh.

17  31, Depo. of Marlene Charlie, p. 136:9-138:2, 147:10-148:17.)

18          ii.    Com-Tech Declarations and Depositions.

19      Plaintiff also offers declarations from several Com-Techs who state they were not

20  relieved of duty at lunch because they were required to respond to calls and messages

21  from dispatch and their supervisors.  (See, e.g., Declarations of Michael Fiorino, Chris

22  Fore, James Grimes, Craig McCullom, Dan Trujillo, Jason Williams and Gabriel

23  Fayerweather.)

24  _____

25  [12] Ms. Chong testified that when she knows the Com-Tech is on his lunch break, she will include in her
message that he does not need to respond until after his break is over. .  (Righetti Reply Decl., Exh. 11,
Depo. of Phoeun Chong, p. 27:15-28:7.)

1   At the hearing, plaintiff also argued that data from the CSG system shows that

2   Com-Techs regularly sent messages to dispatch during the time they posted in CSG that

3   they were on lunch. For example, when Anthony Hayes was twenty-one minutes into the

4   time he posted his lunch break status, he responded to a dispatch message regarding

5   assignment of jobs. (Breshears Reply Decl., Exh. G, p. 31 of 56.)

6   In opposition, Comcast submitted deposition testimony from plaintiff's declarants

7   as well as other Com-Techs. Many testified they did not need to respond to messages

8   during their breaks. They said they understood that practice (of not responding to calls

9   during their breaks) was consistent with Comcast policy. (See, e.g., Alvarez Decl., Exh.

10  1, Depo. of Ernani Alega, p. 64:12-65:11, 109:12-25, 110:22-111:5, 111:15-24; Alvarez

11  Decl. Exh. 2, Depo. of Matthew Brennan, p. 36:13-18; 82:18-83:18; Alvarez Decl., Exh.

12  13, Depo. of Jason Sivell, p. 49:8-50:25 (received calls from other technicians).)

13  Others testified that whether and under what circumstances they were required to

14  respond to calls at lunch varied greatly, depending on (among other things) the demands

15  of their respective supervisor and the on-the-job training received by the Com-Tech.

16  [See, e.g., Alvarez Exh. 6, Depo. of Michael Fiorino, p. 44:9-45:6, 190:10-19 (felt

17  pressure from prior supervisor to respond to calls during lunch but current supervisor tells

18  him to silence his phone during lunch); Alvarez Decl., Exh. 7, Depo. of Chris Fore, p.

19  114:16-115:17, 179:15-180:15 (told by previous supervisor that he could not turn off

20  phone or ignore messages on his laptop during lunch but did not feel same pressure under

21  his current supervisor); Alvarez Decl., Exh. 3, Depo. of Georges Brodeur, p. 152:2-24

22  (told during ride-along trainings that he should respond to all calls and messages

23  immediately).]

24  There was also evidence that, in some cases, Com-Techs responded to calls

25  voluntarily. (See, e.g., Alvarez Exh. 6, Depo. of Michael Fiorino, p. 46:15-47:14;

1   Alvarex Decl., Exh. 13, Depo. of Jason Sivell, p. 104:21-105:16.)  That would not be

2   considered a meal break violation.  *Brinker, supra*, 53 Cal. 4th at 1040 (noting that

3   "employees cannot manipulate the flexibility granted them by employers to use their

4   breaks as they see fit to generate [liability for a missed meal break]").

5        Several Com-Techs also testified that, other than remaining within a reasonable

6   range of their next appointment under certain circumstances, Comcast placed no

7   restrictions on how Com-Techs used their break time.  (Alvarez Decl., Exh. 8, Depo. of

8   James Grimes, p. 61:2-62:16; Alvarez Decl., Exh. 16, Depo. of Jason Williams, p.

9   171:14-23; Alvarez Decl., Exh. 1, Depo. of Ernani Alega, p. 107:15-108:25; Alvarez

10   Decl., Exh. 13, Depo. of Jason Sivell, p. 48:18-49:7.)  In addition, at least one Com-Tech

11   testified that, if he did respond to calls during lunch, he extended his lunch to make up for

12   the interruption.  (See, *e.g.*, Alvarez Exh. 6, Depo. of Michael Fiorino, p. 46:18-47:6.)

13        This evidence is only a sampling of far more that is in the record.  The Court does

14   not examine it to decide the merits of the case.  Rather, this evidence illustrates that there

15   is no predominant common issue.  As discussed below, the practices engaged in by

16   dispatchers and technicians are far from consistent.

17           d.  The Legal Precedent Regarding "On-Duty Breaks"

18        Plaintiff argues, essentially, that the law regarding on-duty breaks is such that

19   class treatment is appropriate despite the disparities in the evidence outlined above.

20        He argues that *Morillon v. Royal Packing Co.* (2000) 22 Cal. 4th 575 supports his

21   on-duty break argument.  In that case, the defendant Royal Packing Company required its

22   agricultural employees to meet at designated departure points to be transported by Royal

23   to and from the fields; employees were prohibited from using alternate transportation.

24   *Morillon, supra*, 22 Cal. 4th at 579.  Royal did not compensate its employees for the time

25   spent on travelling to the fields on Royal's buses.  *Id.*  The California Supreme Court

1  held that the travel time to and from the fields were compensable "hours worked"

2  because Royal exercised significant control over the employees' use of that travel time,

3  which "prohibit[ed] them from effectively using their travel time for their own purposes."

4  *Id.* at 586.

5      Plaintiff also refers to a January 28, 1992 DLSE opinion letter regarding beepers

6  and on-duty meal periods. (Alvarez Decl., Exh. 35, DLSE Opinion Letter 1992.01.28.)

7  There, the DLSE discussed whether an employee who is required to wear a pager is

8  sufficiently relieved of duty. The DLSE stated that

9      [i]f the employee is simply required to wear a pager *or respond to an in-*

10     *house pager* during the meal period there is no presumption that the

11     employee is under the direction or control of the employer so long as no

12     other condition is put upon the employee's conduct during the meal period.

13 (Alvarez Decl., Exh. 35, p. 3) (emphasis added). If, however, additional restrictions are

14 placed on the employee's obligation to respond – *e.g.* the employee is required to stay

15 within a certain distance of a telephone – then such increased level of employer control

16 during the meal period would transform the break to an "on duty" break and the

17 employee would be entitled to compensation for the entire meal period. (*Id.*)

18     Defendants cite *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal. App. 4th 1524.

19 There, the court ordered certification of a class of limousine drivers who were required to

20 be available for dispatch calls at all times during their shifts and, accordingly, were

21 unable to take meal and rest breaks. The court found there was a community of interest

22 between the named plaintiff and putative class members where the official company

23 policy expressly restricted what drivers could do during their shift, including significantly

24 limiting attention to personal business, expressly requiring drivers to respond promptly to

25 dispatch calls, and requiring drivers to clean and maintain their car while they are waiting

22

1    for their next assignment. *Ghazaryan, supra,* 169 Cal. App. 4th at 1536. In light of this

2    express company policy in which the company asserted significant control over its

3    drivers at all times, the court found that evidence that drivers varied in what they did

4    during their "on call" time did not defeat class certification. *Id.*

5            But there is a crucial distinction between this case and the precedent cited by the

6    parties. In each of the cited cases, there was a company-wide policy that governed all

7    employees' behavior. Thus, there was a common question that could be resolved

8    efficiently in a class action. Here, there is no such policy. There are only practices that

9    seem to vary among employees, supervisors, offices, and time frames.

10          *Practices have varied over time due to changing systems.* For example, prior to

11    the introduction of the CSG system, the only way to know if a technician was on break

12    was if he called to inform dispatch that he was going on break. (See, e.g., Alvarez Decl.,

13    Exh. 31, Charlie Depo., p. 78:12-79:8.) After CSG, the technician is supposed to change

14    his or her "status" to "lunch" when on meal break.

15          *Practices have varied by supervisor.* Some of the testimony shows that certain

16    technicians have had difficulty with a particularly harsh overseer. When freed from that

17    supervisor's oversight, they have had little or no problems. (See, e.g., Alvarez Exh. 6,

18    Depo. of Michael Fiorino, p. 44:9-45:6, 190:10-19; Alvarez Decl., Exh. 7, Depo. of Chris

19    Fore, p. 114:16-115:17, 179:15-180:15.)

20          *Practices have varied by dispatcher.* Some dispatchers seem more insistent on

21    communicating with their Com-Techs. Others say they are more "laid back." (Compare

22    Righetti Reply Decl., Exh. 21, Alcantar Depo., p. 57:16-58:23 to Alvarez Decl., Exh. 9,

23    Hodson Depo., p. 94:13-95:1.)

24          *Practices have varied by technician.* Some Com-Techs seem to feel that they

25    must respond to every phone call. (See, e.g., Alvarez Decl., Exh. 10, Lines Depo., p.

126:15-24.)  Most seem to understand that the company policy is to leave them alone for meals and rest breaks.  (See, e.g., Alvarez Decl., Exh. 1, Depo. of Ernani Alega, p. 64:12-65:11, 109:12-25, 110:22-111:5, 111:15-24; Alvarez Decl. Exh. 2, Depo. of Matthew Brennan, p. 36:13-18; 82:18-83:18.)

In short, there is not a consistent practice that violates the company's stated policy. Indeed, it appears far more likely that the general practice is to leave employees free to take their breaks.  But, to the extent there is contrary evidence, it demonstrates that the variations tend to be idiosyncratic.

The Court need not determine whether that is or is not true.  For purposes of determining whether a class should be certified, it is more useful to note only that there is no commonality; no evidence of a common practice that would make class treatment useful.

To determine if some Comcast technicians worked under company imposed circumstances in which they had only "on-duty" meals, would require highly individualized inquiry.  And given the testimony, it appears the issue would not be whether a given technician was required to remain on-duty through break time; the issue would be how often that happened to that technician.  This could be resolved only by particularized inquiry – not by class-wide proof.

Plaintiff has failed to meet his burden of showing there is a company-wide policy or practice pursuant to which Comcast exerts such control over its Com-Techs that renders all breaks "on-duty."

Accordingly, the court finds the question of whether plaintiff's breaks were "on-duty" is not an issue that is amenable to class treatment.

///

///

24

2. *Off the Clock Work*

To show a common interest exists for an off-the-clock claim, plaintiff must present evidence of "a systematic company policy to pressure or require employees to work off-the-clock." *Brinker, supra,* 53 Cal. 4th at 1051. An employer can only be held liable for such claims where the employer knew, or should have known, that work was being performed. *Morillion, supra,* 22 Cal. 4th at 585. If employees were clocked out at the time plaintiff claims they were required to work, then there is "a presumption that they were doing no work...[and] liability is contingent on proof [defendant] knew or should have known the off-the-clock work was occurring." *Brinker* at 1051.

Plaintiff's off-the-clock claim relies on his contention that the company required that he record a lunch of exactly 60 minutes regardless of how much time he actually took. Plaintiff does not argue that there is an express written policy on this issue. The question then is whether there is a practice, amenable of common proof, that plaintiff offers as a way of litigating this matter as a class action. There is not.

Essentially, plaintiff's off-the-clock theory rests on the contention that Comcast's time records must be unreliable because: (1) nearly all the meal breaks recorded by Com-Techs on their timesheets are exactly one hour; and (2) data from the CSG system shows meal periods of varying lengths of time.

Comcast employees submit weekly timesheets for purposes of getting paid. Each is responsible for filling out a time sheet. A sample is found at Plaintiff's Appendix of Evidence at Exhibit K to the Kramer Declaration. When turning in the timesheet, the employee certifies:

> I certify that the time and hours recorded on this timesheet accurately and fully identify all time that I have worked during the designated pay period above. I acknowledge that during that

25

1       designated pay period: (1) I have taken all rest breaks for which I am

2       entitled under the law including at least one 10 minute break for

3       every four hours of work or major portion thereof; (2) I have taken

4       all meal breaks for which I am entitled under the law including at

5       least one half-hour meal break whenever I worked more than five

6       hours and an additional half hour if I worked more than 10 hours;

7       and (3) I am relieved of all duty and free to leave Comcast's

8       premises during my meal breaks. By signing this timesheet, I freely

9       and voluntarily certify that the statements above are true and correct.

10    Plaintiff says that employees are pressured into filling out what are, in effect,

11 fictitious timesheets. Plaintiff cites no common evidence of a central direction that this

12 be done. Instead, plaintiff contrasts the time sheets with something called CSG data.

13    The CSG data relied on by plaintiff are pulled from the CSG database, which

14 stores Comcast's customer records including jobs that are assigned to and completed by

15 Com-Techs. (Glugowski Decl., Exh. 4, Miguel Depo., p. 24:10-25:12, 27:4-20.) To

16 interface with the CSG database, Com-Techs use a system called TechNet to see what

17 jobs they are assigned each day and to report on the status of each job including: the

18 Com-Tech's estimated time of arrival; whether the Com-Tech has started the job; and

19 whether the job has been completed. (Id. at p. 33:4-34:15, 37:19-38:9, 39:10-40:10,

20 42:7-16.) The CSG database records both the status that was entered and the time it was

21 entered. (Id.) Com-Techs can also use TechNet to signify when they are on a lunch or

22 rest break, which information is communicated to dispatch and managers and is also

23 recorded in the CSG database. (Id. at p. 47:11-48:7, 49:4-13.) Comcast can and does run

24 reports summarizing the data captured by the CSG database. (Id. at p. 45:18-46:10.)

25

26

1       Comcast argues that the CSG data are unreliable as time records for compensating

2   employees because a number of factors interfere with the Com-Techs accurately

3   reporting break times including human error, poor cellular reception and glitches with the

4   CSG system software.  (Comcast Response Brief p. 30.)  In addition, Comcast argues that

5   the intent of the CSG system is not to track time for payroll; rather, it is a job

6   management system used to facilitate communication between its Com-Techs and its

7   Dispatchers in order to increase efficiency and productivity in responding to customer's

8   needs.  (Id.)

9       The key question, however, is whether there is common proof that permits this

10  case to proceed as a class action.  Plaintiff says there is, and offers the testimony of its

11  expert, David Breshears.  Mr. Breshears is a Certified Public Accountant (CPA) and

12  Certified Financial Forensics professional (CFF) who analyzed data from both Comcast's

13  timekeeping system ("ESS") as well as the CSG system.

14      According to Mr. Breshears, the CSG status entry data show that the average

15  duration that Com-Techs were in the "lunch break status" was .77 hours.  (Breshears

16  Reply Decl., Exh. C, p. 19.)  Similarly, a daily timeline report prepared by Comcast based

17  on CSG data showed the average lunch status lasted for 49 minutes.  (Glugoski Decl.,

18  Exh. 8.)  Plaintiff argues that this evidence tends to show that Comcast's payroll records

19  ("ESS" records) must be incorrect because those records show that the average lunch

20  duration was .99 hours.  (Breshears Reply Decl., Exh. B, p. 43.)

21      There are significant problems with that offering.  Mr. Breshears does not opine

22  that there were actual violations of the wage and hour laws.  Instead he says these data

23  may be used to identify "potential violations."  Thus, even if the data were reliable

24  (which Comcast disputes) it would not go very far towards determining liability.  Plaintiff

25  does not explain how it would go from Mr. Breshears' opinion of a "potential violation"

1   to proof of an actual violation without calling individual Com-Techs to testify about their

2   individual circumstances. Thus, plaintiff has not shown that there is common proof of

3   liability in order to support class treatment of the off-the-clock claim.

4        There is another problem. Mr. Breshears relies on the CSG data as if they were

5   more accurate than the time records. But there are serious questions about their accuracy.

6        Comcast cites testimony from multiple witnesses who state that CSG is not a

7   reliable indicator of an employee's hours worked or time spent on break. For example, a

8   representative of CSG, Scott Dutton, testified that CSG is not intended to be a

9   timekeeping system. (Dutton Decl. ¶ 4; Alvarez Decl., Exh 28, Dutton Depo., p. 10:6-

10   11:6.)

11        In addition, several Com-Techs testified that CSG is not a good indication of the

12   time they worked or were on break because there were glitches with the system or they

13   mistakenly did not update the system. (See, e.g., Alvarez Decl., Exh. 6, Depo. of

14   Michael Fiorino, p. 101:1-102:18; Alvarez Decl., Exh. 3, Depo. of Georges Brodeur, p.

15   101:2-17; Alvarez Decl., Exh. 15, Depo. of Dan Trujillo, p. 89:10-18, 110:7-21; Alvarez

16   Decl., Exh. 2, Depo. of Matthew Brennan, p. 63:9-64:16.)

17        A Comcast Report Analyst further testified that she has seen situations in which

18   Com-Techs have entered lunch status in the CSG system multiple times in one day.

19   (Glugoski Decl., Exh. 4, Depo. of Shauntee Miguel, p. 106:10-19.) Comcast managers

20   similarly stated that Com-Techs often did not or could not enter a status in CSG in real

21   time. For example, Robert Benefield stated that if a Com-Tech chooses to check on his

22   next job during his meal break, TechNet will automatically take him out of lunch status

23   even though he has not completed his meal break. (Benefield Decl. ¶ 6.) Other managers

24   stated that some Com-Techs have purposely entered incorrect statuses. (See, e.g.,

25   Kurzhals Decl. ¶ 6, Exh. 2; Bratcher Decl. ¶ 5; King Decl. ¶ 7.)

28

1    In addition, in the records put in evidence by the parties, there were often large

2  gaps of time in which no active status was recorded. [See, .e.g., Glugowski Decl., Exh. 5

3  (showing for Charles Anderson that there were several larges blocks of time where he

4  was not on the job or en route to a job).]

5    Again, the Court does not review the evidence to find whether the CSG data are or

6  are not reliable. But it finds that, were this to be certified as a class action, it would be

7  likely that considerable trial time would be spent on the question of whether the CSG

8  data are reliable.

9    If the jury found they were reliable, then it would be left with Mr. Breshears'

10 testimony of "potential violations." Without more, the jury would not have sufficient

11 evidence to find class-wide liability. If, on the other hand, the jury found the CSG data

12 were not reliable, then it would have no basis for determining the off-the-clock claim

13 absent individualized proof from each class member.

14    Given all of this, even if the CSG data were reliable, it does not offer a path to

15 common proof of liability that makes this an appropriate class action. All Mr. Breshears

16 can do is put the parties on inquiry notice; and the necessary inquiry then requires a

17 descent into individual inquiry of each technician with respect to each instance on which

18 the records show a discrepancy between the time reported on his or her time sheets and

19 the CSG data.

20    Simply put, given the quality of the evidence offered by plaintiff, the off-the-clock

21 claim is not susceptible of class treatment.

22    3. *Missed and Late Meal Periods*

23    Plaintiff argues that Comcast failed to pay the putative class members one hour of

24 premium pay for meal breaks not taken or waived in the first six hours of work, meal

25 breaks taken after the fifth hour of work and for meal breaks for durations shorter than 30

29

minutes. Plaintiff also asserts that Comcast failed to pay class members premium pay for meal breaks not taken or waived for shifts greater than 10 hours but less than 12 hours and for meal breaks not taken for shifts greater than 12 hours.

Plaintiff's theory relies, in part, on the assumption that if an employee's time records do not show either a 30-minute meal break (or, where appropriate, a waiver) then the wage and hour laws are violated. Comcast argues that its duty under *Brinker* is to *provide* a duty-free meal break and it does not have a duty to *ensure* that its employees take advantage of the meal break provided.

Here, to determine whether common issues predominate, the court must first resolve the parties' dispute regarding the applicable legal standard defining Comcast's duty with respect to meal breaks. Though a court generally should not resolve legal or factual disputes at the certification stage, "if the presence of an element necessary to certification, such as predominance, cannot be determined without resolving a particular legal issue, the trial court *must* resolve that issue at the certification stage." *Brinker, supra*, 53 Cal. 4th at 1025-6 (emphasis added); *Fireside Bank v. Superior Court* (2007) 40 Cal. 4th 1069, 1085-6; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal. 4th 906, 915-6.

Plaintiff argues that an employer breaches its duty to provide a meal break if the employee does not take a meal break and the employer has not obtained a waiver. Plaintiff further argues that, since Labor Code section 512 prohibits an employer from obtaining a waiver of the second meal period for shifts greater than 12 hours, the employer has violated its duty if the second meal period is not taken.

Plaintiff's theory of liability is not consistent with the California Supreme Court's decision in *Brinker*. In *Brinker*, the court held that the employer's duty is to *provide* its non-exempt employees the *opportunity* to take a first meal period after no more than five

30

hours of work and a second meal period after no more than ten hours of work. *Brinker, supra*, 53 Cal. 4th at 1049. The employer's duty to provide a meal break is satisfied if

> [the employer] relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute meal break, and does not impede or discourage them from doing so.

*Brinker, supra*, 53 Cal. 4th at 1040.

The waiver language in Labor Code section 512 is not inconsistent with the holding in *Brinker*. Labor Code section 512 provides further protection for the employee by limiting the circumstances under which an employer can ask an employee to give up her right to a meal period. Specifically, with respect to the first meal period, section 512 states:

> [a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.

Lab. Code § 512, subd.(a).

As to the second meal period, section 512 similarly limits the circumstances in which an employer can request a meal period waiver as follows:

> ...if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

*Id.*

1    The protections in section 512 restrict when *the employer* can make requests of the
2    employee to waive a meal period.  Nothing in section 512 limits *the employee's* ability to
3    use her meal period as she chooses, including choosing to perform work.  Accordingly, to
4    maintain this matter as a class action, plaintiff must show there is substantial common
5    evidence that Comcast failed to provide its Com-Techs with *the opportunity* to take a
6    duty free meal break lasting at least 30 minutes.

7          The evidence submitted by the parties shows that Comcast had a company-wide
8    meal break policy (quoted in full above) that is consistent with the applicable wage and
9    hour regulations.  Comcast's meal break policy provides for one meal period of at least
10   thirty minutes for shifts in excess of five hours and a second meal period for shifts in
11   excess of ten hours.  (Glugoski Decl., Exh. 15, p. 26.)  The policy further provides that
12   Comcast and the employee can agree to waive the first meal period for shifts of six hours
13   or less.  (Id.)  They can also agree to waive the second meal period if the employee works
14   twelve hours or less, has not waived his first meal period and agrees to the waiver in
15   writing.  (Id.)  Accordingly, to succeed in showing the case should be litigated as a class
16   action, plaintiff must show there is a company-wide practice that undermines this formal
17   policy. *Brown v. Wal-Mart Stores, Inc.* (2012) 2012 U.S. Dist. LEXIS 120733 at * 12
18   (citing *Brinker, supra*, 53 Cal. 4th at 1040).

19         To show there is a company-wide practice that violates applicable wage and hour
20   regulations, plaintiff relies primarily on calculations performed by his expert, David
21   Breshears, and asserts that Comcast time records show a number of missed meal breaks
22   after the fifth and tenth hours of work that he opines are "potential violations" of
23   applicable wage and hour regulations.  (See, e.g., Breshears Reply Decl., Exh. B.)  Mr.
24   Breshears' testimony relies on the analysis of data from both Comcast's technician
25   scheduling software, CSG, as well as Comcast's payroll timekeeping system, ESS.  As

32

1   discussed above, Mr. Breshears' testimony is not sufficient common evidence of

2   Comcast's liability as it only identifies "potential violations."

3           Mr. Breshears testified that, in performing his calculations, he only took into

4   account whether a meal break fell within the four defined categories in his report and did

5   not consider any other factors (*e.g.* whether there was a valid waiver). (Alvarez Decl.,

6   Exh. 41, Depo. of David Breshears, p. 80:24-81:21.) He also testified that he did not

7   know what the employee was doing during the missed lunch break period. (Alvarez

8   Decl., Exh. 41, Depo. of David Breshears, p. 77:25-78:4.) As *Brinker* makes clear, an

9   employer must provide the employees with a reasonable opportunity to take her meal and

10  rest breaks; the employer "is not obligated to police meal breaks...." *Brinker, supra*, 53

11  Cal. App. 4th at 1040.

12          Here, Mr. Breshears has identified only "potential violations" and, in performing

13  his calculations, did not consider the reasons for the missed or late meal breaks.  In

14  addition, several ComTechs testified they would miss meal periods or work during their

15  meal periods for reasons that would not be violations.  (See, Alvarez Decl., Exh. 2, Depo.

16  of Matthew Brennan, p. 67:8-68:2; Alvarez Decl., Exh. 6, Depo. of Michael Fiorino, p.

17  46:18-47:6; Alvarez Decl., Exh. 7, Depo. of Chris Fore, p. 115:12-22.)

18          Absent an over-arching illegal company policy, identifying "potential" violations

19  merely puts the court on inquiry notice.  Any inquiry into actual violations would require

20  individual inquiry into the reasons that a meal break was missed and/or not recorded in

21  Comcast time records.  Thus, since individual issues predominate, this issue is not

22  appropriate for resolution on a class-wide basis.

23  ///

24  ///

25  ///

33

4. *Third Rest Break For Shifts in Excess of 10 Hours*

Plaintiff devotes one paragraph to this issue and asserts that employee time records show that Com-Techs who worked in excess of 10 hours per day were not authorized or permitted a third rest break. This assertion is not supported by the evidence offered by plaintiff.

The corporate rest policy provides that Comcast employees are permitted a rest break of *at least* ten minutes "for every four (4) hours (or major portion thereof) worked." (Glugoski Decl. Exh. 15, p. 26.) Plaintiff cites to a copy of Comcast's paper timecard – though paper timecards have not been employed by Comcast for some time – as evidence of Comcast's policy prohibiting a third rest break. Plaintiff argues that because the timecard does not specifically include a third rest break set of columns. (See, e.g., Glugowski Decl., Exh. 2.)

The evidence does not support plaintiff's position for several reasons. First, the paper timecard includes an "other" column that could arguably be used to record a third rest break. (Glugowaki Decl., Exh. 2.) Second, there is ample evidence from both parties that Comcast has not used the paper timecard system for a significant portion of the class period. (See, e.g., Glugowaki Decl., Exh. 12, Walkover Depo., p. 39:3-14; Glugowaki Decl., Exh. 14, Hemphill Depo., p. 45:17-46:6; Alvarez Decl., Exh. 1, Alega Depo., p. 81:13-20; Alvarez Decl., Exh. 12, Sivell Depo., p. 41:6-24.) Finally, there is no evidence in the record that shows how the current electronic timekeeping system deals with third rest breaks, much less that it shows non-compliance with the applicable laws and regulations.

Plaintiff also cites declarations of several current and former Com-Techs who claimed their work schedules prevented them from taking rest breaks; however, in deposition, many of these Com-Techs disavowed some or all of their statements or

34

1   testified that the missed meal and rest breaks were not the result of a company-wide

2   policy. For example, several of these employees testified at deposition that the issue with

3   scheduling and breaks was the result of issues with a few bad supervisors. (See, e.g.,

4   Alvarez Decl. Exh. 3, Depo. of Georges Brodeur, p. 47:14-24; Alvarez Decl. Exh. 7,

5   Depo. of Chris Fore, p. 179:21-180:15.) Other deponents testified that they regularly

6   took rest breaks and that their rest breaks lasted 20 to 25 minutes. (See, e.g., Alvarez

7   Decl., Exh. 1, Alega Depo., p. 128:25-129:7; Alvarez Decl., Exh. 11, Depo. of Craig

8   McCullom, p. 46:14-47:4.)

9        Finally, plaintiff offers no time records supporting his contention. Indeed, the

10   extensive analysis performed by Mr. Breshears includes no discussion of rest break

11   violations. Accordingly, plaintiff has not met his burden of showing a predominance of

12   common issues with respect to his claim of missed third rest breaks.

13   B. Superiority and Manageability.

14        Plaintiff has the burden to show that a class action is "'superior to other available

15   methods for the fair and efficient adjudication of the controversy.'" *Dean Witter*

16   *Reynolds v. Superior Court* (1989) 211 Cal. App. 3d 758, 773. Courts should "allow

17   maintenance of the class action only where *substantial benefits* accrue *both* to litigants

18   and the courts.'" *Linder v. Thrifty Oil Co.* (2000) 23 Cal. 4th 429, 435 (internal citation

19   omitted) (emphasis added).

20        Given the size of the proposed class and the number of individual issues that must

21   be resolved to determine issues of liability, the court finds that class treatment is not

22   superior because it would required hundreds, if not thousands, of mini-trials and would

23   prove wholly unmanageable.

24   ///

25   ///

1    C. Adequacy of Representation.

2        Since the court has determined that individual issues predominate and class

3    treatment is an inferior means of adjudicating this case, it is unnecessary to reach

4    defendant's argument regarding the adequacy of representation.

5    D. Conclusion.

6        For the reasons set forth above, the court orders the class decertified.

7

8    Date: December 15, 2012

9

10                                           Barry P. Goode
11                                           Judge, Superior Court

Digitally signed by
Barry Goode
DN: cn=Barry
Goode, o=US,
o=Superior Court,
ou=Judge
Date: 2012.12.15
13:34:42 -08'00'

36

# EXHIBIT E

# Fayerweather v. Comcast Corp.

Court of Appeal of California, First Appellate District, Division One

August 28, 2014, Opinion Filed

A137872

**Reporter**

2014 Cal. App. Unpub. LEXIS 6185

GABRIEL FAYERWEATHER et al., Plaintiffs and Appellants, v. COMCAST CORPORATION, et al., Defendants and Respondents.

**Notice:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**Prior History:** [*1] Contra Costa County Super. Ct. No. MSC-08-01470.

**Judges:** Margulies, Acting P.J.; Dondero, J., Becton, J.[*]

**Opinion by:** Margulies, Acting P.J.

# Opinion

Plaintiff Gabriel Fayerweather, a communications technician employed by defendant Comcast Corporation (Comcast), filed this wage and hour action on behalf of his fellow technicians.[1] The trial court initially certified a class with respect to his claim that Comcast has a policy of overworking its technicians, thereby denying them proper meal and rest breaks. When plaintiff's claim appeared to mutate in the course of the litigation, the trial court issued an order to show cause as a means to revisit the certification decision. In response, plaintiff abandoned his claim of understaffing and sought class certification with respect to several new theories, including data recorded by a communications system used by the technicians demonstrated widespread meal and rest break violations not reflected in the technicians' self-reported time records. The trial court decertified the class, finding, among other grounds, the communications [*2] system was an insufficiently accurate measure of the technicians' activities to serve as common proof of the violations. We affirm.

## I. BACKGROUND

Plaintiff filed this putative class action in May 2008, alleging various wage and hour violations by his employer, Comcast, on behalf of a class consisting of all "service technicians" and "communications technicians" (together, technicians) in California. As the first amended complaint explained, technicians' jobs require them to pick up and load a truck at a central office in the morning, drive among off-premises jobsites during the work day, and return the truck to the central office at the end of the day. The first amended complaint alleged Comcast violated various wage orders and statutes by (1) failing to compensate technicians for time worked at the beginning and end of the day, (2) failing to provide proper meal and rest breaks, and (3) failing to provide proper paychecks.

The trial court granted a motion for [*3] class certification in April 2010. The certified class included all technicians, defined by several specified Comcast job titles, employed by Comcast in California from May 2004 through April 2010.

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] The complaint lists two defendants, one of which appears to be a corporate subsidiary of the other. Because the distinction between the defendants is immaterial for purposes of this appeal, we refer to them jointly as "Comcast."

The class was certified with respect to a single legal theory, plaintiff's claim "Comcast has adopted a policy of understaffing (or over scheduling) that makes it unlikely that [technicians] can have their required breaks each day." Although the court considered the matter a "close case," it concluded there were sufficient common issues of fact and law to justify class treatment.

At a status conference in July 2011, the court expressed concern that plaintiff's theory of the case had changed from the claim of understaffing on which certification had been granted, but it deferred action until the next status conference in November. At that conference, plaintiff's counsel outlined new theories, that a communication device carried by technicians prevented them from having meal and rest breaks during which they were relieved of all work-related duties, as required by statute, and that technicians were not, in any event, actually receiving the breaks they reported to Comcast. Recognizing the departure [*4] from the theory on which class certification had been premised, the court determined class certification should be reconsidered. It issued an oral order to show cause "why the class should not be de-certified," directed solely to the issues of common questions of law and fact and the superiority of class treatment with respect to the new theories. The court ordered the parties to submit papers following the Supreme Court's then-anticipated ruling in *Brinker Restaurant Corp. v. Superior Court,* which eventually issued in 2012 and was reported at 53 Cal.4th 1004 (*Brinker*).

According to the evidence before the trial court, Comcast technicians install and service devices providing telephone, Internet, and television services in the homes and businesses of Comcast customers. As one declarant put it, the technician position "is one that is not closely monitored." Normally only one technician is assigned to a particular job. They therefore spend most of their work time alone in the field, outside direct supervision, and decide on their own when to take a meal or rest break. Comcast maintains written policies allowing meal and rest breaks for technicians (as well as other nonexempt employees) that are consistent [*5] with California law.[2]

Within the time period covered by the certified class, technicians made a formal record of their daily activities in two ways. Prior to December 2008, technicians filled out handwritten time cards for each day. After that date, Comcast switched to an electronic timekeeping system, the "Employee Self Service" (ESS) system. Using ESS, each technician could log on to a Web site and enter a record of his or her work and break time.[3] Following supervisor approval, the technicians' time records are used as the basis for their compensation. Technicians are expected to record their time accurately.

Around 2007, Comcast began using a parallel system that allows the tracking of technicians' work, referred to as "TechNet." Using a cellular phone or a laptop, technicians are expected to enter information into the TechNet system about their activities throughout the day and can receive information about their daily jobs. [*6] Technicians log in to the TechNet system at the beginning of their shift and are presented with a list of their assigned jobs for the day. From then on, technicians interact with TechNet throughout the day, signaling the beginning and ending of jobs and transmitting messages to the dispatch office about the status of particular jobs. The technicians are also able to indicate they have begun and ended their lunch and rest break periods. TechNet can be used to generate a "daily timeline" tracking the activities of an individual technician throughout the day, based on his or her interaction with the system.

Plaintiff submitted a sample compilation of TechNet data demonstrating that, during the period December 22, 2010 through January 18, 2011, the average technician lunch hour reported to TechNet was 49 minutes, with 7 percent of technicians reporting no lunch at all. Only 32 percent of technicians reported taking a rest break during their work day, although those breaks lasted longer than the 10-minute legal minimum, at an average duration of 16 minutes.

Plaintiff contended the TechNet data demonstrated technicians regularly worked more than 10 hours without either taking a second meal [*7] break or executing a written waiver, as required by Comcast's policy. To support this contention, plaintiff relied on the expert declaration of accountant David Breshears. Breshears was provided with over eight years of time records and seven months of TechNet data from 2011. Using the time records, Breshears found over 526,000 occasions on which a technician worked between 10 and 12 hours in a day and failed to take a second 30-minute meal break. He also

---

[2]    In general terms, the policies allowed a 10-minute rest break every four hours, a single meal break after five hours, and a second meal break after 10 hours.

[3]    For clarity, the technicians' time cards and the ESS entries will be jointly referred to as "time records."

found over 31,000 occasions on which a technician worked more than 12 hours in a day without a second 30-minute meal break. Further, Breshears found more than 11,000 occasions on which a technician did not take a meal break until after the sixth hour of work and over 25,000 occasions on which a technician worked more than six hours and did not take a 30-minute meal break. Depending upon the circumstances, each of these could have constituted a violation of the wage and hour laws. Based on his analysis, Breshears concluded that 45 percent of technician work days featured "at least one potential meal break violation."

In addition, Breshears compared the duration of meal breaks recorded in the time records and by TechNet. He found 95 [*8]  percent of meal breaks recorded in the time records lasted either exactly 30 or exactly 60 minutes. In contrast, the TechNet data showed meal breaks of a wide variety of durations. Assuming the TechNet data was "a more accurate representation of employees' actual time," Breshears applied the TechNet data to "extrapolate the number of potential meal break violations" over the duration of the time records data, finding a substantially larger number of potential violations than the time records themselves revealed. When time records and TechNet data could be matched up for a particular employee and work day, Breshears compared the meal break duration reported by the technician in the time records with the duration recorded for the same technician by TechNet. He found the meal break times reported in the time records were, on average, nearly 10 minutes longer than the duration recorded by TechNet. Drawing on this type of comparison between TechNet data and the time records, Breshears estimated Comcast technicians had actually worked over 2 million more hours than were recorded in the time records in the years covered by the time records data.

Based on the foregoing, plaintiff sought certification [*9]  of a class on three legal theories: (1) Comcast's policy of requiring technicians to remain connected to TechNet during breaks, combined with an "expectation and requirement" that they respond to TechNet messages sent during breaks, deprived the technicians of "off-duty" breaks;[4] (2) Comcast's failure to use the TechNet data in calculating its payroll "regularly depriv[ed] class members of all wages owed"; and (3) Comcast had a policy of refusing to pay "premium" wages when otherwise required by Labor Code section 226.7, subdivision (c), "even where its own records establish noncompliance with meal/rest break requirements pursuant to California law."

In arguing for decertification, Comcast took [*10]  issue with Breshears's assumption the TechNet data was a more reliable indicator of technicians' work than the time records used to calculate the payroll. In a declaration, Scott Dutton, an employee of the company that had developed TechNet, explained the system had not been designed or marketed to serve as a time-keeping or payroll system. Instead, Dutton described it as "a communication tool" intended to allow Comcast supervisors and dispatchers to manage the operations of technicians in the field more efficiently by matching technicians to jobs. Throughout the day, technicians can use the system to indicate their current work status, such as "ONJOB," "ENROUTE," "MEETING," "LUNCH," and "BREAK." When making work assignments, managers and dispatchers can take each technician's indicated status into account. Dutton claimed TechNet has certain weaknesses as a timekeeping tool. Technicians may forget to indicate their status at any particular time, may choose not to indicate a particular status, or may even falsely report it. Technicians are unable to indicate their status when out of the electronic range of the system, and the system sometimes malfunctions by "kick[ing] out" technicians from [*11]  a status. As a result of the foregoing uncertainties, Dutton opined that TechNet's records "are not reliable to establish the amount of time worked."

For this reason, Dutton believed, Breshears's analysis was unreliable. As an example, he examined the TechNet records of two technicians specifically discussed by Breshears in his declaration. The first technician reported taking an hour lunch between noon and 1:00 p.m. in his time records. TechNet data indicated he ended his last morning job at 11:17 a.m., took lunch from 1:01 p.m. to 1:41 p.m., and did not indicate he had resumed working until 2:37 p.m. From this, Breshears concluded the employee's actual lunch was 20 minutes shorter than indicated in his time records. Dutton pointed out the TechNet data could also be construed to indicate the employee had a duty-free period of over three hours around the noon hour. As a second example, Dutton examined another technician who, Breshears concluded, had worked nearly two hours longer than reported in his time records on a particular day. TechNet data showed the technician had initially logged on at

---

4    The trial court ruled against plaintiff on this first contention, finding no evidence Comcast had "adopted a 'policy' of requiring [technicians] to remain on-duty during their meal and rest breaks." Plaintiff does not acknowledge abandoning the theory in his opening brief, but neither does he address the rejected argument. We deem the theory to be abandoned as a result of plaintiff's failure to address it (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 578) and have not included the evidence relating to the theory in our discussion of the factual underpinnings of the decertification proceeding.

6:40 a.m., but this was followed by several short duration logon entries, suggesting the [*12] technician was merely checking his jobs for the day, rather than actually having begun work. Although the technician did not log off until 8:14 p.m., he had entered "ENDOFDAY" at 6:09 p.m. The two-hour gap before log off suggested the technician forgot to log off and was timed out by the system, rather than working until after 8:00 p.m. In addition, the technician never indicated a "LUNCH" status on TechNet, but there was a long period of apparent inactivity in the middle of the day, since he noted the end of his morning job at 10:31 a.m. and did not indicate a resumption of work until 2:19 p.m. A logical inference is that the technician ate lunch without recording a break on TechNet.

Comcast also submitted declarations and excerpts from the depositions of a number of technicians and their supervisors. The evidence confirmed technicians were instructed to record their time accurately in the time records and were required to certify its accuracy upon submitting it. Some of the technicians stated that time records are more accurate than TechNet data in recording their work activities and confirmed they viewed TechNet as a means to communicate about their assigned work, rather than to [*13] record their activities. Many technicians discussed the technical problems to which TechNet was subject that affected the accuracy of its record-keeping, including slow response, crashes, difficulty in logging on and off and entering statuses, involuntary log outs, and difficulty connecting in remote areas. They admitted their own periodic failures to use the system accurately, largely due to lapses in attention, also diminished its reliability. Dispatchers and supervisors confirmed the sometimes haphazard use of the system. It was not uncommon, they said, for technicians to forget to log on or log out, enter a lunch or break status, and otherwise signal changes in their status in a timely manner. In addition, technicians, supervisors, and dispatchers all noted the system was subject to intentional manipulation by technicians, who are not directly supervised while on jobs. Many technicians also testified they were not required to enter breaks of any particular duration, knew Comcast policy prohibited off-the-clock work, and believed they were paid for all time worked.

In a 36-page written opinion, the trial court decertified the class. On the issue of "off-the-clock" work, the court [*14] rejected the foundation for plaintiff's argument, that the time records should be found less reliable than TechNet data. The court noted there was no direct evidence of a Comcast policy or practice of requiring technicians to falsify their time records by, for example, filling in meal breaks of exactly 30 or 60 minutes. The court held that, even if the TechNet data were reliable, the Breshears statistics did not prove "actual violations of the wage and hour laws," but only "potential" violations. Proving actual violations would require individualized proof. Further, the court held, there were "serious questions" about the accuracy of the TechNet data for the many reasons explained in the Comcast opposition. As a result, the court concluded, plaintiff's off-the-clock work claims were not susceptible of common proof.

On the issue of missed and second meal breaks, the court found plaintiff's theory inconsistent with an employer's legal obligation as explained in *Brinker*. Under that decision, the trial court held, an employer's duty is to provide an *opportunity* for a first meal break to employees working at least five hours and a second meal break after 10 hours. Plaintiff's evidence, which [*15] relied largely on the time records as analyzed by Breshears, did not demonstrate Comcast failed to provide technicians the opportunity for meal breaks. Further, as with off-the-clock work, his data could suggest only potential violations, requiring individual proof to demonstrate an actual violation. In the absence of an illegal company policy, the court held, there were insufficient common issues to justify class treatment.

## II. DISCUSSION

### A. *Legal Background*

As the parties and the court anticipated when the briefing schedule was set for the order to show cause, *Brinker* establishes the legal baseline for evaluating the trial court's ruling.

As *Brinker* explained the burden on a putative class representative: "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class [*16] representatives who can adequately represent the class."'" (*Brinker, supra,* 53 Cal.4th at p. 1021.)

2014 Cal. App. Unpub. LEXIS 6185, *16

As here, the primary issue in *Brinker* was "whether individual questions or questions of common or general interest predominate. The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker, supra,* 53 Cal.4th at pp. 1021-1022, fn. omitted.)

Resolution of the issues bearing on [*17] class certification is largely within the trial court's discretion. "On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .'" (*Brinker, supra,* 53 Cal.4th at p. 1022.)

In addition to summarizing the law bearing on class certification, *Brinker* helpfully explained many [*18] of the principles of California wage and hour law pertinent here. An employer's duty to provide meal breaks is governed by Labor Code section 512, subdivision (a): "An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes . . . . An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." As construed by *Brinker,* this requires employers to "afford employees uninterrupted half-hour periods in which they are relieved of any duty or employer control and are free to come and go as they please." (*Brinker, supra,* 53 Cal.4th at p. 1037.) "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. . . . [¶] On the other hand, the employer is not obligated [*19] to police meal breaks and ensure no work thereafter is performed." (*Id.* at p. 1040.) "What will suffice may vary from industry to industry, and we cannot in the context of this class certification proceeding delineate the full range of approaches that in each instance might be sufficient to satisfy the law." (*Ibid.*)

## B. *The Absence of Written Second Meal Break Waivers*

Under Comcast's personnel policies, an employee who works more than 10 hours in a day has the right to a second meal break. If an employee waives his or her right to the second meal, the waiver must be in writing and executed by both parties. Plaintiff contends, based primarily on Breshears's analysis of the time records, that technicians regularly work 10 or more hours without taking a second meal break or executing a written waiver. He argues the trial court erred in declining to certify a class with respect to his claim that Comcast was liable for premium pay to any technician who was shown to have worked for between 10 and 12 hours without taking a second meal or executing a written waiver of the second meal and to any technician shown to have worked for more than 12 hours without taking a second meal, regardless of waiver.

We agree [*20] with the trial court that plaintiff's theory of automatic liability in the absence of a written waiver is contrary to the law. In evaluating Comcast's compliance, it is important to understand the nature of the technicians' workday. Unlike the work of the typical factory, agricultural, or retail worker, technicians' daily activities are not directly supervised, and their activities need not be coordinated with the activities of a large number of other employees. On the contrary,

2014 Cal. App. Unpub. LEXIS 6185, *20

technicians' daily activities are largely self-policed. Technicians spend most of their days on the road, beyond the direct monitoring of their immediate supervisors. Although they must spend time driving and working at customers' homes and businesses, the nature of the work places few constraints on their ability to take appropriate rest and meal breaks. Under these circumstances, Comcast appears to have satisfied its legal obligation to "afford employees uninterrupted [break] periods in which they are relieved of any duty or employer control and are free to come and go as they please" (*Brinker, supra,* 53 Cal.4th at p. 1037) merely by creating an appropriate policy and instructing the technicians to follow the policy while on the road. There [*21] is no dispute Comcast policy states technicians should take a second meal break if they have worked 10 hours or more. Given the nature of the technicians' workday, implementation of this policy becomes their responsibility; Comcast "is not obligated to police" them. (*Brinker,* at p. 1040.)

Accordingly, Comcast "is not liable for premium pay merely because Breshears's analysis indicates that a particular technician's time records show he or she worked for more than 10 hours without a second meal. Rather, Comcast is liable only if, in some manner, it prevented that technician from taking the second meal break without a waiver. (See *Brinker, supra,* 53 Cal.4th at p. 1040, fn. 19.) There is no evidence suggesting a general policy or practice precluding second breaks, such as supervisors who regularly discouraged technicians from taking advantage of the second meal policy or the assignment of so much work that technicians had no time for the break. Thus, to determine whether any particular skipped meal resulted in a premium pay obligation—i.e., was involuntary and not waived—would require an individualized inquiry into the circumstances of each missed meal.[5] Given the need for an individual analysis of each claimed violation, the trial court did not abuse [*22] its discretion in concluding there was little or no advantage in class treatment.

Plaintiff argues Comcast's liability results merely from the absence of a written waiver, regardless of whether the technician voluntarily skipped a second meal, since Comcast policy requires a written waiver. The requirement of premium pay for a missed meal break, however, follows from a violation of the wage and hour laws, not from a violation of an employer policy. Labor Code section 512 does not require a waiver of the second meal to be in writing.

It is true Labor Code section 512 requires *some* waiver of the meal break, and, as plaintiff points out, the second meal break cannot be waived for a workday longer than 12 hours. Contrary to plaintiff's argument, however, this rule does not require that a waiver be obtained whenever an [*23] employee fails to take a second meal. Rather, a waiver is required whenever an employer declines to satisfy its obligation under section 512, which is defined in *Brinker* as requiring the provision of an *opportunity* for a second meal break. In other words, an employer must obtain a waiver if it requires an employee to work through the time that would otherwise be allotted for the second meal.[6] If the employee voluntarily chooses to continue working through a provided meal break, no waiver is required. As discussed above, the nature of technicians' work suggests they are ordinarily given the opportunity to take a second meal break. Determining whether, in any particular case of a failed second meal break, a waiver was required because the break was actually denied will require individual analysis of every instance, defeating the advantages of class treatment.

## C. *Failure to Pay for Denied Breaks*

Plaintiff contends the trial court erred in denying class treatment in connection with his claim that Comcast fails to maintain a policy to provide premium pay for denied breaks.

Under Labor Code section 226.7, subdivision (c), an employer who fails to provide an employee a legally required meal or rest break must pay the employee an additional hour of compensation. The obligation to provide this premium pay arises

---

[5]   Citing Justice Werdegar's concurring opinion in *Brinker,* plaintiff contends a rebuttable presumption arises that no meal break was provided when none is recorded. Whatever the rule might be in more typical working situations, there is no basis for such a presumption in these circumstances, where the employee effectively determines his or her own break time. (*Brinker, supra,* 53 Cal.4th at p. 1040 ["What will suffice may vary from industry to industry"].)

[6]   As *Brinker* explained the obligation: "When someone is suffered or permitted to work—i.e., employed—for five hours, an employer is put to a choice: it must (1) afford an off-duty meal period; (2) consent to a mutually agreed-upon waiver if one hour or less will end the shift; or (3) obtain written agreement to an on-duty meal period if circumstances [*24] permit." (*Brinker, supra,* 53 Cal.4th at p. 1039.) A waiver is therefore not required unless Comcast did not "afford" a technician a meal break.

only when the employer has failed to provide a required meal break by denying an employee the necessary duty-free time. (*Brinker, supra,* 53 Cal.4th at p. 1040, fn. 19.) An employer who becomes aware an employee has performed work during a properly provided meal break must compensate the employee, but because an employee's voluntary decision to work during a break does not constitute a violation of the wage and hour laws, the employer need only pay ordinary compensation for the time worked. (*Ibid.*) Because the award of premium pay under section 226.7 is in the nature of damages, an employer's failure to provide premium pay to a worker denied a required break is not considered an independent violation of the law. Rather, the violation [*25] is the underlying failure to provide the required duty-free time. (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1256-1257 (*Kirby*).)

In arguing for class treatment based on the absence of a formal premium pay policy, plaintiff relies on *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701 and *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, in which the courts discussed the absence of an employer policy in the process of certifying a class concerning the denial of meal and rest breaks. In both of these cases, however, the employer failed to maintain a policy governing the *breaks* themselves, not a policy governing the award of premium pay. As both courts found, the absence of an appropriate break policy led to widespread violations of the wage and hour laws through the denial of breaks, which were, of course, the underlying legal claims.[7] Because the failure to award premium pay is not itself a violation of the wage and hour laws (*Kirby, supra,* 53 Cal.4th at p. 1256), the absence of a policy governing the award of premium pay does not give rise to such violations. The failure to adopt such a policy therefore provides no basis to support class treatment for a claim of wage and hour violations. In any event, there was evidence Comcast maintained an informal policy of awarding premium pay in appropriate circumstances. For both these reasons, the trial court did not [*26] abuse its discretion in declining to certify a class based solely on the absence of a formal policy governing the award of premium pay.[8]

## D. *Off-the-clock Work*

Plaintiff contends the trial court erred in declining to certify a class with respect to his claim of widespread off-the-clock work.

There appears to be no dispute technicians were properly compensated for the time they actually [*27] reported in the time records. Plaintiff contends, however, that Comcast technicians are systematically underreporting their working time, since they do not claim, and are not paid for, all of time they are shown to be working by the TechNet system. Although plaintiff contended in the trial court that this purported underreporting was due, at least in part, to an informal Comcast policy requiring technicians to report round-number lunch break times of 30 or 60 minutes, he provided no direct proof of such a policy.[9] Nor did he provide proof of any widespread pressure on technicians by their supervisors to underreport their working hours. Rather, his claim is based entirely on inferences from the TechNet data.

*Brinker* is directly on point here. In that case, the employer had a formal policy allowing appropriate meal breaks. The plaintiff sought to certify a class demonstrating that, notwithstanding the policy, the employer "required employees to

---

[7]    The underlying claims were critical to both courts in certifying a class. Whether the absence of a break policy *alone* can support class treatment is unresolved. (See *Benton v. Telecom Network Specialists, Inc., supra,* 220 Cal.App.4th 701, 727 [declining to decide whether the absence of a policy, alone, can support a class claim].)

[8]    To the extent plaintiff's claim is based on an alleged failure to award premium pay in appropriate circumstances, rather than the absence of a policy, there is no legal difference between this claim and his meal break claims. As noted, the obligation to award premium pay arises only when a violation of the meal or rest break rules occurs, and the failure to award premium pay is not considered an independent violation of the law. A claim for failure to provide premium pay is therefore wholly derivative of and dependent upon the demonstration of break violations.

[9]    In his opening brief, plaintiff asserts "Comcast requires that the Technicians' time records show a 60-minute meal period each work day" and provides several record citations in purported support of the assertion. His first citation is to a section of the ESS handbook in which Comcast instructs a hypothetical technician whose lunch break was interrupted by work after 45 minutes to record a 45-minute lunch break. This instruction is consistent with Comcast's written policy. The supposed [*28] proof thereby directly contradicts the assertion it was cited to support. The remaining citations are no more successful. The evidence consistently demonstrated that Comcast expected and encouraged technicians to take a 60-minute meal break, but it instructed them to record the meal break actually taken, even if it was less than 60 minutes.

perform work while clocked out during their meal periods." (*Brinker, supra,* 53 Cal.4th at p. 1051.) In doing so, however, he failed to present "substantial evidence of a systematic company policy to pressure or require employees to work off-the-clock." (*Ibid.*) As the court explained in affirming the court of appeal's decision vacating class certification, "liability is contingent on proof [the employer] knew or should have known off-the-clock work was occurring. [Citations.] Nothing before the trial court demonstrated how this could be shown through common proof, in the absence of evidence of a uniform policy or practice. Instead, the trial court [*29] was presented with anecdotal evidence of a handful of individual instances in which employees worked off-the-clock, with or without knowledge or awareness by [their] supervisors. On a record such as this, where no substantial evidence points to a uniform, companywide policy, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion, demonstrating who worked off-the-clock, how long they worked, and whether [the employer] knew or should have known of their work." (*Id.* at pp. 1051-1052.) Plaintiff's claim is no different.

Plaintiff attempts, in effect, to substitute the TechNet data for his lack of evidence of a uniform Comcast policy, arguing the data constitute common indirect proof of such a policy, or at least proof of Comcast's constructive awareness that technicians were underreporting their time. The argument is successful only if plaintiff provided an evidentiary basis in support of the premise for Breshears's analysis: that the TechNet data are a more accurate reflection of a technician's work day than the time records actually reported by the technician himself or herself. We find substantial evidence to support the trial court's conclusion that plaintiff failed [*30] to prove this premise.

Initially, we note plaintiff provided no basis for doubting the accuracy of the time records. As technicians are aware, their proper compensation depends upon the accurate reporting of their activities in the time records. Not only are they required to certify to the accuracy of the records, technicians have a financial motive to claim every compensable working hour. There was no indication Comcast discouraged technicians from such reporting. Plaintiff provided no explanation for the widespread underreporting of working hours that he claimed to be occurring.[10]

In contrast, there was convincing evidence to cast doubt on the trustworthiness of the TechNet data. TechNet was not designed as a method for keeping time but as a method for communication, and technicians did not treat the system as a means of tracking their time. Individual technicians varied in the manner in which they used TechNet, [*31] could be careless in reporting their statuses, and could manipulate the system. The TechNet system was subject to malfunctions rendering its records inaccurate, and it ceased to work altogether when technicians traveled outside its communication range. The two individual records analyzed by Breshears and Dutton persuasively demonstrated the statuses reported by the technicians on TechNet bore no necessary resemblance to their actual work activities. In short, there was substantial evidence to support a conclusion that TechNet data was far less accurate in characterizing technician work activities than the time records.

Given the relative unreliability of the TechNet data, each departure of that data from the time records must be analyzed individually to determine whether, in fact, the technician's reported hours were inaccurate. Accordingly, the trial court did not abuse its discretion in concluding plaintiff failed to provide sufficient common proof of off-the-clock work to justify class treatment.

### III. DISPOSITION

The judgment of the trial court is affirmed.

Margulies, Acting P.J.

We concur:

Dondero, J.

---

[10] Plaintiff's only evidence of inaccuracy was the regular occurrence of exact 60- and 30-minute meal periods, which he claimed to be suspicious. However, he provided no significant evidence of a Comcast policy to pressure technicians falsely to report round-figure break periods.

2014 Cal. App. Unpub. LEXIS 6185, *31

Becton, J. [*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice [*32] pursuant to article VI, section 6 of the California Constitution.