**EXHIBIT G to NOTICE OF REMOVAL**

1    FRED W. ALVAREZ, State Bar No. 68115
     ALLISON B. MOSER, State Bar No. 223065
2    JONES DAY
     Silicon Valley Office
3    1755 Embarcadero Rd.
     Palo Alto, CA 94303
4    Telephone: (650) 739-3939
     Facsimile: (650) 739-3900
5    Email: falvarez@jonesday.com
     Email: amoser@jonesday.com
6

7    TROY A. VALDEZ, State Bar No. 191478
     ERIN M. DOYLE, State Bar No. 233113
     STEPHEN L. TAEUSCH, State Bar No. 247708
8    VALDEZ TODD & DOYLE LLP
     1901 Harrison Street, Suite 1450
9    Oakland, California 94612
     Telephone: (415) 202-5950
10   Facsimile: (415) 202-5951
     Email: tvaldez@vtdlaw.com
11   Email: edoyle@vtdlaw.com
     Email: staeusch@vtdlaw.com
12   Attorneys for Defendants

13   COMCAST CABLE COMMUNICATIONS
     MANAGEMENT, LLC, erroneously sued as
14   COMCAST CORPORATION and
     COMCAST OF CONTRA COSTA, INC.

FILED

MAY 15 2015

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS
BY_____
     SARAH KIERN, DEPUTY

FILED BY FAX

15

16         SUPERIOR COURT OF THE STATE OF CALIFORNIA

17            FOR THE COUNTY OF STANISLAUS

18

19   JOSEPH JOSHUA DAVIS, PENNY
     SCHOONOVER, LEON GIBSON,
20   DUSTIN WAYNE HAGENS, RAYMOND
     AGUNDEZ, RAFAEL BARAJAS, JR.,

21          Plaintiffs,

22       v.

23   COMCAST CORPORATION, a
     Pennsylvania Corporation; COMCAST OF
24   CONTRA COSTA, INC., a Washington
     Corporation; and DOES 1 through 50,
25   Inclusive,

26         Defendants.

27

28

CASE NO. 2011900

Assigned for all purposes, including Trial
to Judge William A. Mayhew

Dept. 21

**DEFENDANT'S NOTICE OF MOTION
AND MOTION TO STRIKE PORTIONS
OF THE SECOND AMENDED
COMPLAINT**

Date: July 16, 2015
Time: 8:30 a.m.
Dept.: 21

Complaint filed October 27, 2014

---

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF THE SAC - CASE
NO. 2011900**

TO EACH PARTY AND TO THE COUNSEL OF RECORD FOR EACH PARTY:

PLEASE TAKE NOTICE that on July 16, 2015 at 8:30 a.m., or as soon thereafter as may be heard, in Department 21 of the above-entitled Court, located at 1100 I Street #1, Modesto, CA 95354, Defendant Comcast Cable Communications Management, LLC, erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc., will and hereby does move this Court for an order striking the following portions of the Second Amended Complaint filed April 9, 2015 by Plaintiffs Joseph Joshua Davis, Penny Schoonover, Leon Gibson, Dustin Wayne Hagens, Raymond Agundez, and Rafael Barajas, Jr. (collectively, "Plaintiffs") pursuant to California Code of Civil Procedure § 435 *et seq.*:

1.  This complaint challenges Defendants' systemic illegal employment practices resulting in violations of the California Labor Code, Business and Professions Code and applicable IWC wage orders against employees of Defendants. ¶ 2 in its entirety.

2.  Plaintiffs are informed and believe and based thereon allege Defendants, joint and severally have acted intentionally and with deliberate indifference and conscious disregard to the rights of all employees in receiving all wages due and lawful meal and rest periods. ¶ 3 in its entirety.

3.  Plaintiffs are informed and believe and based thereon allege Defendants have engaged in, among other things, a system of willful violations of the California Labor Code, Business and Professions Code and applicable IWC wage orders by creating and maintaining policies, practices and customs that knowingly deny employees (a) all wages due, (b) the opportunity to take meal and rest periods, and (c) accurate, itemized wage statements. ¶ 4 in its entirety.

4.  The policies, practices and customs of defendants described above and below have resulted in unjust enrichment of Defendants and an unfair business advantage over businesses that routinely adhere to the strictures of the California

2

Labor Code, Business and Professions Code and applicable IWC wage orders. ¶ 5 in its entirety.

5.    The filing of the Fayerweather class action complaint on May 27, 2008 tolled the statute of limitations for the named Plaintiffs from four years from the filing of the Fayerweather class action complaint (i.e., May 27, 2004) to the present based upon the facts, representations and reasonable reliance by Plaintiffs as set forth below. ¶ 8 at 3:9-12.

6.    Plaintiffs are and were victims of the policies, practices and customs of Defendants complained of in this action in ways that have deprived them of the rights guaranteed them by California Labor Code § 204, 226.7, 1194, 1198, and 512, California Business and Professions Code § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12. ¶ 8 at 3:14-18.

7.    Unlike federal law, where a decertification order is a final non-appealable order once it is issued as set forth in FRCP Rule 23 (f), in state court actions, where the Fayerweather case was pending and under California state law, which governs Fayerweather, the decertification order is an automatically appealable order and does not become final until exhaustion of appeals.  As *Stephen v. Enter. Rent-A-Car,* 235 Cal. App. 3d 806 explains:

> We hold, first, that no policy in the law allowed Stephen to "renew" a class certification motion which had been denied on the merits by a final, appealable order. The one-final-judgment rule generally precludes piecemeal litigation through appeals from orders which dispose of less than an entire action. (9 Witkin, Cal.Procedure (3d ed. 1985) Appeal, *§ 43*, pp. 66-67; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 806, 94 Cal.Rptr. 796, 484 P.2d 964 *(Vasquez ).*)  An order denying class certification does not finally dispose of an action since it leaves it intact as to the *individual* plaintiff. However, the order is appealable if it effectively terminates the entire action as to the class, in legal effect being "tantamount to a dismissal of the action as to all members of the class other than plaintiff. [Citations.]" *(Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699, 63 Cal.Rptr. 724, 433 P.2d 732; *Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d 462, 470, 174 Cal.Rptr. 515, 629 P.2d 23.) The appeal is allowed, as a matter of state

3

law policy, because the order has "the 'death knell' effect of making further proceedings in the action impractical...." (*General Motors Corp. v. Superior Court* (1988) 199 Cal.App.3d 247, 251, 244 Cal.Rptr. 776.) Federal law, by contrast, while acknowledging death-knell consequences, denies a right of direct appeal in any circumstances. *(Ibid; Coopers & Lybrand v. Livesay* (1978) 437 U.S. 463, 469-470, 98 S.Ct. 2454, 2458-2459, 57 L.Ed.2d 351.) Because California allows direct appeals of death-knell orders, a plaintiff who fails to appeal from one loses forever the right to attack it. The order becomes final and binding. Two cases from this district illustrate the concept, holding that plaintiffs could not, on appeal from final judgments on the merits of their cases, attack final orders denying class certification. (*Guenter v. Lomas & Nettleton Co.* (1983) 140 Cal.App.3d 460, 465, 189 Cal.Rptr. 470; *Morrissey v. City and County of San Francisco* (1977) 75 Cal.App.3d 903, 906-908, 142 Cal.Rptr. 527.) This, of course, is the reverse of federal law, which makes certification orders reviewable only on appeal *812 from the final judgment. (*General Motors Corp. v. Superior Court, supra*, 199 Cal.App.3d 247, 251, 244 Cal.Rptr. 776.)

*Stephen v. Enter. Rent-A-Car*, 235 Cal. App. 3d 806, 811-12, 1 Cal. Rptr. 2d 130, 132-33 (Ct. App. 1991).

¶ 8 at 4:4-28.

8.    Thus, the decertification order did not become final until after this case had already been filed. ¶ 8 at 5:3-4.

9.    Thus, the statute of limitations on Plaintiffs' claim was tolled from May 27, 2004 up to the time this case was filed. ¶ 8 at 5:20-21.

10.   Defendant had a uniform policy and practice of contacting Plaintiffs through their Nextel devices at all times of the day including interrupting Plaintiffs during what would otherwise be meal periods and rest breaks. ¶ 21 at 7:27-8:1.

11.   . . . and the uniform policy of being "on duty" at all times . . . ¶ 24 at 8:23-24.

12.   . . . and the uniform policy of being "on duty" at all times . . . ¶ 25 at 8:26-27.

13.   As a pattern and practice, Defendants relied on punch data/time sheets in many instances filed [sic] out before the work day commenced to compensate Plaintiffs for hours worked rather than relying on the actual records that reflect hours worked and meal periods, i.e. the CSG records that were kept in real time. As a result, Plaintiffs were not compensated for all hours they were subject to the

4

control of Defendants, including all time they were suffered or permitted to work. ¶ 30 in its entirety.

14.    Plaintiffs are informed and believe and based thereon allege Defendants uniformly administered a corporate policy concerning staffing levels, duties, and responsibilities which required Plaintiffs to work without appropriate pay. This included a uniform corporate pattern and practice of allocating and authorizing inadequate staffing levels. The inadequate staffing levels were enforced and ensured through the uniform and mandated corporate policy of a minimal labor budget. This corporate conduct is accomplished with the advance knowledge and designed intent to save labor costs by required [sic] Plaintiffs to work without proper compensation because they were unable to take the meal periods which were automatically deducted from their time records. ¶ 31 in its entirety.

15.    As a pattern and practice, in violation of the aforementioned labor laws and wage orders, Plaintiffs are informed and believe and based thereon allege Defendants did not properly maintain records pertaining to when Plaintiffs began and ended each work period, meal period, the total daily hours worked, and the total hours worked per pay period and applicable rates of pay in violation of California Labor Code § 1174. ¶ 32 in its entirety.

16.    Plaintiffs are informed and believe and based thereon allege Defendants willfully failed to pay employees proper compensation for all hours worked. Plaintiffs are informed and believe and based thereon allege Defendants' willful failure to provide wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due. Therefore, Plaintiffs who have separated from employment are entitled to compensation pursuant to Labor Code § 203. ¶ 34 in its entirety.

17.    Such a pattern, practice and uniform administration of corporate policy regarding illegal employee compensation as described herein is unlawful and creates an

5

entitlement to recovery by Plaintiff [sic] in a civil action, for the unpaid balance of the full amount of straight time compensation and overtime premiums owing, including interest thereon, penalties, reasonable attorneys' fees, and costs of suit according to Labor Code § 1194, et seq. ¶ 35 in its entirety.

18.    By failing to properly compensate hourly-paid employees for off-the-clock work, Defendants breached their employment contracts with Plaintiffs. ¶ 41 in its entirety.

19.    Defendants failed in their affirmative obligation to ensure that all of their employees, including Plaintiffs, were actually relieved of all duties, not performing any work, and free to leave the premises during meal periods. Plaintiffs were suffered and permitted to work through legally required meal breaks. As such, Defendant is responsible for paying premium compensation for missed meal periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B). Defendants shall pay the [sic] each affected employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal break was not provided. ¶ 44 in its entirety.

20.    As a pattern and practice, Defendants regularly required employees to work through their meal periods without proper compensation. Defendants did staff and schedule employees in such a manner and at such posts that would make it impossible for these employees to take their meal period as required under California law. This policy of requiring employees to work through their legally mandated meal periods is a violation of California law. Indeed, Defendants' own records, i.e. the CSG data, confirms whether an employee used the Nextel device to clock out for a meal period lasting not less than thirty minutes. For those instances where the CSG data shows a meal period lasting less than 30 minutes, Defendants did not compensate Plaintiff with an extra hour of pay. ¶ 46 in its entirety.

6

21.    Plaintiffs are informed and believe and based thereon allege Defendants willfully failed to pay employees who were not provided the opportunity to take meal breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage Order No 4 § 11(B).  Plaintiffs are informed and believe and based thereon allege Defendants' willful failure to provide Plaintiffs the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due.  Therefore, Plaintiffs who have separated from employment are entitled to compensation pursuant to Labor Code § 203. ¶ 49 in its entirety.

22.    As a pattern and practice, in violation of the aforementioned labor laws and wage orders, Plaintiffs are informed and believe and based thereon allege Defendants did not properly maintain records pertaining to when Plaintiffs began and ended each meal period in violation of California Labor Code § 1174 and § 4 of the applicable IWC Wage Order(s).  This, despite the fact that Defendant knew the CSG data was an accurate record of meal periods taken and the length of each meal period.  ¶ 50 in its entirety.

23.    Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff [sic] identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No 4 § 11(B), including interest thereon, penalties, reasonable attorneys' fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194.  ¶ 51 in its entirety.

24.    Plaintiff regularly worked in excess of three and half (3 ½) hours per day Defendants' policies and practices prevented Plaintiff [sic] from enjoying their right to a ten (10) minute rest period in the middle of each four (4) hour work period. ¶ 55 in its entirety.

7

25.    As a pattern and practice, Defendants regularly required employees to work through rest periods.  Defendants and Defendants' supervisors assigned work, scheduled shifts, and staffed worksites in a manner that did not allow Plaintiff [sic] to regularly take rest periods. ¶ 56 in its entirety.

26.    Plaintiffs are informed and believes [sic] and based thereon alleges [sic] Defendants willfully failed to pay employees who were not provided the opportunity to take rest breaks the premium compensation set out in Labor Code 226.7 and IWC Wage Order No 4 § 12(B).  Plaintiffs are informed and believes and based thereon alleges [sic] Defendants' willful failure to provide Plaintiffs the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due.  Therefore, Plaintiffs who have separated from employment are entitled to compensation pursuant to Labor Code § 203. ¶ 58 in its entirety.

27.    Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiffs identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No 4 § 12(B), including interest thereon, penalties, reasonable attorney's [sic] fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194. ¶ 59 in its entirety.

28.    Defendants, and each of them, have engaged and continue to engage in unfair business practices in California by practicing, employing and utilizing the employment practices outlined above, inclusive, to wit, (a) not compensate employees for all hours worked, and (b) to require employees to work through meal and rest periods.  ¶ 62 in its entirety.

29.    As a pattern and practice, Defendant failed to furnish Plaintiffs, either semimonthly or at the time of each payment of wages, either as a detachable part

of the check or separately, an accurate, itemized statement in writing showing gross wages earned, total hours worked, and the applicable hourly rates and corresponding number of hours worked by Plaintiffs at each rate. ¶ 71 in its entirety.

This motion is based upon sections 435 through 437 of the California Code of Civil Procedure and California Rule of Court 3.1322; this Notice; the Memorandum of Points and Authorities, the Request for Judicial Notice, and the Proposed Order filed herewith; the pleadings on file in this case; and such further evidence and argument as may be presented at or before the hearing on this matter.

Dated: May 15, 2015                              JONES DAY


By: _____
                                                 Fred W. Alvarez
                                                 Allison B. Moser

                                                 Attorney for Defendants
                                                 COMCAST CABLE COMMUNICATIONS
                                                 MANAGEMENT, LLC, erroneously sued as
                                                 COMCAST CORPORATION and
                                                 COMCAST OF CONTRA COSTA, INC.

9



1   FRED W. ALVAREZ, State Bar No. 68115
    ALLISON B. MOSER, State Bar No. 223065
2   JONES DAY
    Silicon Valley Office
3   1755 Embarcadero Rd.
    Palo Alto, CA 94303
4   Telephone: (650) 739-3939
    Facsimile: (650) 739-3900
5   Email: falvarez@jonesday.com
    Email: amoser@jonesday.com
6
    TROY A. VALDEZ, State Bar No. 191478
7   ERIN M. DOYLE, State Bar No. 233113
    STEPHEN L. TAEUSCH, State Bar No. 247708
8   VALDEZ TODD & DOYLE LLP
    1901 Harrison Street, Suite 1450
9   Oakland, California 94612
    Telephone: (415) 202-5950
10  Facsimile: (415) 202-5951
    Email: tvaldez@vtdlaw.com
11  Email: edoyle@vtdlaw.com
    Email: staeusch@vtdlaw.com
12
    Attorneys for Defendants
13  COMCAST CABLE COMMUNICATIONS
    MANAGEMENT, LLC, erroneously sued as
14  COMCAST CORPORATION and
    COMCAST OF CONTRA COSTA, INC.
15
16              SUPERIOR COURT OF THE STATE OF CALIFORNIA
17                    FOR THE COUNTY OF STANISLAUS
18
19  JOSEPH JOSHUA DAVIS, PENNY          CASE NO. 2011900
    SCHOONOVER, LEON GIBSON,
20  DUSTIN WAYNE HAGENS, RAYMOND        Assigned for all purposes, including Trial
    AGUNDEZ, RAFAEL BARAJAS, JR.,       to Judge William A. Mayhew
21          Plaintiffs,                 Dept. 21
22          v.                          **DEFENDANT'S MEMORANDUM OF
                                        POINTS AND AUTHORITIES IN
23  COMCAST CORPORATION, a              SUPPORT OF ITS MOTION TO STRIKE
    Pennsylvania Corporation; COMCAST OF PORTIONS OF THE SECOND AMENDED
24  CONTRA COSTA, INC., a Washington    COMPLAINT**
    Corporation; and DOES 1 through 50,
25  Inclusive,                          Date:   July 16, 2015
                                        Time:   8:30 a.m.
26          Defendants.                 Dept.:  21
27                                      Complaint filed October 27, 2014
28

────────────────────────────────────────────────────
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE SAC - CASE NO. 2011900

FILED BY FAX

FILED

MAY 15 2015
CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS
BY_____
SARAH KIERNAN DEPUTY

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3      Defendant Comcast Cable Communications Management, LLC, erroneously sued as

4  Comcast Corporation and Comcast of Contra Costa, Inc., ("Comcast"), moves to strike portions

5  of the Second Amended Complaint ("SAC") filed by Plaintiffs Joseph Joshua Davis, Penny

6  Schoonover, Leon Gibson, Dustin Wayne Hagens, Raymond Agundez, and Rafael Barajas, Jr.

7  (collectively, "Plaintiffs").  Specifically, Comcast moves to strike the portions of the SAC that

8  (1) misstate the law with respect to tolling of the statute of limitations and (2) attempt to re-

9  litigate the lawfulness of Comcast's policies.

10      Comcast recognizes that this Court has already ruled on its earlier Motion to Strike

11  portions of Plaintiffs' First Amended Complaint ("FAC") and that it declined to strike certain

12  allegations related to tolling and to Comcast's purported maintenance of unlawful policies.

13  However, Plaintiffs have unaccountably amended their pleading to include a lengthy new

14  argument on the tolling question that was <u>not</u> included in the FAC and that introduces several

15  misstatements of law.  Comcast accordingly requests that these new allegations, at least, be

16  stricken from the SAC.[1]

17      With respect to the issue preclusion question, Comcast moves to strike portions of the

18  SAC alleging that Comcast maintains policies that unlawfully deprive technicians of meal and

19  rest periods.  Since this Court's order on Comcast's earlier Motion to Strike, Judge Goode (who

20  issued the class decertification order in *Fayerweather*) has applied issue preclusion to bar the

21  plaintiffs in an identical case from re-litigating issues that were already resolved in *Fayerweather*.

22  Moreover, although this Court denied Comcast's prior motion on this question on the ground that

23  certification orders are necessarily procedural in nature and not orders "on the merits," California

24  Courts of Appeal have specifically held that certification orders can involve merits determinations

25  _____

26  [1] If the Court again declines to rule <u>as a matter of law</u> that tolling could <u>not</u> extend beyond
class decertification in *Fayerweather*, Comcast requests that the Court deny Comcast's motion

27  with respect to that issue <u>without</u> prejudice to Comcast's revisiting the tolling question if facts
emerge showing that tolling was not warranted either before or after the decertification order in

28  *Fayerweather*.

1    that may be given preclusive effect. *See, e.g., Johnson v. GlaxoSmithKline, Inc.*, 166 Cal. App.

2    4th 1497, 1510 (2008) ("If all five elements required for application of collateral estoppel are

3    present, <u>the doctrine is fully applicable to preclude relitigation of issues finally resolved as part of</u>

4    <u>a class certification determination in a prior proceeding</u>.") (emphasis added).

5            As set forth more fully below, Comcast therefore requests that this Court strike from the

6    SAC the allegations that (1) the statute of limitations on Plaintiffs' claims was tolled through the

7    filing of this lawsuit (well beyond the date Judge Goode decertified the class in *Fayerweather*)

8    and (2) Comcast maintained policies that deprived Plaintiffs of meal and rest breaks.

9    **II.    PROCEDURAL BACKGROUND**

10           **A.    Concluding That Comcast Does <u>Not</u> Maintain A Policy Of Requiring
                 Technicians To Work Through Meal And Rest Breaks, Contra Costa
11               Superior Court Judge Barry Goode Decertifies The Class In *Fayerweather*.**

12           On May 27, 2008, Gabriel Fayerweather filed a class action complaint in Contra Costa

13   County Superior Court on his own behalf and on behalf of all similarly situated current and

14   former service technicians, communications technicians, and other non-exempt hourly employees

15   of Comcast. *See* Request for Judicial Notice ("RJN"), <u>Exhibit A</u> (the "*Fayerweather* Complaint").

16   After substantial discovery and extensive briefing, the Hon. Barry Goode held a hearing to

17   consider whether the previously-certified class should be decertified. RJN, <u>Exhibit B</u> (the

18   "Decertification Order") at 5:16-17. Judge Goode thereafter issued an order decertifying the

19   class, in which he resolved a threshold issue—whether Comcast had any policy or consistent

20   practice that required the class members to work through meal and rest breaks—in Comcast's

21   favor. *See id.* at 12:19-20 ("It is clear that Comcast has not adopted a 'policy' of requiring Com-

22   Techs to remain on duty during their meal breaks."); 14:5-6 ("Comcast's policy is clear. When

23   Com-Techs are on break or at lunch, they are to be relieved of all duty."); 18:5-6 ("A careful

24   analysis of the parties' positions shows there is really no dispute about Comcast's policy: Com-

25   Techs are to do no work during their breaks."); 24:5 ("In short, there is not a consistent practice

26   that violates the company's stated policy.").[2]

27   _____

28          [2] Judge Goode's findings with respect to these issues were affirmed on appeal. RJN,
     <u>Exhibit C</u>. The *Fayerweather* plaintiffs then filed a Petition for Review with the California

2

1     **B.    Plaintiffs File A First Amended Complaint In This Matter That Repeats
            Allegations Already Adjudicated In Comcast's Favor In *Fayerweather*, And
2           Comcast Moves To Strike.**

3          On November 7, 2014, Plaintiffs here filed the FAC, which repeated allegations that had

4    already been litigated and determined to be untrue in *Fayerweather*.  Specifically, Plaintiffs

5    alleged that they were deprived of meal and rest breaks as a result of Comcast's "***pattern, practice***

6    ***and uniform administration of corporate policy.***"  *Compare* FAC ¶¶ 35, 51, 59, *with*

7    *Fayerweather* Complaint ¶¶ 48, 63, 71.  The FAC also asserted that the statute of limitations on

8    Plaintiffs' claims was tolled during the period between the Decertification Order and the filing of

9    their complaint in this matter.  FAC ¶ 8.

10         On January 28, 2015, Comcast filed a Motion to Strike portions of the FAC.[3]  Comcast

11   moved to strike the portions of the FAC that (1) purported to extend the tolling period of the

12   statute of limitations beyond the date of the Decertification Order, (2) were inconsistent with

13   California law regarding meal breaks, and (3) attempted to relitigate the lawfulness of Comcast's

14   policies, patterns, or practices.

15         **C.    The Court Grants The Motion In Part And Denies The Motion In Part.**

16         After the hearing on the Motion to Strike, the Court issued a Minute Order in which it

17   affirmed its tentative ruling granting Comcast's motion as to the FAC's allegation that, under

18   California law, employers must ensure that employees take meal and rest breaks, not simply

19   provide them with the opportunity to take duty-free breaks at proper intervals.  However, the

20   Court denied Comcast's motion as to the other challenged portions of the FAC.  The Court

21   concluded that the doctrine of issue preclusion did not prevent Plaintiffs here from re-litigating

22   whether Comcast maintained policies or practices that violated the law because "[t]he class

23

24   _____
     (continued...)

25   Supreme Court, which was denied. *Fayerweather v. Comcast Corp.*, No. S221245, Dkt No. 8
     (Cal. Nov. 25, 2014).

26         [3] Comcast filed similar motions to strike portions of 20 virtually identical complaints filed
     by former *Fayerweather* class members in courts across California, including in *Hollander v.*
27   *Comcast Corporation*, Contra Costa Superior Court Case No. MSC14-01996 ("*Hollander*"),
     which is pending before Judge Goode.
28

                                          3

1   decertification order in *Fayerweather* is not an order issued 'on the merits.'" *See* March 27, 2015

2   Minute Order.  With respect to the equitable tolling question, the Court concluded that tolling of

3   the statute of limitations through the filing of this lawsuit was appropriate given that Plaintiffs had

4   filed their original complaint promptly after exhausting their avenues for appeal.  *Id.*  The Court

5   allowed Plaintiffs until April 10, 2015 to file an amended complaint.

6   **D.    Plaintiffs File A Second Amended Complaint That Includes Extraneous And**
        **Erroneous Legal Argument On The Tolling Issue.**

7

8       Plaintiffs filed the SAC on April 9, 2015.  While the SAC omits the FAC's improper

9   statement of California employers' meal and rest break obligations in compliance with this

10  Court's order, it now includes a lengthy new argument on the tolling question that was <u>not</u>

11  included in the FAC and that misstates the law.  *See* SAC ¶ 8.

12  **E.    In *Hollander*, Judge Goode Grants Comcast's Motion To Strike On The Issue**
        **Preclusion Question, Explaining Whether Comcast Maintained Policies That**
        **Violate The Labor Code Was Resolved In *Fayerweather*.**

13

14      On May 6, 2015, Judge Goode issued his opinion on Comcast's Motion to Strike portions

15  of the plaintiffs' complaint in *Hollander*.  RJN, <u>Exhibit D</u>.  Judge Goode granted Comcast's

16  motion on the issue preclusion question, concluding that "[t]he Decertification Order clearly

17  concluded that there was no evidence of any company-wide Comcast policy concerning meal and

18  rest periods that violated any provision of California law."  *Id.* at 13:18-20.  Judge Goode further

19  concluded that "[t]he issue of whether Comcast had adopted company-wide policies that violated

20  the Labor Code was vigorously litigated and actually decided."  *Id.* at 19:20-21; *see also id.* at

21  19:24-25 ("To find that decertification was appropriate, the [trial and appeals] courts necessarily

22  first had to find that there was no uniform, illegal policy.  They so found.").  Judge Goode

23  accordingly struck all references to alleged illegal "policies" from the *Hollander* complaint,

24  explaining that "[i]t is hard to believe that any more could be discovered about the company's

25  policies or that it would be a useful investment of any party's time or resources to contend that

26  the trial court and the Court of Appeal did not have before it [sic] all relevant evidence of those

27  policies."  *Id.* at 17:10-13.

28

4

III.    **ARGUMENT**

Under California Code of Civil Procedure section 436, a court may strike out any "irrelevant, false, or improper matter inserted in any pleading." Cal. Code Civ. Proc. § 436. This includes "a substantive defect [that] is clear from the face of a complaint, such as . . . a purported claim of right which is legally invalid." *PH II, Inc. v. Superior Court*, 33 Cal. App. 4th 1680, 1682-83 (Cal. Ct. App. 1995); *see also Rose v. Superior Court of Imperial County*, 80 Cal. App. 739, 745 (Cal. Ct. App. 1927) ("It has been the practice to raise the issues of law by a demurrer or motion to strike and we see nothing improper in this method of confining and defining the issues.").

A.    **The SAC's Extraneous New Allegations Regarding Equitable Tolling Are Inconsistent With The Law And Should Be Stricken.**

Even though this Court denied Comcast's prior motion to strike portions of the FAC alleging that the statute of limitations on Plaintiffs' claims was tolled between the Decertification Order in *Fayerweather* and the filing of this lawsuit, Plaintiffs unaccountably chose not to leave that portion of this Court's order alone. The SAC now includes, for the first time, various misstatements of law that should be stricken. Specifically, Plaintiffs have cut and pasted a lengthy excerpt from *Stephen v. Enter. Rent-A-Car*, 235 Cal. App. 3d 806 (1991) into the SAC even though the case includes statements of law that are no longer correct as a result of a subsequent amendment of Federal Rule of Civil Procedure 23. *See* SAC ¶ 8 at 4:9-5:6. The quote Plaintiffs have pasted into the SAC, for example, states that "[f]ederal law, by contrast, while acknowledging death-knell consequences, denies a direct appeal in any circumstances." *Id.* at 4:19-20. That is not correct, because Rule 23 was amended after *Stephen* was decided and now states that "[a] court of appeals may permit an appeal from an order granting or denying class certification under this rule . . ." Fed. R. Civ. Proc. 23(f). For the same reason, the *Stephen* court's statement (quoted in the SAC) that California law is "the reverse of federal law" because under federal law "certification orders [are] reviewable only on appeal from the final judgment" is now equally untrue. SAC ¶ 8 at 4:25-26. So, too, is Plaintiffs' allegation that under federal law "a decertification order is a final non-appealable order once it is issued as set forth in FRCP

5

1    Rule 23(f)." *Id.* at 4:4-5. Each of these false statements of law should be stricken from the SAC.

2            As to the SAC's tolling allegations generally, Comcast does not now dispute that the

3    statute of limitations on Plaintiffs' claims may have been tolled between the filing of the

4    complaint in *Fayerweather* and the issuance of the *Fayerweather* Decertification Order.

5    Comcast only urges the Court to strike Plaintiffs' tolling allegations to the extent they purport that

6    tolling could have extended even <u>beyond</u> the Decertification Order and up to the date they filed

7    this lawsuit because that allegation is inconsistent with weight of federal case law,[4] which

8    California courts should follow in the absence of controlling state authority. *See Jolly v. Eli Lilly*

9    *& Co.*, 44 Cal. 3d 1103, 1118 (1988). To the extent the Court again declines to rule as a matter of

10   law that tolling could not continue beyond class decertification in *Fayerweather*, Comcast

11   requests that the Court deny its motion to strike on this issue without prejudice to Comcast's

12   revisiting the question if facts emerge showing that tolling would not be equitable under the

13   specific circumstances presented here.

14        **B.    The Court Should Strike The SAC's Various Allegations Regarding
              Comcast's Purportedly Illegal "Policies" Under The Doctrine Of Issue
15            Preclusion Because Whether Comcast Maintains The Challenged Policies
              Was Decided In *Fayerweather*.**
16

17           Issue preclusion applies when: (1) an issue sought to be precluded is identical to that

18   decided in a prior proceeding; (2) the issue is actually litigated in the prior proceeding; (3) the

19   issue was necessarily decided in the prior proceeding; (4) the decision in the prior proceeding was

20   final and on the merits; and (5) the party against whom preclusion is sought is the same as, or in

21   privity with, the party to the former proceeding. *Lucido v. Superior Court*, 51 Cal. 3d 335, 341

22   (1990). In their opposition to Comcast's Motion to Strike portions of the FAC, Plaintiffs argued

23   _____

24           [4] *See, e.g., Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372 (5th Cir. 2013) (decided
     after the 1998 amendment of Federal Rule 23(f) allowing for appeal of a denial of certification,
25   and holding that the statute of limitations resumes running when a trial court decertifies a class
     and <u>is not extended</u> by an unsuccessful appeal); *Giovanniello v. ALM Media, LLC*, 726 F.3d 106
26   (2nd Cir. 2013) (holding the same and citing cases from the First, Third, Fourth, Fifth, Sixth,
     Seventh, Eleventh, and Federal Circuits); *Tosti v. Los Angeles*, 754 F.2d 1485 (9th Cir. 1985);
27   *Stiller v. Costco Wholesale Corp.*, 2014 U.S. Dist. LEXIS 140435, 6 (S.D. Cal. Oct. 1, 2014)
     (holding that tolling does not extend through an interlocutory appeal and that "a bright-line rule
28   with regard to *American Pipe* tolling is necessary to prevent abuse and reduce uncertainty").

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE SAC - CASE NO. 2011900**

only that they were not in privity with the *Fayerweather* plaintiffs and that the *Fayerweather*

Decertification Order was not "on the merits." This Court denied Comcast's prior Motion to

Strike solely on the grounds that the Decertification Order was procedural in nature and not an

order "on the merits."

> **1.    Plaintiffs, As Former *Fayerweather* Class Members, Are In Privity With The *Fayerweather* Plaintiffs.**

There can be no question that Plaintiffs, as former *Fayerweather* class members, are

"sufficiently close to the original case to afford application of the principle of preclusion."

*Alvarez*, 143 Cal. App. 4th at 1236-37. In *Alvarez*, the Court of Appeal held that issue preclusion

can properly apply to claims asserted in a subsequent action by members of a putative class in an

earlier action. *Id.* at 1226. Here, the parties' claims, counsel, and interests are identical, and the

parties in *Fayerweather* had a strong motive and full opportunity to present their case.

Application of issue preclusion is thus appropriate here to prevent Plaintiffs from re-litigating

issues that were already adjudicated in *Fayerweather*. *Id.* at 1238.

> **2.    The Decertification Order In *Fayerweather* Resolved The Merits Of The Issue Whether Comcast Maintains Policies That Deprive Technicians Of Meal And Rest Breaks.**

The SAC's various allegations regarding Comcast's illegal "policies" should be stricken

under the doctrine of issue preclusion because the existence or non-existence of such policies is

an issue that was actually litigated and necessarily decided in *Fayerweather*, as Judge Goode

himself recently concluded in *Hollander*. *See* Section II.E, *supra*. Although this Court denied

Comcast's earlier Motion to Strike on this issue on the ground that class certification orders are

procedural in nature and not orders "on the merits," Judge Goode explained in his recent order

granting Comcast's Motion to strike that he and the Court of Appeal did resolve (in Comcast's

favor) the merits of Plaintiffs' allegation that Comcast maintained policies that unlawfully

deprived technicians of meal and rest breaks. RJN, Exhibit D, at 19:21-25. Judge Goode

indicated that it was appropriate to make this sort of merits determination in the class certification

context, because the California Supreme Court has instructed that "when evidence or legal issues

germane to the certification question bear as well on aspects of the merits, a court may properly

7

1   evaluate them." *Id.* at 11:13-14 (quoting *Brinker Restaurant Corp. v. Super. Court*, 53 Cal. 4th

2   1004, 1023-24 (2012)).  In *Fayerweather*, before deciding whether the plaintiffs' claims could

3   manageably be adjudicated on a class-wide basis, Judge Goode first had to resolve whether

4   Comcast maintained company-wide policies that could serve as common proof of a class-wide

5   violation.  *Id.* at 14:23-15:4 ("The Court examined the evidence carefully to determine if there

6   was sufficient evidence to support a jury finding that there was a company-wide policy. Had there

7   been such evidence, it would have supported plaintiff's view that the case could be tried on that

8   theory as a class action. [¶]  But the Court found that there was no evidence of a company-wide

9   policy at odds with the Labor Code."). *Fayerweather* thus resolved the question Plaintiffs seek to

10  re-litigate here.

11          Moreover, if class certification orders were by definition not "on the merits," they could

12  never be given preclusive effect.  But that cannot be true, because Courts of Appeal have

13  specifically held that issue preclusion may properly apply to issues that are resolved as part of

14  class certification determinations. *See Johnson*, 166 Cal. App. 4th at 1510 ("If all five elements

15  required for application of collateral estoppel are present, <u>the doctrine is fully applicable to</u>

16  <u>preclude relitigation of issues finally resolved as part of a class certification determination in a</u>

17  <u>prior proceeding</u>.") (emphasis added); *Alvarez v. May Dept. Stores Co.*, 143 Cal. App. 4th 1223,

18  1236 (2006) (order denying class certification given preclusive effect against putative class

19  member who later sought to re-litigate issues decided in the earlier action).  In *Alvarez*, for

20  example, the Court of Appeal concluded that issue preclusion prevented the plaintiffs from

21  seeking class action status, because class certification had been denied in prior proceedings in

22  which the plaintiffs were the "virtual representatives" of the *Alvarez* plaintiffs and where the

23  "interested parties, their claims, and their counsel [were] the same." *Alvarez*, 143 Cal. App. 4th at

24  1238.  The Court of Appeal in *Alvarez* could not have endorsed application of issue preclusion in

25  that case if it viewed a class certification order as necessariliy procedural and not "on the merits."

26          Here, the issue whether Comcast maintains policies that deprive technicians of meal and

27  rest breaks was actually litigated and necessarily decided in *Fayerweather*.  Because the

28

8

1    *Fayerweather* Decertification Order constitutes a final judgment on the merits of that issue,

2    Plaintiffs should not be permitted to re-litigate the issue here.

3    **IV.    CONCLUSION**

4           For the foregoing reasons, Comcast requests that the Court strike the portions of

5    Plaintiffs' SAC that misstate the law regarding equitable tolling and that attempt to re-litigate the

6    allegation that Comcast maintains illegal policies, an issue that was fully litigated and resolved in

7    *Fayerweather*.

8    Dated: May 15, 2015                              JONES DAY

9

10                                                    By: _____

11                                                       Fred W. Alvarez
                                                         Allison B. Moser

12                                                    Attorneys for Defendants
13                                                    COMCAST CABLE COMMUNICATIONS
                                                      MANAGEMENT, LLC, erroneously sued as
14                                                    COMCAST CORPORATION and
                                                      COMCAST OF CONTRA COSTA, INC.

15

16    NAI-1500339686v1

17

18

19

20

21

22

23

24

25

26

27

28
                                            9
─────────────────────────────────────────────────────────────
**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION
TO STRIKE PORTIONS OF THE SAC - CASE NO. 2011900**

1   FRED W. ALVAREZ, State Bar No. 68115
    ALLISON B. MOSER, State Bar No. 223065
2   JONES DAY
    Silicon Valley Office
3   1755 Embarcadero Rd.
    Palo Alto, CA 94303
4   Telephone: (650) 739-3939
    Facsimile: (650) 739-3900
5   Email: falvarez@jonesday.com
    Email: amoser@jonesday.com
6
7   TROY A. VALDEZ, State Bar No. 191478
    ERIN M. DOYLE, State Bar No. 233113
8   STEPHEN L. TAEUSCH, State Bar No. 247708
    VALDEZ TODD & DOYLE LLP
9   1901 Harrison Street, Suite 1450
    Oakland, California 94612
10  Telephone: (415) 202-5950
    Facsimile: (415) 202-5951
11  Email: tvaldez@vtdlaw.com
    Email: edoyle@vtdlaw.com
12  Email: staeusch@vtdlaw.com

13  Attorneys for Defendants
    COMCAST CABLE COMMUNICATIONS
14  MANAGEMENT, LLC, erroneously sued as
    COMCAST CORPORATION and
15  COMCAST OF CONTRA COSTA, INC.

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                    FOR THE COUNTY OF STANISLAUS

18

19  JOSEPH JOSHUA DAVIS, PENNY          CASE NO. 2011900
    SCHOONOVER, LEON GIBSON,
20  DUSTIN WAYNE HAGENS, RAYMOND        Assigned for all purposes, including Trial
    AGUNDEZ, RAFAEL BARAJAS, JR.,       to Judge William A. Mayhew
21
                Plaintiffs,             Dept. 21
22
         v.
23                                      REQUEST FOR JUDICIAL NOTICE IN
    COMCAST CORPORATION, a              SUPPORT OF DEFENDANT'S MOTION
24  Pennsylvania Corporation; COMCAST OF TO STRIKE PORTIONS OF THE SECOND
    CONTRA COSTA, INC., a Washington    AMENDED COMPLAINT
25  Corporation; and DOES 1 through 50,
    Inclusive,                          Date:  July 16, 2015
26                                      Time:  8:30 a.m.
                Defendants.             Dept.: 21
27
                                        Complaint filed October 27, 2014
28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE
PORTIONS OF THE SAC - CASE NO. 2011900

FILED BY FAX

FILED

MAY 15 2015

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS
SARAH KIERNAN DEPUTY

1   Pursuant to sections 452(d) and 453 of the California Evidence Code and Rule 3.1306(c)

2   of the California Rules of Court, Defendant Comcast Cable Communications Management, LLC,

3   erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc., (hereinafter,

4   "Comcast") respectfully requests that the Court take judicial notice of the following document in

5   support of its Motion to Strike Portions of Plaintiffs' Complaint:

6       1.   Exhibit A is a true and correct copy of the First Amended Complaint filed in

7            *Fayerweather v. Comcast Corporation*, Contra Costa County Superior Court, Case

8            No. MSC08-01470 (hereinafter, "*Fayerweather*").

9       2.   Exhibit B is a true and correct copy of the Order Decertifying Class filed on

10           December 15, 2012 in *Fayerweather*.

11      3.   Exhibit C is a true and correct copy of the California Court of Appeal's opinion

12           affirming *Fayerweather*, available at 2014 Cal. App. Unpub. LEXIS 6185.

13      4.   Exhibit D is a true and correct copy of the May 6, 2015 Opinion and Order on

14           Motion to Strike Portions of Plaintiffs' Complaint filed in *Hollander v. Comcast*

15           *Corporation*, Contra Costa County Superior Court, Case No. MSC14-01996.

16   Exhibits A, B, C, and D are records of California courts that are properly the subject of

17   judicial notice under Evidence Code section 452(d)(1). Cal. Evid. Code § 452 ("Judicial notice

18   may be taken of . . . records of any court of this state").

19

20   Dated: May 15, 2015                    JONES DAY

21

22                                          By: _____

23                                          Fred W. Alvarez
                                            Allison B. Moser

24
                                            Attorney for Defendants
25                                          COMCAST CORPORATION and
                                            COMCAST OF CONTRA COSTA, INC.

26

27   NAI-1500339681v1

28

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE
PORTIONS OF THE SAC - CASE NO. 2011900**

# EXHIBIT A

**RECEIVED**

SEP 1 7 2008

WILSON, SONSINI,
GOODRICH & ROSATI

1  Arlo Garcia Uriarte, SBN 231764
2  Jason J. Szydlik, SBN 238356
   LIBERATION LAW GROUP
3  2760 Mission Street
   San Francisco, CA 94110
4  Telephone: (415) 695-1000
5  Facsimile:  (415) 695-1006

6

7  Jennifer Kramer, SBN 203385
   Judith Wiederhorn, SBN 239885
8  JENNIFER KRAMER LEGAL, APC
9  707 Wilshire Blvd., Suite 3600
   Los Angeles, CA 90017
10 Telephone: (213) 955-0200
11 Facsimile: (213) 955-0215

12 Attorneys for Plaintiff
13 GABRIEL FAYERWEATHER

14
          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
15
            **FOR THE COUNTY OF CONTRA COSTA**
16

17 | GABRIEL FAYERWEATHER, as an | **Case No.: C-08-01470** |
18 individual and on behalf of others similarly
19 situated,

20            Plaintiff,                 **FIRST AMENDED COMPLAINT:**
21      vs.                              **(1) FAILURE TO PAY WAGES**
                                         **(2) BREACH OF IMPLIED CONTRACT**
22 COMCAST CORPORATION, a                **(3) DENIAL OF MEAL PERIODS**
23 Pennsylvania Corporation; COMCAST OF  **(4) DENIAL OF REST PERIODS**
   CONTRA COSTA, INC., a Washington
24 Corporation; and DOES 1 through 50,   **(5) UNFAIR BUSINESS PRACTICES**
   Inclusive,                            **(Violation of California Business &**
25                                       **Professions Code §17200 et seq.)**
26            Defendants.                **(6) FAILURE TO PROVIDE**
                                         **ACCURATE, ITEMIZED WAGE**
27                                       **STATEMENTS**

28

---
1

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff GABRIEL FAYERWEATHER (hereinafter referred to as "Plaintiff" or "FAYERWEATHER"), hereby submits his First Amended Complaint against Defendants COMCAST CORPORATION, COMCAST OF CONTRA COSTA, INC ("COMCAST"), and Does 1-50 (hereinafter collectively referred to as "Defendants") on behalf of himself, and the class of others similarly situated, as follows:

## INTRODUCTION

1. This class action is within the Court's jurisdiction under California <u>Labor Code</u> §§ 201-204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission ("IWC") including IWC Wage Order No. 4.

2. This complaint challenges systemic illegal employment practices resulting in violations of the California <u>Labor Code</u>, <u>Business and Professions</u> Code and applicable IWC wage orders against employees of Defendants.

3. Plaintiff is informed and believes and based thereon alleges Defendants, joint and severally have acted intentionally and with deliberate indifference and conscious disregard to the rights of all employees in receiving all wages due and lawful meal and rest periods.

4. Plaintiff is informed and believes and based thereon alleges Defendants have engaged in, among other things a system of willful violations of the California <u>Labor Code</u>, <u>Business and Professions Code</u> and applicable IWC wage orders by creating and maintaining policies, practices and customs that knowingly deny employees: (a) all wages due, (b) the opportunity to take meal and rest periods, and (c) accurate, itemized wage statements.

5. The policies, practices and customs of defendants described above and below have resulted in unjust enrichment of Defendants and an unfair business advantage over businesses that routinely adhere to the strictures of the California <u>Labor Code</u>, <u>Business and Professions Code</u> and applicable IWC wage orders.

2

## JURISDICTION AND VENUE

**6.** The Court has jurisdiction over the violations of the California <u>Labor Code</u> §§ 201-204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12 claims alleged herein.

**7.** Venue is proper because the alleged wrongs occurred in Contra Costa County. Defendants are located within California and Contra Costa County. Plaintiff worked for Defendants in Contra Costa County. The events that are the subject of this action took place in Contra Costa County.

## PARTIES

**8.** Plaintiff has been employed as a service technician with Defendants since September of 1996. Plaintiff is and was a victim of the policies, practices and customs of Defendants complained of in this action in ways that have deprived him of the rights guaranteed him by California <u>Labor Code</u> §§ 204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12. Plaintiff resides in Contra Costa County, and is and was employed by Defendants at all times relevant to this complaint in Contra Costa.

**9.** Plaintiff is informed and believes and based thereon alleges Defendant COMCAST CORPORATION was and is a California Corporation doing business in the State of California with its principal place of business in San Ramon.

**10.** Plaintiff is informed and believes and based thereon alleges Defendant COMCAST OF CONTRA COSTA, INC. was and is a California Corporation doing business in the State of California with its principal place of business in Contra Costa County.

**11.** Plaintiff is informed and believes and thereon alleges that at all times herein mentioned Defendants and DOES 1 through 50, are and were corporations, business

---

entities, individuals, and partnerships, licensed to do business and actually doing business in the State of California. Defendants own and operate an industry, business and establishment throughout California and is headquartered in San Ramon County, for the purpose of providing cable, internet, telephone and other communications services. As such, and based upon all the facts and circumstances incident to Defendants' business in California, Defendants are subject to California <u>Labor Code</u> §§ 201-204, 226.7, and 512, California <u>Business and Professions Code</u> § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12.

12.    Plaintiff does not know the true names or capacities, whether individual, partner or corporate, of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, said Defendants are sued under such fictitious names, and Plaintiff prays leave to amend this complaint when the true names and capacities are known. Plaintiff is informed and believes and thereon alleges that each of said fictitious Defendants was responsible in some way for the matters alleged herein and proximately caused Plaintiff and members of the class to be subject to the illegal employment practices, wrongs and injuries complained of herein.

13.    At all times herein mentioned, each of said Defendants participated in the doing of the acts hereinafter alleged to have been done by the named Defendants; and furthermore, the Defendants, and each of them, were the agents, servants and employees of each of the other Defendants, as well as the agents of all Defendants, and at all times herein mentioned, were acting within the course and scope of said agency and employment.

14.    Plaintiff is informed and believes and based thereon alleges that at all times material hereto, each of the Defendants named herein was the agent, employee, alter ego and/or joint venturer of, or working in concert with each of the other co-Defendants and was acting within the course and scope of such agency, employment, joint venture, or

concerted activity. To the extent said acts, conduct, and omissions were perpetrated by certain Defendants, each of the remaining Defendants confirmed and ratified said acts, conduct, and omissions of the acting Defendant.

15. At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

16. At all times herein mentioned, the acts and omissions of various Defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

17. At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages as herein alleged.

## CLASS ACTION ALLEGATIONS

18. **Definition:** The named individual Plaintiff brings this action on behalf of himself and the class pursuant to California Code of Civil Procedure § 382 and is consistent with Fed. R. Civ. P. Rules 23(a), (b)(1), (b)(2), and (b)(3). The class is defined as: "All current and former service technicians, communications technicians, and other non-exempt, hourly-paid employees with similar job duties who worked for Defendants in California from May 27, 2004 to the present."

19. **Numerosity:** The members of the class are so numerous that joinder of all members would be impractical, if not impossible. The identity of the members of the class is readily ascertainable by review of Defendants' records. Plaintiff is informed and believes and based thereon alleges that (a) class members regularly were denied payment of all wages due, and (b) class members were regularly denied meal breaks and/or rest

breaks.

**20.    Adequacy of Representation:** The named Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the class defined above. Plaintiff's attorneys are ready, willing and able to fully and adequately represent the class and individual Plaintiff.

**21.** Defendants uniformly administered a corporate policy, practice and/or custom concerning staffing levels, duties, responsibilities of the class members, which required that the class members to work through the legally required rest and meal breaks. Plaintiff is informed and believes and based thereon alleges this corporate conduct is accomplished with the advance knowledge and designed intent to willfully withhold appropriate wages for work performed by class members. Additionally, Defendants uniformly administered a corporate policy, practice and/or custom of not paying members of the class for all hours worked. Plaintiff is informed and believes and based thereon alleges this corporate conduct is accomplished with the advance knowledge and designed intent to willfully withhold appropriate wages for work performed by class members.

**22.** Plaintiff is informed and believes and based thereon alleges Defendants, in violation of California Labor Code §§ 201 and 202, et seq., respectfully, had a consistent and uniform policy, practice and custom of willfully failing to comply with Labor Code §§ 226.7 and 1194, and 1198. Plaintiff and other members of the class did not secret or absent themselves from Defendants, nor refuse to accept the earned and unpaid wages from Defendants. Accordingly, Defendants are liable for waiting time compensation for the unpaid wages to separated employees pursuant to California Labor Code § 203.

**23.** As a pattern and practice, in violation of the aforementioned labor laws and wage orders, Defendants did not maintain adequate records, and/or altered with records pertaining to when Plaintiff and the members of the class began and ended each work period, meal period, the total daily hours worked, and the total hours worked per pay

**FIRST AMENDED CLASS ACTION COMPLAINT**

period and applicable rates of pay in violation of California Labor Code § 1174.

24.   **Common Question of Law and Fact:** There are predominant common questions of law and fact and a community of interest amongst Plaintiff and the claims of the class concerning whether (a) class members regularly were denied payment of all wages due, and (b) class members were regularly denied meal breaks and/or rest breaks, was and is a violation of California Labor Code §§ 201-204, 226.7, and 512 and California Industrial Welfare Commission wage orders including IWC Wage Order No. 4. Defendants' employment policies and practices wrongfully and illegally failed to compensate Plaintiff and the other members of the class as required by California law.

25.   **Typicality:** The claims of Plaintiff are typical of the claims of all members of the class. The Plaintiff is a member of the class and has suffered the alleged violations of California Labor Code §§ 201-204, 226.7, and 512 and California Industrial Welfare Commission wage orders including IWC Wage Order No. 4.

26.   The California Labor Code and Wage Order provisions upon which Plaintiff bases his claims are broadly remedial in nature. These laws and labor standards serve an important public interest in establishing minimum working conditions and standards in California. These laws and labor standards protect the average working employee from exploitation by employers who may seek to take advantage of superior economic and bargaining power in setting onerous terms and conditions of employment.

27.   The nature of this action and the format of laws available to Plaintiff and members of the class identified herein make the class action format a particularly efficient and appropriate procedure to redress the wrongs alleged herein. If each employee were required to file an individual lawsuit, the corporate Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with their vastly superior financial and legal resources. Requiring each class member to pursue and individual remedy would also discourage the assertion of lawful claims by employees who would be

disinclined to file an action against their former and/or current employer for real and justifiable fear of retaliation and permanent damage to their careers at subsequent employment.

28.    The prosecution of separate actions by the individual class members, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual class members against the Defendants and which would establish potentially incompatible standards of conduct for the Defendants, and/or (b) adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interest of the other class members not parties to the adjudications or which would substantially impair or impede the ability of the class members to protect their interests.  Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

29.    Such a pattern, practice and uniform administration of corporate policy regarding illegal employee compensation described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the class identified herein, in a civil action, for the unpaid balance of the full amount of unpaid premium compensation for missed meal and rest periods pursuant to  Labor Code § 226.7 and IWC Wage Order No. 4 §§ 11(B) and 12 (B), unpaid wages both straight-time and overtime, including interest thereon, applicable penalties, reasonable attorney's fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194 and Code of Civil Procedure § 1021.5.

30.    Proof of a common business practice or factual pattern, of which the named Plaintiff experienced, are representative and will establish the right of each of the members of the plaintiff class to recovery on the causes of action alleged herein.

31.    The plaintiff class is commonly entitled to a specific fund with respect to the compensation illegally and unfairly retained by Defendants.  The Plaintiff class is

8

1  commonly entitled to restitution of those funds being improperly withheld by Defendants.

2  This action is brought for the benefit of the entire class and will result in the creation of a

3  common fund.

## FACTUAL ALLEGATIONS RELEVANT TO CAUSES OF ACTION

4

5      **32.**    Defendants are a cable services and communications company.

6      **33.**    Plaintiff FAYERWEATHER has been employed by Defendants for a

7  period of over eleven (11) years beginning in September of 1996. Plaintiff

8  FAYERWEATHER is currently employed by Defendants.

9      **34.**    Plaintiff and the class members report to Defendants' Richmond office at

10  around 7:15 a.m. to load equipment and tools onto their trucks and check their routes

11  before they head out to their first job. Plaintiff and the class members then commute

12  from job site to job site.

13      **35.**    Class members are not allowed to clock in and receive payment for hours

14  worked until they leave the office around 7:30 a.m. The class members work another

15  eight (8) hours on the clock.

16      **36.**    Plaintiff and class members work for periods of more than five (5) hours

17  without a meal period of thirty (30) minutes.

18      **37.**    Plaintiff and class members work for periods of more than four (4) hours

19  without a rest period of ten (10) minutes.

20      **38.**    After completing their work at the job sites, Plaintiff and class members

21  then travel back to the office to unload their truck and complete paperwork while off the

22  clock and not receiving compensation.

23

24      **39.**    Plaintiff and the class members were not paid for hours worked in the

25  office in the mornings or evenings.

26

27

28

9

## FIRST CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### FOR FAILURE TO COMPENSATE FOR ALL HOURS WORKED IN
### PURSUANT TO
### IWC WAGE ORDER NO. 4 AND LABOR CODE § 1194)

40.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 39 as though fully set for herein.

41.   This cause of action is brought pursuant to Labor Code §1194, et seq., which provides that employees are entitled to wages and compensation for work performed, and provides a private right of action for failure to pay legal compensation for work performed, whether it be straight-time or overtime.

42.   At all times relevant herein, Defendants were required to compensate its non-exempt, hourly employees for all hours worked pursuant to in violation of California Labor Code §1194 and IWC Wage Order No. 4.

43.   As a pattern and practice, Defendants regularly deducted time from employees' daily time records for the time they worked at Defendant's office in the morning and at the end of their shifts. Plaintiff and class members were not compensated for all hours they were subject to the control of Defendants; including all time they were suffered or permitted to work.

44.   Plaintiff is informed and believes and based thereon alleges Defendants uniformly administered a corporate policy concerning staffing levels, duties and responsibilities which required Plaintiff and the class members to work without appropriate pay. This included a uniform corporate pattern and practice of allocating and authorizing inadequate staffing levels. The inadequate staffing levels were enforced and ensured through the uniform and mandated corporate policy of a minimal labor budget. This corporate conduct is accomplished with the advance knowledge and designed intent to save labor costs by required Plaintiff and members of the class to work without proper

FIRST AMENDED CLASS ACTION COMPLAINT

1  compensation because they were unable to take the meal periods which were

2  automatically deducted from their time records.

3      **45.**    As a pattern and practice, in violation of the aforementioned labor laws and

4  wage orders, Plaintiff is informed and believes and based thereon alleges Defendants did

5  not properly maintain records pertaining to when Plaintiff and the class began and ended

6  each work period, meal period, the total daily hours worked, and the total hours worked

7  per pay period and applicable rates of pay in violation of California Labor Code §1174.

8      **46.**    The conduct of Defendants and their agents and employees as described

9  herein was oppressive, fraudulent and malicious, done in conscious disregard of

10  Plaintiff's and class members' rights, and was done by managerial employees of

11  Defendants. Plaintiff and class members are thereby entitled to an award of punitive

12  damages against Defendants, in an amount appropriate to punish and make an example of

13  Defendants, and in an amount to conform to proof.

14      **47.**    Plaintiff is informed and believes and based thereon alleges Defendants

15  willfully failed to pay employees proper compensation for all hours worked. Plaintiff is

16  informed and believes and based thereon alleges Defendants' willful failure to provide

17  wages due and owing them upon separation from employment results in a continued

18  payment of wages up to thirty (30) days from the time the wages were due. Therefore,

19  Plaintiff and other members of the class who have separated from employment are

20  entitled to compensation pursuant to Labor Code § 203.

21      **48.**    Such a pattern, practice and uniform administration of corporate policy

22  regarding illegal employee compensation as described herein is unlawful and creates an

23  entitlement to recovery by Plaintiff in a civil action, for the unpaid balance of the full

24  amount of straight time compensation and overtime premiums owing, including interest

25  thereon, penalties, reasonable attorneys' fees, and costs of suit according to California

26  Labor Code §1194, et seq.

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

## SECOND CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS FOR BREACH OF IMPLIED CONTRACT FORM BY CONDUCT:  WORKING OFF-THE CLOCK)

49.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

50.    Plaintiffs plead this cause of action as an alternative theory of liability to their First Cause of Action.

51.    As noted by the United States Supreme Court, ""[A]n informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace." Hishon v. King & Spalding, 467 U.S. 69, 74 (1984).

52.    The employment contracts between hourly-paid employees and Defendants, arise from, among other things: Defendants' conduct of treating hourly-paid employees as their employees; Defendants' standardized employee orientation; hourly-paid employees' pay-stubs; Defendants' corporate meal break policy; and the distribution of the Handbook to hourly-paid employees.

53.    By furnishing their labor on behalf of Defendants and/or with their knowledge and/or acquiescence, hourly-paid employees duly performed all the conditions on their part under their employment contracts.

54.    By failing to properly compensate hourly-paid employees for off-the-clock work, Defendants breached their employment contracts with Plaintiffs and the Class members.

55.    Plaintiffs and the Class members suffered damages in the form of lost wages and benefits as a direct result of Defendants' conduct. Defendants are liable to Plaintiffs and the Class members for the damages incurred as a result of Defendants' failure to pay Plaintiffs and the Class members for their off-the-clock work.

12

## THIRD CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### FOR FAILURE TO PROVIDE MEAL BREAKS
### IN VIOLATION OF LABOR CODE §§ 226.7 AND 512
### AND IWC WAGE ORDER NO. 4)

56.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

57.    Defendants failed in their affirmative obligation to ensure that all of their employees, including Plaintiff and other members of the class, were actually relieved of all duties, not performing any work, and free to leave the premises during meal periods. Plaintiff and the class were suffered and permitted to work through legally required meal breaks. As such, Defendant is responsible for paying premium compensation for missed meal periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B). Defendants shall pay the each affected employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal break was not provided.

58.    Plaintiff and class members regularly worked in excess of five (5) hours per day and accordingly had a right to take a 30-minute meal period each day worked in excess of five (5) hours.

59.    As a pattern and practice, Defendants regularly required employees to work through their meal periods without proper compensation. Defendants did staff employees in such a manner and at such posts that would make it impossible for these employees to take their meal period. This policy of requiring employees to work through their legally mandated meal periods is a violation of California law.

60.    Plaintiff is informed and believes and based thereon alleges Defendants failure to provide Plaintiff and other members of the class with the opportunity to take meal breaks was willful and done with the wrongful and deliberate intention of injuring Plaintiff and other members of the class, from improper motives amounting to malice,

and in conscious disregard of Plaintiff and other members of the class' rights.

61.    Plaintiff is informed and believes and based thereon alleges Defendants willfully failed to pay employees who were not provided the opportunity to take meal breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B).  Plaintiff is informed and believes and based thereon alleges Defendants' willful failure to provide Plaintiff and other members of the class the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due.  Therefore, Plaintiff and other members of the class who have separated from employment are entitled to compensation pursuant to Labor Code § 203.

62.    As a pattern and practice, in violation of the aforementioned labor laws and wage orders, Plaintiff is informed and believes and based thereon alleges Defendants did not properly maintain records pertaining to when Plaintiff began and ended each meal period in violation of California Labor Code §1174 and § 4 of the applicable IWC Wage Order(s).

63.    Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the class identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B), including interest thereon, penalties, reasonable attorney's fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194.

64.    Defendants' wrongful and illegal conduct in failing provide class members with the opportunity to take meal breaks and to provide premium compensation in accordance with Labor Code §§ 226.7 and 512 and IWC Wage Order No. 4 § 11(B) despite the clear legal obligation to do so, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff and all members of the class in that the Defendants will continue to violate these California laws, represented

1  by labor statutes and IWC wage orders, unless specifically ordered to comply with same.

2  This expectation of future violations will require current and future employees to

3  repeatedly and continuously seek legal redress in order to gain compensation to which

4  they are entitled under California law.  Plaintiff has no other adequate remedy at law to

5  insure future compliance with the California labor laws and wage orders alleged to have

6  been violated herein.

### FOURTH CAUSE OF ACTION

**(BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS**
**FOR FAILURE TO PROVIDE REST BREAKS IN VIOLATION OF <u>LABOR</u>**
**<u>CODE</u> §§ 226.7 AND 512 AND IWC WAGE ORDER NO. 4)**

11      **65.**     Plaintiffs re-allege and incorporate by reference each and every allegation

12  set forth in the preceding paragraphs.

13      **66.**     Defendants affirmatively prevented Plaintiff and class members from

14  taking legally mandated rest breaks.  As such, Defendant is responsible for paying

15  premium compensation for missed rest periods pursuant to <u>Labor Code</u> § 226.7 and IWC

16  Wage Order No. 4 § 12(B). Defendants shall pay the each affected employee one (1) hour

17  of pay at the employee's regular rate of compensation for each workday that the rest

18  break was not provided.

19      **67.**     Plaintiff and class members regularly worked in excess of three and half (3

20  ½) hours per day.  Defendants' policies and practices prevented Plaintiff and class

21  members from enjoying their right to a ten (10) minute rest period in the middle of each

22  four (4) hour work period.

23

24      **68.**     As a pattern and practice, Defendants regularly required employees to work

25  through rest periods.  Defendants and Defendants' supervisors assigned work, scheduled

26  shifts, and staffed worksites in a manner that did not allow Plaintiff and class members to

27  regularly take rest periods.

28      **69.**     Plaintiff is informed and believes and based thereon alleges Defendants

failure to provide Plaintiff and other members of the class with the opportunity to take rest breaks was willful and done with the wrongful and deliberate intention of injuring Plaintiff and other members of the class, from improper motives amounting to malice, and in conscious disregard of Plaintiff and other members of the class' rights.

70.     Plaintiff is informed and believes and based thereon alleges Defendants willfully failed to pay employees who were not provided the opportunity to take rest breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage Order No. 4 § 12(B).  Plaintiff is informed and believes and based thereon alleges Defendants' willful failure to provide Plaintiff and other members of the class the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due.  Therefore, Plaintiff and other members of the class who have separated from employment are entitled to compensation pursuant to Labor Code § 203.

71.     Such a pattern, practice and uniform administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the class identified herein, in a civil action, for the unpaid balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 12(B), including interest thereon, penalties, reasonable attorney's fees, and costs of suit according to the mandate of California Labor Code §§ 218.5 or 1194.

72.     Defendants' wrongful and illegal conduct in failing provide class members with the opportunity to take rest breaks and to provide premium compensation in accordance with Labor Code §§ 226.7 and 512 and IWC Wage Order No. 4§ 12(B) despite the clear legal obligation to do so, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff and all members of the class in that the Defendants will continue to violate these California laws, represented by labor statutes and IWC wage orders, unless specifically ordered to comply with same. This expectation of future violations will require current and future employees to

1   repeatedly and continuously seek legal redress in order to gain compensation to which

2   they are entitled under California law.  Plaintiff has no other adequate remedy at law to

3   insure future compliance with the California labor laws and wage orders alleged to have

4   been violated herein.

## FIFTH CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS

### FOR VIOLATIONS OF BUSINESS AND PROFESSIONS CODE § 17200 ET

### SEQ.)

73.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

74.   Defendants, and each of them, have engaged and continue to engage in unfair business practices in California by practicing, employing and utilizing the employment practices outlined above, inclusive, to wit, by requiring Plaintiff and the members of the class to (a) not compensate employees for all hours worked, and (b) to require employees to work through meal and rest periods.

75.   Defendants' utilization of such unfair business practices constitutes unfair competition and provides an unfair advantage over Defendants' competitors.

76.   Plaintiff seeks, on his own behalf, on behalf of other members of the class similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies withheld, acquired and/or converted by the Defendants by means of the unfair practices complained of herein.

77.   Plaintiff seeks, on his own behalf, on behalf of other members of the class similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair business practices complained of herein.

78.   The restitution includes the equivalent of (a) all unpaid wages for hours worked whether it be straight-time or overtime, and (b) all unpaid premium compensation mandated by Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B) and 12(B),

1    including interest thereon.

2    **79.**    The acts complained of herein occurred within the last four years preceding

3    the filing of the complaint in this action.

4    **80.**    Plaintiff is informed and believes and on that basis alleges that at all times

5    herein mentioned Defendants have engaged in unlawful, deceptive and unfair business

6    practices, as proscribed by California <u>Business and Professions Code</u> § 17200 et seq.,

7    including those set forth herein above thereby depriving Plaintiff and other members of

8    the class the minimum working condition standards and conditions due to them under the

9    California laws and Industrial Welfare Commission wage orders as specifically described

10   therein.

## SIXTH CAUSE OF ACTION

### (BY PLAINTIFF ON BEHALF OF HIMSELF AND THE CLASS
### For Violation of <u>LABOR CODE § 226</u>

11
12
13
14   **81.**    Plaintiffs re-allege and incorporate by reference each and every allegation

15   set forth in the preceding paragraphs.

16   **82.**    Plaintiff and all similarly situated employees have been harmed as

17   described herein and set forth in the First, Second, Third, and Fourth Causes of Action.

18
19   **83.**    As a pattern and practice, Defendant failed to furnish Plaintiff and all

20   similarly situated employees, either semimonthly or at the time of each payment of

21   wages, either as a detachable part o the check or separately, an accurate, itemized

22   statement in writing showing gross wages earned, total hours worked, and the applicable

23   hourly rates and corresponding number of hours worked by Plaintiff and all similarly

24   situated employees at each rate.

25   **84.**    Defendant willfully and intentionally failed to provide Plaintiff and all

26   similarly situated employees with accurate, itemized statements, to show on such

27   itemized statements the proper total hours, including overtime hours, worked by Plaintiff

28   and all similarly situated employees in that it required or suffered them to work and failed

---

to pay wages to them for all hours worked. Defendant willfully and intentionally failed to show accurate gross wages earned, total hours worked by Plaintiff and all similarly situated employees, and all applicable hourly rates and the corresponding number of hours worked by Plaintiff and all similarly situated employees at each rate.

85.     As such, Plaintiff and all similarly situated employees are entitled to payment from Defendant of the greater of actual damages or $50 for the initial pay period in which the violation occurred and $100 for each subsequent violation, up to a maximum of $4000, pursuant to Labor Code § 226, as well as reasonable attorney's fees and costs of suit

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on his own behalf and on the behalf of the members of the class, prays for judgment as follows:

1.  For an order certifying the proposed class;

2.  Upon the First and Second Cause of Action, for consequential damages according to proof;

3.  Upon the First and Second Cause of Action, for punitive and exemplary damages according to proof;

4.  Upon the First and Second Cause of Action, for waiting time wages according to proof pursuant to California Labor Code § 203;

5.  Upon the Third Cause of Action, for consequential damages according to proof as set forth in California Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B) related to meal breaks;

6.  Upon the Third Cause of Action, for waiting time compensation according to proof pursuant to California Labor Code § 203;

7.  Upon the Third Cause of Action, that Defendants be ordered to show cause why they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to meal breaks and record

FIRST AMENDED CLASS ACTION COMPLAINT

keeping for Defendants' employees related to same; and for an order enjoining and restraining Defendants and their agents, servants and employees related thereto;

8. Upon the Fourth Cause of Action, for consequential damages according to proof as set forth in California <u>Labor Code</u> § 226.7 and IWC Wage Order No. 4 § 12(B) related to rest breaks;

9. Upon the Fourth Cause of Action, for waiting time compensation according to proof pursuant to California <u>Labor Code</u> § 203;

10. Upon the Fourth Cause of Action, that Defendants be ordered to show cause why they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to rest breaks; and for an order enjoining and restraining Defendants and their agents, servants and employees related thereto;

11. Upon the Fifth Cause of Action, for restitution to Plaintiff and other similarly effected members of the class of all funds unlawfully acquired by Defendants by means of any acts or practices declared by this Court to be violative of the mandate established by California <u>Business and Professions Code</u> § 17200 et seq.;

12. Upon the Fifth Cause of Action, for an injunction to prohibit Defendants to engage in the unfair business practices complained of herein;

13. Upon the Fifth Cause of Action, for an injunction requiring Defendants to give notice to persons to whom restitution is owing of the means by which to file for restitution;

14. Upon the Sixth Cause of Action, for actual damages or statutory penalties according to proof as set forth in California <u>Labor Code</u> § 226 and IWC Wage Order No. 4 § 7(B) related to record keeping;

15. Upon the Sixth Cause of Action, that Defendants be ordered to show cause why

20

they should not be enjoined and ordered to comply with the applicable California Industrial Welfare Commission wage orders related to record keeping for Defendant's' employees related to same; and for an order enjoining and restraining Defendants and their agents, servants and employees related thereto;

16. For pre-judgment interest as allowed by California Labor Code §§ 218.5 or 1194 and California Civil Code § 3287;

17. For reasonable attorneys fees, expenses and costs as provided by California Labor Code §§ 218.5 or 1194 and Code of Civil Procedure § 1021.5; and,

18. For such other and further relief the court may deem just and proper.

Dated:  September 12, 2008             JENNIFER KRAMER LEGAL, APC

                                       By: _____
                                           Jennifer Kramer, Esq.
                                           Judith Wiederhorn, Esq.
                                           Attorneys for Plaintiffs

21

**PROOF OF SERVICE**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA | FOR COURT USE ONLY |
|---|---|
| **TITLE OF CASE**<br>FAYERWEATHER v. COMCAST CORPORATION, et al. | |
| **ATTORNEY(S) NAME AND ADDRESS**          **TELEPHONE**<br>Jennifer Kramer, Esq., SBN 203385          (213) 955-0200<br>Judith Wiederhorn, Esq., SBN 239885<br>JENNIFER KRAMER LEGAL, APC<br>707 Wilshire Boulevard, Suite 3600<br>Los Angeles, CA  90017 | |

| **ATTORNEY(S) FOR:**<br>Plaintiff | **HEARING DATE-TIME-DEPT** | **CASE NUMBER**<br>C-08-01470 |
|---|---|---|

I am employed in the City of Los Angeles, County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 707 Wilshire Boulevard, Suite 3600, Los Angeles, CA  90017.  On **September 15, 2008,** I served the documents named below on the parties in this action as follows:

**DOCUMENT(S) SERVED:**    <u>FIRST AMENDED COMPLAINT</u>:  (1) FAILURE TO PAY WAGES

(2) BREACH OF IMPLIED CONTRACT; (3) DENIAL OF MEAL PERIODS; (4) DENIAL OF REST PERIODS

(5) UNFAIR BUSINESS PRACTICES (Violation of California Business & Professions Code §17200 et seq.)

**(6) FAILURE TO PROVIDE ACCURATE, ITEMIZED WAGE STATEMENTS**

**SERVED UPON:**          **SEE ATTACHED SERVICE LIST**

[X] (BY U.S. MAIL) I caused each envelope, with postage thereon fully prepaid, to be placed in the United States mail Los Angeles, California.  I am readily familiar with the practice of the Firm for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection.

[ ] (BY PERSONAL SERVICE) I caused to be delivered by an authorized courier or driver the documents listed above to be received and delivered on the same date.  A Proof of Service signed the authorized courier will be filed forthwith.

[ ] (BY FACSIMILE) I caused to be transmitted the document(s) described herein via fax

[ ] (BY OVERNIGHT MAIL) I am readily familiar with the practice of the Firm for collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by California Overnite for overnight delivery.

[X] (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 15, 2008, at Los Angeles, California.

_____
Michael Bew

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
FAYERWEATHER v. COMCAST CORPORATION, et al.
CCSC Case No. C-08-01470

## SERVICE LIST

Fred W. Alvarez
Troy A. Valdez
Michael D. Schlemmer
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
     Attorneys for Defendants COMCAST CORPORATION, and COMCAST OF CONTRA COSTA,
INC.

# EXHIBIT B

SUPERIOR COURT OF THE STATE OF CALIFORNIA
CONTRA COSTA COUNTY

GABRIEL FAYERWEATHER, as an individual
and on behalf of others similarly situated

PLAINTIFF

V.

COMCAST CORPORATION, a Pennsylvania
Corporation; COMCAST OF CONTRA COSTA,
INC.; a Washington Corporation; and DOES 1
through 50 Inclusive,

DEFENDANTS

MSC08-01470

ORDER DECERTIFYING CLASS

This is a wage and hour class action.  Plaintiff is a communications technician
("Com-Tech") employed by Comcast[1] and is responsible for installing cable, internet,
telephone and related services in Comcast customers' homes and offices.

In his first amended complaint, plaintiff asserts causes of action for: (1) failure to
pay for all hours worked, (2) breach of an implied-in-fact contract, (3) failure to provide
proper meal breaks, (4) failure to provide proper rest breaks, (5) unfair business practices
and (6) failure to provide accurate itemized wage statements.

Plaintiff sues on behalf of himself and others similarly situated.  The parties have
identified a class of more than 1,800 communications technicians.

---

[1] As used in this Order, "Comcast" refers to defendants Comcast Corporation and Comcast of Contra
Costa, Inc.

1

1       On April 12, 2010, the Court granted plaintiff's motion for class certification. In

2 its order granting class certification, the Court found the issue of commonality,

3 specifically the predominance of common questions, presented a "close case." (Order

4 Granting Class Certification, Apr. 12, 2010, p. 5.) However, the court granted the

5 motion, finding that there was a predominance of common questions under "plaintiff's

6 theory that Comcast has adopted a policy of understaffing (or over-scheduling) that

7 makes it unlikely that Com-Techs can have their required breaks each day." (*Id.* at p. 6.)

8       The Court rejected defendants' argument that individualized inquiries would be

9 needed to determine liability. In rejecting that argument, the Court expressly relied on

10 plaintiff's theory of the case that defendants had a company-wide policy that created

11 liability.

12       Once the class was certified, plaintiff sought to set a trial date. The Court asked

13 the parties how long the trial would take. Plaintiff was unable to give a reasoned estimate

14 because he had not sufficiently considered how he would present his case.

15       The Court asked plaintiff to prepare a workable plan for the trial of his case-in-

16 chief. It also asked the parties to meet and confer about the trial plan and attempt to

17 determine a realistic estimate for the length of the trial. The Court conducted case

18 management conferences on April 21, 2011, July 18, 2011 and November 17, 2011. At

19 none of those hearings was plaintiff able to present a workable plan for the management

20 of the trial. Defendant asked the Court to decertify the class.

21       By the time of the November 17, 2011 hearing, the California Supreme Court had

22 heard oral argument in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal. 4th

23 1004. It was clear that the outcome of that case could have a significant bearing on this

24 litigation.

25

After a discussion of these matters the Court ordered plaintiff to show cause why the class should not be decertified based on lack of predominance of common questions and lack of superiority and manageability. (Minute Order, Nov. 17, 2011.) It also asked the parties to address – in their decertification briefs – the effect of the California Supreme Court decision in *Brinker Restaurant Corp. v. Superior Court* on the issue of certification. (*Id.*) It ordered that plaintiff's opening brief be filed 45 days after the Supreme Court issued its ruling in *Brinker*.

Plaintiff filed his opening brief on May 29, 2012. In it he advanced new theories which he claimed support a finding that common questions dominate the litigation. Essentially, plaintiff abandoned his claim that Comcast has a "policy of understaffing or over-scheduling." In other words, plaintiff discarded the principal theory on which the Court had based its decision to certify a class.

Now plaintiff's theories are:

(1) Comcast has adopted a policy or practice that requires Com-Techs to (a) keep their phones on and (b) remain logged-on to the TechNet network[2], so that they are not relieved of all duty during their meal and rest breaks;

(2) Comcast has adopted a policy or practice that requires Com-Techs to record a 60 minute meal period on their timecards even though other company records show shorter lunch periods, making it likely that employees are required to work off-the-clock;

---

[2] TechNet is a component of a scheduling system developed for Comcast by CSG. The TechNet component is used by Com-Techs to log various status (*e.g.* "on job", "en route", "break", "lunch", etc.) that are reviewed by Comcast's dispatchers and supervisors for purposes of managing Com-Techs' schedules and work assignments. The component of the CSG system used by dispatchers and supervisors is called WorkForce Express. (See, Dutton Decl. ¶¶ 4-7.) Collectively, these components are sometimes referred to as the "CSG system."

3

1    (3) Comcast has failed to pay putative class members one hour of premium pay for

2    missed or late meal periods;

3    (4) Comcast has adopted a policy that prohibits Com-Techs from waiving a second

4    meal period for shifts greater than 12 hours, yet Comcast's records show that meal

5    breaks for such shifts are often not taken; and

6    (5) Comcast has adopted a policy of not providing a third rest break for shifts

7    greater than 10 hours in duration.[3]

8    In opposition, Comcast argues that plaintiff has not met his burden of showing

9    these theories are susceptible to common proof. Comcast also argues that class treatment

10   is not a superior means of litigating the case and that plaintiff's case would be

11   unmanageable as a class action. Comcast adds that, under his new theories, plaintiff is no

12   longer an adequate representative of the putative class.[4] Finally, Comcast moves to strike

13   the declaration of plaintiff's expert, David Breshears.

14   On October 25, 2012, the court issued a tentative ruling with respect to the class

15   certification motion and the motion to strike. As to the former, it wrote:

16       The parties are to appear and be prepared to argue the merits of the

17       class certification issues. The Court will allow each side an opening

18       argument and asks that each side address at least: 1) whether there is

19       a common issue with regard to an "on-duty lunch" and if so, what

20       evidence supports the argument that Comcast has a policy of

21

22   [3] With his first motion for class certification, plaintiff presented theories similar to numbers two and three

23   above. In its prior order granting class certification, these two theories were not separately addressed.
     Rather, the Court treated these two theories as derivative of plaintiff's theory that Comcast had a policy of

24   understaffing and found that common issues predominated based on this overarching theory.

25   [4] Plaintiff testified in his deposition that the only basis for his meal and rest break claims was that
     Comcast was understaffed, which forced him to miss his breaks. (Alvarez Decl., Exh. 5, Depo. of Gabriel
     Fayerweather, p. 131:10-13.)

                                                                                                                4

requiring Com Techs to remain on duty; 2) how there can be proof
that comports with *Brinker* and *Wal-Mart* to establish liability with
regard to alleged missed meal and rest breaks; 3) what weight, if any
to give to the Breshears declaration — and if it is to be given any
weight, how (if at all) it is helpful in deciding the issue before the
Court.  [¶]  By identifying these issues, the Court does not mean to
preclude counsel from addressing whatever else he or she thinks
relevant to the issue before it.

As to the Breshears declaration, it wrote:

> Defendants' motion to strike the declaration of David Breshears is <u>denied</u>.
> This order is made without prejudice to defendants' ability to challenge the
> admissibility of Mr. Breshears' testimony at a later stage of the litigation.
> It is also without prejudice to any argument that may be made as to what
> weight that should be given to Mr. Breshears' conclusions about "potential
> violations" at this stage of the litigation.

A hearing was held on October 26, 2012 at which time the court heard oral
argument from counsel for plaintiff and defendants.

The Court has read the extensive pleadings filed by the parties.  It has read the
declarations, testimony and other supporting material submitted by them.  It has carefully
considered the issues raised by both the motion to strike and the order to show cause.  It
has determined that the motion to strike should be denied but that the class must be
decertified.

///
///

1   **I.   EVIDENTIARY RULINGS**

2   As a preliminary matter, the Court addresses the parties' evidentiary objections.

3   On October 25, 2012 the Court provided the parties with its tentative rulings on

4   those objections. Neither party challenged the tentative rulings which, therefore, became

5   final. Those rulings were (and are) as follows.

6   Defendants' Objections to Plaintiff's Opening Brief are <u>overruled</u> on all stated

7   grounds. The objections are directed to the briefs as opposed to the underlying evidence,

8   which goes to the weight of the argument and not the admissibility of the evidence.

9   Defendants' Objections to Dispatcher Declarations are <u>overruled</u> on all stated

10  grounds, except as follows:

11  • Alcantar Declaration ¶ 4, last sentence, <u>sustained</u> for lack of foundation and

12    lack of personal knowledge.

13  • Hodson Declaration ¶ 11, <u>sustained</u> for lack of personal knowledge and

14    hearsay.

15  • Hodson Declaration ¶ 18, last sentence, <u>sustained</u> as improper opinion

16    testimony.

17  • Hodson Declaration ¶ 21, first sentence, <u>sustained</u> for lack of personal

18    knowledge.

19  • Douglas Declaration ¶ 13, last sentence, <u>sustained</u> as improper opinion

20    testimony.

21  Plaintiff's Objections to Defendant's Evidence are <u>overruled</u>. Code of Civil

22  Procedure § 436 is not a valid grounds for evidentiary objections; rather, it addresses the

23  procedure for bringing a notice motion to strike an improper pleading. The objection to

24  the declaration of Joshua Simes on relevance and foundational grounds is also <u>overruled</u>.

25

6

1   Defendants' Objections to Plaintiff's Evidence in Reply are <u>overruled</u> on all stated

2   grounds. Though the objections appear to be directed to particular evidence, the bases for

3   the objections are that plaintiff mischaracterized the evidence in his reply brief and his

4   statement of evidence. This goes to the weight of the argument, not the admissibility of

5   the evidence.

6       Defendants' unopposed request for judicial notice is <u>granted</u>. Evid. Code § 452,

7   subd. (b), (d).

8   **II.    MOTION TO STRIKE**

9       Comcast seeks to strike the declaration of Mr. Breshears on the grounds that (1) he

10  is not qualified to give an expert opinion on the matters asserted in his declaration; (2) his

11  testimony is based on an unreliable scientific method; and (3) his testimony is based on

12  unreliable data and does not concern issues that aid the trier of fact.

13      In his report, Mr. Breshears summarizes "potential" meal period violations based

14  on his analysis of both Comcast's electronic time keeping system ("ESS") as well as a

15  system developed CSG and used by Comcast to facilitate communications between Com-

16  Techs and Dispatchers regarding the scheduling of appointments ("CSG"). Mr.

17  Breshears opines that the CSG data is a more accurate representation of Com-Techs'

18  hours, including when meal breaks were taken and the duration of each meal break.

19      Comcast first argues Mr. Breshears is not a qualified expert because he is not a

20  statistical expert and no special training is required to report on employee pay data.

21  Comcast cites no authority in support of its contention that only a statistical expert is

22  qualified to testify on matters relating to an analysis of employee time records.

23      As a Certified Public Accountant (CPA) and Certified Financial Forensics

24  professional (CFF), Mr. Breshears is qualified to review financial and payroll records

25  from Comcast and prepare summary reports of those records. Indeed, Mr. Breshears

7

1   testified that he has performed such analyses in wage and hour matters, including class

2   actions, for over ten years. (Alvarez Decl., Exh. B, p. 11:6-12:15.)

3        The real concern, as discussed below, is not whether Mr. Breshears is qualified

4   but, rather, whether his testimony and reports will aid the court in determining common

5   questions of liability. In order to rely on this type of procedural tool, plaintiff "must

6   [first] explain how the procedure will effectively manage the issues in question." *Dunbar*

7   *v. Albertson's, Inc.* (2006) 141 Cal. App. 4th 1422, 1432.

8        Comcast next argues that Mr. Breshears' testimony does not satisfy the *Kelly/Frye*

9   standard because it is not based on generally accepted scientific techniques. The purpose

10  of the test set forth in the *Kelly* and *Frye* cases is to determine whether a new scientific

11  method or novel method of proof employed by an expert is sufficiently reliable. *People*

12  *v. Kelly* (1976) 17 Cal. 3d 24 (declining to admit expert testimony regarding voiceprint

13  identification because there was insufficient evidence the procedure had gained general

14  scientific acceptance); *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013 (holding expert

15  testimony regarding lie detector results was not admissible because the new procedure

16  had not yet gained scientific recognition).

17       There is no evidence that Mr. Breshears has employed a new scientific method or

18  that preparing a summary of payroll records is a novel method of proof in wage and hour

19  class actions. To the contrary, analyses of payroll records have regularly been relied on

20  at various stages of wage and hour class actions. Although that kind of evidence has had

21  varying success on the merits, the evidence has been admitted by the courts. *See, e.g.,*

22  *Bell v. Farmers Ins. Exchange* (2004) 115 Cal. App. 4th 715, 746-7. Moreover,

23  Comcast's expert testified that Mr. Breshears' methods were appropriate for preparing a

24  summary report of the data he analyzed. (Righetti Decl., Exh. 1, Depo. of Dr. Johnson, p.

25  187:16-188:20.)

1    Comcast finally argues that Mr. Breshears' testimony does not satisfy the standard

2   set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 because

3   the testimony and declaration are based on unreliable data and do not aid the trier of fact.

4   In evaluating the admissibility of expert testimony, *Daubert* provides that a court must

5   consider whether the proposed expert is qualified to testify about the proposed scientific

6   knowledge and the testimony will aid the trier of fact. *Daubert*, 509 U.S. at 592-3.

7    With respect to the CSG data, there is evidence that Comcast has employed the

8   CSG system to provide visibility into what Com-Techs are doing throughout their work

9   shifts, including identifying when and for how long the Com-Techs are on meal and rest

10   breaks. There is also evidence that Comcast trains its employees to update the CSG

11   system in real time and to attempt to ensure the data is accurate.

12    However, Comcast has also offered ample, persuasive evidence that a number of

13   factors interfere with the Com-Techs accurately reporting break times including human

14   error, poor cellular reception and issues with the CSG system software.

15    With respect to the ESS data, Comcast does not argue that the data are unreliable;

16   however, as with the CSG data, there is evidence that some of the data may not be

17   accurate. For example, some employees testified that they recorded their lunch break at

18   noon even if they took an earlier or later lunch whereas others Com-Techs testified they

19   put the actual time of the lunch break in their ESS timesheet. (Alvarez Decl., Exh. 1,

20   Alega Depo., p. 167:12-168:4; Alvarez Decl., Exh. 2, Brennan Depo., p. 53:13-54:25;

21   Alvarez Decl., Exh. 3, Brodeur Depo., p. 108:23-109:5; Alvarez Decl., Exh. 8, Grimes

22   Depo., p. 88:8-15; Alvarez Decl., Exh. 21, Harrell Depo. p. 142:8-17.)

23    At this stage, the Court has serious concerns about Mr. Breshears' reliance on the

24   CSG data. However, those concerns appear to go to the weight, not the admissibility of

25   his opinion. Since his conclusions refer largely to "potential violations" it appears that

1   the opinion may be entitled to very limited weight and (more to the point) may not aid the

2   court in determining the class certification motion.

3        Thus, the court denies the motion to strike.  However, it will give Mr. Breshears'

4   declaration only the weight to which it is entitled.  In addition, the Court will consider

5   carefully Mr. Breshears' conclusions, noting the limitations on what he does say and

6   equally importantly, the absence of conclusions that would be more useful in determining

7   the class certification issue.

8   **III.   CLASS CERTIFICATION**

9        The standard for determining whether to decertify a class is "simply whether the

10  class meets the requirements for class certification." *Walsh v. IKON Office Solutions,*

11  *Inc.* (2007) 148 Cal. App. 4th 1440, 1451.

12       Code of Civil Procedure section 382 provides that a plaintiff may sue for the

13  benefit of a class of individuals "when the question is one of a common or general

14  interest, of many persons, or when the parties are numerous, and it is impracticable to

15  bring them all before the court."  Code Civ. Proc. § 382; *Sav-On Drug Stores, Inc. v.*

16  *Superior Court* (2004) 34 Cal.4th 319, 332.

17       The party seeking class certification has the burden of establishing by a

18  preponderance of evidence (1) the existence of an ascertainable class, (2) a well-defined

19  community of interest among the class members, and (3) that substantial benefit to

20  litigants and court would result from class certification.  *Sav-On, supra,* 34 Cal. 4th at

21  326; *Brinker v. Superior Court* (2012) 53 Cal. 4th 1004, 1021.  Community of interest is

22  comprised of three elements: (a) predominant common questions of law or fact; (b) class

23  representatives with claims or defenses typical of the class; and (c) class representatives

24  who can adequately represent the class.  *Id.*

25

10

1    The certification question is essentially a procedural one that does not ask whether

2  an action is legally or factually meritorious. *Sav-On, supra,* 34 Cal. 4th at 326; *Linder v*

3  *Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439-440.  The task of the court is to "examine the

4  allegations of the complaint and supporting declarations and consider whether the legal

5  and factual issues they present are such that their resolution in a single class proceeding

6  would be both desirable and feasible." *Brinker v. Superior Court* (2012) 53 Cal. 4th 1004,

7  1021-2 (internal citations omitted).

8       Here, the parties' filings include argument on the merits of the claims.  The Court

9  has considered them, but only to understand the nature of the claims made by Mr.

10  Fayerweather, the defenses asserted by Comcast and how the litigation could and would

11  proceed as a practical matter.  It has attempted to determine what the litigation involves,

12  what proof would be proffered and how the court's processes might be used to discover,

13  refine and resolve the issues presented.  This ruling neither makes nor implies any

14  decision on any question of the merits of the litigation.[5]

15    A. Predominance of Common Questions of Law or Fact.

16       Common issues predominate if "'the issues which may be jointly tried, when

17  compared with those requiring separate adjudication, are so numerous or substantial that

18  the maintenance of a class action would be advantageous to the judicial process and to

19  the litigants.'" *Brinker, supra,* 53 Cal. 4th at 1021.  Conversely, "the community of

20  interest requirement is not satisfied if every member of the alleged class would be

21  required to litigate numerous and substantial questions determining his individual right to

22  recover...." *City of San Jose v. Superior Court* (1974) 12 Cal. 3d 447, 459.

23

24  _____

25  [5] Though the Court did not consider the merits of the parties' claims in resolving the certification question, it is not precluded from doing so under certain circumstances. "When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them." *Brinker, supra,* 53 Cal. 4th at 1023-4.

1    In wage and hour class actions, predominance of common issues may often be

2  found where the plaintiff claims "a uniform policy consistently applied to a group of

3  employees is in violation of wage and hour laws...." *Brinker, supra,* 53 Cal. 4th at 1033.

4  Even where there is a policy in place that complies with applicable law, common issues

5  may predominate where there is substantial evidence the policy is a sham – *i.e.* the

6  employer has a common practice that undermines the formal policy "'by pressuring

7  employees to perform their duties in ways that [violate the regulations].'" *Brown v. Wal-*

8  *Mart Stores, Inc.* (2012) 2012 U.S. Dist. LEXIS 120733 at * 12 (citing *Brinker, supra,* 53

9  Cal. 4th at 1040).

10          1.  *On Duty Breaks.*

11          Plaintiff argues Comcast has adopted a policy or practice that requires its

12  technicians to keep their phones on and to remain logged-on to the TechNet network.

13  This, they say, makes it unlikely that Com-Techs are relieved of all duty during their

14  meal and rest breaks.  Essentially, they argue the technicians get no breaks.

15          In determining whether to certify a class it is important to distinguish between a

16  "policy" and a "practice."  If a company has adopted a company-wide "policy," common

17  proof is more easily found.  If plaintiff relies on a "practice," then matters of proof may

18  be far more individualized and problematic.  That distinction is well-illustrated here.

19          It is clear that Comcast has not adopted a "policy" of requiring Com-Techs to

20  remain on-duty during their meal and rest breaks.  The evidence, as summarized below,

21  shows that Comcast's policy is to relieve the Com-Techs of duty during their meal

22  breaks.  Instead, plaintiff seeks to rely on establishing that there is a "practice" that is at

23  odds with the "policy."

24  ///

25  ///

12



a. The Legal Standard For Meal and Rest Breaks.

The employer's duty to provide a meal break is satisfied "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute meal break, and does not impede or discourage them from doing so." *Brinker, supra,* 53 Cal. 4th at 1040. An employer must also permit employees to take a second meal period for workdays in excess of 10 hours, which may be waived under certain circumstances. *Id.* at 1037. For rest breaks, an employer must authorize and permit its non-exempt employees "10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." *Id.* at 1029. Though the employer must provide the employee with an opportunity to take such breaks, the employer "need not ensure that the employee does no work." *Id.* at 1034.

Whether an employee is relieved of duty when he is required to carry a beeper or company telephone depends on several factors including:

"'1. Whether there are excessive geographic restrictions on the employee's movements[;] [¶] 2. Whether the frequency of calls is unduly restrictive[;] [¶] 3. Whether a fixed time limit for response is unduly restrictive[;] [¶] 4. Whether the on-call employee can easily trade his or her on-call responsibilities with another employee[;] and [¶] 5. Whether and to what extent the employee engages in personal activities during on-call periods.'" *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal. App. 4th 1524, 1535.

13

1    The determinative factor is "the level of the employer's control over its

2 employees, rather than the mere fact that the employer requires the employees'

3 activity...." *Morillion v. Royal Packing Co.* (2000) 22 Cal. 4th 575, 587.[6]

4        b.  Comcast's Policy.

5    Comcast's policy is clear.  When Com-Techs are on break or at lunch, they are to

6 be relieved of all duty.  The relevant policy is stated in at least two places.  The first is in

7 Comcast's Northern California Pay Policy Manual:

8    <u>POLICY STATEMENT</u>:

9    • Rest (Break) Periods

10    Non-exempt employees scheduled to work at least 3 ½ hours in a

11    workday will be given a ten (10) minute paid rest period for every

12    four (4) minutes (or major portion thereof) worked.  The Company may

13    require employees to remain on the premises during the rest (break)

14    period.  At the department manager's discretion, breaks may be

15    fifteen (15) minutes.

16    • Meal Period

17    Non-exempt employees who work a shift in excess of five hours are

18    provided at least a thirty (30) minute unpaid, duty free, meal period;

19    unless, the employee's total number of hours worked is not more

20    than six (6) hours and the Company and employee have agreed to

21    waive this meal period requirement.  When an employee works more

22    than ten hours per day, the second meal period may be waived if (1)

23    the employee works no more than twelve hours that day, (2) the

24

25    _____

[6] This is discussed in more detail below.

14

1   employee and the employer agree in writing to waive the second

2   meal period, and (3) the first meal period has not been waived.

3   Employees may be allowed to leave the premises during unpaid meal

4   periods.  Actual time the non-exempt employee spends on meal

5   period must be recorded on the employee time sheet.  An 'on-duty'

6   meal period is permitted only when the nature of the work prevents

7   the employee from being relieved of all duty and when agreed to in

8   writing by both the employer and the employee.  Time worked

9   during 'on-duty' meal periods is included for purposes of overtime

10   calculations, hence these types of arrangements should be kept to a

11   minimum.[7] (Glugowski Decl., Exh. 15 at p. 26.)

12   The other policy statement is found in the Field Technician Manual:

13   Comcast's Technician WFX policy indicates that you should change

14   your status to 'Break' or 'Lunch' as appropriate, during which you

15   should not perform any work-related tasks.  You should change your

16   status back to 'Available' when the break period has been completed

17   and prior to beginning any work-related tasks.  (Glugoski Decl., Exh.

18   1A at p. 22.)

19   This is supported by the testimony and declarations of numerous supervisors,

20   dispatchers and Com-Techs.[8]  On the other hand, there was little or no testimony that

21

22   [7] Comcast University training materials also cited by plaintiff provides that if a Com-Tech performs any
23   work during his meal break, he should record it as time worked on his timesheet. (Glugoski Decl., Exh.
    21.)

24   [8] See, e.g., Benefield Decl. ¶ 4; Bratcher Decl. ¶ 7; Chambers Decl. ¶ 6; Darlin Decl. ¶ 4; Escobar Decl. ¶
    5; Goyer Decl. ¶ 4; Jones Decl. ¶ 7; King Decl. ¶¶12, 15; Kurzhals Decl. ¶¶ 11-13; Simes Decl. ¶ 5;
25   Vargas Decl. ¶¶ 9-10; Walkover Decl. ¶ 3; Sears Decl. ¶¶ 12-13; Cabada Decl. ¶¶ 5, 16; Chong Decl. ¶¶
    8-9; Alvarez Decl., Exh. 6, Florino Depo., p. 44:9-45:6, 55:3-12, 190:10-19; Alvarez Decl., Exh. 1, Alega
    Depo., p. 64:12-65:11; Alvarez Decl., Exh. 2, Brennan Depo., p. 36:13-18; Alvarez Decl., Exh. 13, Sivell

15

1   there was a policy that Com-Techs respond to communications during meal and rest

2   breaks.[9]

3          Plaintiff seeks to show that there was a different policy. He cites portions of the

4   Field Technician and Dispatcher manuals that say Com-Techs and Dispatchers should be

5   in communication throughout the work day via TechNet/Workforce Express. For this he

6   cites, Exh. 1A (p.1) and Exh. 1B (p. 17) of the Glugoski Declaration.

7          The first says,

8                 Increased communication amongst the team is a key element of

9                 success. Every team member must remain committed to updating

10                their status in real time and communicating continuously throughout

11                the day.

12         The second says,

13                Dispatch Messaging – continual communication with the field is a

14                critical component in a dynamic dispatch environment. You should

15                utilize the Dispatch Messaging function in WFX to maintain

16                communication to individual or groups of technicians.

17         But those passages are simply general statements about the use of the CSG system.

18  They are clearly modified by the more specific policies regarding meal and rest breaks.

19  So, for example, the document quoted above (Glugoski Decl., Exh. 1A at p. 22), says that

20

---

21  Depo., p. 104:21-105:11; Alvarez Decl., Exh. 21, Harell Depo., p. 65:3-19; Alvarez Decl., Exh. 18,
    Douglas Depo., p. 64:17-65:25; Alvarez Decl., Exh. 19, Mainville Depo., p. 88:1-89:12; Alvarez Decl.,
22  Exh. 23, Burroughs Depo., p. 20:7-11; Alvarez Decl., Exh. 25, Navarro Depo., p. 25:4-12; Alvarez Decl.,
    Exh. 26, Ng Depo., p. 34:12-35:2, 53:13-25; Alvarez Decl., Exh. 27, Salazar Depo., p. 39:17-40:3, 40:22-
23  41:3, 42:3-21; Righetti Reply Decl., Exh. 15, Cabada Depo., p. 49:3-21; Righetti Reply Decl., Exh. 15,
    Chong Depo., p. 16:19-17:10; Righetti Decl., Exh. 9, Sears Depo., p. 25:21-26:25.

24
    [9] Though there were declarations and deposition testimony from Com-Techs who were told they had to
25  respond to calls and messages during meal breaks, the testimony is clear that it was at the request of a
    specific supervisor and not because of a company-wide policy. (Alvarez Decl., Exh. 6, Florino Depo., p.
    48:17-49:17; Alvarez Decl., Exh. 7, Fore Depo., p. 155:18-22, 179:21-180:15.)

1    part of the "continual communication" process is having the technician use the system to

2    indicate when he or she is at lunch or on a break, during which time he or she should do

3    no work-related tasks.

4        Plaintiff also cites sections of the Field Technical manual as well as dispatcher

5    deposition testimony that say the TechNet system will prompt Com-Techs if an assigned

6    job has not been acknowledged by the Com-Tech. (See, e.g., Righetti Reply Decl., Exh.

7    31, p. 5.)

8        But "prompting Com-Techs" means that the system will automatically send an

9    electronic message. It does not mean that the Com-Tech is required to respond to the

10   message instantaneously.[10] It is more like the sending of an e-mail. Though a task

11   message may be sent to a Com-Tech while he is on lunch, the evidence is there is no

12   expectation or requirement that the message be read simultaneously (or near-

13   simultaneously). Rather, the evidence shows that the expectation is it will be read when

14   the recipient returns to duty and looks at his communication device.

15       Plaintiff argues, more generally, that the policy requires the technician to be "in

16   communication" with the dispatchers at all times. But plaintiff has chosen the phrase "in

17   communication" very carefully. A close review of the material submitted by plaintiff —

18   as illuminated by colloquy during oral argument — shows that "in communication" is

19   different from "speaking with." "In communication" means that some electronic device

20

---

21   [10]  Alvarez Decl., Exh. 1, Alega Depo., p. 124:21-125:20 (if received message from dispatch his phone
     would beep but he could press the button to stop the reminder and then wait until after lunch to respond

22   after lunch); Alvarez Decl., Exh. 2, Brennan Depo., p. 83:4-18; Alvarez Decl., Exh. 17, Alcantar Depo., p.
     79:13-19; Alvarez Decl., Exh. 18, Douglas Depo., p. 93:12-94:1, 94:20-95:6; Alvarez Decl., Exh. 9,

23   Hodson Depo., p. 96:15-20; Alvarez Decl., Exh. 19, Mainville Depo., p. 89:13-90:4, 90:13-91:23;
     Alvarez Decl., Exh. 26, Ng Depo. p. 151:-152:5; Alvarez Decl., Exh. 23, Burroughs Depo., p. 32:2-10,

24   54:4-17; Righetti Reply Decl., Exh. 15, Chong Depo., p. 27:1-28:7; Righetti Reply Decl., Exh. 22,
     DeGuzman Depo., p. 43:3-44:25; Righetti Reply Decl., Exh. 8, Leon Depo., p. 92:4-25; Righetti Reply

25   Decl., Exh. 10, Palma Depo., p. 32:23-33:24 (did not expect immediate response to task messages that
     were sent during Com-Techs meal break); Righetti Reply Decl., Exh. 9, Sears Depo., p. 41:9-15; Righetti
     Reply Decl., Exh. 8, Leon Depo., p. 11-25.)

1  is capable of receiving messages while the Com-Tech has a meal or rest break regardless

2  of whether the device is turned on or is available to the Com-Tech.  That a machine

3  remains capable of receiving messages even while the human is on break does not mean

4  that the human is not relieved of all work during a break.

5      A careful analysis of the parties' positions shows there is really no dispute about

6  Comcast's policy: Com-Techs are to do no work during their breaks.  The Court finds

7  that plaintiff's argument about a policy that the Com-Techs remain "in communication"

8  does not come close to meeting the standards of *Ghazaryan* and *Morillion* discussed

9  below.  There is no common issue to be tried with respect to Comcast's policy.

10              c.  Comcast's Practices.

11      Plaintiff also asserts there is a company-wide practice that undermines the

12  company's meal and rest break policy.

13              i.  Dispatchers' Declarations and Depositions.

14      In support of his argument, plaintiff submits declarations from dispatchers who

15  stated that they send messages to Com-Techs through the CSG system throughout the

16  work day and, to do their jobs, they need Com-Techs to be in "constant and continuous

17  contact" with them.  (See, *e.g.*, Declarations of Leticia Alcantar, Celeste Bartol (Marty),

18  Marlene Charlie, Winifred Davey, Paulette Douglas, William Hodson, Shawn Mainville

19  and Anthony Lee.)  Many of these declarations are written in identical language.[11]

20      However, when Comcast deposed these declarants, their testimony was often

21  quite different from the declaration.  Testimony submitted by Comcast shows that, while

22  dispatchers may have sent messages to Com-Techs during break periods, there was not

23

24  _____

25  [11] At the hearing on the order to show cause, plaintiff also cited the deposition testimony of dispatcher
Phoeun Chong who testified that if a Com-Tech does not timely acknowledge a job, she will try to reach
him and, if she is unsuccessful, will call his supervisor. (Righetti Reply Decl., Exh. 11, Depo. of Phoeun
Chong, p. 20:16-21:18.)

1   necessarily an expectation that a Com-Tech would read or respond to the message if he or

2   she were on a break.

3        For example, several dispatchers testified that they did not expect Com-Techs to

4   respond to dispatch calls or messages when they were on break.  (See, e.g., Alvarez

5   Decl., Exh. 20, Depo. of Celeste (Bartol) Marty, p. 68:4-24; Alvarez Decl., Exh. 18,

6   Depo. of Paulette Douglas, p. 71:7-15, 86:4-19; Alvarez Decl., Exh. 9, Depo. of William

7   Hodson, p. 131:18-21; Alvarez Decl., Exh. 19, Depo. of Shawn Mainville, p. 88:1-89:7,

8   90:13-91:2.)

9        Other dispatchers testified that when they knew a Com-Tech was at lunch, they

10  would not actively attempt to contact the Com-Tech but might send updates on jobs for

11  the Com-Tech to review after his break.  (See, e.g., Alvarez Decl., Exh. 9, Depo. of

12  William Hodson, p. 92:5-93:19; Alvarez Decl., Exh. 31, Depo. of Marlene Charlie, p.

13  149:7-151:9.) [12]

14       Dispatchers also testified they understood they would not be able to communicate

15  with Com-Techs at all times and would simply move on to other technicians and other

16  job assignments until the Com-Tech was available again.  (See, e.g., Alvarez Decl., Exh.

17  31, Depo. of Marlene Charlie, p. 136:9-138:2, 147:10-148:17.)

18              ii.    Com-Tech Declarations and Depositions.

19       Plaintiff also offers declarations from several Com-Techs who state they were not

20  relieved of duty at lunch because they were required to respond to calls and messages

21  from dispatch and their supervisors.  (See, e.g., Declarations of Michael Fiorino, Chris

22  Fore, James Grimes, Craig McCullom, Dan Trujillo, Jason Williams and Gabriel

23  Fayerweather.)

24  _____

25  [12] Ms. Chong testified that when she knows the Com-Tech is on his lunch break, she will include in her
    message that he does not need to respond until after his break is over. .  (Righetti Reply Decl., Exh. 11,
    Depo. of Phoeun Chong, p. 27:15-28:7.)

At the hearing, plaintiff also argued that data from the CSG system shows that Com-Techs regularly sent messages to dispatch during the time they posted in CSG that they were on lunch. For example, when Anthony Hayes was twenty-one minutes into the time he posted his lunch break status, he responded to a dispatch message regarding assignment of jobs. (Breshears Reply Decl., Exh. G, p. 31 of 56.)

In opposition, Comcast submitted deposition testimony from plaintiff's declarants as well as other Com-Techs. Many testified they did not need to respond to messages during their breaks. They said they understood that practice (of not responding to calls during their breaks) was consistent with Comcast policy. (See, e.g., Alvarez Decl., Exh. 1, Depo. of Ernani Alega, p. 64:12-65:11, 109:12-25, 110:22-111:5, 111:15-24; Alvarez Decl. Exh. 2, Depo. of Matthew Brennan, p. 36:13-18; 82:18-83:18; Alvarez Decl., Exh. 13, Depo. of Jason Sivell, p. 49:8-50:25 (received calls from other technicians).)

Others testified that whether and under what circumstances they were required to respond to calls at lunch varied greatly, depending on (among other things) the demands of their respective supervisor and the on-the-job training received by the Com-Tech. [See, e.g., Alvarez Exh. 6, Depo. of Michael Fiorino, p. 44:9-45:6, 190:10-19 (felt pressure from prior supervisor to respond to calls during lunch but current supervisor tells him to silence his phone during lunch); Alvarez Decl., Exh. 7, Depo. of Chris Fore, p. 114:16-115:17, 179:15-180:15 (told by previous supervisor that he could not turn off phone or ignore messages on his laptop during lunch but did not feel same pressure under his current supervisor); Alvarez Decl., Exh. 3, Depo. of Georges Brodeur, p. 152:2-24 (told during ride-along trainings that he should respond to all calls and messages immediately).]

There was also evidence that, in some cases, Com-Techs responded to calls voluntarily. (See, e.g., Alvarez Exh. 6, Depo. of Michael Fiorino, p. 46:15-47:14;

1    Alvarex Decl., Exh. 13, Depo. of Jason Sivell, p. 104:21-105:16.)  That would not be

2    considered a meal break violation.  *Brinker, supra*, 53 Cal. 4th at 1040 (noting that

3    "employees cannot manipulate the flexibility granted them by employers to use their

4    breaks as they see fit to generate [liability for a missed meal break]").

5         Several Com-Techs also testified that, other than remaining within a reasonable

6    range of their next appointment under certain circumstances, Comcast placed no

7    restrictions on how Com-Techs used their break time.  (Alvarez Decl., Exh. 8, Depo. of

8    James Grimes, p. 61:2-62:16; Alvarez Decl., Exh. 16, Depo. of Jason Williams, p.

9    171:14-23; Alvarez Decl., Exh. 1, Depo. of Ernani Alega, p. 107:15-108:25; Alvarez

10   Decl., Exh. 13, Depo. of Jason Sivell, p. 48:18-49:7.)  In addition, at least one Com-Tech

11   testified that, if he did respond to calls during lunch, he extended his lunch to make up for

12   the interruption.  (See, *e.g.*, Alvarez Exh. 6, Depo. of Michael Fiorino, p. 46:18-47:6.)

13        This evidence is only a sampling of far more that is in the record.  The Court does

14   not examine it to decide the merits of the case.  Rather, this evidence illustrates that there

15   is no predominant common issue.  As discussed below, the practices engaged in by

16   dispatchers and technicians are far from consistent.

17              d.  The Legal Precedent Regarding "On-Duty Breaks"

18        Plaintiff argues, essentially, that the law regarding on-duty breaks is such that

19   class treatment is appropriate despite the disparities in the evidence outlined above.

20        He argues that *Morillon v. Royal Packing Co.* (2000) 22 Cal. 4th 575 supports his

21   on-duty break argument.  In that case, the defendant Royal Packing Company required its

22   agricultural employees to meet at designated departure points to be transported by Royal

23   to and from the fields; employees were prohibited from using alternate transportation.

24   *Morillon, supra*, 22 Cal. 4th at 579.  Royal did not compensate its employees for the time

25   spent on travelling to the fields on Royal's buses.  *Id.*  The California Supreme Court

21

1    held that the travel time to and from the fields were compensable "hours worked"

2    because Royal exercised significant control over the employees' use of that travel time,

3    which "prohibit[ed] them from effectively using their travel time for their own purposes."

4    *Id.* at 586.

5          Plaintiff also refers to a January 28, 1992 DLSE opinion letter regarding beepers

6    and on-duty meal periods.  (Alvarez Decl., Exh. 35, DLSE Opinion Letter 1992.01.28.)

7    There, the DLSE discussed whether an employee who is required to wear a pager is

8    sufficiently relieved of duty.  The DLSE stated that

9          [i]f the employee is simply required to wear a pager *or respond to an in-*

10         *house pager* during the meal period there is no presumption that the

11         employee is under the direction or control of the employer so long as no

12         other condition is put upon the employee's conduct during the meal period.

13   (Alvarez Decl., Exh. 35, p. 3) (emphasis added).  If, however, additional restrictions are

14   placed on the employee's obligation to respond – *e.g.* the employee is required to stay

15   within a certain distance of a telephone – then such increased level of employer control

16   during the meal period would transform the break to an "on duty" break and the

17   employee would be entitled to compensation for the entire meal period.  (*Id.*)

18         Defendants cite *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal. App. 4th 1524.

19   There, the court ordered certification of a class of limousine drivers who were required to

20   be available for dispatch calls at all times during their shifts and, accordingly, were

21   unable to take meal and rest breaks.  The court found there was a community of interest

22   between the named plaintiff and putative class members where the official company

23   policy expressly restricted what drivers could do during their shift, including significantly

24   limiting attention to personal business, expressly requiring drivers to respond promptly to

25   dispatch calls, and requiring drivers to clean and maintain their car while they are waiting

22

1    for their next assignment. *Ghazaryan, supra,* 169 Cal. App. 4th at 1536. In light of this

2    express company policy in which the company asserted significant control over its

3    drivers at all times, the court found that evidence that drivers varied in what they did

4    during their "on call" time did not defeat class certification. *Id.*

5        But there is a crucial distinction between this case and the precedent cited by the

6    parties. In each of the cited cases, there was a company-wide policy that governed all

7    employees' behavior. Thus, there was a common question that could be resolved

8    efficiently in a class action. Here, there is no such policy. There are only practices that

9    seem to vary among employees, supervisors, offices, and time frames.

10       *Practices have varied over time due to changing systems.* For example, prior to

11   the introduction of the CSG system, the only way to know if a technician was on break

12   was if he called to inform dispatch that he was going on break. (See, e.g., Alvarez Decl.,

13   Exh. 31, Charlie Depo., p. 78:12-79:8.) After CSG, the technician is supposed to change

14   his or her "status" to "lunch" when on meal break.

15       *Practices have varied by supervisor.* Some of the testimony shows that certain

16   technicians have had difficulty with a particularly harsh overseer. When freed from that

17   supervisor's oversight, they have had little or no problems. (See, e.g., Alvarez Exh. 6,

18   Depo. of Michael Fiorino, p. 44:9-45:6, 190:10-19; Alvarez Decl., Exh. 7, Depo. of Chris

19   Fore, p. 114:16-115:17, 179:15-180:15.)

20       *Practices have varied by dispatcher.* Some dispatchers seem more insistent on

21   communicating with their Com-Techs. Others say they are more "laid back." (Compare

22   Righetti Reply Decl., Exh. 21, Alcantar Depo., p. 57:16-58:23 to Alvarez Decl., Exh. 9,

23   Hodson Depo., p. 94:13-95:1.)

24       *Practices have varied by technician.* Some Com-Techs seem to feel that they

25   must respond to every phone call. (See, e.g., Alvarez Decl., Exh. 10, Lines Depo., p.

23

1   126:15-24.) Most seem to understand that the company policy is to leave them alone for

2   meals and rest breaks. (See, e.g., Alvarez Decl., Exh. 1, Depo. of Ernani Alega, p. 64:12-

3   65:11, 109:12-25, 110:22-111:5, 111:15-24; Alvarez Decl. Exh. 2, Depo. of Matthew

4   Brennan, p. 36:13-18; 82:18-83:18.)

5       In short, there is not a consistent practice that violates the company's stated policy.

6   Indeed, it appears far more likely that the general practice is to leave employees free to

7   take their breaks. But, to the extent there is contrary evidence, it demonstrates that the

8   variations tend to be idiosyncratic.

9       The Court need not determine whether that is or is not true. For purposes of

10  determining whether a class should be certified, it is more useful to note only that there is

11  no commonality; no evidence of a common practice that would make class treatment

12  useful.

13      To determine if some Comcast technicians worked under company imposed

14  circumstances in which they had only "on-duty" meals, would require highly

15  individualized inquiry. And given the testimony, it appears the issue would not be

16  whether a given technician was required to remain on-duty through break time; the issue

17  would be how often that happened to that technician. This could be resolved only by

18  particularized inquiry – not by class-wide proof.

19      Plaintiff has failed to meet his burden of showing there is a company-wide policy

20  or practice pursuant to which Comcast exerts such control over its Com-Techs that

21  renders all breaks "on-duty."

22      Accordingly, the court finds the question of whether plaintiff's breaks were "on-

23  duty" is not an issue that is amenable to class treatment.

24  ///

25  ///

24

2. *Off the Clock Work*

To show a common interest exists for an off-the-clock claim, plaintiff must present evidence of "a systematic company policy to pressure or require employees to work off-the-clock." *Brinker, supra*, 53 Cal. 4th at 1051. An employer can only be held liable for such claims where the employer knew, or should have known, that work was being performed. *Morillion, supra*, 22 Cal. 4th at 585. If employees were clocked out at the time plaintiff claims they were required to work, then there is "a presumption that they were doing no work...[and] liability is contingent on proof [defendant] knew or should have known the off-the-clock work was occurring." *Brinker* at 1051.

Plaintiff's off-the-clock claim relies on his contention that the company required that he record a lunch of exactly 60 minutes regardless of how much time he actually took. Plaintiff does not argue that there is an express written policy on this issue. The question then is whether there is a practice, amenable of common proof, that plaintiff offers as a way of litigating this matter as a class action. There is not.

Essentially, plaintiff's off-the-clock theory rests on the contention that Comcast's time records must be unreliable because: (1) nearly all the meal breaks recorded by Com-Techs on their timesheets are exactly one hour; and (2) data from the CSG system shows meal periods of varying lengths of time.

Comcast employees submit weekly timesheets for purposes of getting paid. Each is responsible for filling out a time sheet. A sample is found at Plaintiff's Appendix of Evidence at Exhibit K to the Kramer Declaration. When turning in the timesheet, the employee certifies:

> I certify that the time and hours recorded on this timesheet
> accurately and fully identify all time that I have worked during the
> designated pay period above. I acknowledge that during that

designated pay period: (1) I have taken all rest breaks for which I am
entitled under the law including at least one 10 minute break for
every four hours of work or major portion thereof; (2) I have taken
all meal breaks for which I am entitled under the law including at
least one half-hour meal break whenever I worked more than five
hours and an additional half hour if I worked more than 10 hours;
and (3) I am relieved of all duty and free to leave Comcast's
premises during my meal breaks. By signing this timesheet, I freely
and voluntarily certify that the statements above are true and correct.

Plaintiff says that employees are pressured into filling out what are, in effect,
fictitious timesheets. Plaintiff cites no common evidence of a central direction that this
be done. Instead, plaintiff contrasts the time sheets with something called CSG data.

The CSG data relied on by plaintiff are pulled from the CSG database, which
stores Comcast's customer records including jobs that are assigned to and completed by
Com-Techs. (Glugowski Decl., Exh. 4, Miguel Depo., p. 24:10-25:12, 27:4-20.) To
interface with the CSG database, Com-Techs use a system called TechNet to see what
jobs they are assigned each day and to report on the status of each job including: the
Com-Tech's estimated time of arrival; whether the Com-Tech has started the job; and
whether the job has been completed. (Id. at p. 33:4-34:15, 37:19-38:9, 39:10-40:10,
42:7-16.) The CSG database records both the status that was entered and the time it was
entered. (Id.) Com-Techs can also use TechNet to signify when they are on a lunch or
rest break, which information is communicated to dispatch and managers and is also
recorded in the CSG database. (Id. at p. 47:11-48:7, 49:4-13.) Comcast can and does run
reports summarizing the data captured by the CSG database. (Id. at p. 45:18-46:10.)

26

1    Comcast argues that the CSG data are unreliable as time records for compensating

2    employees because a number of factors interfere with the Com-Techs accurately

3    reporting break times including human error, poor cellular reception and glitches with the

4    CSG system software. (Comcast Response Brief p. 30.) In addition, Comcast argues that

5    the intent of the CSG system is not to track time for payroll; rather, it is a job

6    management system used to facilitate communication between its Com-Techs and its

7    Dispatchers in order to increase efficiency and productivity in responding to customer's

8    needs. (Id.)

9    The key question, however, is whether there is common proof that permits this

10    case to proceed as a class action. Plaintiff says there is, and offers the testimony of its

11    expert, David Breshears. Mr. Breshears is a Certified Public Accountant (CPA) and

12    Certified Financial Forensics professional (CFF) who analyzed data from both Comcast's

13    timekeeping system ("ESS") as well as the CSG system.

14    According to Mr. Breshears, the CSG status entry data show that the average

15    duration that Com-Techs were in the "lunch break status" was .77 hours. (Breshears

16    Reply Decl., Exh. C, p. 19.) Similarly, a daily timeline report prepared by Comcast based

17    on CSG data showed the average lunch status lasted for 49 minutes. (Glugoski Decl.,

18    Exh. 8.) Plaintiff argues that this evidence tends to show that Comcast's payroll records

19    ("ESS" records) must be incorrect because those records show that the average lunch

20    duration was .99 hours. (Breshears Reply Decl., Exh. B, p. 43.)

21    There are significant problems with that offering. Mr. Breshears does not opine

22    that there were actual violations of the wage and hour laws. Instead he says these data

23    may be used to identify "potential violations." Thus, even if the data were reliable

24    (which Comcast disputes) it would not go very far towards determining liability. Plaintiff

25    does not explain how it would go from Mr. Breshears' opinion of a "potential violation"

1   to proof of an actual violation without calling individual Com-Techs to testify about their

2   individual circumstances. Thus, plaintiff has not shown that there is common proof of

3   liability in order to support class treatment of the off-the-clock claim.

4          There is another problem. Mr. Breshears relies on the CSG data as if they were

5   more accurate than the time records. But there are serious questions about their accuracy.

6          Comcast cites testimony from multiple witnesses who state that CSG is not a

7   reliable indicator of an employee's hours worked or time spent on break. For example, a

8   representative of CSG, Scott Dutton, testified that CSG is not intended to be a

9   timekeeping system. (Dutton Decl. ¶ 4; Alvarez Decl., Exh 28, Dutton Depo., p. 10:6-

10  11:6.)

11         In addition, several Com-Techs testified that CSG is not a good indication of the

12  time they worked or were on break because there were glitches with the system or they

13  mistakenly did not update the system. (See, e.g., Alvarez Decl., Exh. 6, Depo. of

14  Michael Fiorino, p. 101:1-102:18; Alvarez Decl., Exh. 3, Depo. of Georges Brodeur, p.

15  101:2-17; Alvarez Decl., Exh. 15, Depo. of Dan Trujillo, p. 89:10-18, 110:7-21; Alvarez

16  Decl., Exh. 2, Depo. of Matthew Brennan, p. 63:9-64:16.)

17         A Comcast Report Analyst further testified that she has seen situations in which

18  Com-Techs have entered lunch status in the CSG system multiple times in one day.

19  (Glugoski Decl., Exh. 4, Depo. of Shauntee Miguel, p. 106:10-19.) Comcast managers

20  similarly stated that Com-Techs often did not or could not enter a status in CSG in real

21  time. For example, Robert Benefield stated that if a Com-Tech chooses to check on his

22  next job during his meal break, TechNet will automatically take him out of lunch status

23  even though he has not completed his meal break. (Benefield Decl. ¶ 6.) Other managers

24  stated that some Com-Techs have purposely entered incorrect statuses. (See, e.g.,

25  Kurzhals Decl. ¶ 6, Exh. 2; Bratcher Decl. ¶ 5; King Decl. ¶ 7.)

28

1    In addition, in the records put in evidence by the parties, there were often large

2  gaps of time in which no active status was recorded.  [See, .e.g., Glugowski Decl., Exh. 5

3  (showing for Charles Anderson that there were several larges blocks of time where he

4  was not on the job or en route to a job).]

5    Again, the Court does not review the evidence to find whether the CSG data are or

6  are not reliable.  But it finds that, were this to be certified as a class action, it would be

7  likely that considerable trial time would be spent on the question of whether the CSG

8  data are reliable.

9    If the jury found they were reliable, then it would be left with Mr. Breshears'

10  testimony of "potential violations."  Without more, the jury would not have sufficient

11  evidence to find class-wide liability.  If, on the other hand, the jury found the CSG data

12  were not reliable, then it would have no basis for determining the off-the-clock claim

13  absent individualized proof from each class member.

14    Given all of this, even if the CSG data were reliable, it does not offer a path to

15  common proof of liability that makes this an appropriate class action.  All Mr. Breshears

16  can do is put the parties on inquiry notice; and the necessary inquiry then requires a

17  descent into individual inquiry of each technician with respect to each instance on which

18  the records show a discrepancy between the time reported on his or her time sheets and

19  the CSG data.

20    Simply put, given the quality of the evidence offered by plaintiff, the off-the-clock

21  claim is not susceptible of class treatment.

22    3.  *Missed and Late Meal Periods*

23    Plaintiff argues that Comcast failed to pay the putative class members one hour of

24  premium pay for meal breaks not taken or waived in the first six hours of work, meal

25  breaks taken after the fifth hour of work and for meal breaks for durations shorter than 30

29

1  minutes. Plaintiff also asserts that Comcast failed to pay class members premium pay for

2  meal breaks not taken or waived for shifts greater than 10 hours but less than 12 hours

3  and for meal breaks not taken for shifts greater than 12 hours.

4      Plaintiff's theory relies, in part, on the assumption that if an employee's time

5  records do not show either a 30-minute meal break (or, where appropriate, a waiver) then

6  the wage and hour laws are violated. Comcast argues that its duty under *Brinker* is to

7  *provide* a duty-free meal break and it does not have a duty to *ensure* that its employees

8  take advantage of the meal break provided.

9      Here, to determine whether common issues predominate, the court must first

10  resolve the parties' dispute regarding the applicable legal standard defining Comcast's

11  duty with respect to meal breaks. Though a court generally should not resolve legal or

12  factual disputes at the certification stage, "if the presence of an element necessary to

13  certification, such as predominance, cannot be determined without resolving a particular

14  legal issue, the trial court *must* resolve that issue at the certification stage." *Brinker*,

15  *supra*, 53 Cal. 4th at 1025-6 (emphasis added); *Fireside Bank v. Superior Court* (2007) 40

16  Cal. 4th 1069, 1085-6; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal. 4th 906,

17  915-6.

18      Plaintiff argues that an employer breaches its duty to provide a meal break if the

19  employee does not take a meal break and the employer has not obtained a waiver.

20  Plaintiff further argues that, since Labor Code section 512 prohibits an employer from

21  obtaining a waiver of the second meal period for shifts greater than 12 hours, the

22  employer has violated its duty if the second meal period is not taken.

23      Plaintiff's theory of liability is not consistent with the California Supreme Court's

24  decision in *Brinker*. In *Brinker*, the court held that the employer's duty is to *provide* its

25  non-exempt employees the *opportunity* to take a first meal period after no more than five

30

hours of work and a second meal period after no more than ten hours of work. *Brinker, supra*, 53 Cal. 4th at 1049.  The employer's duty to provide a meal break is satisfied if

> [the employer] relieves its employees of all duty, relinquishes
> control over their activities and permits them a reasonable
> opportunity to take an uninterrupted 30-minute meal break, and does
> not impede or discourage them from doing so.

*Brinker, supra*, 53 Cal. 4th at 1040.

The waiver language in Labor Code section 512 is not inconsistent with the holding in *Brinker*.  Labor Code section 512 provides further protection for the employee by limiting the circumstances under which an employer can ask an employee to give up her right to a meal period.  Specifically, with respect to the first meal period, section 512 states:

> [a]n employer may not employ an employee for a work period of
> more than five hours per day without providing the employee with a
> meal period of not less than 30 minutes, except that if the total work
> period per day of the employee is no more than six hours, the meal
> period may be waived by mutual consent of both the employer and
> employee.

Lab. Code § 512, subd.(a).

As to the second meal period, section 512 similarly limits the circumstances in which an employer can request a meal period waiver as follows:

> ...if the total hours worked is no more than 12 hours, the second
> meal period may be waived by mutual consent of the employer and
> the employee only if the first meal period was not waived.

*Id.*

31

1    The protections in section 512 restrict when *the employer* can make requests of the

2    employee to waive a meal period. Nothing in section 512 limits *the employee's* ability to

3    use her meal period as she chooses, including choosing to perform work. Accordingly, to

4    maintain this matter as a class action, plaintiff must show there is substantial common

5    evidence that Comcast failed to provide its Com-Techs with *the opportunity* to take a

6    duty free meal break lasting at least 30 minutes.

7        The evidence submitted by the parties shows that Comcast had a company-wide

8    meal break policy (quoted in full above) that is consistent with the applicable wage and

9    hour regulations. Comcast's meal break policy provides for one meal period of at least

10   thirty minutes for shifts in excess of five hours and a second meal period for shifts in

11   excess of ten hours. (Glugoski Decl., Exh. 15, p. 26.) The policy further provides that

12   Comcast and the employee can agree to waive the first meal period for shifts of six hours

13   or less. (Id.) They can also agree to waive the second meal period if the employee works

14   twelve hours or less, has not waived his first meal period and agrees to the waiver in

15   writing. (Id.) Accordingly, to succeed in showing the case should be litigated as a class

16   action, plaintiff must show there is a company-wide practice that undermines this formal

17   policy. *Brown v. Wal-Mart Stores, Inc.* (2012) 2012 U.S. Dist. LEXIS 120733 at * 12

18   (citing *Brinker, supra*, 53 Cal. 4th at 1040).

19       To show there is a company-wide practice that violates applicable wage and hour

20   regulations, plaintiff relies primarily on calculations performed by his expert, David

21   Breshears, and asserts that Comcast time records show a number of missed meal breaks

22   after the fifth and tenth hours of work that he opines are "potential violations" of

23   applicable wage and hour regulations. (See, e.g., Breshears Reply Decl., Exh. B.) Mr.

24   Breshears' testimony relies on the analysis of data from both Comcast's technician

25   scheduling software, CSG, as well as Comcast's payroll timekeeping system, ESS. As

1    discussed above, Mr. Breshears' testimony is not sufficient common evidence of

2    Comcast's liability as it only identifies "potential violations."

3         Mr. Breshears testified that, in performing his calculations, he only took into

4    account whether a meal break fell within the four defined categories in his report and did

5    not consider any other factors (*e.g.* whether there was a valid waiver). (Alvarez Decl.,

6    Exh. 41, Depo. of David Breshears, p. 80:24-81:21.) He also testified that he did not

7    know what the employee was doing during the missed lunch break period. (Alvarez

8    Decl., Exh. 41, Depo. of David Breshears, p. 77:25-78:4.) As *Brinker* makes clear, an

9    employer must provide the employees with a reasonable opportunity to take her meal and

10   rest breaks; the employer "is not obligated to police meal breaks...." *Brinker, supra,* 53

11   Cal. App. 4th at 1040.

12        Here, Mr. Breshears has identified only "potential violations" and, in performing

13   his calculations, did not consider the reasons for the missed or late meal breaks.  In

14   addition, several ComTechs testified they would miss meal periods or work during their

15   meal periods for reasons that would not be violations. (See, Alvarez Decl., Exh. 2, Depo.

16   of Matthew Brennan, p. 67:8-68:2; Alvarez Decl., Exh. 6, Depo. of Michael Fiorino, p.

17   46:18-47:6; Alvarez Decl., Exh. 7, Depo. of Chris Fore, p. 115:12-22.)

18        Absent an over-arching illegal company policy, identifying "potential" violations

19   merely puts the court on inquiry notice.  Any inquiry into actual violations would require

20   individual inquiry into the reasons that a meal break was missed and/or not recorded in

21   Comcast time records.  Thus, since individual issues predominate, this issue is not

22   appropriate for resolution on a class-wide basis.

23   ///

24   ///

25   ///

33

1    4.   *Third Rest Break For Shifts in Excess of 10 Hours*

2        Plaintiff devotes one paragraph to this issue and asserts that employee time records

3    show that Com-Techs who worked in excess of 10 hours per day were not authorized or

4    permitted a third rest break.  This assertion is not supported by the evidence offered by

5    plaintiff.

6        The corporate rest policy provides that Comcast employees are permitted a rest

7    break of *at least* ten minutes "for every four (4) hours (or major portion thereof) worked."

8    (Glugoski Decl. Exh. 15, p. 26.)  Plaintiff cites to a copy of Comcast's paper timecard –

9    though paper timecards have not been employed by Comcast for some time – as evidence

10   of Comcast's policy prohibiting a third rest break.  Plaintiff argues that because the

11   timecard does not specifically include a third rest break set of columns.  (See, e.g.,

12   Glugowski Decl., Exh. 2.)

13       The evidence does not support plaintiff's position for several reasons.  First, the

14   paper timecard includes an "other" column that could arguably be used to record a third

15   rest break.  (Glugowaki Decl., Exh. 2.)  Second, there is ample evidence from both parties

16   that Comcast has not used the paper timecard system for a significant portion of the class

17   period.  (See, e.g., Glugowaki Decl., Exh. 12, Walkover Depo., p. 39:3-14; Glugowaki

18   Decl., Exh. 14, Hemphill Depo., p. 45:17-46:6; Alvarez Decl., Exh. 1, Alega Depo., p.

19   81:13-20; Alvarez Decl., Exh. 12, Sivell Depo., p. 41:6-24.)  Finally, there is no evidence

20   in the record that shows how the current electronic timekeeping system deals with third

21   rest breaks, much less that it shows non-compliance with the applicable laws and

22   regulations.

23       Plaintiff also cites declarations of several current and former Com-Techs who

24   claimed their work schedules prevented them from taking rest breaks; however, in

25   deposition, many of these Com-Techs disavowed some or all of their statements or

34

testified that the missed meal and rest breaks were not the result of a company-wide

policy. For example, several of these employees testified at deposition that the issue with

scheduling and breaks was the result of issues with a few bad supervisors. (See, e.g.,

Alvarez Decl. Exh. 3, Depo. of Georges Brodeur, p. 47:14-24; Alvarez Decl. Exh. 7,

Depo. of Chris Fore, p. 179:21-180:15.) Other deponents testified that they regularly

took rest breaks and that their rest breaks lasted 20 to 25 minutes. (See, e.g., Alvarez

Decl., Exh. 1, Alega Depo., p. 128:25-129:7; Alvarez Decl., Exh. 11, Depo. of Craig

McCullom, p. 46:14-47:4.)

Finally, plaintiff offers no time records supporting his contention. Indeed, the

extensive analysis performed by Mr. Breshears includes no discussion of rest break

violations. Accordingly, plaintiff has not met his burden of showing a predominance of

common issues with respect to his claim of missed third rest breaks.

B. Superiority and Manageability.

Plaintiff has the burden to show that a class action is "'superior to other available

methods for the fair and efficient adjudication of the controversy.'" *Dean Witter*

*Reynolds v. Superior Court* (1989) 211 Cal. App. 3d 758, 773. Courts should "allow

maintenance of the class action only where *substantial benefits* accrue *both* to litigants

and the courts." *Linder v. Thrifty Oil Co.* (2000) 23 Cal. 4th 429, 435 (internal citation

omitted) (emphasis added).

Given the size of the proposed class and the number of individual issues that must

be resolved to determine issues of liability, the court finds that class treatment is not

superior because it would required hundreds, if not thousands, of mini-trials and would

prove wholly unmanageable.

///

///

C. <u>Adequacy of Representation.</u>

Since the court has determined that individual issues predominate and class treatment is an inferior means of adjudicating this case, it is unnecessary to reach defendant's argument regarding the adequacy of representation.

D. <u>Conclusion.</u>

For the reasons set forth above, the court orders the class decertified.

Date: December 15, 2012

Digitally signed by
Barry Goode
DN: cn=Barry
Goode, o=US,
o=Superior Court,
ou=Judge
Date: 2012.12.15.
13:34:42 -08'00'

Barry P. Goode
Judge, Superior Court

36

# EXHIBIT C

# Fayerweather v. Comcast Corp.

Court of Appeal of California, First Appellate District, Division One

August 28, 2014, Opinion Filed

A137872

**Reporter**

2014 Cal. App. Unpub. LEXIS 6185

GABRIEL FAYERWEATHER et al., Plaintiffs and Appellants, v. COMCAST CORPORATION, et al., Defendants and Respondents.

**Notice:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**Prior History:** [*1] Contra Costa County Super. Ct. No. MSC-08-01470.

**Judges:** Margulies, Acting P.J.; Dondero, J., Becton, J.[*]

**Opinion by:** Margulies, Acting P.J.

# Opinion

Plaintiff Gabriel Fayerweather, a communications technician employed by defendant Comcast Corporation (Comcast), filed this wage and hour action on behalf of his fellow technicians.[1] The trial court initially certified a class with respect to his claim that Comcast has a policy of overworking its technicians, thereby denying them proper meal and rest breaks. When plaintiff's claim appeared to mutate in the course of the litigation, the trial court issued an order to show cause as a means to revisit the certification decision. In response, plaintiff abandoned his claim of understaffing and sought class certification with respect to several new theories, including data recorded by a communications system used by the technicians demonstrated widespread meal and rest break violations not reflected in the technicians' self-reported time records. The trial court decertified the class, finding, among other grounds, the communications [*2] system was an insufficiently accurate measure of the technicians' activities to serve as common proof of the violations. We affirm.

## I. BACKGROUND

Plaintiff filed this putative class action in May 2008, alleging various wage and hour violations by his employer, Comcast, on behalf of a class consisting of all "service technicians" and "communications technicians" (together, technicians) in California. As the first amended complaint explained, technicians' jobs require them to pick up and load a truck at a central office in the morning, drive among off-premises jobsites during the work day, and return the truck to the central office at the end of the day. The first amended complaint alleged Comcast violated various wage orders and statutes by (1) failing to compensate technicians for time worked at the beginning and end of the day, (2) failing to provide proper meal and rest breaks, and (3) failing to provide proper paychecks.

The trial court granted a motion for [*3] class certification in April 2010. The certified class included all technicians, defined by several specified Comcast job titles, employed by Comcast in California from May 2004 through April 2010.

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] The complaint lists two defendants, one of which appears to be a corporate subsidiary of the other. Because the distinction between the defendants is immaterial for purposes of this appeal, we refer to them jointly as "Comcast."

The class was certified with respect to a single legal theory, plaintiff's claim "Comcast has adopted a policy of understaffing (or over scheduling) that makes it unlikely that [technicians] can have their required breaks each day." Although the court considered the matter a "close case," it concluded there were sufficient common issues of fact and law to justify class treatment.

At a status conference in July 2011, the court expressed concern that plaintiff's theory of the case had changed from the claim of understaffing on which certification had been granted, but it deferred action until the next status conference in November. At that conference, plaintiff's counsel outlined new theories, that a communication device carried by technicians prevented them from having meal and rest breaks during which they were relieved of all work-related duties, as required by statute, and that technicians were not, in any event, actually receiving the breaks they reported to Comcast. Recognizing the departure [*4] from the theory on which class certification had been premised, the court determined class certification should be reconsidered. It issued an oral order to show cause "why the class should not be de-certified," directed solely to the issues of common questions of law and fact and the superiority of class treatment with respect to the new theories. The court ordered the parties to submit papers following the Supreme Court's then-anticipated ruling in *Brinker Restaurant Corp. v. Superior Court,* which eventually issued in 2012 and was reported at 53 Cal.4th 1004 (*Brinker*).

According to the evidence before the trial court, Comcast technicians install and service devices providing telephone, Internet, and television services in the homes and businesses of Comcast customers. As one declarant put it, the technician position "is one that is not closely monitored." Normally only one technician is assigned to a particular job. They therefore spend most of their work time alone in the field, outside direct supervision, and decide on their own when to take a meal or rest break. Comcast maintains written policies allowing meal and rest breaks for technicians (as well as other nonexempt employees) that are consistent [*5] with California law.[2]

Within the time period covered by the certified class, technicians made a formal record of their daily activities in two ways. Prior to December 2008, technicians filled out handwritten time cards for each day. After that date, Comcast switched to an electronic timekeeping system, the "Employee Self Service" (ESS) system. Using ESS, each technician could log on to a Web site and enter a record of his or her work and break time.[3] Following supervisor approval, the technicians' time records are used as the basis for their compensation. Technicians are expected to record their time accurately.

Around 2007, Comcast began using a parallel system that allows the tracking of technicians' work, referred to as "TechNet." Using a cellular phone or a laptop, technicians are expected to enter information into the TechNet system about their activities throughout the day and can receive information about their daily jobs. [*6] Technicians log in to the TechNet system at the beginning of their shift and are presented with a list of their assigned jobs for the day. From then on, technicians interact with TechNet throughout the day, signaling the beginning and ending of jobs and transmitting messages to the dispatch office about the status of particular jobs. The technicians are also able to indicate they have begun and ended their lunch and rest break periods. TechNet can be used to generate a "daily timeline" tracking the activities of an individual technician throughout the day, based on his or her interaction with the system.

Plaintiff submitted a sample compilation of TechNet data demonstrating that, during the period December 22, 2010 through January 18, 2011, the average technician lunch hour reported to TechNet was 49 minutes, with 7 percent of technicians reporting no lunch at all. Only 32 percent of technicians reported taking a rest break during their work day, although those breaks lasted longer than the 10-minute legal minimum, at an average duration of 16 minutes.

Plaintiff contended the TechNet data demonstrated technicians regularly worked more than 10 hours without either taking a second meal [*7] break or executing a written waiver, as required by Comcast's policy. To support this contention, plaintiff relied on the expert declaration of accountant David Breshears. Breshears was provided with over eight years of time records and seven months of TechNet data from 2011. Using the time records, Breshears found over 526,000 occasions on which a technician worked between 10 and 12 hours in a day and failed to take a second 30-minute meal break. He also

---

[2]    In general terms, the policies allowed a 10-minute rest break every four hours, a single meal break after five hours, and a second meal break after 10 hours.

[3]    For clarity, the technicians' time cards and the ESS entries will be jointly referred to as "time records."

2014 Cal. App. Unpub. LEXIS 6185, *7

found over 31,000 occasions on which a technician worked more than 12 hours in a day without a second 30-minute meal break. Further, Breshears found more than 11,000 occasions on which a technician did not take a meal break until after the sixth hour of work and over 25,000 occasions on which a technician worked more than six hours and did not take a 30-minute meal break. Depending upon the circumstances, each of these could have constituted a violation of the wage and hour laws. Based on his analysis, Breshears concluded that 45 percent of technician work days featured "at least one potential meal break violation."

In addition, Breshears compared the duration of meal breaks recorded in the time records and by TechNet. He found 95 [*8] percent of meal breaks recorded in the time records lasted either exactly 30 or exactly 60 minutes. In contrast, the TechNet data showed meal breaks of a wide variety of durations. Assuming the TechNet data was "a more accurate representation of employees' actual time," Breshears applied the TechNet data to "extrapolate the number of potential meal break violations" over the duration of the time records data, finding a substantially larger number of potential violations than the time records themselves revealed. When time records and TechNet data could be matched up for a particular employee and work day, Breshears compared the meal break duration reported by the technician in the time records with the duration recorded for the same technician by TechNet. He found the meal break times reported in the time records were, on average, nearly 10 minutes longer than the duration recorded by TechNet. Drawing on this type of comparison between TechNet data and the time records, Breshears estimated Comcast technicians had actually worked over 2 million more hours than were recorded in the time records in the years covered by the time records data.

Based on the foregoing, plaintiff sought certification [*9] of a class on three legal theories: (1) Comcast's policy of requiring technicians to remain connected to TechNet during breaks, combined with an "expectation and requirement" that they respond to TechNet messages sent during breaks, deprived the technicians of "off-duty" breaks;[4] (2) Comcast's failure to use the TechNet data in calculating its payroll "regularly depriv[ed] class members of all wages owed"; and (3) Comcast had a policy of refusing to pay "premium" wages when otherwise required by Labor Code section 226.7, subdivision (c), "even where its own records establish noncompliance with meal/rest break requirements pursuant to California law."

In arguing for decertification, Comcast took [*10] issue with Breshears's assumption the TechNet data was a more reliable indicator of technicians' work than the time records used to calculate the payroll. In a declaration, Scott Dutton, an employee of the company that had developed TechNet, explained the system had not been designed or marketed to serve as a time-keeping or payroll system. Instead, Dutton described it as "a communication tool" intended to allow Comcast supervisors and dispatchers to manage the operations of technicians in the field more efficiently by matching technicians to jobs. Throughout the day, technicians can use the system to indicate their current work status, such as "ONJOB," "ENROUTE," "MEETING," "LUNCH," and "BREAK." When making work assignments, managers and dispatchers can take each technician's indicated status into account. Dutton claimed TechNet has certain weaknesses as a timekeeping tool. Technicians may forget to indicate their status at any particular time, may choose not to indicate a particular status, or may even falsely report it. Technicians are unable to indicate their status when out of the electronic range of the system, and the system sometimes malfunctions by "kick[ing] out" technicians from [*11] a status. As a result of the foregoing uncertainties, Dutton opined that TechNet's records "are not reliable to establish the amount of time worked."

For this reason, Dutton believed, Breshears's analysis was unreliable. As an example, he examined the TechNet records of two technicians specifically discussed by Breshears in his declaration. The first technician reported taking an hour lunch between noon and 1:00 p.m. in his time records. TechNet data indicated he ended his last morning job at 11:17 a.m., took lunch from 1:01 p.m. to 1:41 p.m., and did not indicate he had resumed working until 2:37 p.m. From this, Breshears concluded the employee's actual lunch was 20 minutes shorter than indicated in his time records. Dutton pointed out the TechNet data could also be construed to indicate the employee had a duty-free period of over three hours around the noon hour. As a second example, Dutton examined another technician who, Breshears concluded, had worked nearly two hours longer than reported in his time records on a particular day. TechNet data showed the technician had initially logged on at

---

[4]  The trial court ruled against plaintiff on this first contention, finding no evidence Comcast had "adopted a 'policy' of requiring [technicians] to remain on-duty during their meal and rest breaks." Plaintiff does not acknowledge abandoning the theory in his opening brief, but neither does he address the rejected argument. We deem the theory to be abandoned as a result of plaintiff's failure to address it (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 578) and have not included the evidence relating to the theory in our discussion of the factual underpinnings of the decertification proceeding.

6:40 a.m., but this was followed by several short duration logon entries, suggesting the [*12] technician was merely checking his jobs for the day, rather than actually having begun work. Although the technician did not log off until 8:14 p.m., he had entered "ENDOFDAY" at 6:09 p.m. The two-hour gap before log off suggested the technician forgot to log off and was timed out by the system, rather than working until after 8:00 p.m. In addition, the technician never indicated a "LUNCH" status on TechNet, but there was a long period of apparent inactivity in the middle of the day, since he noted the end of his morning job at 10:31 a.m. and did not indicate a resumption of work until 2:19 p.m. A logical inference is that the technician ate lunch without recording a break on TechNet.

Comcast also submitted declarations and excerpts from the depositions of a number of technicians and their supervisors. The evidence confirmed technicians were instructed to record their time accurately in the time records and were required to certify its accuracy upon submitting it. Some of the technicians stated that time records are more accurate than TechNet data in recording their work activities and confirmed they viewed TechNet as a means to communicate about their assigned work, rather than to [*13] record their activities. Many technicians discussed the technical problems to which TechNet was subject that affected the accuracy of its record-keeping, including slow response, crashes, difficulty in logging on and off and entering statuses, involuntary log outs, and difficulty connecting in remote areas. They admitted their own periodic failures to use the system accurately, largely due to lapses in attention, also diminished its reliability. Dispatchers and supervisors confirmed the sometimes haphazard use of the system. It was not uncommon, they said, for technicians to forget to log on or log out, enter a lunch or break status, and otherwise signal changes in their status in a timely manner. In addition, technicians, supervisors, and dispatchers all noted the system was subject to intentional manipulation by technicians, who are not directly supervised while on jobs. Many technicians also testified they were not required to enter breaks of any particular duration, knew Comcast policy prohibited off-the-clock work, and believed they were paid for all time worked.

In a 36-page written opinion, the trial court decertified the class. On the issue of "off-the-clock" work, the court [*14] rejected the foundation for plaintiff's argument, that the time records should be found less reliable than TechNet data. The court noted there was no direct evidence of a Comcast policy or practice of requiring technicians to falsify their time records by, for example, filling in meal breaks of exactly 30 or 60 minutes. The court held that, even if the TechNet data were reliable, the Breshears statistics did not prove "actual violations of the wage and hour laws," but only "potential" violations. Proving actual violations would require individualized proof. Further, the court held, there were "serious questions" about the accuracy of the TechNet data for the many reasons explained in the Comcast opposition. As a result, the court concluded, plaintiff's off-the-clock work claims were not susceptible of common proof.

On the issue of missed and second meal breaks, the court found plaintiff's theory inconsistent with an employer's legal obligation as explained in *Brinker*. Under that decision, the trial court held, an employer's duty is to provide an *opportunity* for a first meal break to employees working at least five hours and a second meal break after 10 hours. Plaintiff's evidence, which [*15] relied largely on the time records as analyzed by Breshears, did not demonstrate Comcast failed to provide technicians the opportunity for meal breaks. Further, as with off-the-clock work, his data could suggest only potential violations, requiring individual proof to demonstrate an actual violation. In the absence of an illegal company policy, the court held, there were insufficient common issues to justify class treatment.

## II. DISCUSSION

### A. *Legal Background*

As the parties and the court anticipated when the briefing schedule was set for the order to show cause, *Brinker* establishes the legal baseline for evaluating the trial court's ruling.

As *Brinker* explained the burden on a putative class representative: "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class [*16] representatives who can adequately represent the class."'" (*Brinker, supra,* 53 Cal.4th at p. 1021.)

As here, the primary issue in *Brinker* was "whether individual questions or questions of common or general interest predominate. The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker, supra,* 53 Cal.4th at pp. 1021-1022, fn. omitted.)

Resolution of the issues bearing on [*17]  class certification is largely within the trial court's discretion. "On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .'" (*Brinker, supra,* 53 Cal.4th at p. 1022.)

In addition to summarizing the law bearing on class certification, *Brinker* helpfully explained many [*18]  of the principles of California wage and hour law pertinent here. An employer's duty to provide meal breaks is governed by Labor Code section 512, subdivision (a): "An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes . . . . An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." As construed by *Brinker,* this requires employers to "afford employees uninterrupted half-hour periods in which they are relieved of any duty or employer control and are free to come and go as they please." (*Brinker, supra,* 53 Cal.4th at p. 1037.) "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. . . . [¶] On the other hand, the employer is not obligated [*19]  to police meal breaks and ensure no work thereafter is performed." (*Id.* at p. 1040.) "What will suffice may vary from industry to industry, and we cannot in the context of this class certification proceeding delineate the full range of approaches that in each instance might be sufficient to satisfy the law." (*Ibid.*)

## B. *The Absence of Written Second Meal Break Waivers*

Under Comcast's personnel policies, an employee who works more than 10 hours in a day has the right to a second meal break. If an employee waives his or her right to the second meal, the waiver must be in writing and executed by both parties. Plaintiff contends, based primarily on Breshears's analysis of the time records, that technicians regularly work 10 or more hours without taking a second meal break or executing a written waiver. He argues the trial court erred in declining to certify a class with respect to his claim that Comcast was liable for premium pay to any technician who was shown to have worked for between 10 and 12 hours without taking a second meal or executing a written waiver of the second meal and to any technician shown to have worked for more than 12 hours without taking a second meal, regardless of waiver.

We agree [*20]  with the trial court that plaintiff's theory of automatic liability in the absence of a written waiver is contrary to the law. In evaluating Comcast's compliance, it is important to understand the nature of the technicians' workday. Unlike the work of the typical factory, agricultural, or retail worker, technicians' daily activities are not directly supervised, and their activities need not be coordinated with the activities of a large number of other employees. On the contrary,

technicians' daily activities are largely self-policed. Technicians spend most of their days on the road, beyond the direct monitoring of their immediate supervisors. Although they must spend time driving and working at customers' homes and businesses, the nature of the work places few constraints on their ability to take appropriate rest and meal breaks. Under these circumstances, Comcast appears to have satisfied its legal obligation to "afford employees uninterrupted [break] periods in which they are relieved of any duty or employer control and are free to come and go as they please" (*Brinker, supra,* 53 Cal.4th at p. 1037) merely by creating an appropriate policy and instructing the technicians to follow the policy while on the road. There [*21] is no dispute Comcast policy states technicians should take a second meal break if they have worked 10 hours or more. Given the nature of the technicians' workday, implementation of this policy becomes their responsibility; Comcast "is not obligated to police" them. (*Brinker,* at p. 1040.)

Accordingly, Comcast "is not liable for premium pay merely because Breshears's analysis indicates that a particular technician's time records show he or she worked for more than 10 hours without a second meal. Rather, Comcast is liable only if, in some manner, it prevented that technician from taking the second meal break without a waiver. (See *Brinker, supra,* 53 Cal.4th at p. 1040, fn. 19.) There is no evidence suggesting a general policy or practice precluding second breaks, such as supervisors who regularly discouraged technicians from taking advantage of the second meal policy or the assignment of so much work that technicians had no time for the break. Thus, to determine whether any particular skipped meal resulted in a premium pay obligation—i.e., was involuntary and not waived—would require an individualized inquiry into the circumstances of each missed meal.[5] Given the need for an individual analysis of each claimed violation, the trial court did not abuse [*22] its discretion in concluding there was little or no advantage in class treatment.

Plaintiff argues Comcast's liability results merely from the absence of a written waiver, regardless of whether the technician voluntarily skipped a second meal, since Comcast policy requires a written waiver. The requirement of premium pay for a missed meal break, however, follows from a violation of the wage and hour laws, not from a violation of an employer policy. Labor Code section 512 does not require a waiver of the second meal to be in writing.

It is true Labor Code section 512 requires *some* waiver of the meal break, and, as plaintiff points out, the second meal break cannot be waived for a workday longer than 12 hours. Contrary to plaintiff's argument, however, this rule does not require that a waiver be obtained whenever an [*23] employee fails to take a second meal. Rather, a waiver is required whenever an employer declines to satisfy its obligation under section 512, which is defined in *Brinker* as requiring the provision of an *opportunity* for a second meal break. In other words, an employer must obtain a waiver if it requires an employee to work through the time that would otherwise be allotted for the second meal.[6] If the employee voluntarily chooses to continue working through a provided meal break, no waiver is required. As discussed above, the nature of technicians' work suggests they are ordinarily given the opportunity to take a second meal break. Determining whether, in any particular case of a failed second meal break, a waiver was required because the break was actually denied will require individual analysis of every instance, defeating the advantages of class treatment.

## C. *Failure to Pay for Denied Breaks*

Plaintiff contends the trial court erred in denying class treatment in connection with his claim that Comcast fails to maintain a policy to provide premium pay for denied breaks.

Under Labor Code section 226.7, subdivision (c), an employer who fails to provide an employee a legally required meal or rest break must pay the employee an additional hour of compensation. The obligation to provide this premium pay arises

---

[5]  Citing Justice Werdegar's concurring opinion in *Brinker,* plaintiff contends a rebuttable presumption arises that no meal break was provided when none is recorded. Whatever the rule might be in more typical working situations, there is no basis for such a presumption in these circumstances, where the employee effectively determines his or her own break time. (*Brinker, supra,* 53 Cal.4th at p. 1040 ["What will suffice may vary from industry to industry"].)

[6]  As *Brinker* explained the obligation: "When someone is suffered or permitted to work—i.e., employed—for five hours, an employer is put to a choice: it must (1) afford an off-duty meal period; (2) consent to a mutually agreed-upon waiver if one hour or less will end the shift; or (3) obtain written agreement to an on-duty meal period if circumstances [*24] permit." (*Brinker, supra,* 53 Cal.4th at p. 1039.) A waiver is therefore not required unless Comcast did not "afford" a technician a meal break.

only when the employer has failed to provide a required meal break by denying an employee the necessary duty-free time. (*Brinker, supra,* 53 Cal.4th at p. 1040, fn. 19.) An employer who becomes aware an employee has performed work during a properly provided meal break must compensate the employee, but because an employee's voluntary decision to work during a break does not constitute a violation of the wage and hour laws, the employer need only pay ordinary compensation for the time worked. (*Ibid.*) Because the award of premium pay under section 226.7 is in the nature of damages, an employer's failure to provide premium pay to a worker denied a required break is not considered an independent violation of the law. Rather, the violation [*25] is the underlying failure to provide the required duty-free time. (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1256-1257 (*Kirby*).)

In arguing for class treatment based on the absence of a formal premium pay policy, plaintiff relies on *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701 and *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, in which the courts discussed the absence of an employer policy in the process of certifying a class concerning the denial of meal and rest breaks. In both of these cases, however, the employer failed to maintain a policy governing the *breaks* themselves, not a policy governing the award of premium pay. As both courts found, the absence of an appropriate break policy led to widespread violations of the wage and hour laws through the denial of breaks, which were, of course, the underlying legal claims.[7] Because the failure to award premium pay is not itself a violation of the wage and hour laws (*Kirby, supra,* 53 Cal.4th at p. 1256), the absence of a policy governing the award of premium pay does not itself give rise to such violations. The failure to adopt such a policy therefore provides no basis to support class treatment for a claim of wage and hour violations. In any event, there was evidence Comcast maintained an informal policy of awarding premium pay in appropriate circumstances. For both these reasons, the trial court did not [*26] abuse its discretion in declining to certify a class based solely on the absence of a formal policy governing the award of premium pay.[8]

## D. *Off-the-clock Work*

Plaintiff contends the trial court erred in declining to certify a class with respect to his claim of widespread off-the-clock work.

There appears to be no dispute technicians were properly compensated for the time they actually [*27] reported in the time records. Plaintiff contends, however, that Comcast technicians are systematically underreporting their working time, since they do not claim, and are not paid for, all of time they are shown to be working by the TechNet system. Although plaintiff contended in the trial court that this purported underreporting was due, at least in part, to an informal Comcast policy requiring technicians to report round-number lunch break times of 30 or 60 minutes, he provided no direct proof of such a policy.[9] Nor did he provide proof of any widespread pressure on technicians by their supervisors to underreport their working hours. Rather, his claim is based entirely on inferences from the TechNet data.

*Brinker* is directly on point here. In that case, the employer had a formal policy allowing appropriate meal breaks. The plaintiff sought to certify a class demonstrating that, notwithstanding the policy, the employer "required employees to

---

[7]    The underlying claims were critical to both courts in certifying a class. Whether the absence of a break policy *alone* can support class treatment is unresolved. (See *Benton v. Telecom Network Specialists, Inc., supra,* 220 Cal.App.4th 701, 727 [declining to decide whether the absence of a policy, alone, can support a class claim].)

[8]    To the extent plaintiff's claim is based on an alleged failure to award premium pay in appropriate circumstances, rather than the absence of a policy, there is no legal difference between this claim and his meal break claims. As noted, the obligation to award premium pay arises only when a violation of the meal or rest break rules occurs, and the failure to award premium pay is not considered an independent violation of the law. A claim for failure to provide premium pay is therefore wholly derivative of and dependent upon the demonstration of break violations.

[9]    In his opening brief, plaintiff asserts "Comcast requires that the Technicians' time records show a 60-minute meal period each work day" and provides several record citations in purported support of the assertion. His first citation is to a section of the ESS handbook in which Comcast instructs a hypothetical technician whose lunch break was interrupted by work after 45 minutes to record a 45-minute lunch break. This instruction is consistent with Comcast's written policy. The supposed [*28]  proof thereby directly contradicts the assertion it was cited to support. The remaining citations are no more successful. The evidence consistently demonstrated that Comcast expected and encouraged technicians to take a 60-minute meal break, but it instructed them to record the meal break actually taken, even if it was less than 60 minutes.

perform work while clocked out during their meal periods." (*Brinker, supra,* 53 Cal.4th at p. 1051.) In doing so, however, he failed to present "substantial evidence of a systematic company policy to pressure or require employees to work off-the-clock." (*Ibid.*) As the court explained in affirming the court of appeal's decision vacating class certification, "liability is contingent on proof [the employer] knew or should have known off-the-clock work was occurring. [Citations.] Nothing before the trial court demonstrated how this could be shown through common proof, in the absence of evidence of a uniform policy or practice. Instead, the trial court [*29] was presented with anecdotal evidence of a handful of individual instances in which employees worked off-the-clock, with or without knowledge or awareness by [their] supervisors. On a record such as this, where no substantial evidence points to a uniform, companywide policy, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion, demonstrating who worked off-the-clock, how long they worked, and whether [the employer] knew or should have known of their work." (*Id.* at pp. 1051-1052.) Plaintiff's claim is no different.

Plaintiff attempts, in effect, to substitute the TechNet data for his lack of evidence of a uniform Comcast policy, arguing the data constitute common indirect proof of such a policy, or at least proof of Comcast's constructive awareness that technicians were underreporting their time. The argument is successful only if plaintiff provided an evidentiary basis in support of the premise for Breshears's analysis: that the TechNet data are a more accurate reflection of a technician's work day than the time records actually reported by the technician himself or herself. We find substantial evidence to support the trial court's conclusion that plaintiff failed [*30] to prove this premise.

Initially, we note plaintiff provided no basis for doubting the accuracy of the time records. As technicians are aware, their proper compensation depends upon the accurate reporting of their activities in the time records. Not only are they required to certify to the accuracy of the records, technicians have a financial motive to claim every compensable working hour. There was no indication Comcast discouraged technicians from such reporting. Plaintiff provided no explanation for the widespread underreporting of working hours that he claimed to be occurring.[10]

In contrast, there was convincing evidence to cast doubt on the trustworthiness of the TechNet data. TechNet was not designed as a method for keeping time but as a method for communication, and technicians did not treat the system as a means of tracking their time. Individual technicians varied in the manner in which they used TechNet, [*31] could be careless in reporting their statuses, and could manipulate the system. The TechNet system was subject to malfunctions rendering its records inaccurate, and it ceased to work altogether when technicians traveled outside its communication range. The two individual records analyzed by Breshears and Dutton persuasively demonstrated the statuses reported by the technicians on TechNet bore no necessary resemblance to their actual work activities. In short, there was substantial evidence to support a conclusion that TechNet data was far less accurate in characterizing technician work activities than the time records.

Given the relative unreliability of the TechNet data, each departure of that data from the time records must be analyzed individually to determine whether, in fact, the technician's reported hours were inaccurate. Accordingly, the trial court did not abuse its discretion in concluding plaintiff failed to provide sufficient common proof of off-the-clock work to justify class treatment.

### III. DISPOSITION

The judgment of the trial court is affirmed.

Margulies, Acting P.J.

We concur:

Dondero, J.

---

[10]   Plaintiff's only evidence of inaccuracy was the regular occurrence of exact 60- and 30-minute meal periods, which he claimed to be suspicious. However, he provided no significant evidence of a Comcast policy to pressure technicians falsely to report round-figure break periods.

2014 Cal. App. Unpub. LEXIS 6185, *31

Becton, J.[*]

---

[*]   Judge of the Contra Costa County Superior Court, assigned by the Chief Justice [*32]   pursuant to article VI, section 6 of the California Constitution.

# EXHIBIT D

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
2                   CONTRA COSTA COUNTY
3
4
5    CHARLES HOLLANDER, *et. al.*,

6              Plaintiffs                      MSC14-01996

7    V.                                        **OPINION AND ORDER**

8    COMCAST CORPORATION, *et. al.*,            **ON MOTION TO STRIKE**

9              Defendants                       **PORTIONS OF PLAINTIFFS'**

10                                              **COMPLAINT**

11

12

13   **I.    Introduction**

14         On May 27, 2008, plaintiffs' counsel filed a putative class action entitled *Gabriel*

15   *Fayerweather v. Comcast Corporation et al.* It was assigned number MSC08-01470. On

16   September 15, 2008 plaintiffs filed a First Amended Complaint. On April 12, 2010, after

17   extensive discovery and briefing the Court certified a class. On December 17, 2012, after a

18   number of case management conferences, further discovery and additional extensive briefing the

19   court decertified the class. On August 28, 2014 the Court of Appeal affirmed the Order

20   decertifying the class. In this Opinion and Order that case is referred to as *"Fayerweather."*

21         On November 14, 2014 plaintiffs' counsel filed this case, *Hollander et al. v. Comcast*

22   *Corporation et al.* Most of the allegations of the *Hollander* complaint are virtually identical to

23   those in the *Fayerweather* first amended complaint. It appears that plaintiffs' counsel essentially

24   copied the majority of the *Fayerweather* allegations, making only those changes necessary to

25   state an action on behalf of these individual plaintiffs, rather than a class action. Plaintiffs'

1

counsel also modified the complaint to include some of the material plaintiffs discovered during the *Fayerweather* litigation -- material which was discussed at length in the class decertification briefs.

On February 3, 2015, defendant, Comcast Cable Communications Management, LLC, -- erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc. ("Comcast") -- filed a motion to strike portions of plaintiffs' complaint (the "Motion").

The Motion sought to strike from the complaint all or portions of the following paragraphs: 2, 3, 4, 5, 8, 21, 24, 25, 30, 31, 32, 34, 35, 41, 44, 46, 49, 50, 51, 55, 56, 58, 59, 62, and 71.  That essentially called upon the Court to answer three questions:

1. Assuming that equitable tolling under *American Pipe & Construction v. Utah* (1974) 414 U.S. 538 ("*American Pipe*"), *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 ("*Jolly*") and their progeny applies, did that equitable tolling cease when the Court decertified the class in *Fayerweather*, or did such equitable tolling continue until all appeals of the decertification order were exhausted?

2. Must the Court strike paragraph 44 (pertaining to meal and rest break periods) because its allegations misstate the law under the relevant sections of the Labor Code and *Brinker Restaurant Corp. v. Super. Ct.* (2012) 53 Cal.4th 1004 ("*Brinker*")?

3. Must the Court strike allegations pertaining to Comcast's purported systematic unlawful policies, patterns, and practices because the doctrine of issue preclusion prevents plaintiffs from re-litigating those issues?

Plaintiffs opposed the Motion.

**II.    Tentative Ruling and Oral Argument**

On March 18, 2015, the Court posted its tentative ruling.  A copy is attached as Exhibit A.  The parties timely challenged those portions of the tentative ruling that addressed questions 1 and 3, so on March 19, 2015, the Court heard oral argument.

2

With respect to *American Pipe* equitable tolling[1], the Court's tentative ruling noted that Comcast had not conceded that *American Pipe* applies; it only raised it *arguendo*. Thus it appeared that Comcast was seeking an advisory opinion.

However, at oral argument Comcast conceded that *American Pipe* equitable tolling applies to this case from the filing of the complaint until the *Fayerweather* class was decertified on December 17, 2012. (The "Decertification Order").[2] As a result, the Court discusses that issue below.

Plaintiffs did not contest the portion of the tentative ruling that struck Paragraph 44 of the complaint as an inaccurate statement of law in light of our Supreme Court's holding in *Brinker Restaurant Corp. v. Super. Ct.* (2012) 53 Cal.4th 1004. Therefore, that tentative ruling is confirmed. Paragraph 44 is struck from the complaint.

With respect to issue preclusion, plaintiffs' brief argued "class certification is a procedural device, not a ruling on the merits."[3] It also argued "one way intervention…compels a finding that decisions in *Fayerweather* are not binding on the named plaintiffs."[4]

At oral argument, plaintiffs argued (1) the Decertification Order stated that it was not making any determinations on the merits and that, as such, the Court's tentative ruling contradicted the language of the Decertification Order and (2) the Court of Appeal in *Fayerweather* approached the appeal of the Decertification Order assuming this Court had

---

[1] The parties referred to the doctrine as "*American Pipe* equitable tolling" and the Court accepts that shorthand usage.

[2] The tentative ruling refers to the Decertification Order as being entered on December 15, 2012. The order was signed on December 15, 2012, but was not actually filed until December 17, 2012.

[3] Plaintiffs' Opposition to Defendant's Motion to Strike Portions of the Complaint, p. 6.

[4] Id., p. 7. The one-way intervention argument is irrelevant, since the Court had already certified the class. The well-known concerns of *Fireside Bank v. Superior Court* (2007) 40 Cal. 4th 1069 cease once a class is certified, notice is given and members have an opportunity to opt-out. That was done here long before the Decertification Order was issued. The question now before the Court is what preclusive effect, if any, to give to a Decertification (not a certification) Order.

3

declined to make merits determinations in connection with class certification proceedings. Plaintiffs urged the Court to revisit both the Decertification Order and the unpublished appellate opinion affirming the Decertification Order. Plaintiffs argued that both would support their view that no merits determinations had been made in either, preventing the application of the doctrine of issue preclusion.

Comcast did not contest the tentative ruling's finding that issue preclusion could not apply to anything beyond Comcast's "policies." Comcast did not argue, for example, that the Decertification Order made any merits determinations concerning its "patterns" or "practices."

### III.    Equitable Tolling

Comcast relies on federal cases holding that *American Pipe* equitable tolling does not continue beyond the date a class certification motion is denied. *See, e.g., Catholic Soc. Servs., Inc. v. I.N.S.* (9th Cir. 2000) 232 F.3d 1139, 1147; *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.* (C.D. Cal. Mar. 9, 2012), No. 2:11-CV-07166-MRP, 2012 U.S. Dist. LEXIS 60776. It argues that the Court should follow these federal authorities under the rule announced in cases like *Green v. Obledo* (1981) 29 Cal.3d 126, 145-46 ("It is well established that in the absence of relevant state precedents our trial courts are urged to follow the procedures prescribed in rule 23 of the Federal Rules of Civil Procedure for conducting class actions").

Plaintiffs argue that the equities demand that *American Pipe* equitable tolling be extended to toll the limitations period on their individual claims until the appellate process in *Fayerweather* was fully exhausted.

Neither party has provided the Court with California authority that squarely answers the question before the Court here. Likewise, the Court's research uncovered no such authority. As a result, the Court is driven to an analysis of the principles underlying the doctrine of *American Pipe* equitable tolling – as stated by California authority where available – and to determining the result those principles require in this case.

4

The seminal California case on the topic of *American Pipe* equitable tolling is *Jolly*, which noted that two major policy considerations undergird the tolling rule of *American Pipe*. *Jolly* described the first policy consideration as:

> the protection of the class action device. In cases where class certification is denied for what [*American Pipe*] characterized as subtle factors, unforeseeable by class members, a rule that failed to protect putative class members from the statute of limitations after denial of certification would induce potential class members to file protective motions to intervene or to join in the event that a class was later found unsuitable, depriving class actions of the efficiency and economy of litigation which is a principal purpose of the procedure.

*Jolly* at p. 1121 (citations and quotations omitted).

*Jolly* identified the second policy consideration as involving

> [t]he effectuation of the purposes of the statute of limitations. "The policies of ensuring essential fairness to defendants and of barring a plaintiff who has 'slept on his rights,' the high court stated, "are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendant not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. *Id.* (quoting *American Pipe*).

*Jolly* also articulated a concern over the potential abuse that could result from the rule of *American Pipe*; namely, the filing of spurious class action complaints to take advantage of the tolling rule. Thus, tolling is only allowed where the class action and the later individual action are based on the same claims, subject matter, and similar evidence. *Id.* at p.1124.

*Becker v. McMillin Constr. Co.* (1991) 226 Cal.App.3d 1493 provides an illustration of these principles in action. There, a homeowner, Castro, purchased a house in a residential development in 1980. In September 1984, after other efforts at resolution had failed, Castro filed a class action against McMillin, the builder, and others. *Id.* at p. 1496. Notice was provided to homeowners of the pending class action. *Id.* On January 30, 1987, another homeowner, Becker, filed an individual action seeking damages against McMillin. On February 11, 1987, the trial court denied certification of the *Castro* class action. *Id.* McMillin argued that the statute of

5

limitations barred Becker's individual action. Becker argued that the limitations period was tolled during the pendency of the *Castro* class action.

*Becker* found that both policy considerations identified by *Jolly* favored tolling the limitations period. "[T]he equities demand that tolling be permitted. Even though there was clearly a lack of commonality for class certification purposes, the substantive class and individual claims were sufficiently similar to give McMillin notice….[T]he *Castro* action gave McMillin notice that construction defects were claimed by some homeowners at the site. It was then aware of the need to preserve evidence and witnesses respecting the claims of all members of the class." *Id.* at p. 1501.

In addition, *Becker* emphasized that each case must be carefully analyzed on its own merits: "[c]onsistent with the Supreme Court's approach in *Jolly*, the applicability of *American Pipe* can only be determined by individualized attention to the identity of the claimants and the nature of the claims involved, and by a careful weighing of the important policy considerations in this area." *Id.* at p. 1502.

Of course, both *Jolly* and *Becker* were concerned with whether *American Pipe* equitable tolling applied *at all*, rather than the related question the Court is called upon to answer in this matter: when does *American Pipe* equitable tolling stop?

It appears no California case addresses this issue, but the federal cases answer this question by posing a related one: at what point is it no longer reasonable for an individual plaintiff to continue relying on the putative class action to protect her rights? *See, e.g., In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig., supra,* 2012 U.S. Dist. LEXIS 60776 at *19 ("*American Pipe* tolling is meant to protect a plaintiff's reasonable reliance on the class action device"); *Armstrong v. Martin Marietta Corp.* (11th Cir. 1998) 138 F.3d 1374, 1380 ("[o]nce the district court enters the order denying class certification, however, reliance on the named plaintiffs' prosecution of the matter ceases to be reasonable, and, we hold, the excluded

putative class members *are put on notice that they must act independently to protect their rights*") (emphasis added; note however, this dealt with an opt-in class under federal law, and certain plaintiffs were *individually* dismissed or not permitted to opt-in); *Bridges v. Dept. of Maryland State Police* (4th Cir. 2006) 441 F.3d 197, 211 ("*American Pipe* tolling extends as far as is justified by the objectively reasonable reliance interests of the absent class members"); *Giovanniello v. ALM Media, LLC* (2d Cir. 2013) 726 F.3d 106, 116-118 (collecting cases).[5]

The Court considers that the unique procedural posture of this case demands great caution before the Court makes any ruling that could have the effect of barring potentially viable claims. *Armstrong v. Martin Marietta Corp., supra,* speaks in terms of the putative class members being "put on notice." Presumably, it is speaking of constructive notice. Similarly, *Bridges* speaks of "objectively reasonable" reliance. But none of those case involved *decertification* of a class that was previously certified. And in some of those cases, the absent class members had actual notice.

Here, we are dealing with certification, notice, an opportunity to opt out and then decertification. The facts are, therefore, a bit more complex. Since this is a case of first impression, it appears that it would be useful to develop a factual record before attempting a decision. In that way, the Court can be more certain of the case it is deciding.

---

[5] Soon after the 1998 amendment of Federal Rule of Civil Procedure 23 to include subdivision (f), which made it easier to obtain appellate review of an order granting or denying class certification (though still not "of right," as is the case in California under the "death knell" doctrine), at least two federal district courts opined that an appeal of the certification decision would continue to toll the limitations period. *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.* (E.D.N.Y. Sept. 26, 2000), No. 98-CV-1492, 2000 U.S. Dist. LEXIS 13910 at *2, *8; *Monahan v. City of Wilmington* (D. Del. Jan. 30, 2004), No. 00-505-JJF, 2004 U.S. Dist. LEXIS 1322 at *7-8. However, in those cases, it appears plaintiffs sought a stay of the enforcement of the order denying certification pending appeal, and that this may be a distinguishing factor. In any event, as *Giovanniello* observes, the prevailing federal rule is that taking an appeal under Rule 23(f) does *not* toll the limitations period. *But see Jimenez v. Weinberger* (7th Cir. 1975) 523 F.2d 689, 696 (suggesting, in dicta, that if the denial of certification had been appealed, *American Pipe* equitable tolling would have continued during the pendency of the appeal). The Court's research failed to locate any federal appellate authority that followed *Nat'l Asbestos, Monahan,* or *Jimenez,* but neither did the Court's research suggest these cases had been explicitly overruled.

7

So far, there is evidence before the Court that a class was certified in April 2010 and that actual notice was sent to putative class members. It advised the class members that their rights were being protected by the class, and that they need not take any additional action to protect those rights.

Paragraph 13 of the Notice sent to class members said, in part, "What happens if I do nothing at all? By doing nothing, you remain in the Class and keep the possibility of getting money or benefits from this lawsuit...."

The notice permitted putative members to opt out, and reportedly, some did.

Subsequently, the class was decertified in December 2012. Again, there is some evidence of some notice being sent. But here the record is incomplete.

Defendant has pointed to evidence that at least some class members were advised that they could no longer rely on the prior class certification order. Comcast called to the Court's attention a February 21, 2013 letter in the Court's file. On that date, counsel for defendant sent a letter to the judge then handling this case, complaining about a communication sent to former class members. It enclosed a copy of a January 11, 2013 letter that appears to have been sent as part of a mass mailing.

The letter said,

> The court has recently decided that Techs who wish to pursue their claims and
> receive money must step forward and assert their claims…If you are interested in
> making a claim alongside the many other Techs who are submitting claims
> against Comcast then please complete and return the enclosed postcard.
> Likewise, if you do not wish to pursue your claims then you have an opportunity
> to make that clear on the postcard. Under the law in the event one does not
> pursue a claims (sic) then his/her right to any recovery will eventually be lost
> through the passage of time.

8

It is not clear who received this letter. More to the point, it is not clear whether the plaintiffs in this action received it.[6] The evidentiary record is not yet developed.

It appears that determination of this issue would benefit, as *Becker* says, from some "individualized attention." Assuming, for example, that the letter was sent to Mr. Hollander and his co-plaintiffs, it would likely fortify a conclusion that it would be reasonable to determine that equitable tolling ceased when they were told to "step forward."[7]

At bottom, the Court is mindful that equitable tolling is, as the name suggests, an equitable doctrine. *See Becker, supra,* 226 Cal.App.3d at p. 1501 (court's conclusion guided by what "the equities demand.") In determining what is equitable, it is usually helpful to have a clear view of the facts of the matter. Here, the record has not fully developed those facts. Thus, rather than venture to decide this question as a matter of law, the Court believes it would be more prudent to revisit it after the facts have been developed. Indeed, development of the facts may guide a determination of not only *whether* equitable tolling should cease, but *precisely when* it ceased.

So on this record, and at this time, the Motion is denied. However, the Court emphasizes that this ruling is without prejudice to any party's ability to revisit it upon the development of a more comprehensive factual record.

---

[6] Comcast's counsel observed in his February 21, 2013 letter, "Righetti Glugoski never inform recipients that the Court decertified the formerly certified class. Nor do they bother to include a copy of the Court's order. Instead, their letter states: 'The court has recently decided that Techs who wish to pursue their claims and *receive* money must step forward and assert their claims. (Emphasis added). This statement would mislead former class members to believe that the Court issued a directive that former class members must 'step forward to assert their claims' and "*receive money*' as if the Court has encouraged individuals to 'step forward,' that the claims has already been adjudicated, and that an award of damages were a foregone conclusion."

[7] That is not to say that if they did not receive the letter that equitable tolling should continue indefinitely. Indeed, the cases say they turn more on notions of constructive notice than actual notice – although the facts sometimes reflect actual notice. However, if there were actual notice, this case becomes clearer.

9

IV.   **Issue Preclusion**

The Motion contends that the Court's December 15, 2012 Decertification Order was a determination on the merits and that the doctrine of issue preclusion prevents Plaintiffs from re-litigating Comcast's purported systematic unlawful policies, patterns, and practices.

To apply issue preclusion the Court must find (1) the issue sought to be precluded is identical to that decided in a prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the issue was necessarily decided in the prior proceeding; (4) the decision in the prior proceeding was final and on the merits; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding. *Lucido, supra*, 51 Cal.3d at p. 341.

In their brief, at oral argument, and in a post-hearing letter, plaintiffs argued that no issues were decided in the Decertification Order.[8]  They did not argue any of the other *Lucido* factors.

At oral argument, plaintiffs asked the Court to re-examine not only the Decertification Order but also the Court of Appeal opinion.  Plaintiffs argued such a review would show no factual findings were made.  The Court agreed to do that, and its analysis is discussed below.

It is generally the case that a trial court does not resolve disputes concerning the merits of the claims in connection with class certification proceedings. *Brinker*.  Rather, the certification question is essentially a procedural question that does not ask whether an action is legally or factually meritorious. *Sav-On Drug Stores, Inc. v. Super. Ct.* (2004) 34 Cal.4th 319, 326.

---

[8] At the end of plaintiffs' post-hearing letter, there was a two-sentence assertion that the order in *Fayerweather* is not final. That contradicted what plaintiffs wrote in their Opposition to Defendant's Motion to Strike Portions of the Complaint. ("Here the order did not become final until the appeal ran its course." Page 9, lines 25-26. Plaintiffs dated that as November 25, 2014. *Id.* at 10:4.)  In fact, the order is final. The Court of Appeal affirmed the Decertification Order and the Supreme Court denied review on November 26, 2014. (Plaintiff's Opposition to Defendant's Motion to Strike Portions of the Complaint says, at page 5, that the Supreme Court denied review on November 25, 2014.  The Court of Appeal website says review was denied on November 26, 2014. http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=1&doc_id=2037662&doc_no=A137872. The difference is immaterial.)

10

1         Indeed, the Court took pains to explain that it was not seeking to decide factual

2  disagreements or to rule on the merits of the claims in the Decertification Order. For example, it

3  wrote "[t]his ruling neither makes nor implies any decision on any question of the merits of the

4  litigation." (Decertification Order, p. 11.)

5         The Court also indicated that with respect to whether there was a "consistent practice that

6  violates the company's stated policy … [t]he Court need not determine whether that is or is not

7  true. For purposes of determining whether a class should be certified, it is more useful to note

8  only that there is no commonality; no evidence of a common practice that would make class

9  treatment useful." (Decertification Order, p. 24.) There are other examples of the Court's

10  reluctance to decide factual disputes. *See, e.g.,* Decertification Order at p. 21 (Court declined to

11  examine evidence to decide merits of case); p. 29 (Court declined to decide if CSG data were

12  reliable).

13         However, "when evidence or legal issues germane to the certification question bear as

14  well on aspects of the merits, a court may properly evaluate them." *Brinker* at p. 1023-24. Thus,

15  "if a particular determination is necessarily dispositive of the certification question," the trial

16  court is permitted to "resolve threshold disputes over the elements of a plaintiff's claims."

17  However, "[s]uch inquiries are closely circumscribed," because, as *Brinker* cautioned, a class

18  certification motion "is not a license for a free-floating inquiry into the validity of the

19  complaint's allegations." *Id.* at pp. 1023-24.

20         As the Fourth District Court of Appeal recently explained, these portions of *Brinker* mean

21  that threshold legal matters should only be determined at the class certification stage to the extent

22  necessary to determine the propriety of certification. *Hall v. Rite Aid Corp.* (2014) 226

23  Cal.App.4th 278, 294:

24            Rite Aid, seizing on *Brinker*'s observation that "[t]o the extent the propriety of

25            certification depends upon disputed threshold legal or factual questions, a court may,

and indeed must, resolve them," argues the court properly evaluated the merits of

Hall's legal theory as a predicate to ruling on the decertification motion. However,

*Brinker* repeatedly cautioned that "[s]uch inquiries are closely circumscribed" and

ordinarily should not be addressed as part of the certification evaluation. We interpret

the highlighted language in the passage from *Brinker* cited by Rite Aid to mean, by

negative implication, that to the extent *the propriety of certification* does not depend

on determining threshold legal matters, such determinations should be deferred.

> *Id.* at p. 294 (internal citations and quotations omitted).

In *Fayerweather*, the Court initially certified a class based on a theory of the case that plaintiff had advanced in 2010: essentially that Comcast hired so few employees, that it was not possible for them to have their meal and rest breaks. After certification, there were a series of case management conferences to prepare the matter for trial. Over time, it became clear that plaintiff's theory was changing. That raised serious questions with respect to whether the case could manageably be tried as aggregate litigation.

After discussions with the parties, and to frame that question, the Court issued an order to show cause why the case should not be decertified. The crux of the Court's inquiry required an assessment of whether common questions of law and fact still predominated over individual questions of law and fact; and to determine if "the theory of recovery advanced by the plaintiff [was] likely to prove amenable to class treatment." *Jaimez v. DAIOHS, USA* (2010) 181 Cal.App.4th 1286, 1298. Thus the Court's was required to "examine the plaintiff's theory of recovery" and "assess the nature of the legal and factual disputes likely to be presented." *Brinker* at p. 1025.

Broadly speaking, the *Fayerweather* plaintiffs then asserted (i) that Comcast maintained uniform policies concerning meal and rest periods that were contrary to California law and (ii) that Comcast's patterns and practices concerning meal and rest periods ran afoul of California

law. As a result, in connection with the decertification proceedings, the Court was called upon to examine carefully the evidence concerning both Comcast's (i) policies, and (ii) patterns and practices to understand how the case would likely be tried, and to determine if it was, therefore, amenable to class treatment. If there were unlawful policies, the case was likely to be manageable to try. If there was really no evidence of an unlawful policy, the trial would revolve around claims of patterns and practices, and the Court would have to consider the manageability of those issues.

That is why the Court first noted the difference between a "policy" and a "practice:"

> In determining whether to certify a class it is important to distinguish between a "policy" and a "practice." If a company has adopted a company-wide "policy," common proof is more easily found. If plaintiff relies on a "practice," then matters of proof may be far more individualized and problematic." (Decertification Order at p. 12.)

The Court then analyzed Comcast's policies in great detail in the Decertification Order. It conducted a closely circumscribed analysis of the evidence concerning Comcast's company-wide policies to determine if the case really turned on "policies" as opposed to "patterns and practices."

The Decertification Order clearly concluded that there was no evidence of any unlawful company-wide Comcast <u>policy</u> concerning meal and rest periods that violated any provision of California law. Instead, the case would have to focus on <u>patterns and practices.</u> Having made that determination, the Court focused on the manageability of trying a patterns and practices case as a class action.

This Court's specific determinations in the Decertification Order are of some interest, and they are discussed next. However, there has also been an appellate court opinion on those same subjects, and that appellate opinion is the law of the *Fayerweather* case and the highest authority

13

on its determination. So the Court looks to that, too (as requested by plaintiffs' counsel), to

examine what was actually litigated and necessarily decided in *Fayerweather*. Since the Court

of Appeal affirmed the trial court's findings and order, there is no real difference between the

two decisions that is material to the question now before the Court.

**A. The Decertification Order**

In the Decertification Order, the Court initially discussed the standard set by *Sav-On*,

*supra*, and *Brinker, supra.* (Decertification Order, p. 11.) It considered carefully whether, given

the evidence presented by the parties, it was dealing with a case in which the issues would turn

on defendant's policies or its patterns and practices; did Comcast have a "companywide policy"

that violated the Labor Code? That "carefully circumscribed" issue was necessarily examined

and decided in the Decertification Order.

The Court cited *Brinker* and *Brown v. Wal-Mart:*

> In wage and hour class actions, predominance of common issues may often be
> found where the plaintiff claims "a uniform policy consistently applied to a group
> of employees is in violation of wage and hour laws…." *Brinker, supra,* 53 Cal.
> 4th at 1033. Even where there is a policy in place that complies with applicable
> law, common issues may predominate where there is substantial evidence the
> policy is a sham – *i.e.* the employer has a common practice that undermines the
> formal policy "'by pressuring employees to perform their duties in ways that
> [violate the regulations].'" *Brown v. Wal-Mart Stores, Inc.* (2012) 2012 U.S. Dist.
> LEXIS 120733 at *12 (citing *Brinker, supra,* 53 Cal. 4th at 1040)."

(Decertification Order, p. 12.)

The Court examined the evidence carefully to determine if there was sufficient

evidence to support a jury finding that there was a company-wide policy. Had there been such

14

evidence, it would have supported plaintiff's view that the case could be tried on that theory as a class action.[9]

But the Court found that there was no evidence of a company-wide policy at odds with the Labor Code. For example, with respect to the allegation of ComTechs being required to remain on-duty during meal and rest periods, it wrote:

> [i]t is clear that Comcast has not adopted a 'policy' of requiring Com-Techs to remain on-duty during their meal and rest breaks. The evidence, as summarized below, shows that Comcast's policy is to relieve the Com-Techs of duty during their meal breaks. (Decertification Order, p. 12; *see also id.*, pp. 14-15 (summarizing relevant Comcast policy).)

Similar statements were made with respect to the other categories of alleged company-wide policies:

> Comcast's policy is clear. When Com-Techs are on break or at lunch, they are to be relieved of all duty. The relevant policy is stated in at least two places. (*Id.* p. 14)

> A careful analysis of the parties' positions shows there is really no dispute about Comcast's policy: Com-Techs are to do no work during their breaks. The Court finds that plaintiff's argument about a policy that the Com-Techs remain "in communication" does not come close to meeting the standards of *Ghazaryan* and *Morillion* discussed below. There is no common issue to be tried with respect to Comcast's policy. (*Id.* p.18.)

---

[9] The Court had to weigh the evidence of Comcast's policies to know whether the litigation would realistically be framed in terms of an "unlawful policy" or whether, at trial, it would really be presented as a "pattern and practices" case. If the evidence of unlawful policies was so slight (or, as here, non-existent) then the Court must know it was faced with managing a "policy and practices" case. Thus, it has to determine if common issues would predominate in such a case. In a sense, a court is required to be intensely practical in understanding how the case is *really* likely to be tried so it can properly determine issues such as predominance and manageability.

Plaintiff has failed to meet his burden of showing there is a company-wide policy or practice pursuant to which Comcast exerts such control over its Com-Techs that renders all breaks 'on-duty.' (*Id.* p. 24)…

Plaintiff's off-the-clock claim relies on his contention that the company required that he record a lunch of exactly 60 minutes regardless of how much time he actually took. Plaintiff does not argue that there is an express written policy on this issue. The question then is whether there is a practice, amenable of common proof, that plaintiff offers as a way of litigating this matter as a class action. (*Id.* p. 25.)

The evidence submitted by the parties shows that Comcast had a company-wide meal break policy (quoted in full above) that is consistent with the applicable wage and hour regulations. (*Id.* p. 32.)

The corporate rest policy provides that Comcast employees are permitted a rest break of *at least* ten minutes "for every four (4) hours (or major portion thereof) worked." (Glugoski Decl. Exh. 15, p. 26.) (*Id.* p. 34.)

In each instance, where relevant, the Court distinguished "policy" from "pattern" or "practice." It made specific findings with respect to the former (policy), but not the latter (pattern or practice). That was done to focus the analysis on the issues necessary to the class certification questions. Whether there was an unlawful policy was actually litigated and necessary to the class certification decision.

It may be useful to note that the class certification and decertification orders followed extensive discovery, briefing and hearings. The complaint was filed on May 27, 2008. After nearly two years of discovery, plaintiff filed his opening brief, seeking class certification, on March 10, 2010. It was supported by many exhibits and declarations. Defendant's opposition was equally lengthy and included compendia of declarations, many exhibits, and requests for

1   judicial notice. Plaintiff's reply was again, extensive. On April 7, 2010 the court heard

2   extensive argument and on April 12, 2010 issued its order certifying the class.

3          Further discovery ensued as did a number of case management conferences to discuss

4   how to bring the matter to trial. Those conferences (and the publication of *Brinker*) led to an

5   order to show cause why the matter should not be decertified. From May to October 2012 there

6   was again extensive briefing, complete with many more declarations, appendices, and exhibits.

7   Finally, on December 17, 2012 the Court filed its order decertifying the class.

8          There is no question this matter was extensively discovered and actually litigated.

9   Plaintiff had (and took) every opportunity to inquiring into Comcast's policies, patterns and

10  practices. It is hard to believe that anything more could be discovered about the company's

11  policies or that it would be a useful investment of any party's time or resources to contend that

12  the trial court and the Court of Appeal did not have before it all relevant evidence of those

13  policies.

14         All that work, over more than four years of discovery showed quite clearly that

15  plaintiffs' case must turn on patterns and practices, not policies.

16      **B. The Court of Appeal Decision**

17         The Court of Appeal affirmed the Decertification Order. It too, reviewed Comcast's

18  policies and measured them against the requirements of California law. The appellate court noted

19  that the *Fayerweather* plaintiffs "sought certification of a class on three legal theories: (1)

20  Comcast's policy of requiring technicians to remain connected to TechNet during breaks,

21  combined with an 'expectation and requirement' that they respond to TechNet messages sent

22  during breaks, deprived the technicians of 'off-duty' breaks; (2) Comcast's failure to use the

23  TechNet data in calculating its payroll 'regularly depriv[ed] class members of all wages owed';

24  and (3) Comcast had a policy of refusing to pay 'premium' wages when otherwise required by

25  *Labor Code section 226.7, subdivision (c)*, 'even where its own records establish noncompliance

with meal/rest break requirements pursuant to California law.' *Fayerweather v. Comcast Corp.* (1st District Ct. of App., Aug. 28, 2014) Case No. A137872, 2014 Cal.App.Unpub. LEXIS 6185.[10]

Thus, plaintiffs sought certification of two issues related to Comcast's alleged company-wide policies (numbers 1 and 3 above) and one issue related to Comcast's alleged pattern or practice (number 2 above).

The First District Court of Appeal unequivocally held that there was no evidence that Comcast had any company-wide meal or rest period policies that violated California law: "According to the evidence before the trial court … Comcast maintains written policies allowing meal and rest breaks for technicians (as well as other nonexempt employees) that are consistent with California law." *Fayerweather, supra,* 2014 Cal.App.Unpub. at *4-5.

The appellate court then noted that although this Court had ruled against the *Fayerweather* class plaintiffs on their first theory, finding "no evidence Comcast had 'adopted a 'policy' of requiring [technicians] to remain on-duty during their meal and rest breaks," plaintiffs had abandoned that theory on appeal. *Id.* at *9, n. 4. As a result, the appellate court did not re-examine that theory and the trial court finding was undisturbed. *Id.*

The appellate court examined the record and concluded that there was no evidence of any other relevant company-wide Comcast policy that violated California law, which would provide a basis for class treatment. For example, it found "[t]here is no dispute Comcast policy states technicians should take a second meal break if they have worked 10 hours or more. Given the nature of the technicians' workday, implementation of this policy becomes their responsibility; Comcast is 'not obligated to police' them." *Id.* at *20-21 (citing *Brinker* at p. 1040).

---

[10] The Court is aware that ordinarily, it must not cite unpublished appellate opinions. Cal. Rule of Court 8.1115. However, in this case, the *Fayerweather* appellate opinion is citable to the extent it is relevant under the exception for doctrines of law of the case, res judicata or collateral estoppel. Cal. Rule of Court 8.1115(b). The Court cites it for that purpose only.

18

The appellate court also observed that "[t]here is no evidence suggesting a general policy or practice precluding second breaks, such as supervisors who regularly discouraged technicians from taking advantage of the second meal policy or the assignment of so much work that technicians had no time for the break." *Id.* at *21. And "[a]lthough plaintiff contended in the trial court that this purported underreporting was due, at least in part, to an informal Comcast policy requiring technicians to report round-number lunch break times of 30 or 60 minutes, he provided no direct proof of such a policy." *Id.* at *27.

The appellate court summed it up by citing *Brinker*:

> "[o]n a record such as this, where no substantial evidence points to a uniform, companywide policy, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion, demonstrating who worked off-the-clock, how long they worked, and whether [the employer] knew or should have known of their work." (*[Brinker]* at pp. 1051-1052) Plaintiff's claim is no different." Plaintiff attempts, in effect, to substitute the TechNet data for his lack of evidence of a uniform Comcast policy…." *Id.* at *29.

In short, the Court of Appeal combed the record for evidence of company-wide policies that would make it manageable to litigate the case as a class action. It found there were none. Thus, it considered whether the case could be manageably litigated as a "patterns and practices" class action, and affirmed the trial court's decision that it could not. The determination that there was no evidence of an unlawful policy was necessary to the Court of Appeal's decision.

**C. Conclusion**

The issue of whether Comcast had adopted company-wide policies that violated the Labor Code was vigorously litigated and actually decided. In both the trial court and the Court of Appeal there was a "closely circumscribed" decision necessary to the holding that the class must be decertified. To find that decertification was appropriate, the courts necessarily first had to find that there was no uniform, illegal policy. They so found.

All of the elements of issue preclusion are met, and the Court finds that its application to this issue is appropriate.

**V.     ORDER**

For the reasons stated above:

1. The words "policy" or "policies" are struck from the following paragraphs: 4, 8, 21, and 55.

2. In Paragraphs 24 and 25 the phrase "and the uniform policy of being 'on duty' at all times" is struck.

3. Paragraph 31 is struck.

4.  In paragraphs 35, 51, and 59 the phrase "and uniform administration of corporate policy" is struck.

5. In paragraph 46 the sentence "This policy of requiring employees to work through their legally mandated meal periods is a violation of California law" is struck.

6. Paragraph 44 is struck.

7. Defendant's motion regarding equitable tolling is denied without prejudice.

Date: May 6, 2015

Hon. Barry Goode
cn=Hon. Barry Goode,
o, ou,
email=cxlit@contracos
ta.courts.ca.gov, c=US
2015.05.06 12:02:56
-07'00'

Barry P. Goode
Judge, Superior Court

20

**Exhibit A**
**Tentative Ruling Posted March 18, 2015**

Before the Court is a Motion to Strike Portions of the Complaint (the "Motion") filed by the defendants in this matter, Comcast Cable Communications Management, LLC, erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc. ("Comcast"). The Motion is opposed by plaintiffs Charles Hollander, Gregory Stewart, Adele Richard, Lawrence Bains, Marlin Deol, Dominic Williams, Esteban Alejandrez, Dana Todd, Victor Sanchez, James Dillard, Corey Orlando Johnson, Tony Klemen, David Simmons, Kristopher McCullough, and Michael J. Ortiz (collectively, "Plaintiffs").

The Court addresses two preliminary matters initially. First, the Court orders this matter to e-filing. The parties are not to paper-file anything with the Court after March 19, 2015. Instead, the parties shall e-file all papers in this matter through File & Serve Xpress. A separate e-filing order will be issued by the Court. Second, there being no opposition, all of the various requests for judicial notice are granted.

The Motion seeks to strike from the Complaint portions of the following paragraphs: 2, 3, 4, 5, 8, 21, 24, 25, 30, 31, 32, 34, 35, 41, 44, 46, 49, 50, 51, 55, 56, 58, 59, 62, and 71. That presents three questions:

8. Assuming equitable tolling under *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 and its progeny applies to this case, did such equitable tolling cease when the Court decertified the class in the *Fayerweather* matter, or did such equitable tolling continue until all appeals of that decertification were exhausted?

9. Must the Court strike paragraph 44 (pertaining to meal and rest break periods) because its allegations misstate the law under the relevant sections of the Labor Code and *Brinker Restaurant Corp. v. Super. Ct.* (2012) 53 Cal.4th 1004 ("*Brinker*")?

10. Must the Court strike allegations pertaining to Comcast's purported systematic unlawful policies, patterns, and practices because the doctrine of issue preclusion prevents Plaintiffs from re-litigating those issues?

Procedural History

In May 2008, a putative class action, *Fayerweather v. Comcast,* was filed under case number MSC08-01470 ("*Fayerweather*"). Broadly speaking, *Fayerweather* alleged that Comcast violated various sections of the Labor Code by, among other things, failing to provide adequate meal and rest periods for its technicians. In April 2010, the Court certified a class in the *Fayerweather* action. However, for reasons explained in its December 15, 2012 Order, the Court decertified the class. The named plaintiff appealed the decertification order, and in an unpublished opinion filed in August 2014, the First District Court of Appeals affirmed. *See*

21

*Fayerweather v. Comcast* (Aug. 28, 2014) 2014 Cal.App.Unpub. LEXIS 6185.

On November 14, 2014, Plaintiffs in this case filed their complaint, which seeks relief similar to the relief sought in *Fayerweather*. The Motion followed.

Collateral Estoppel as to Comcast's Motion

As a threshold matter, Plaintiffs argue that Comcast is collaterally estopped from bringing the Motion because it has brought similar motions in various other courts in California. However, the results concerning those motions have not been uniform, and the Court considers that the policies underlying collateral estoppel (the preservation of judicial integrity and the protection of litigants from harassment by vexatious litigation) would not be served by a refusal to consider Comcast's Motion on the merits. In addition, none of those decisions are "sufficiently firm" to merit issue preclusion. Further, the Court finds that considering the Motion on its merits is the fairest result for the parties and the best expression of sound judicial policy under these particular circumstances. *See, e.g., Lucido v. Super. Ct.* (1990) 51 Cal.3d 335, 343.

With that, the Court turns to the three questions listed above.

Question 1: Equitable Tolling

When its papers are read with care, it becomes clear that Comcast has posed a hypothetical question. The relevant heading in its Memorandum of Points and Authorities in Support of this Motion is carefully phrased: "*To the extent* equitable tolling applies, the statute of limitations is tolled only to the date of the *Fayerweather* decertification order." (At p.4. Emphasis supplied.) Its statement of the issue is consistently hedged, e.g. "…the filing of a class action complaint *may* toll" the statute. (*Id.* Emphasis supplied.) "Comcast does not dispute that equitable tolling *may* apply up to December 15, 2012." (Reply at 3:22-23. Emphasis supplied.)

In short, Comcast does not concede that these plaintiffs are entitled to equitable tolling under *American Pipe & Constr. Co. v. Utah* (1974) 414 U.S. 538 and *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103. It carefully preserves the ability to move to deny any equitable tolling.

That makes it difficult for the Court to come to grips with the matter. The Court is being asked to decide a stopping point for something that might not exist. The parties have not briefed or argued the factors that must be considered in determining the applicability of *American Pipe* equitable tolling. Thus, the Court does not know how those factors might bear, if at all, on the length of any equitable tolling. Simply put, the Motion seeks an advisory opinion concerning the appropriate stopping point of *American Pipe* equitable tolling, should equitable tolling apply.

It is well-settled that California courts do not render advisory opinions. "The rendering of advisory opinions falls within neither the function nor the jurisdiction" of California courts. *People v. McKay* (2002) 27 Cal.4th 601, 607; *Salazar v. Eastin* (1995) 9 Cal.4th 836, 860.

The Court declines to issue an advisory opinion concerning the appropriate stopping point of *American Pipe* equitable tolling in a case where it has not been conceded or determined, as an initial matter, that *American Pipe* equitable tolling applies.

Question 2:  Paragraph 44's Allegations

*Brinker* held (among other things) that while an employer must "relieve the employee of all duty" during meal and rest periods, it need not "police" such breaks to ensure that absolutely no work is performed. Rather, the touchstone is that the employer provide the opportunity for a duty-free meal or rest period. *Id.* at pp. 1017; 1029; 1034-1041.

Accordingly, the Court finds that Paragraph 44 of the Complaint contains an inaccurate statement of the law.  The Motion to strike it is granted.

Question 3:  Issue Preclusion

The Motion contends that the Court's December 15, 2012 Order Decertifying Class ("Decertification Order") was a determination on the merits and that the doctrine of issue preclusion prevents Plaintiffs from re-litigating Comcast's purported systematic unlawful policies, patterns, and practices.

To apply issue preclusion, the Court must find (1) the issue sought to be precluded is identical to that decided in a prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the issue was necessarily decided in the prior proceeding; (4) the decision in the prior proceeding was final and on the merits; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding. *Lucido, supra,* 51 Cal.3d at p. 341.

As a starting point, it is, of course, generally the case that a trial court does not resolve disputes concerning the merits of the claims on a class certification motion. *Brinker, supra,* 53 Cal.4th at p. 1017. Rather, the certification question is essentially a procedural one that does not ask whether an action is legally or factually meritorious. *Sav-On Drug Stores, Inc. v. Super. Ct.* (2004) 34 Cal.4th 319, 326.

Indeed, the Court took pains to explain that it was not seeking to decide factual disagreements or to rule on the merits of the claims in the Decertification Order. For example, it wrote "[t]his ruling neither makes nor implies any decision on any question of the merits of the litigation." (Decertification Order, p. 11.)

The Court also indicated that with respect to whether there was a "consistent practice that violates the company's stated policy … [t]he Court need not determine whether that is or is not true. For purposes of determining whether a class should be certified, it is more useful to note only that there is no commonality; no evidence of a common practice that would make class treatment useful." (Decertification Order, p. 24.) There are other examples of the Court's reluctance to decide factual disputes. *See, e.g.,* Decertification Order at p. 21 (Court declined to examine evidence to decide merits of case); p. 29 (Court declined to decide if CSG data were reliable).

However, there are limited circumstances in which a trial court does make a finding related to the merits of the claim in the course of a class certification ruling. *See, e.g., Brinker, supra,* 53 Cal.4th at p. 1017 (trial court can "resolve threshold disputes over the elements of a plaintiff's claims" if "a particular determination is necessarily dispositive of the certification question."); *id.* at pp. 1023-24 ("[w]hen evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them.")

*Hall v. Rite Aid Corp.* (2014) 226 Cal.App.4th 278 explained this well:

Rite Aid, seizing on *Brinker*'s observation that "[t]o the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them," argues the court properly evaluated the merits of Hall's legal theory as a predicate to ruling on the decertification motion. However, *Brinker* repeatedly cautioned that "[s]uch inquiries are closely circumscribed" and ordinarily should not be addressed as part of the certification evaluation. We interpret the highlighted language in the passage from *Brinker* cited by Rite Aid to mean, by negative implication, that to the extent *the propriety of certification* does not depend on determining threshold legal matters, such determinations should be deferred.

*Id.* at p. 294 (internal citations and quotations omitted).

In ruling on Comcast's request to decertify the class in *Fayerweather*, there was one set of issues that was necessarily decided: whether Comcast had a "companywide policy" that violated the Labor Code. That "carefully circumscribed" issue was necessarily examined and decided in the Decertification Order.

The Court was careful to note the difference between a "policy" and a "practice:"

In determining whether to certify a class it is important to distinguish between a "policy" and a practice." If a company has adopted a company-wide "policy," common proof is more easily found. If plaintiff relies on a "practice," then matters of proof may be far more individualized and problematic."

(*Id.* at p. 12.)

The Court cited *Brinker* and *Brown v. Wal-Mart:*

"In wage and hour class actions, predominance of common issues may often be found where the plaintiff claims "a uniform policy consistently applied to a group of employees is in violation of wage and hour laws...." *Brinker, supra,* 53 Cal. 4th at 1033. Even where there is a policy in place that complies with applicable law, common issues may predominate where there is substantial evidence the policy is a sham – *i.e.* the employer has a common practice that undermines the formal policy "'by pressuring employees to perform their duties in ways that [violate the regulations].'" *Brown v. Wal-Mart Stores, Inc.* (2012) 2012 U.S. Dist. LEXIS 120733 at *12 (citing *Brinker, supra,* 53 Cal. 4th at 1040)."

(*Id.*)

24

The Court examined the evidence carefully to determine if there was sufficient evidence to support a jury finding that there was a company-wide policy. Had there been such evidence, it would have supported plaintiff's view that the case could be tried on that theory as a class action.

But the Court found that there was no evidence of a company-wide policy that was at odds with the Labor Code. For example, with respect to the allegation of ComTechs being required to remain on-duty during meal and rest periods, it found:

[i]t is clear that Comcast has not adopted a 'policy' of requiring Com-Techs to remain on-duty during their meal and rest breaks. The evidence, as summarized below, shows that Comcast's policy is to relieve the Com-Techs of duty during their meal breaks.

(Decertification Order, p. 12; *see also id.*, pp. 14-15 (summarizing relevant Comcast policy).)

Similar findings were made with respect to the other categories of alleged company-wide policies:

Comcast's policy is clear. When Com-Techs are on break or at lunch, they are to be relieved of all duty. The relevant policy is stated in at least two places. (*Id.* p. 14)

A careful analysis of the parties' positions shows there is really no dispute about Comcast's policy: Com-Techs are to do no work during their breaks. The Court finds that plaintiff's argument about a policy that the Com-Techs remain "in communication" does not come close to meeting the standards of *Ghazaryan* and *Morillion* discussed below. There is no common issue to be tried with respect to Comcast's policy. (*Id.* p.18.)

Plaintiff has failed to meet his burden of showing there is a company-wide policy or practice pursuant to which Comcast exerts such control over its Com-Techs that renders all breaks 'on-duty.' (*Id.* p. 24)

Plaintiff's off-the-clock claim relies on his contention that the company required that he record a lunch of exactly 60 minutes regardless of how much time he actually took. Plaintiff does not argue that there is an express written policy on this issue. The question then is whether there is a practice, amenable of common proof, that plaintiff offers as a way of litigating this matter as a class action. (*Id.* p. 25.)

The evidence submitted by the parties shows that Comcast had a company-wide meal break policy (quoted in full above) that is consistent with the applicable wage and hour regulations. (*Id.* p. 32.)

The corporate rest policy provides that Comcast employees are permitted a rest break of *at least* ten minutes "for every four (4) hours (or major portion thereof) worked." (Glugoski Decl. Exh. 15, p. 26.) (*Id.* p. 34.)

In each instance, where relevant, the Court distinguished "policy" from "pattern" or "practice." It made specific findings with respect to the former (policy), but not the latter (pattern or practice).

On appeal, the *Fayerweather* plaintiff abandoned the theory that Comcast adopted a company-wide policy of requiring Com-Techs to remain on duty during meal and rest periods. *Fayerweather v. Comcast Corp.*, 2014 Cal.App.Unpub. LEXIS 6185 (Aug. 28, 2014), at *9 n. 4 (noting that trial court found "no evidence Comcast had 'adopted a policy of requiring [technicians] to remain on duty during their meal and rest breaks'" and that plaintiff's failure to address this argument constituted abandoning it). The appellate court affirmed the Court's findings with respect to the other issues. *Id.* at pp. *21-22, *26, *31

That issue – whether Comcast had adopted company-wide policies that violated the Labor Code as set forth above – was vigorously litigated and actually decided. It was a decision that was necessary to the holding that the class must be decertified. All the elements of issue preclusion are met, and the Court finds that its application to this issue is appropriate.

The analysis is different with respect to alleged patterns and practices. There, the question was not whether there were *any* patterns and practices that might violate the Labor Code. Rather, the issue was whether there was sufficient evidence of *class-wide* patterns and practices. The evidence was far from uniform. There were some practices that arguably violated the Labor Code; there were others that seemed to comport with the Labor Code. But there was not enough evidence of a class-wide pattern or practice to make aggregate litigation superior to individual litigation. Indeed, there clearly remained the individual cases of those whose declarations suggested they were subject to unlawful practices. It may be that as to a certain collection of employees, working under the direction of a certain small group of supervisors, there existed a local pattern or practice that could be relevant to this litigation. Whether such a pattern or practice existed was not decided on the merits by the Decertification Order.

The Court is mindful of the fact that in ordinary circumstances, absent class members should not be bound by a class certification decision. But this was an unusual set of circumstances. Here, a class was first certified. Once that was done, the "one-way intervention" problem ceased to be cause for concern, because the class – as well as the defendant – was bound by decisions made. Since the decisions in question were made on a motion for *decertification*, there was a represented class of litigants properly before the Court, and therefore bound by the decertification decision and all that entails.

As a result, the Court grants the Motion on the basis of issue preclusion to the extent it seeks to strike references to a company-wide policy that violated the Labor Code as set forth above, and denies the Motion in all other respects as to

issue preclusion.

Court's Ruling

For the sake of clarity, the Court sets forth below the language to be stricken from the Complaint.

The words "policy" or "policies" are struck from the following paragraphs: 4, 8, 21, and 55.

In addition, the following are struck:

Paragraphs 24 and 25: "and the uniform policy of being 'on duty' at all times."

Paragraph 31.

Paragraphs 35, 51, and 59: "and uniform administration of corporate policy."

Paragraph 44.

Paragraph 46: "This policy of requiring employees to work through their legally mandated meal periods is a violation of California law."

Should Plaintiffs choose to amend their complaint in response to this ruling, an amended complaint shall be served and filed on or before April 17, 2015.

Comcast shall prepare an appropriate order pursuant to Rule 3.1312 of the California Rules of Court and Local Rule 3.54.

1   FRED W. ALVAREZ, State Bar No. 68115
    ALLISON B. MOSER, State Bar No. 223065
2   JONES DAY
    Silicon Valley Office
3   1755 Embarcadero Rd.
    Palo Alto, CA 94303
4   Telephone: (650) 739-3939
    Facsimile: (650) 739-3900
5   Email: falvarez@jonesday.com
    Email: amoser@jonesday.com
6

7   TROY A. VALDEZ, State Bar No. 191478
    ERIN M. DOYLE, State Bar No. 233113
    STEPHEN L. TAEUSCH, State Bar No. 247708
8   VALDEZ TODD & DOYLE LLP
    1901 Harrison Street, Suite 1450
9   Oakland, California 94612
    Telephone: (415) 202-5950
10  Facsimile: (415) 202-5951
    Email: tvaldez@vtclaw.com
11  Email: edoyle@vtclaw.com
    Email: staeusch@vtclaw.com
12

13  Attorneys for Defendants
    COMCAST CABLE COMMUNICATIONS
    MANAGEMENT, LLC, erroneously sued as
14  COMCAST CORPORATION and
    COMCAST OF CONTRA COSTA, INC.

15

16           SUPERIOR COURT OF THE STATE OF CALIFORNIA

17              FOR THE COUNTY OF STANISLAUS

18

19  JOSEPH JOSHUA DAVIS, PENNY    CASE NO. 2011900
    SCHOONOVER, LEON GIBSON,
20  DUSTIN WAYNE HAGENS, RAYMOND   Assigned for all purposes, including Trial
    AGUNDEZ, RAFAEL BARAJAS, JR.,    to Judge William A. Mayhew
21
            Plaintiffs,        Dept. 21
22
        v.               **[PROPOSED] ORDER GRANTING**
                          **DEFENDANT'S MOTION TO STRIKE**
23  COMCAST CORPORATION, a       **PORTIONS OF THE SECOND AMENDED**
    Pennsylvania Corporation; COMCAST OF  **COMPLAINT**
24  CONTRA COSTA, INC., a Washington
    Corporation; and DOES 1 through 50,    Date:  July 16, 2015
25  Inclusive,                      Time:  8:30 a.m.
                                Dept.:  21
26           Defendants.
                           Complaint filed October 27, 2014
27

28

---

[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE SAC
- CASE NO. 2011900

FILED BY FAX

1    The Court, having considered Defendant Comcast Cable Communications Management,

2    LLC's, erroneously sued as Comcast Corporation and Comcast of Contra Costa, Inc., (hereinafter,

3    "Comcast") Motion to Strike Portions of Complaint and all evidence submitted therewith, good

4    cause appearing, hereby the Court HEREBY GRANTS Comcast's Motion to Strike and orders

5    the following language stricken from Plaintiffs' Second Amended Complaint:

6        1.    This complaint challenges Defendants' systemic illegal employment practices

7            resulting in violations of the California Labor Code, Business and Professions

8            Code and applicable IWC wage orders against employees of Defendants. ¶ 2 in

9            its entirety.

10       2.    Plaintiffs are informed and believe and based thereon allege Defendants, joint

11           and severally have acted intentionally and with deliberate indifference and

12           conscious disregard to the rights of all employees in receiving all wages due and

13           lawful meal and rest periods. ¶ 3 in its entirety.

14       3.    Plaintiffs are informed and believe and based thereon allege Defendants have

15           engaged in, among other things, a system of willful violations of the California

16           Labor Code, Business and Professions Code and applicable IWC wage orders by

17           creating and maintaining policies, practices and customs that knowingly deny

18           employees (a) all wages due, (b) the opportunity to take meal and rest periods,

19           and (c) accurate, itemized wage statements. ¶ 4 in its entirety.

20       4.    The policies, practices and customs of defendants described above and below

21           have resulted in unjust enrichment of Defendants and an unfair business

22           advantage over businesses that routinely adhere to the strictures of the California

23           Labor Code, Business and Professions Code and applicable IWC wage orders. ¶

24           5 in its entirety.

25       5.    The filing of the Fayerweather class action complaint on May 27, 2008 tolled the

26           statute of limitations for the named Plaintiffs from four years from the filing of the

27           Fayerweather class action complaint (i.e., May 27, 2004) to the present based upon

28           the facts, representations and reasonable reliance by Plaintiffs as set forth below. ¶

2

8 at 3:9-12.

6. Plaintiffs are and were victims of the policies, practices and customs of Defendants complained of in this action in ways that have deprived them of the rights guaranteed them by California Labor Code § 204, 226.7, 1194, 1198, and 512, California Business and Professions Code § 17200, et seq., (Unfair Practices Act) and the applicable wage order(s) issued by the Industrial Welfare Commission including IWC Wage Order No. 4 §§ 11 and 12. ¶ 8 at 3:14-18.

7. Unlike federal law, where a decertification order is a final non-appealable order once it is issued as set forth in FRCP Rule 23 (f), in state court actions, where the Fayerweather case was pending and under California state law, which governs Fayerweather, the decertification order is an automatically appealable order and does not become final until exhaustion of appeals. As *Stephen v. Enter. Rent-A-Car,* 235 Cal. App. 3d 806 explains:

> We hold, first, that no policy in the law allowed Stephen to "renew" a class certification motion which had been denied on the merits by a final, appealable order. The one-final-judgment rule generally precludes piecemeal litigation through appeals from orders which dispose of less than an entire action. (9 Witkin, Cal.Procedure (3d ed. 1985) Appeal, § 43, pp. 66-67; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 806, 94 Cal.Rptr. 796, 484 P.2d 964 *(Vasquez)* .) An order denying class certification does not finally dispose of an action since it leaves it intact as to the *individual* plaintiff. However, the order is appealable if it effectively terminates the entire action as to the class, in legal effect being "tantamount to a dismissal of the action as to all members of the class other than plaintiff. [Citations.]" *(Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699, 63 Cal.Rptr. 724, 433 P.2d 732; *Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d 462, 470, 174 Cal.Rptr. 515, 629 P.2d 23.) The appeal is allowed, as a matter of state law policy, because the order has "the 'death knell' effect of making further proceedings in the action impractical...." (*General Motors Corp. v. Superior Court* (1988) 199 Cal.App.3d 247, 251, 244 Cal.Rptr. 776.) Federal law, by contrast, while acknowledging death-knell consequences, denies a right of direct appeal in any circumstances. *(Ibid; Coopers & Lybrand v. Livesay* (1978) 437 U.S. 463, 469-470, 98 S.Ct. 2454, 2458-2459, 57 L.Ed.2d 351.) Because California allows direct appeals of death-knell orders, a plaintiff who fails to appeal from one loses forever the right to attack it. The order becomes final and binding. Two cases from this district illustrate the concept, holding that plaintiffs could not, on appeal from final judgments on the merits of their cases, attack final orders

3

1

2

3

4

denying class certification. (*Guenter v. Lomas & Nettleton Co.* (1983) 140 Cal.App.3d 460, 465, 189 Cal.Rptr. 470; *Morrissey v. City and County of San Francisco* (1977) 75 Cal.App.3d 903, 906-908, 142 Cal.Rptr. 527.) This, of course, is the reverse of federal law, which makes certification orders reviewable only on appeal \*812 from the final judgment. (*General Motors Corp. v. Superior Court, supra*, 199 Cal.App.3d 247, 251, 244 Cal.Rptr. 776.)

5

6

*Stephen v. Enter. Rent-A-Car*, 235 Cal. App. 3d 806, 811-12, 1 Cal. Rptr. 2d 130, 132-33 (Ct. App. 1991).

7

¶ 8 at 4:4-28.

8

9

8.    Thus, the decertification order did not become final until after this case had already been filed.  ¶ 8 at 5:3-4.

10

11

9.    Thus, the statute of limitations on Plaintiffs' claim was tolled from May 27, 2004 up to the time this case was filed.  ¶ 8 at 5:20-21.

12

13

14

10.    Defendant had a uniform policy and practice of contacting Plaintiffs through their Nextel devices at all times of the day including interrupting Plaintiffs during what would otherwise be meal periods and rest breaks. ¶ 21 at 7:27-8:1.

15

11.    . . . and the uniform policy of being "on duty" at all times . . . ¶ 24 at 8:23-24.

16

12.    . . . and the uniform policy of being "on duty" at all times . . . ¶ 25 at 8:26-27.

17

18

19

20

21

22

23

13.    As a pattern and practice, Defendants relied on punch data/time sheets in many instances filed [sic] out before the work day commenced to compensate Plaintiffs for hours worked rather than relying on the actual records that reflect hours worked and meal periods, i.e. the CSG records that were kept in real time.  As a result, Plaintiffs were not compensated for all hours they were subject to the control of Defendants, including all time they were suffered or permitted to work.  ¶ 30 in its entirety.

24

25

26

27

28

14.    Plaintiffs are informed and believe and based thereon allege Defendants uniformly administered a corporate policy concerning staffing levels, duties, and responsibilities which required Plaintiffs to work without appropriate pay.  This included a uniform corporate pattern and practice of allocating and authorizing inadequate staffing levels.  The inadequate staffing levels were enforced and

4

1    ensured through the uniform and mandated corporate policy of a minimal labor

2    budget.  This corporate conduct is accomplished with the advance knowledge

3    and designed intent to save labor costs by required [sic] Plaintiffs to work

4    without proper compensation because they were unable to take the meal periods

5    which were automatically deducted from their time records.  ¶ 31 in its entirety.

6    15.    As a pattern and practice, in violation of the aforementioned labor laws and wage

7    orders, Plaintiffs are informed and believe and based thereon allege Defendants

8    did not properly maintain records pertaining to when Plaintiffs began and ended

9    each work period, meal period, the total daily hours worked, and the total hours

10    worked per pay period and applicable rates of pay in violation of California

11    Labor Code § 1174.  ¶ 32 in its entirety.

12    16.    Plaintiffs are informed and believe and based thereon allege Defendants willfully

13    failed to pay employees proper compensation for all hours worked.  Plaintiffs are

14    informed and believe and based thereon allege Defendants' willful failure to

15    provide wages due and owing them upon separation from employment results in

16    a continued payment of wages up to thirty (30) days from the time the wages

17    were due.  Therefore, Plaintiffs who have separated from employment are

18    entitled to compensation pursuant to Labor Code § 203.  ¶ 34 in its entirety.

19    17.    Such a pattern, practice and uniform administration of corporate policy regarding

20    illegal employee compensation as described herein is unlawful and creates an

21    entitlement to recovery by Plaintiff [sic] in a civil action, for the unpaid balance

22    of the full amount of straight time compensation and overtime premiums owing,

23    including interest thereon, penalties, reasonable attorneys' fees, and costs of suit

24    according to Labor Code § 1194, et seq.  ¶ 35 in its entirety.

25    18.    By failing to properly compensate hourly-paid employees for off-the-clock work,

26    Defendants breached their employment contracts with Plaintiffs.  ¶ 41 in its

27    entirety.

28

5

19.    Defendants failed in their affirmative obligation to ensure that all of their employees, including Plaintiffs, were actually relieved of all duties, not performing any work, and free to leave the premises during meal periods. Plaintiffs were suffered and permitted to work through legally required meal breaks. As such, Defendant is responsible for paying premium compensation for missed meal periods pursuant to Labor Code § 226.7 and IWC Wage Order No. 4 § 11(B). Defendants shall pay the [sic] each affected employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal break was not provided. ¶ 44 in its entirety.

20.    As a pattern and practice, Defendants regularly required employees to work through their meal periods without proper compensation. Defendants did staff and schedule employees in such a manner and at such posts that would make it impossible for these employees to take their meal period as required under California law. This policy of requiring employees to work through their legally mandated meal periods is a violation of California law. Indeed, Defendants' own records, i.e. the CSG data, confirms whether an employee used the Nextel device to clock out for a meal period lasting not less than thirty minutes. For those instances where the CSG data shows a meal period lasting less than 30 minutes, Defendants did not compensate Plaintiff with an extra hour of pay. ¶ 46 in its entirety.

21.    Plaintiffs are informed and believe and based thereon allege Defendants willfully failed to pay employees who were not provided the opportunity to take meal breaks the premium compensation set out in Labor Code § 226.7 and IWC Wage Order No 4 § 11(B). Plaintiffs are informed and believe and based thereon allege Defendants' willful failure to provide Plaintiffs the wages due and owing them upon separation from employment results in a continued payment of wages up to thirty (30) days from the time the wages were due. Therefore, Plaintiffs who

6

1    have separated from employment are entitled to compensation pursuant to Labor

2    Code § 203. ¶ 49 in its entirety.

3    22.    As a pattern and practice, in violation of the aforementioned labor laws and wage

4    orders, Plaintiffs are informed and believe and based thereon allege Defendants

5    did not properly maintain records pertaining to when Plaintiffs began and ended

6    each meal period in violation of California Labor Code § 1174 and § 4 of the

7    applicable IWC Wage Order(s).  This, despite the fact that Defendant knew the

8    CSG data was an accurate record of meal periods taken and the length of each

9    meal period.  ¶ 50 in its entirety.

10    23.    Such a pattern, practice and uniform administration of corporate policy as

11    described herein is unlawful and creates an entitlement to recovery by the

12    Plaintiff [sic] identified herein, in a civil action, for the unpaid balance of the

13    unpaid premium compensation pursuant to Labor Code § 226.7 and IWC Wage

14    Order No 4 § 11(B), including interest thereon, penalties, reasonable attorneys'

15    fees, and costs of suit according to the mandate of California Labor Code §§

16    218.5 or 1194.  ¶ 51 in its entirety.

17    24.    Plaintiff regularly worked in excess of three and half (3 ½) hours per day

18    Defendants' policies and practices prevented Plaintiff [sic] from enjoying their

19    right to a ten (10) minute rest period in the middle of each four (4) hour work

20    period. ¶ 55 in its entirety.

21    25.    As a pattern and practice, Defendants regularly required employees to work

22    through rest periods.  Defendants and Defendants' supervisors assigned work,

23    scheduled shifts, and staffed worksites in a manner that did not allow Plaintiff

24    [sic] to regularly take rest periods. ¶ 56 in its entirety.

25    26.    Plaintiffs are informed and believes [sic] and based thereon alleges [sic]

26    Defendants willfully failed to pay employees who were not provided the

27    opportunity to take rest breaks the premium compensation set out in Labor Code

28    226.7 and IWC Wage Order No 4 § 12(B).  Plaintiffs are informed and believes

7

1    and based thereon alleges [sic] Defendants' willful failure to provide Plaintiffs

2    the wages due and owing them upon separation from employment results in a

3    continued payment of wages up to thirty (30) days from the time the wages were

4    due. Therefore, Plaintiffs who have separated from employment are entitled to

5    compensation pursuant to Labor Code § 203. ¶ 58 in its entirety.

6    27.    Such a pattern, practice and uniform administration of corporate policy as

7    described herein is unlawful and creates an entitlement to recovery by the

8    Plaintiffs identified herein, in a civil action, for the unpaid balance of the unpaid

9    premium compensation pursuant to Labor Code § 226.7 and IWC Wage Order

10    No 4 § 12(B), including interest thereon, penalties, reasonable attorney's [sic]

11    fees, and costs of suit according to the mandate of California Labor Code §§

12    218.5 or 1194. ¶ 59 in its entirety.

13    28.    Defendants, and each of them, have engaged and continue to engage in unfair

14    business practices in California by practicing, employing and utilizing the

15    employment practices outlined above, inclusive, to wit, (a) not compensate

16    employees for all hours worked, and (b) to require employees to work through

17    meal and rest periods. ¶ 62 in its entirety.

18    29.    As a pattern and practice, Defendant failed to furnish Plaintiffs, either

19    semimonthly or at the time of each payment of wages, either as a detachable part

20    of the check or separately, an accurate, itemized statement in writing showing

21    gross wages earned, total hours worked, and the applicable hourly rates and

22    corresponding number of hours worked by Plaintiffs at each rate. ¶ 71 in its

23    entirety.

24

**IT IS SO ORDERED.**

25

26

27    Dated: _____, 2015

      _____
      Honorable Judge of the Superior Court

28    NAI-1500339683v1

8

1    FRED W. ALVAREZ, State Bar No. 68115
      ALLISON B. MOSER, State Bar No. 223065
2    JONES DAY
      Silicon Valley Office
3    1755 Embarcadero Rd.
      Palo Alto, CA 94303
4    Telephone: (650) 739-3939
      Facsimile: (650) 739-3900
5    Email: falvarez@jonesday.com
      Email: amoser@jonesday.com
6
7    TROY A. VALDEZ, State Bar No. 191478
      ERIN M. DOYLE, State Bar No. 233113
8    VALDEZ TODD & DOYLE LLP
      1901 Harrison Street, Suite 1450
9    Oakland, California 94612
      Telephone:  (415) 202-5950
      Facsimile:  (415) 202-5951
10    Email: tvaldez@vtdlaw.com
      Email: edoyle@vtdlaw.com
11
12    Attorneys for Defendants
      COMCAST CABLE COMMUNICATIONS
13    MANAGEMENT, LLC, erroneously sued as
      COMCAST CORPORATION and
14    COMCAST OF CONTRA COSTA, INC.

15            SUPERIOR COURT OF THE STATE OF CALIFORNIA

16               FOR THE COUNTY OF STANISLAUS

17

18    JOSEPH JOSHUA DAVIS, PENNY
      SCHOONOVER, LEON GIBSON,
19    DUSTIN WAYNE HAGENS, RAYMOND
      AGUNDEZ, RAFAEL BARAJAS, JR.,
20
             Plaintiffs,
21
        v.
22
      COMCAST CORPORATION, a
23    Pennsylvania Corporation; COMCAST OF
      CONTRA COSTA, INC., a Washington
24    Corporation; and DOES 1 through 50,
      Inclusive,
25
             Defendants.
26

27

28

CASE NO. 2011900

Assigned for all purposes, including Trial
to Judge William A. Mayhew
Dept. 21

**PROOF OF SERVICE**

Date:  July 16, 2015
Time:  8:30 a.m.
Dept.: 21

Complaint filed October 27, 2014

FILED

MAY 15 2015

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS
SARAH KIERNAN
BY_____
              DEPUTY

Filed By Fax

**PROOF OF SERVICE - CASE NO. 2011900**

1
## PROOF OF SERVICE

2
     I, Margarita M. Lopez, declare:

3
     I am a citizen of the United States and employed in Santa Clara County, California.  I am

4
over the age of eighteen years and not a party to the within-entitled action.  My business address

5
is Silicon Valley Office, 1755 Embarcadero Road, Palo Alto, California  94303.  On May 15,

6
2015, I served a copy of the within document(s):

7
    1.  **DEFENDANT'S NOTICE OF MOTION AND**

8
        **MOTION TO STRIKE PORTIONS OF THE SECOND COMPLAINT**

9
    2.  **DEFENDANT'S MEMORANDUM OF POINTS AND**

10
        **AUTHORITIES IN SUPPORT OF ITS MOTION TO STRIKE PORTIONS OF THE COMPLAINT SECOND**

11
        **AMENDED COMPLAINT**

12
    3.  **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE**

13
        **PORTIONS OF THE COMPLAINT SECOND AMENDED COMPLAINT**

14
    4.  **[PROPOSED] ORDER GRANTING DEFENDANT'S**

15
        **MOTION TO STRIKE PORTIONS OF THE COMPLAINT SECOND AMENDED COMPLAINT**

16
☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set

17
forth below on this date before 5:00 p.m.

18
☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Palo Alto, California addressed as set

19
forth below.

20
☒    by placing the document(s) listed above in a sealed UPS envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a UPS agent for

21
delivery.

22
☐    by causing hand delivery the document(s) listed above to the person(s) at the

23
address(es) set forth below.

24
☐    by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

25

26

27

28

Matthew Righetti (SBN 121012)
John Glugoski (SBN 191551)
RIGHETTI GLUGOSKI, P.C.
456 Montgomery Street, Suite 1400
San Francisco, CA 94104

*Attorneys for Plaintiffs*

Jennifer Kramer (SBN 203385)
JENNIFER KRAMER LEGAL, APC
453 S. Spring Street, Ste. 1000
Los Angeles, CA 90013

Email: Jennifer@laborex.com
Telephone: (213) 955-0200
Facsimile: (213) 226-4358

Arlo Garcia Uriarte (SBN 231764)
LIBERATION LAW GROUP
2760 Mission Street
San Francisco, CA 94110

Email: arlo@liberationlawgroup.com
Telephone: 415.695.1000
Facsimile: 415.695.1006

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 15, 2015, at Palo Alto, California.

_____
Margarita M. Lopez

NAI-1500339823v1

2

**PROOF OF SERVICE - CASE NO. 2011900**